# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAUNDRA FLANAGAN | ) |
| | ) |
| and | ) |
| | ) |
| JAMES RUX | ) |
| | ) |
| and | ) |
| | ) |
| THOMAS RUX | ) |
| | ) |
| and | ) |
| | ) |
| TIMOTHY RUX | ) |
| | ) |
| and | ) |
| | ) |
| MATTHEW RUX | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| ISLAMIC REPUBLIC OF IRAN, | ) |
| c/o Ministry of Foreign Affairs | ) |
| Khomeini Avenue | ) |
| United Nations Street | ) |
| Tehran, Iran | ) |
| | ) |
| and | ) |
| | ) |
| AGENCIES AND INSTRUMENTALITIES | ) |
| OF THE ISLAMIC REPUBLIC OF IRAN, | ) |
|     Ministry of Intelligence and Security | ) |
|     Islamic Revolutionary Guard Corps | ) |
|     Islamic Revolutionary Guard Corps- | ) |
|     Qods Division | ) |
| | ) |
| and | ) |
| | ) |
| REPUBLIC OF THE SUDAN, | ) |
| c/o Ministry of External Affairs | ) |

JURY ACTION

Case: 1:10-cv-01643
Assigned To : Kollar-Kotelly, Colleen
Assign. Date : 9/28/2010
Description: PI/Malpractice

Jury Trial Demanded

Case No. _____

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

1

3

People's Palace )
Khartoum, Sudan )
)
and )
)
AGENCIES AND INSTRUMENTALITIES )
OF THE REPUBLIC OF THE SUDAN, )
    Ministry of the Interior )
    Ministry of Defense )
    Security of the Revolution )
    Military Intelligence )
    State Security )
    Popular Defense Force )
    Revolutionary Security Services )
)
and )
)
SYRIAN ARAB REPUBLIC, )
c/o Ministry of Foreign Affairs )
Al-Rachid Street )
Damascus, Syria )
)
and )
)
AGENCIES AND INSTRUMENTALITIES )
OF THE SYRIAN ARAB REPUBULIC, )
National Security Directorate )
    Republican Guard )
    Ministry of Interior )
    Military Intelligence Service )
    Air Force Intelligence )
    Special Forces )
)
)
and )
)
JOHN DOES 1-99, )
)
       Defendants. )

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

**COMPLAINT**

Plaintiffs, by and through their undersigned counsel, seek judgment against Defendants, Islamic Republic of Iran ("Iran"), Republic of Sudan ("Sudan"), and Syrian Arab Republic ("Syria"), their agencies and instrumentalities, and John Does 1-99, jointly and severally, pursuant to the Foreign Sovereign Immunities Act, as amended, 28 U.S.C. § 1605A.  Plaintiffs seek individual damages arising out of the extrajudicial killing of Electronic Warfare Technician First Class Kevin Shawn Rux, an American sailor stationed aboard the U.S.S. Cole DDG-67 in the Port of Aden, Yemen, on October 12, 2000.  Defendants provided material support, including financing and training, to Al Qaeda, a worldwide terrorist organization, whose operatives facilitated the planning and execution of the bombing of the U.S.S. Cole.

In *Rux v. Republic of Sudan*, Case No. 2:04-cv-428, the U.S. District Court for the Eastern District of Virginia found Sudan liable for its material support of Al Qaeda, which enabled the terrorist group to execute the bombing of the U.S.S. Cole.  495 F. Supp. 2d 541, 569 (E.D.Va. 2007).  Plaintiffs in that case were certain family members of the seventeen U.S. sailors killed in the bombing that brought suit pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §1605(a)(7), the former state-sponsor-terrorism exception to the general rule of sovereign immunity enumerated in the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602-1611.  *See id.* at 543.  In its opinion and order, issued on July 25, 2007, the court in its conclusions of law found Sudan liable for the pecuniary losses suffered by the family members under the Death on the High Seas Act.  *See id.* at 558-567.  However, the court held that plaintiffs could not recover damages for emotional distress and other non-pecuniary losses.  *See id.* at 563-565.  The

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

3

Death on the High Seas Act provided only for recovery of pecuniary damages and was the plaintiffs' exclusive remedy since 28 U.S.C. §1605(a)(7) was solely a jurisdictional statute and did not create an independent cause of action. *See id.*; *see also Cicippio-Puleo v. Islamic Republic of Iran*, 353 F. 3d 1024, 1033 (D.C. Cir. 2004).

On January 28, 2008, 28 U.S.C. §1605(a)(7) was repealed and replaced by 28 U.S.C. §1605A. 28 U.S.C. §1605A(c) creates a private cause of action against state sponsors of terrorism and provides for economic damages, solatium, pain and suffering, and punitive damages. Subsequent to the amendment, on April 15, 2010, nearly all of the same plaintiffs from *Rux v. Republic of Sudan*, filed *Kumar v. Republic of Sudan*, Case No. 2:10-cv-171, in the U.S. District Court for the Eastern District of Virginia. The Plaintiffs named herein were not a party to either case.

Accordingly, pursuant to 28 U.S.C. § 1605A(c), as amended, Plaintiffs hereby file suit against Defendants Iran, Sudan, and Syria, as state sponsors of terrorism, their agencies and instrumentalities, and John Does 1-99, for providing material support to Al Qaeda, whose operatives facilitated the planning and execution of the bombing of the U.S.S. Cole, which caused the extrajudicial killing of Electronic Warfare Technician First Class Kevin Shawn Rux.

In support of their Complaint, Plaintiffs allege as follows:

## JURISDICTION AND VENUE

1.     Jurisdiction in this Court arises pursuant to 28 U.S.C. §§ 1605A, 1330(a), 1331, and 1332(a)(2).

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

2.     Defendants Iran, Sudan, and Syria, their agencies and instrumentalities, and John Does 1-99, are subject to suit in the courts of the United states as sponsors of the terrorist group Al Qaeda pursuant to the Foreign Sovereign Immunities Act, as amended, 28 U.S.C. § 1605A(c), and related statutes, including Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j), Section 40 of the Arms Export Control Act (22 U.S.C. § 2780), and Section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), which designated Sudan, Iran, and Syria as state sponsors of terrorism.

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

## THE PARTIES

### PLAINTIFFS

4.     Plaintiff Saundra Flanagan ("Plaintiff Flanagan") is a United States citizen and is currently a resident of the state of West Virginia. At all relevant times Plaintiff Flanagan was, and is, the natural mother of the deceased Kevin Shawn Rux. Plaintiff Flanagan can sue and be sued in this Court. Plaintiff Flanagan brings this suit in her personal capacity.

5.     Plaintiff James Rux ("Plaintiff James Rux") is a United States citizen and is currently a resident of the state of West Virginia. At all relevant times Plaintiff James Rux was, and is, the natural born brother of the deceased Kevin Shawn Rux. Plaintiff James Rux can sue and be sued in this Court. Plaintiff James Rux brings this suit in his personal capacity.

6.     Plaintiff Thomas Rux ("Plaintiff Thomas Rux") is a United States citizen and is currently a resident of the state of West Virginia. At all relevant times Plaintiff Thomas

Rux was, and is, the natural born brother of the deceased Kevin Shawn Rux. Plaintiff Thomas Rux can sue and be sued in this Court. Plaintiff Thomas Rux brings this suit in his personal capacity.

7.      Plaintiff Timothy Rux ("Plaintiff Timothy Rux") is a United States citizen and is currently a resident of the state of West Virginia. At all relevant times Plaintiff Timothy Rux was, and is, the natural born brother of the deceased Kevin Shawn Rux. Plaintiff Timothy Rux can sue and be sued in this Court. Plaintiff Timothy Rux brings this suit in his personal capacity.

8.      Plaintiff Matthew Rux ("Plaintiff Matthew Rux") is a United States citizen and is currently a resident of the state of West Virginia. At all relevant times Plaintiff Matthew Rux was, and is, the natural born brother of the deceased Kevin Shawn Rux. Plaintiff Matthew Rux can sue and be sued in this Court. Plaintiff Matthew Rux brings this suit in his personal capacity.

## DEFENDANTS

9.      Defendant Iran is a foreign state that has been designated and remains designated by the U.S. Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)), Section 40 of the Arms Export Control Act (22 U.S.C. § 2780), and Section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), since January 19, 1984. Iran provided material support and resources to Al Qaeda within the meaning of 18 § U.S.C. 2339A. Iran is a foreign state within the meaning of 28 U.S.C. § 1391(f).

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

6

10.     Defendants Iranian Ministry of Intelligence and Security, Iranian Islamic Revolutionary Guard Corps, and Iranian Islamic Revolutionary Guard Corps-Qods Division were among the officials, officers, agents, employees, agencies and instrumentalities of Iran, through which they caused, supported, and contributed to the terrorist acts that resulted in the death of Electronic Warfare Technician First Class Kevin Shawn Rux.

11.     Defendant Sudan is a foreign state that has been designated and remains designated by the U.S. Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)), Section 40 of the Arms Export Control Act (22 U.S.C. § 2780), and Section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), since August 12, 1993.  Sudan provided material support and resources to Al Qaeda within the meaning of 18 § U.S.C. 2339A.  Sudan is a foreign state within the meaning of 28 U.S.C. § 1391(f).

12.     Defendants Sudanese Ministry of the Interior, Sudanese Ministry of Defense, the Security of the Revolution, Sudanese Military Intelligence, Sudanese State Security, the Popular Defense Force, and the Revolutionary Security Services, were among the officials, officers, agents, employees, agencies and instrumentalities of Sudan through which they caused, supported, and contributed to the terrorist acts that resulted in the death of Electronic Warfare Technician First Class Kevin Shawn Rux.

13.     Defendant Syria is a foreign state that has been designated and remains designated by the U.S. Department of State as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)), Section 40 of the Arms Export Control Act (22 U.S.C. § 2780), and Section 620A of the Foreign

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

Assistance Act of 1961 (22 U.S.C. § 2371), since December 29, 1979.  Syria provided

material support and resources to Al Qaeda within the meaning of 18 § U.S.C. 2339A.

Syria is a foreign state within the meaning of 28 U.S.C. § 1391(f).

14.     Defendants the Syrian National Security Directorate, the Syrian Republican

Guard, the Syrian Ministry of Interior, the Syrian Military Intelligence Service, Syrian

Air Force Intelligence, and Syrian Special Forces, were among the officials, officers,

agents, employees, agencies and instrumentalities of Syria through which they caused,

supported, and contributed to the terrorist acts that resulted in the death of Electronic

Warfare Technician First Class Kevin Shawn Rux.

15.     Defendants John Does 1-99 are other officials, employees, and/or agencies or

instrumentalities of Iran, Sudan, and Syria, or others, whose identities are presently

unknown, who performed acts that resulted in acts of terrorism, including the actions

relating to the attacks on the U.S.S. Cole in the Port of Aden, Yemen, on October 12,

2000, which caused the extrajudicial killing of the decedent Electronic Warfare

Technician First Class Kevin Shawn Rux and others.  Defendants John Does 1-99 acted

as agencies or instrumentalities of Sudan, Iran and/or Syria, performed acts within the

scope of their offices, employments and/or agencies, within the meaning of 28 U.S.C. §

1605A(a)(1), which caused the extrajudicial killings described herein.


## FACTUAL ALLEGATIONS

16.     The following facts were found by the Court in *Rux, et. al. v. Republic of Sudan*,

Case No. 2:04-cv-428.  *See Rux v. Republic of Sudan*, 495 F. Supp. 2d 541 (E.D. Va.

2007).

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

8

17.     At approximately 8:30 a.m. on October 12, 2000, the U.S.S. Cole entered the Port

of Aden, Yemen, to temporarily stop for refueling. The Republic of Yemen is a country

of 203,850 square miles located on the southern coast of the Arabian Peninsula. Aden is a

city of approximately 440,000 located on Yemen's south coast. The Port of Aden is a

natural harbor with a deep draft in most areas and natural land protection on all sides. In

February 1999, the Navy began using Aden instead of Djibouti as the primary refueling

stop for American ships during their 3,000-mile journey to the Arabian Gulf from the

Mediterranean Sea. Under a contract entered into between the United States and Yemen,

U.S. Navy vessels could obtain fuel at one of two fueling "dolphins" located near the

mouth of the harbor without going to the pier.

18.     The U.S.S. Cole DDG-67, an Arleigh Burke Class Destroyer, was the twenty-fifth

Navy ship to stop in Aden Harbor for refueling over the previous nineteen months. As of

October 2000, the ship had a crew of twenty-six officers and 270 enlisted personnel. The

U.S.S. Cole departed from its home port of Norfolk, Virginia, on August 8, 2000, before

patrolling the Mediterranean Sea. On October 9, 2000, the ship transited the Suez Canal

and headed for Yemen. At the time that the ship entered the Port of Aden on October 12,

2000, the U.S. Department of Defense terrorist threat level in Aden was "Threat

Condition (THREATCON) BRAVO," which indicated an "increased and more

predictable threat of terrorist activity."

19.     At approximately 8:49 a.m., the U.S.S. Cole moored starboard side to Refueling

Dolphin Seven, near the mouth of the harbor. The ship began refueling at approximately

10:31 a.m. At approximately 11:10 a.m., one of the sailors standing watch over the

refueling noticed a small boat heading "fast and hard" toward the U.S.S. Cole from the

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

direction of the city. The boat, painted white with fire red trim, was about thirty-five feet long and six to seven feet wide and had a shallow V-hull. The boat was similar in size and shape to many other small vessels in the harbor, including the service craft that had been alongside the U.S.S. Cole. The boat was manned by two males, both of whom appeared to be in their early thirties. The two men slowed the boat as they approached the U.S.S. Cole, maneuvered it parallel to the ship and came down the port side headed aft. As they did so, the two men in the boat were smiling, and waved to the crew. Some crew members returned the greeting. Seconds later, the boat exploded.

20.    The explosion occurred between approximately 11:15 and 11:18 a.m., just as some of the crew was sitting down for lunch. The blast ripped a thirty-two by thirty-six-foot hole in the port side. Smoke, dust, and fuel vapors filled the air. The main engine room, auxiliary machine room, and the dry provisions storeroom were flooded. Several chambers, including the Crew and Chief Petty Officer's Galley, were structurally destroyed. The blast and its after-effects killed seventeen navy sailors, all of them American citizens. Forty-two others were injured, some of them sustaining serious burns to their faces, hands and arms, as well as lacerations and fractures.

21.    The Plaintiffs learned of the attack the day it occurred from the television news, or from friends or relatives. They waited anxiously before being told that in fact their loved one had died. Each of the Plaintiffs suffered upon learning that Kevin Shawn Rux had been murdered in a terrorist attack.

22.    Years after the attack Plaintiffs continue to suffer an unimaginable loss. They have experienced depression, among other emotional and physical ailments, that began in the aftermath of the attack. Plaintiff Flanagan, although not present at the bombing,

suffered extreme mental anguish and grief as a result of her son's tragic death.  Likewise,

Plaintiffs James Rux, Thomas Rux, Timothy Rux, and Matthew Rux, the brothers of

Kevin Shawn Rux, although not present at the bombing, suffered extreme mental anguish

and grief as a result of their brother's tragic death.

## AL QAEDA

23.      Al Qaeda is a worldwide terrorist network led by Osama bin Laden that has

declared war against the United States and others who do not share his militant brand of

Islam.  Al Qaeda was founded by Bin Laden in approximately 1990 to serve as a base for

like-minded Sunni Islamic extremists.  During the Afghanistan war from 1979 to 1989,

Bin Laden, the son of a wealthy Saudi construction magnate, organized and financed the

recruitment and training of Arab nationals to fight alongside the Afghan mujahadin

against the Soviets.  As is well known today, Al Qaeda has organized, executed or

inspired acts of terrorism around the world that killed or injured thousands of innocent

people, including the September 11, 2001, attacks on the United States.  Al Qaeda has

supported terrorists in Afghanistan, Bosnia, Chechnya, Tajikistan, Somalia, Yemen, and

Kosovo, and has trained terrorists from countries including the Philippines, Algeria, and

Eritrea.

24.      The strike against the U.S.S. Cole was part of a decade-long plan conceived and

executed by Osama Bin Laden and Al Qaeda to attack U.S. interests in the Middle East,

specifically American military forces.  In early 1992, Bin Laden issued a fatwa that stated

that U.S. forces stationed in the Arabian Peninsula, where Yemen is located, should be

attacked. A fatwa is an Islamic religious decree which purports to direct Muslim

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

followers to commit, or not to commit, certain acts. Fatwas provided Al Qaeda with religious justification for its terrorist attacks.

25.    By 1992, Bin Laden was well known as a senior figure among Islamic extremists. At the time that Bin Laden issued his fatwa in 1992, the only American military presence in Yemen was that of Navy vessels refueling in Aden Harbor.  In that regard, the fatwa provided religious support for an attack directed at the U.S. Navy.  In December 1992, Al Qaeda operatives bombed two hotels in Aden, Yemen, occasionally used by U.S. military personnel, killing two tourists but no Americans.

26.    According to the 9/11 Commission Report, citing CIA and FBI intelligence reports, the perpetrators of that 1992 attack "are reported to have belonged to a group from southern Yemen headed by a Yemeni member of Bin Laden's Islamic Army *Shura*" (italics added).  In August 1996, Bin Laden issued a statement outlining Al Qaeda's goals: drive United States forces from the Arabian Peninsula, overthrow the Government of Saudi Arabia, "liberate" Muslim holy sites in "Palestine," and support Islamic revolutionary groups around the world.

27.    On February 23, 1998, Bin Laden issued another fatwa that was published by allied groups under the name "World Islamic Front for Jihad Against the Jews and Crusaders."  The statement asserted that America had declared war against God and his messenger, and that the murder of any American, military or civilian, was the "individual duty for every Muslim who can do it in any country in which it is possible to do it."  Bin Laden also stated in February 1998, "If someone can kill an American soldier, it is better than wasting time on other matters."  By the time he issued his 1998 declaration of war, Bin Laden's organization had blossomed into a substantial, worldwide organization.

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

12

28.     Less than a month after Bin Laden's fatwa was published, Al Qaeda operatives began planning the August 7, 1998, bombings of the U.S. embassy in Nairobi, Kenya, and Dar es Salaam, Tanzania, which killed twelve Americans and 212 others, and injured about 5,000 others.

29.     Following the 1998 U.S. embassy bombings, an Egyptian informant told FBI Special Agent John P. O'Neill, Sr. and his counterterrorism unit that Al Qaeda would hit an American warship.  John P. O'Neill, Sr., then head of the flagship antiterrorism unit in New York City, was the former chief of counterterrorism for the FBI.  He was the world's foremost expert on Islamic terrorism and Osama Bin Laden's terror network.  For six years he led the fight to track down and prosecute Al Qaeda operatives throughout the world.  On August 22, 2001, his last day at the FBI, he sent a letter to the father of a sailor killed in the U.S.S. Cole attack.  In the letter he stated his proudest moment in government services was being selected to lead the investigation of the attack on the U.S.S. Cole.  He left the FBI after 31 years of service to become Chief of Security at the World Trade Center.  Less than two weeks after taking the position, on September 11, 2001, he was killed when the South Tower of the World Trade Center collapsed.  He died after rushing back into the burning towers to aid in the rescue efforts.

30.     On October 12, 2000, Al Qaeda struck the U.S.S. Cole.  The U.S.S. Cole plot was an Al Qaeda operation supervised directly by Bin Laden.  As stated in the 9/11 Commission Report, Bin Laden "chose the target and location of the attack, selected the suicide operatives, and provided the money needed to purchase explosives and equipment."  The attack's "mastermind," the late Qaed Salim Sinan al-Harethi, also known as Ali Qaed Sinan Harthi, was one of Bin Laden's bodyguards.

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

13

31.     On May 15, 2003, the United States criminally indicted Al Qaeda operatives Jamal Ahmad Mohammad Al-Badawi and Fahad Al-Quso for their roles in the U.S.S. Cole bombing.  The indictment details the actions of Al Qaeda leading up to and immediately following the bombing of the U.S.S. Cole.

32.     According to the indictment, in or about the spring of 1999 in Yemen, Al Qaeda leader Abd Al-Rahim Al-Nashiri presented Jamal Ahmad Mohammad Al-Badawi with a letter from Al Qaeda commander Walid Muhammad Salih bin Roshayed bin 'Attash a/k/a Khallad bin Attash, enlisting Al-Badawi to assist Al-Nashiri in an operation.

33.     In or about the summer of 1999 Al-Badawi located, at Al-Nashiri's request, a residence that afforded privacy in the Madinat al Sha'ab area of Aden, Yemen.  Al-Nashiri, under the name "Abda Hussein Mohammed," leased the Madinat al Sha'ab property for an initial six month term.  Thereafter Al-Nashiri directed Al-Badawi to procure a boat and a truck to tow the boat to Aden Harbor in Aden, Yemen.

34.     Al-Nashiri asked the landlord of the Madinat al Sha'ab location to install a gate in the entrance to the wall surrounding the property in order to secure a boat there.  In or about the summer and fall of 1999, Al-Nashiri secured a white boat with a red velvet deck cover within the premises of the Madinat al Sha'ab location.  In or about the fall of 1999 Al-Nashiri transported explosives from Sa'dah, Yemen, to the Madinat al Sha'ab location in a 1979 Shaus truck.

35.     On or about January 3, 2000, Al-Nashiri and others transported a bomb-laden boat from the Madinat al Sha'ab location to the beach front of Aden Harbor, in Aden, Yemen.  That same day, as the United States Navy Vessel the U.S.S. The Sullivans was refueling

in the Aden Habor, Al-Nashiri and others launched from the beach in Aden Habor an explosives-laden boat, which sank shortly after launching.

36.     On or about January 4, 2000, Al-Nashiri with others returned to the beach area of Aden Harbor and salvaged the sunken boat and explosives.

37.     In or about the spring and summer of 2000, Al-Nashiri apprised Al-Badawi of the aborted effort to attack the U.S.S. The Sullivans, and of the ongoing plot to comply with Osama Bin Laden's edicts to drive American forces from the Arabian peninsula, by attacking a United States naval vessel.

38.     Around January 2000, Fahad Al-Quso and Ibrahim Al-Thawar a/k/a "Nibrass" traveled to Bangkok, Thailand. Prior to departing Bangkok Nibrass instructed Al-Quso to shave and wear western clothes so as not to attract the attention of law enforcement while they were on their trip. Al-Quso and Nibrass delivered approximately $36,000 to Khallad in Bangkok, Thailand.

39.     In or about the summer of 2000, Hassan Awadh Al-Khamri, a/k/a Hasan Al-Ta-Efi a/k/a Hasan, leased a safehouse in the Al-Burayqat Kud Al-Namar area of Aden, Yemen. He also leased an apartment perched on the hills of the Al-Tawahi area of Aden, Yemen, overlooking Aden Harbor where the U.S.S. Cole would later be berthed.

40.     Around the spring and summer of 2000, Khallad and Al-Nashiri met with Osama Bin Laden and others near Qandahar, Afghanistan.

41.     Around the summer and fall of 2000 Al-Nashiri and Musin Musa Matawalli Atwah, a/k/a "Abdel Rahman al Muhajer," tested explosives at a camp used by Al Qaeda near Qandahar, Afghanistan.

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

15

42.     Around the summer and fall of 2000 Al-Nashiri and others successfully tested the explosives that had sunk in January 2000. At the Madinat al Sha'ab location, Al-Nashiri and others refitted the boat that had sunk in January 2000 to strengthen the hull and increase the number of fuel tanks.

43.     In or about September or October of 2000, Al-Badawi enlisted and trained Al-Quso to film the attack on the U.S.S. Cole from the Tawahi apartment. Al-Badawi provided a pager to Al-Quso and advised Al-Quso that he would receive on the pager a predetermined code that would indicate an imminent attack on the U.S.S. Cole, and signal Al-Quso to depart for the Tawahi apartment.

44.     At various times Khallad traveled between Afghanistan and Yemen to engage in activities on behalf of Al Qaeda. Around September or early October 2000 Bin Laden arranged for Khallad to return from Yemen to Afghanistan.

45.     In or about the morning of October 12, 2000, Nibrass, Hasan, and others towed the white boat laden with explosives, including TNT and RDX, to Aden Harbor in Aden, Yemen. Around 11:00 that morning Al-Quso departed his residence in Aden for the Tawahi apartment. Minutes later Nibrass and Hasan piloted the bomb laden boat alongside the U.S.S. Cole and detonated the bomb.

46.     Shortly after the bombing of the U.S.S. Cole, Al-Badawi contacted Al-Quso and asked him to retrieve and then conceal the car and trailer used to tow the attack boat, which had been abandoned by Nibrass and Hasan in the vicinity of Aden Harbor.

47.     In or about mid-October 2000 Bin Laden and Al Qaeda operatives met in Qandahar, Afghanistan and discussed the attack on the U.S.S. Cole. In or about April 2001, while at one of Bin Laden's guesthouses in Qandahar, Afghanistan, Al-Nashiri

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

apprised a co-conspirator of the attack on the U.S.S. Cole, identified the two suicide bombers as Nibrass and Hasan, and indicated that Osama Bin Laden had planned the attack. Around the spring or summer of 2001, while en route to a camp near Qandahar, Afghanistan, Khallad discussed the costs of the attack on the U.S.S. Cole with a co-conspirator. At the training camp in Afghanistan Bin Laden praised Nibrass and Hasan for their successful suicide mission against the U.S.S. Cole and exhorted the trainees at the camp to follow their example in future operations. In or about June 2001 Bin Laden appeared in a video in which he praised the attack on the U.S.S. Cole.

48.     Unclassified evidence from the Department of Defense Office for the Administrative Review of the Detention of Enemy Combatants proves Al Qaeda leader Al-Nashiri's involvement in the bombing.[1] According to the evidence, Al-Badawi, convicted in Yemen in 2004 for helping to plan the U.S.S. Cole attack, admitted that he met Al-Nashiri in Aden, Yemen, in the summer of 1999. Al-Badawi further stated he purchased a boat for Al-Nashiri upon Al-Nashiri's request. Al-Badawi also stated Al-Nashiri bought explosives in Sa'dah, Yemen, and transported the explosives concealed in fishing coolers. Approximately one and a half months prior to the U.S.S. Cole bombing Al-Nashiri explained to Al-Badawi the details of an operation in the port of Aden, Yemen, against a U.S. naval ship. Al-Nashiri asked Al-Badawi for assistance videotaping the operation. An alias used by Al-Nashiri was found on a contract for the purchase of a vehicle in Yemen, which was used in support of the U.S.S. Cole attack. Al-Nashiri was tried and convicted in absentia in Yemen for his role in the U.S.S. Cole bombing.

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

[1] Although the charges against Al-Nashiri were dismissed without prejudice for political reasons on February 5, 2009, the facts are known to be true by the U.S. Government.

## THE ISLAMIC REPUBLIC OF IRAN AND ITS AGENCIES AND INSTRUMENTALITIES MATERIAL SUPPORT OF AL QAEDA

49.     Defendant Iran and its agencies and instrumentalities, Iranian Ministry of

Intelligence and Security ("MOIS"), Iranian Islamic Revolutionary Guard Corps

("IRGC"), and Iranian Islamic Revolutionary Guard Corps-Qods Division ("IRGC-

Qods"), have long provided material support and resources to Al Qaeda and affiliated

terrorist organizations, persons, organizations, commercial entities, and parties.

50.     The relationship between Al Qaeda and the Government of Iran goes back to at

least 1992 in Albania when they both supported the Kosovo Liberation Army ("KLA") to

fight in the Muslim province of Kosovo in neighboring Serbia.  U.S. intelligence has

acknowledged Bin Laden's Al Qaeda link to the KLA and had "both trained and

financially supported the Albanians and that the Kosovo border had been infiltrated by

Bosnian, Chechnyan and Afghan mujaheedin...."  Other information suggests Bin

Laden's support for KLA from Albania began in 1994, after telling the Albanian

government that he headed a Saudi humanitarian agency to help Albania.

51.     In testimony in the trial of the 1998 U.S. embassy bombings in Kenya and

Tanzania, it was revealed that there were connections between Al Qaeda and the Iranian

government beginning in the early 1990s.  Meetings between Al Qaeda and an Iranian

religious leader took place at various times between 1992 and 1996 in Sudan with

Mamdouh Mahmud Salim, Osama Bin Laden's former finance manager, representing Al

Qaeda, according to the U.S. embassy bombings trial prosecutors.  Prosecutors further

stated that the meetings held "at various times" between 1992 and 1996 were to arrange a

tripartite agreement among Al Qaeda, the National Islamic Front of Sudan and elements

of the government of Iran "to work together against the United States, Israel and other western countries."

52.     U.S. intelligence has stated that Osama Bin Laden's operatives had approached MOIS agents in 1995 and again in 1996, offering to join forces against the United States. Phone records obtained by U.S. officials investigating the 1998 U.S. embassy bombings in Kenya and Tanzania reveal that ten percent of the calls made from the Compact-M satellite phone used by Bin Laden and his key lieutenants were to Iran.  In its 1998 indictment, the U.S. Justice Department said that Bin Laden, working through Al Qaeda, forged alliances with government officials in Iran, the National Islamic Front in the Sudan and the Iranian terrorist organization Hezbollah.

53.     Transcripts from the U.S. embassy bombings trial reveal that by 1998, the U.S. Government was aware that on various occasions during the early to mid-1990s, high-ranking Al Qaeda members met with Iranian officials and that Osama Bin Laden himself met with Imad Mughniyeh, leader of the terrorist wing of Hezbollah and a senior officer of IRGC, to "cooperate against the perceived common enemy," the United States.

54.     Mughniyeh was killed by a car bomb in Syria on February 12, 2008.

55.     The Bin Laden meeting with Mughniyeh, held in 1994, took place in Sudan.  Ali Mohammed, Bin Laden's security chief and a former U.S. army intelligence analyst, stated during the guilty plea in the U.S. embassy bombings case in October 2000 that "I was aware of certain contacts between Al Qaeda and Egyptian Islamic Jihad on one side and Iran and Hezbollah on the other side.  I arranged security for a meeting in the Sudan between Mughniyeh and Bin Laden."

56.     Hamid Reza Zakeri, who defected Iran in 2001, linked Iran's IRGC and MOIS with Al Qaeda. Zakeri said that Al Qaeda had contacts with an Iranian elite military unit which helped terrorists train and plot attacks against Americans. Zakeri said that Al Qaeda leader Ayman Al-Zawahiri maintained close ties with the IRGC-Qods, said to be Iran's Islamic shock troops. Zakeri said that Zawahiri was close to former IRGC deputy commander General Mohammad Baqer Zolqadr.

57.     The IRGC and its paramilitary arm, the Qods Division, is a non-traditional agency of Iran that has evolved into one of the most powerful organizations in Iran and functions as an intelligence organization, both within and beyond Iran's borders. It has become a powerful military instrument for defending and furthering Iran's Islamic fundamentalist revolution and is dedicated to the export of Islamic fundamentalist principles throughout the world through acts of terrorism.

58.     A recent letter signed by Zawahiri thanks the leadership of Iran's IRGC for providing assistance to Al Qaeda to set up its terrorist network in Yemen. The letter makes it clear that Iranian influence aided Al Qaeda in carrying out the attack on the U.S.S. Cole since the IRGC provided assistance to Al Qaeda ever since it set up its network in Yemen, which was established well before the October 2000 attack on the U.S.S. Cole.

59.     Separate information reveals that Zawahiri was a frequent guest of Iran's former Minister of Intelligence and Security, Ali Fallahian, in addition to Ahmad Vahedi, whose former position as commander of IRGC-Qods forces placed him as the head of foreign terrorist operations. Zakeri confirms the relationship of Al Qaeda to Hezbollah dating back to the 1990s.

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

20

60.     Hezbollah is regarded as Iran's proxy army and serves as the chief tool for the

implementation of Iran's foreign policy.  It receives its principal financing of some $100

million a year and logistical support and training from the government of Iran.  This

assistance is funneled to Hezbollah through the IRGC and the MOIS with the knowledge

of the Iranian Supreme leader Ayatollah Ali Hoseini-Khamenei.  In 1997, the United

States placed Hezbollah on the State Department terrorist list.

61.     In the past 20 years, Hezbollah has killed some 300 Americans overseas,

including 241 U.S. Marines in the suicide attack on the Marine barracks in Beirut in

1983.  In *Peterson v. Islamic Republic of Iran*, Case No. 1:01-cv-02094, U.S. District

Judge Royce C. Lamberth concluded that Hezbollah was formed under the auspices of

the Iranian government, was completely reliant on Iran in the 1983 attack and assisted

MOIS agents in carrying out the operation.  264 F. Supp. 2d 46, 51-61 (D.D.C. 2003).  In

*Heiser v. Islamic Republic of Iran*, Case No. 1:00-cv-02329, Judge Lamberth found that

Hezbollah carried out the 1996 bombing of the Khobar Towers in Saudi Arabia, which

killed 19 U.S. Air Force personnel, under the direction of Iran, MOIS and the IRGC.  466

F. Supp. 2d 229, 248-254 (D.D.C. 2006).

62.     In a December 18, 2001 statement, J.T. Caruso, then Acting Assistant Director of

the Counter-Terrorism Division of the Federal Bureau of Investigation, testified that a

witness recounted how the Al Qaeda network had privately declared war on America and

was operating both on its own and as an umbrella for other terrorist groups.  The FBI

witness, who is a former member of Bin Laden's Al Qaeda network, recounted that Bin

Laden and Al Qaeda were seeking to obtain nuclear and chemical weapons and that the

organization engaged in sophisticated training.  The witness also revealed that Al Qaeda

obtained specialized terrorist training from and worked with Iranian government officials and Hezbollah.  Considerable information is available to show that there not only was ideological but operational connections between Hezbollah and Al Qaeda.

63.     Hezbollah provided explosives training for Al Qaeda.  A former CIA official has been cited as saying that Al Qaeda relied on experts from Hezbollah to build the shaped charge that badly damaged the U.S.S. Cole. According to UPI:

A U.S. government official told (UPI) that the blast was a "cone-shaped charge" that used moldable high explosives such as SEMTEX H," shaped to create a high-speed, high temperature blast wave.  During the first state of the blast, the explosion "forces all the air out with tremendous force," creating a vacuum, but as air rushes back in, it creates another tremendous force that causes further damage.  "It's a trademark of bombs made by Hezbollah and raises the question of the involvement of Iran," he said.  A former CIA official agree:   "We have to start looking at Iran's involvement in the incident. The evidence warrants this."

64.     Magnus Ranstorp, former deputy director of the Centre for the Study of Terrorism and Political Violence at the University of St. Andrews in Scotland, stated that the suspects in the U.S. embassy bombings mentioned individuals who had gone to Lebanon for explosives training from Hezbollah. "The military manuals of Al Qaeda showed innovation in the making of explosives including RDX and C4," he said, "but there was an admission that some of its members had gone to Lebanon to get that expertise." Such expertise would have come from Hezbollah.

65.     A direct link between Iran and the joint activities of Hezbollah and Al Qaeda is the Al-Taqwa bank of Switzerland and Liechtenstein.  The link primarily was through the late Ahmad Huber-El Biali (aka Ahmed Huber).  Huber was a principal shareholder of Al-Taqwa bank which was sanctioned by the U.S. government for helping to finance Al Qaeda.  Starting in 1983, Huber repeatedly visited Iran.  In 1988, Huber first met Youssef

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

22

Nada in Iran.  Nada, an Egyptian, belongs to the Muslim Brotherhood.  Like Nada, Huber

embraced the Muslim Brotherhood.  At a conference in Iran in 1988, Nada asked Huber

to participate in the founding of Al-Taqwa.  Al-Taqwa bank has been a funding source

for activities involving Hamas, which has received direct funding from Iran.  Hamas, an

outgrowth of Palestinian Muslim Brotherhood founder, the late Abdullah Azzam, is

closely associated with Hezbollah.  Azzam, along with Osama Bin Laden, were

cofounders of the Maktab al-Khidamir (MAK), a precursor to Al Qaeda.  Iran appointed

the late Imad Mughniyeh, leader of the terrorist wing of Hezbollah and a senior officer of

IRGC, as coordinator of Iran's activities with Hamas and the Palestinian Islamic Jihad in

Lebanon.

66.      According to Israeli intelligence Mughniyeh and Al Qaeda leader Ayman Al-

Zawahiri directed the terrorist attacks on September 11, 2001.  According to the U.S.

Justice Department, Mughniyeh had close ties to Bin Laden.  Contacts between

Mughniyeh and Bin Laden, for example, mainly occurred through Usbat Al-Ansar, a

Palestinian Sunni Islamist group operating primarily at the Ein al-Hilweh Palestinian

refugee camp in the southern Lebanese port of Sidon and the Nahr al-Bared camp in

northern Lebanon.  Usbat al-Ansar received considerable financing during the late 1990s

from Bin Laden.


## IRAN'S CONTINUING PROVISION OF SAFE HAVEN TO AL QAEDA FUGITIVES

67.      Iran has become a safe haven to senior Al Qaeda fugitives.  There have also been

reports that the IRGC assisted Al Qaeda commanders in entering Iran from Afghanistan.

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

In addition to being a transit route, Iran also has allowed Al Qaeda to use the country as a staging area.

68.     On February 15, 2002, Turkish police arrested two Palestinians and a Jordanian who entered Turkey illegally from Iran on their way to conduct bombing attacks in Israel. Turkish police said the three had fought for the Taliban, receiving terrorist training from Afghanistan and were members of Beyyiat el-Imam, a group linked to Al Qaeda. The terrorists said they were acting on orders from Abu Musaab, whom Israeli intelligence has identified as a senior al Qaeda member, Abu Musaab Zarqawi.

69.     On June 7, 2006, Zarqawi was killed in an American air strike near the city of Baquba, Iraq.

70.     U.S. and Israeli intelligence agencies say that Zarqawi had fled Afghanistan in October 2001 and later turned up in Tehran under the protection of Iranian security forces.  Upon information and belief, Zarqawi then left for Iraq where he received medical treatment for one of his legs. He then went to Syria.  Zarqawi was also linked with Hezbollah.

71.     Although Iran was against the Taliban in Afghanistan prior to U.S. action, that opposition did not translate into opposition to Osama Bin Laden or Al Qaeda.  Under the watchful surveillance of Iran's military and intelligence services, U.S. intelligence has detected what it describes as a suspected Al Qaeda training camp in a remote area of eastern Iran along the border with Afghanistan.  Overhead imagery shows a training camp complete with a terrorist obstacle course and a rifle range, much like those Al Qaeda used in Afghanistan to train for assassinations.

72.     For some time, the U.S. Government believes, Iranian officials who control the military and intelligence services are working with Al Qaeda.  In April 2002, then Defense Secretary Donald Rumsfeld said "there is no question but that Al Qaeda has moved into Iran, out of Iran to the south and dispersed to some other countries."  Israeli intelligence also has told U.S. officials that it had strong evidence that Al Qaeda members went through Iran and Iraq to the Bekaa Valley of Lebanon and teamed up with Hezbollah.

73.     In a February 6, 2002 *Christian Science Monitor* article, a Saudi captive, Haji Mohamad Akram, chef to Osama Bin Laden, said in an interview that Bin Laden had escaped to Iran following the bombing of Tora Bora in November 2001.  The captured Saudi chef further claims that Bin Laden had three offers of escape.  "One from Iraq, one from Iran, and another from some mafia types…We received a lot of Iranian currency, and the commanders distributed it to the soldier," he said, adding that he received 700,000 rials ($1,400) for personal use.

74.     Intelligence officials said Iran's support for terrorists, including Al Qaeda, in the past was carried out by agents of MOIS, and the IRGC-Qods.  The Defense Intelligence Agency in 2000 uncovered information linking Al Qaeda to Iran's government.

75.     In addition to Al Qaeda training bases, intelligence reports in August 2002 revealed that Al Qaeda leaders, Abu Hafs the Mauritanian and Saif al-Adil were in eastern Iran. *The Washington Post* reported that the two may have been planning Al Qaeda operations from Iran.

76.     Upon information and belief, Al Qaeda terrorists have escaped to eastern Iran following U.S. action in Afghanistan.  The Iranian MOIS is aware of the concentration of

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

25

Al Qaeda terrorists in the region but has taken no action against them.  In February 2003,

U.S. intelligence agencies reported that Osama Bin Laden's oldest son, Saad, was in Iran

along with other senior Al Qaeda terrorists.  Saad Bin Laden had been spotted in Iran in

January 2003, according to U.S. officials.  Saad Bin Laden, reportedly killed in 2009, was

believed to be a key leader of the Al Qaeda terrorist network since U.S. and allied forces

ousted the ruling Taliban militia in Afghanistan.  In testimony before the U.S. Senate in

February 2003, then CIA Director George Tenet said that "we see disturbing signs that Al

Qaeda has established a presence in both Iran and Iraq."

77.     Defense Secretary Donald H. Rumsfeld also said in a Senate hearing in

September 2002 that the Iranian government is "currently harboring reasonably large

numbers of Al Qaeda.  The Al Qaeda (is) functioning in that country, both transiting and

located, and operating," Secretary Rumsfeld told the Senate Armed Services Committee.

78.     In a March 2010 written statement to the Senate Armed Services Committee, U.S.

Army General David H. Petraeus stated that "al-Qaeda continues to use Iran as a key

facilitation hub, where facilitators connect al-Qaeda's senior leadership to regional

affiliates."

79.     As a result of Iran and its agencies and instrumentalities material support of Al

Qaeda, including but not limited to providing financing, lodging, training, and

safehouses, Al Qaeda was able to plan and execute its attack against the U.S.S. Cole,

which caused the death of Kevin Shawn Rux.  As a result, Iran and its agencies and

instrumentalities are liable to Plaintiffs for their damages.

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

## THE REPUBLIC OF SUDAN AND ITS AGENCIES AND
## INSTRUMENTALITIES SUPPORT OF AL QAEDA

80.     Defendant Sudan and its agencies and instrumentalities, Sudanese Ministry of the Interior, Sudanese Ministry of Defense, the Security of the Revolution, Sudanese Military Intelligence, Sudanese State Security, the Popular Defense Force, and the Revolutionary Security Services, have long provided material support and resources to Al Qaeda and affiliated terrorist organizations, persons, organizations, commercial entities, and parties.

81.     Sudan is a country of 41.2 million inhabitants. It is located at the east end of the Sahara desert in northern Africa. Sudan is bounded on the northeast by the Red Sea. Directly across the Red Sea from Sudan is the Republic of Yemen, and the span between the two countries can be easily crossed by boat.

82.     Sudan's population is a majority of Sunni Muslim, most of whom are in the north. The country has for years been ravaged by war and humanitarian crises, including an ongoing conflict that began in the mid-1980s between the Muslim government in the north and the rebels in the rural south, which is populated by tribal and Christian groups.

83.     In 1989, General Omar Bashir assumed the presidency of Sudan in a military coup that overthrew the elected government and converted Sudan into an Islamic Arab state. Bashir remains Sudan's President today. The coup was orchestrated by Hassan Abdallah Turabi, head of the Sudanese political party the National Islamic Front ("NIF") and leader of the Muslim Brotherhood. Turabi was the regime's de facto leader from 1988 until late 1999, when he was ousted and later put in jail. During the 1990s, Turabi and the NIF transformed Sudan into a centralized, radical Islamic state that openly supported movements and organizations with militant Islamic, anti-American, and anti-Western ideologies.

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

27

84.     Since 1993, the United States has continuously designated Sudan as a state

sponsor of terrorism. 58 Fed. Reg. 52523-01 (Oct. 8, 1993).

85.     Following the withdrawal of the Soviet Union from Afghanistan in 1989, Al

Qaeda was no longer welcome in Afghanistan. Bin Laden briefly returned to his home

country of Saudi Arabia but was expelled in 1990 for his support of terrorism. At a time

when Al Qaeda found itself without a territory from which it could base its operations,

Turabi offered the organization refuge in Sudan.   Following Al Qaeda's move to Sudan

in or about 1991, Osama Bin Laden established a headquarters in the Riyadh section of

Khartoum, Sudan, heavily populated by Saudis.

86.     As stated in a 1996 U.S. Department of State report on Bin Laden, Bin Laden

"relocated to Sudan in 1991, where he was welcomed by National Islamic Front (NIF)

leader Hassan al-Turabi." Bin Laden lived in Sudan from 1991 until May 1996, when he

was expelled from the country under international pressure.  The Sudanese government

permitted Bin Laden to relocate to Afghanistan, where he was welcome as an honored

guest of the ruling Taliban government, rather than surrendering him to international

authorities for prosecution.

87.     Turabi and Bin Laden shared a common extremist ideological and religious

outlook.  Turabi, who was dean of the University of Khartoum law school in the 1960s,

envisioned a pan-Islamic force consisting of both Shiites and Sunnis to counterbalance

Western powers militarily, economically, and politically.  As the de facto leader of the

Sudanese regime, Turabi sought to impose a sharia, or Islamic law, as the only source of

law in Sudan, a goal shared by Al Qaeda.  Bin Laden agreed to help Turabi in the

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

28

region's ongoing war against African Christian separatists in southern Sudan, and also to invest his wealth in the poor country's infrastructure.

88.    In exchange, Sudan provided Bin Laden's fledgling terrorist group with a sanctuary within which it could freely meet, organize, and train militants for operations. Osama Bin Laden organized Al Qaeda into camps dedicated to the export of terrorism throughout Sudan, the main one being a 20 acre site near Soba, 10 kilometers south of Khartoum.

89.    Bin Laden established several joint business ventures with the Sudanese regime that began to flourish upon his arrival in the Sudanese capital of Khartoum in 1991.  Bin Laden formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf.

90.    Bin Laden's business in Sudan included:

(1)    Al-Hijrah for Construction and Development, Ltd., which built the Tahaddi road between Khartoum and Port Sudan on the Red Sea coast, as well as a modern international airport near Port Sudan;

(2)    An import-export firm, Wadi al Aqiq Company, Ltd., which, in conjunction with Bin Laden's Taba Investment Company, Ltd., and with the cooperation of prominent NIF members, secured a near monopoly over Sudan's agricultural exports of gum, corn, sunflower, and sesame seed products; and

(3)    Al-Themar al-Mubarak-ah Agriculture Company, Ltd., which acquired large tracts of land near Khartoum and in eastern Sudan;

(4)    Gum Arabic Company Ltd., which was jointly owned by Osama Bin Laden and the Sudanese government;

(5)     Ladin International Company, an international commerce company;

(6)     The Blessed Fruits Company, an agricultural company for the growth of fruits and vegetables, in which Osama Bin Laden held an interest;

(7)     Al-Ikhlas, a candy manufacturer, in which Osama Bin Laden held an interest. These businesses provided income to Al Qaeda, as well as cover for the procurement of explosives, weapons, and technical equipment, and for the travel of Al Qaeda operatives. Bin Laden continued to maintain many of his substantial business interests and facilities in Sudan even after his departure to Afghanistan in 1996.

91.     Sudan allowed its banking institutions to be used by Al Qaeda to launder money. Bin Laden and wealthy members of the NIF capitalized Al-Shamal Islamic Bank in Khartoum; Bin Laden personally invested $50 million in the bank. In the late 1980s, Sudan adopted an Islamic banking system that forbids interest and lacks the rigorous accounting standards used by Western banking systems. The lack of scrutiny associated with this system was ideal for Al Qaeda because it allowed the group to move large sums of money in support of its operations without detection. As Mr. Farah, who is the author of "Blood From Stones:  The Secret Financial Network of Terror," testified, Sudan "provided [Al Qaeda] fundamentally with a banking structure, Islamic structure that's out of the norm of the banking rules that we're acquainted with in the west, and allowed them channels to move money through that would be virtually undiscoverable to the outside world." He added that Sudan "clearly had control over the banking system...[Al Qaeda] couldn't have operated with that degree of freedom and openness if they had not been sanctioned by the central government to do so."

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

92.     In addition, as reported by the U.S. Department of State in its annual "Patterns of

Global Terrorism" reports, the Sudanese military cooperated with Bin Laden and Al

Qaeda to finance at least three terrorist training camps in northern Sudan by January

1994.

93.     Bin Laden's Al-Hijrah for Construction and Development company worked

directly with Sudanese military officials to transport and provision the camps, where

terrorists of Egyptian, Algerian, Tunisian, and Palestinian origin received training.  From

as early as 1997 to at least 1999, Sudan served as a "training hub" for Al Qaeda and other

terrorist groups that used Sudan as a secure base for assisting compatriots elsewhere.

94.     Furthermore, starting as early as 1997 the Sudanese Government provided

paramilitary training to terrorist organizations in Sudan.

95.     Starting in the early 1990's, Turabi and the Sudanese regime convened annual

conferences in Sudan under the label Popular Arab and Islamic Conference.  At these

conferences, Bin Laden and other top leaders and operatives from the most violent

Islamic terrorist organizations, including Bin Laden's Islamic Army Shura, the

Palestinian Liberation Organization, Hamas, and Hezbollah, congregated to exchange

information and plan terrorist activities.  Turabi saw the conference as a means of

bringing together Sunnis and Shiites in the fight against the common enemy, i.e., the

United States and other Western powers.  Although the conference was closed down in

approximately 2000, Sudan "continued to be used as a safehaven" by Al Qaeda and other

terrorist groups.

96.     In or about the early 1990's, Jamal al-Fadl, one of Bin Laden's lieutenants in

Sudan, went to Hilat Koko, a suburb of Khartoum, where he met with representatives of

Al Qaeda and the Sudanese army to discuss the joint manufacture of chemical weapons.

Al Qaeda and the Sudanese army cooperated in efforts to mount chemical agents on

artillery shells. Al Qaeda at this time also began to experiment with biological warfare

injecting or gassing dogs with cyanide.

97.     In Sudan, between the years 1990 and 1993, members of Al Qaeda undertook the

task of writing the *Encyclopedia of the Afghan Jihad*. Al Qaeda wrote another terrorist

work entitled *Military Studies in the Jihad against the Tyrants*.

98.     At various times in or about 1992 and 1996, Osama Bin Laden and Mamdouh

Mahmud Salim, Osama Bin Laden's former finance manager, worked together with a

ranking official in the NIF to obtain communication equipment on behalf of the Sudanese

intelligence service.

99.     On at least two occurrences from in or about 1992 until 1995, members of Al

Qaeda transported weapons and explosives from Khartoum to the coastal city of Port

Sudan for trans-shipment to the Saudi Arabia peninsula, using vehicles associated with

Osama Bin Laden's "business."

100.     In 1993, Al Qaeda paid $210,000 for an airplane in Tucson, Arizona, that was

then flown to Khartoum, Sudan. This plane was intended to transport American Stinger

Anti-Aircraft missiles from Pakistan to Sudan, although that missile transport did not take

place.

101.     Osama Bin Laden stated publicly that one of his proudest achievements during the

period of time Al Qaeda was based in Sudan was Al Qaeda's role in the killing of more

than a dozen American soldiers stationed in Somalia. Al Qaeda and its allies launched

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

operations in Somalia to foment and participate in an attack on British and American

forces taking part in Operation Restore Hope in Somalia.

102.    As early as 1998, Sudan provided Al Qaeda members with Sudanese diplomatic

passports as well as regular Sudanese travel documentation that facilitated the movement

of Al Qaeda operatives in and out of Sudan.  Diplomatic passports allow the holder to

pass through airport security in airports and port around the world without his bags being

checked and without the same level of security or searches normally given to regular

passport holders.  A diplomatic passport typically lasts between five and ten years.  Thus,

these diplomatic passports issued in 1998 would not have expired prior to 2003.  The use

of diplomatic passports allowed Al Qaeda agents to enter and leave Sudan and cross

borders in other countries with diplomatic pouches carrying secret materials to prepare

for attacks without arousing suspicion.

103.    In exchange for 200 passports provided by the Sudanese government to Al Qaeda,

so that terrorists could travel with new identities, Al Qaeda purchased communications

equipment, radios, and rifles for the Sudanese NIF.

104.    The Government of Sudan's provision of diplomatic passports to Al Qaeda, which

was necessarily a government function carried out by government officers or agents, was

critical to Al Qaeda's method of training its operatives in one country and then

dispatching them with their materials to other countries to carry out operations or await

instructions.  By giving Al Qaeda diplomatic passports, as well as diplomatic pouches

that could be carried without inspection, Sudan enabled Al Qaeda to transport weapons

and munitions outside the country and into other countries undetected by custom agents.

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

33

105.    In addition, Sudan exempted Al Qaeda and its members from paying any taxes or import duties and permitted it to bring containers into the country without inspection by customs.

106.    Sudan's support of Al Qaeda continued even after Bin Laden's expulsion from the country in 1996 and lasted at least until the U.S.S. Cole bombing in October 2000. As reported in the U.S. Department's annual "Patterns of Global Terrorism" reports, each year from 1997 through 2000 Sudan continued to serve as a meeting place, safe haven, and training hub for Al Qaeda and other terrorist groups including Lebanese Hezbollah, Palestinian Islamic Jihad, Abu Nidal Organization, and Hamas. As of 1999, this support included "paramilitary training, money, religious indoctrination, travel, documents, safe passage, and refuge" and as of 2000 it "included the provision of travel documentation, safe passage, and refuge. Most of the groups maintained offices and other forms of representation in the capital, using Sudan primarily as a secure base for organizing terrorist operations and assisting compatriots elsewhere."

107.    The U.S.S. Cole attack's "mastermind," the late Qael Salim al-Harethi, was trained by Al Qaeda in Sudan in the 1990s before being dispatched to Yemen where he became chief of operations of Al Qaeda in Yemen.

108.    The explosives used in the U.S.S. Cole attack were sent by Al Qaeda operatives in Sudan. This finding corroborated the testimony of one of Bin Laden's lieutenants in Sudan, Jamal Al-Fadl, who testified in criminal proceedings against Bin Laden arising out of the 1998 U.S. embassy bombings. Mr. Al-Fadl stated in sworn testimony in a trial before the U.S. District Court for the Southern District of New York that he worked under Bin Laden in Sudan; that he stored four crates of weapons and explosives at a farm

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

34

in Sudan owned by Bin Laden; and that he shipped the four crates in an Al Qaeda-owned boat from a facility owned by the Sudanese military in Port Sudan to Yemen, where they were to be used to "fight the Communists."

109.    Ayman Al-Zawahiri, a top-ranking member of Al Qaeda, reached an agreement in 1998 with Sudan's national Islamic groups to establish budgets to finance terror operations.

110.    Mustafa Osman Ismail, Sudanese Foreign Minister from February 18, 1998 to September 18, 2005, admitted Sudan's role in supporting terrorism and Al Qaeda specifically on a C-SPAN broadcast on May 21, 2003.

111.    In addition to extensive direct support of Al Qaeda, Sudan has long provided material support and resources to foreign terrorist organizations Egyptian Islamic Jihad and Hezbollah.  By virtue of its mergers with Egyptian Islamic Jihad, and affiliation with Hezbollah, Al Qaeda has materially benefited from Sudan's sponsorship of those foreign terrorist organizations.

112.    Sudan maintained close ties with the Republic of Iraq as early as the first Persian Gulf War in 1990, at which time both countries were supporting Al Qaeda and Osama Bin Laden.  Sudan permitted Iraq to establish a major Iraqi intelligence operation in Sudan through Iraq's ambassador to Khartoum, Abd al Samad al-Ta'ish.  Ta'ish remained in Sudan through the summer of 1998.  By allowing Iraqi intelligence to operate within its borders, Sudan facilitated Iraq's smuggling of weapons and provision of other material support to Al Qaeda and Osama Bin Laden.

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

113.    Sudan continues to serve as a safe haven for members of Al Qaeda, the Lebanese Hezbollah, al-Gama'a al-Islamiyya, Egyptian Islamic Jihad, the Palestine Islamic Jihad, and Hamas.

114.    As a result of Defendant Sudan and its agencies and instrumentalities material support of Al Qaeda, including but not limited to providing financing, lodging, training, and safehouses, Al Qaeda was able to plan and execute its attack against the U.S.S. Cole, which caused the death of Kevin Shawn Rux.  As a result, Sudan and its agencies and instrumentalities are liable to Plaintiffs for their damages.

### THE SYRIAN ARAB REPUBLIC AND ITS AGENCIES AND INSTRUMENTALITIES MATERIAL SUPPORT OF AL QAEDA

115.    Defendant Syria and its agencies and instrumentalities, the Syrian National Security Directorate, the Syrian Republican Guard, the Syrian Ministry of Interior, the Syrian Military Intelligence Service, Syrian Air Force Intelligence, and Syrian Special Forces, have long provided material support and resources to Al Qaeda and affiliated terrorist organizations, persons, organizations, commercial entities, and parties.

116.    Syria has long provided material support and resources to a variety of foreign terrorist organizations which are affiliated with Al Qaeda, including, without limitation, Hezbollah, Hamas, and Palestine Islamic Jihad.  Syria knew of such foreign terrorist organizations' affiliation with Al Qaeda and expected its support to flow ultimately to Al Qaeda.

117.    According to the U.S. government, Syria has provided safe haven, financial and logistical assistance, training facilities and political support for the terrorist organization Hezbollah.  Syria has for many years facilitated weapons shipments from Iran to

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

Hezbollah.  By virtue of its affiliation with Hezbollah, Al Qaeda has materially benefited from Syria's sponsorship of that foreign terrorist organization.

118.     Between 1992 and 2003, Defendant Syria continually purchased crude oil from the Republic of Iraq, in violation of United Nations Security Council Resolutions and sanctions programs designed to inhibit Iraq's ability to use funds derived from the sale of Iraq's natural resources to promote international terrorism and pursue the development of weapons of mass destruction. Through its state-controlled bank, Syria assisted Iraq in laundering revenues realized by Iraq through the illegal oil sales, and through other illicit activities.

119.     Syria's violations of the United Nations Security Council Resolutions and sanctions programs, as described above, enabled the Republic of Iraq to maintain and expand its terrorist sponsorship, including its provision of material support and resources to Al Qaeda and affiliated foreign terrorist organizations.  At the time Syria knowingly violated the United Nations Sanctions, Syria knew its financial assistance to Iraq was being used to fund Al Qaeda and other foreign terrorist organizations referenced herein.

120.     Western intelligence agencies have confirmed that Syria has allowed between 150 and 200 Al Qaeda operatives to settle in Ein el-Hilweh since the start of the U.S. offensive in Afghanistan.  Ein el-Hilweh is a Palestinian refugee camp located in the southern Lebanese port of Sidon where the Palestinian Sunni Islamist group Usbat Al-Ansar primarily operates.  Usbat Al-Ansar received considerable financing from Bin Laden in the late 90s.

121.     In *Gates v. Syrian Arab Republic*, Case No. 1:06-cv-01500, U.S. Judge Rosemary M. Collyer concluded that Syria was liable for providing material support to Al Qaeda

after Al Qaeda members beheaded two U.S. Civilian contractors in 2004. 580 F. Supp. 2d 53, 66-69 (D.D.C. 2008). Judge Collyer made findings that Syria has often supported terrorist groups, such as Al Qaeda, Hamas, and Palestinian Islamic Jihad, in order to destabilize the middle peace process, beginning as early as 1974 and continuing. *Id.* at 62.

122.   As a result of Syria and its agencies and instrumentalities material support of Al Qaeda, including but not limited to providing financing, lodging, training, and safehouses, Al Qaeda was able to plan and execute its attack against the U.S.S. Cole, which caused the death of Kevin Shawn Rux. As a result, Syria and its agencies and instrumentalities are liable to Plaintiffs for their damages.

### THE DEFENDANTS JOHN DOES 1-99

123.   Defendants John Does 1-99 are other officials, employees, and/or agencies or instrumentalities of Iran, Sudan and/or Syria, and/or others, whose identities are presently unknown, who performed acts that resulted in acts of terrorism, including the actions relating to the attack against the U.S.S. Cole, which caused the extrajudicial killing of Kevin Shawn Rux and other U.S. navy sailors. Defendants John Does 1-99 acted as agencies or instrumentalities of Iran, Sudan, and Syria, and/or others, whose identities are presently unknown, and performed acts within the scope of their offices, employments and/or agencies, within the meaning of 28 U.S.C. § 1605A(a)(1), which caused the extrajudicial killings described herein.

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

## COUNT I
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AND LOSS OF SOLATIUM
### (Under 28 U.S.C. § 1605A(c))

124.   Plaintiffs repeat, reallege and incorporate by reference those facts and allegations

set forth in all the foregoing paragraphs as if fully set forth herein.

125.   The actions of Defendants of providing material support causing the bombing of

the U.S.S. Cole constitute extreme and outrageous conduct intended to cause Plaintiffs

severe emotional distress.

126.   The actions by Defendants were undertaken deliberately and recklessly, with

knowledge that they would cause severe emotional distress to the family members of the

U.S. Navy sailors killed in the bombing of the U.S.S. Cole.

127.   The Plaintiffs were aware that the bombing of the U.S.S. Cole had taken place,

and that their loved one, Kevin Shawn Rux, was killed in the attack.

128.   The actions of Defendants did in fact cause the bombing and subsequently was

the cause in fact of the Plaintiffs suffering severe emotional distress.

129.   Defendants, by engaging in this intentional, unlawful conduct, intentionally

inflicted emotional distress upon Plaintiffs.

130.   As a direct consequence of the actions of the Defendants Iran, Sudan, and Syria,

their agencies and instrumentalities, and John Does 1-99, the mother and brothers of

Kevin Shawn Rux, to wit, Plaintiff Flanagan, Plaintiff James Rux, Plaintiff Thomas Rux,

Plaintiff Timothy Rux, and Plaintiff Matthew Rux, have suffered mental anguish,

emotional distress, and loss of solatium, in accordance with 28 U.S.C. § 1605A(c).

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

## COUNT II
## PUNITIVE DAMAGES
### (Under 28 U.S.C. § 1605A(c))

131.    Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

132.    The actions of the Defendants, carried out in their names and by their agencies and instrumentalities, were malicious, willful, unlawful, reckless and in wanton disregard of life and the standards of law that govern the actions of civilized nations. The loss of life as above described was intended as a result and was caused by each Defendant.

133.    Pursuant to 28 U.S.C. §1605A(c), which specifically authorizes a claim for punitive damages arising from state-sponsored terrorist acts, and for the reasons stated above, Defendants Iran, Sudan, and Syria, their agencies and instrumentalities, and John Does 1-99 are liable to Plaintiffs for punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court grant judgment in their favor against Defendants jointly and severally, and grant Plaintiffs:

a.    Compensatory damages against Defendants for the mental anguish, emotional distress, and loss of solatium of the Plaintiffs, for not less than the following amounts:

| | |
|---|---|
| Saundra Flanagan | $5,000,000.00 |
| James Rux | $2,500,000.00 |
| Thomas Rux | $2,500,000.00 |
| Timothy Rux | $2,500,000.00 |
| Matthew Rux | $2,500,000.00 |

JOSHUA M. AMBUSH
ATTORNEY AT LAW
1726 REISTERSTOWN ROAD
SUITE 206
BALTIMORE, MD 21208

40

b.       Punitive damages against Defendants in the amount of **ONE BILLION**

**DOLLARS** ($1,000,000,000.00);

c.       Interest;

d.       Reasonable costs and expenses;

e.       Reasonable attorneys' fees; and

f.       Such other and further relief that the Court may determine to be just and equitable

under the circumstances.


                                    Respectfully submitted,



                                    Joshua M. Ambush
                                    Bar No. MD 27025
                                    Law Offices of Joshua M. Ambush, LLC
                                    Hilton Plaza
                                    1726 Reisterstown Road, Suite 206
                                    Baltimore, Maryland 21208
                                    Phone: (410) 484-2070
                                    Facsimile: (410) 484-9330
                                    joshua@ambushlaw.com