IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


SAUNDRA FLANAGAN, ET AL.,            )
                                     )
          Plaintiff,                 )    CA No. 10-1643
                                     )
                                     )    Washington, D.C.
          vs.                        )    August 12, 2014
                                     )    10:00 a.m.
ISLAMIC REPUBLIC OF IRAN, ET AL.,    )
                                     )
          Defendant.                 )
_____)


TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE JOHN FACCIOLA
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:          LAW OFFICES OF
                            JOSHUA M. AMBUSH, LLC.
                            JOSHUA M. AMBUSH, ESQ.
                            JENNIFER KENT, ESQ.
                            1726 Reistertown Road
                            Pikesville, MD 21208
                            410-484-2070



Court Reporter:             William P. Zaremba, RMR, CRR
                            U.S. Courthouse
                            333 Constitution Avenue, NW
                            Room 6511
                            Washington, D.C. 20001
                            (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

– – –

WITNESS INDEX

– – –

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

PLAINTIFF's:

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DOE VICTIM A | 14 | | | |
| DOE VICTIM E | 32 | | | |
| DOE VICTIM D | 45 | | | |
| DOE VICTIM C | 55 | | | |
| DOE VICTIM B | 67 | | | |
| DALE L. WATSON | 81 | | | |
| HANNAH L. RUX | 130 | | | |

P R O C E E D I N G S

1

2       DEPUTY CLERK:  This is Civil Case year 2010-1643,

3  Doe Victim A, et al, vs. Islamic Republic of Iran, et al.

4       THE COURT:  Plaintiffs ready to proceed?

5       MR. AMBUSH:  Yes, Your Honor.

6       THE COURT:  You may.

7       MR. AMBUSH:  Joshua Ambush on behalf of the

8  Plaintiffs, Your Honor.

9       May it please the Court.  This case arises out of

10  the October 12th, 2010 terrorist bombing of the U.S.S. Cole

11  during a temporary refueling stop in the port of Aiden,

12  Yemen.

13       As a result of this terrorist attack, 17 American

14  sailors stationed aboard the Cole were killed, including

15  Electronic Warfare Technician First Class Kevin Rux.

16  Plaintiffs here are Kevin's mother and brothers, Doe Victim

17  A, Doe Victim B, Doe Victim C, Doe Victim D, and Doe Victim

18  E, who have brought claims for intentional infliction of

19  emotional stress, resulting from Kevin's death.  Plaintiffs

20  seeks solatium and punitive damages.

21       Since 1996, Congress has authorized suits against

22  certain foreign sovereign countries that sponsor terrorism

23  by individual family members who have lost loved ones at the

24  hands of murderous terrorists.

25       While numerous cases have become before this

1   Court, this case is unique.  Coming 14 years after the

2   attack on the U.S.S. Cole, it is the first and possibly only

3   opportunity this family has to have their voices heard.

4   The Court will hear who Kevin Shawn Rux was from the people

5   who loved him most, the people who loved him, relied on him

6   and miss him the most:  His mother Doe Victim A and his

7   brothers, Doe Victim E, Doe Victim C, Doe Victim D and Doe

8   Victim E.

9        The first aspect of this case, Your Honor,

10  involves the relationship between Al-Qaeda and Sudan and its

11  military and intelligence agencies.  The evidence will

12  demonstrate that after the war against the Soviet Union

13  ended, Al-Qaeda relocated from Afghanistan to Sudan at the

14  personal invitation of President Omar al-Bashir.  Bin Laden

15  and Al-Qaeda were welcomed by the National Islamic Front,

16  known as the NIF, and their leader Hassan al-Turabi, who

17  shared the same vision of a pan-Islamic force consisting of

18  both Shiites and Sunnis to counterbalance Western powers

19  militarily, economically, and politically.

20       Bin Laden lived in Sudan from 1991 until May 1996,

21  when he was expelled from the country under international

22  pressure.  During Al-Qaeda's five years in Sudan, it became

23  wealthy, going into business with several National Islamic

24  Front members and using the Sudanese banking system to

25  launder money for its members and for terrorist operations.

1    It became well-trained with bin Laden, establishing at least

2    four trading camps in northern Sudan, and Al-Qaeda members

3    traveling to and from Iran and Hezbollah-controlled Lebanon

4    for explosives training.  It had freedom of movement due to

5    Sudanese passports supplied by Sudan and was able to develop

6    a network in Yemen and beyond.

7            And it became well-connected, developing

8    relationships with Iranians and most other terrorist

9    organizations in the region.

10           The evidence will also prove Sudan's support of

11   Al-Qaeda continued even after bin Laden's expulsion from the

12   country in 1996 and lasted until at least the Cole bombing

13   in October of 2000.

14           Another aspect of this case, Your Honor, involves

15   the relationship between Al-Qaeda and Islamic Republic of

16   Iran, working through its Ministry of Intelligence and

17   Security, also known as the MOIS, and the Islamic

18   Revolutionary Guard Corps, also known as the IRGC, and the

19   IRGC Qods Division and the country known as the Sudan.

20           It is well-established that Iran and Sudan

21   provided material support to Al-Qaeda for a massive bombing

22   of a large structure of vital importance to the

23   United States.  In *Owens v. Sudan*, Iran and Sudan were found

24   liable by this Court under 28 U.S.C. 1605(a) for the

25   material support of Al-Qaeda in relation to the 1998 East

1    Africa U.S. Embassy bombings, a mere two years before the

2    Cole attack.

3            The evidence will show that the relationship

4    between Al-Qaeda, Iran and Sudan began almost as soon as

5    Al-Qaeda relocated from Afghanistan to Sudan.

     The interactions between Defendants Iran and Sudan and the

7    terror groups Hezbollah and Al-Qaeda occurred with the

8    blessing of Hassan al-Turabi, the President of Sudan.

9            The outcome of Iran and Sudan's sponsorship of

10   these terror groups, the U.S.S. Cole bombing, is precisely

11   what the Defendants desired.

12           The evidence will establish that a relationship

13   existed between Iran, Sudan, and Al-Qaeda, and Hezbollah,

14   another Jihadi terror group that was forged to target U.S.

15   military interests in the Arabian peninsula.  The Cole

16   bombing was a result of this relationship.

17           As reported by both the Central Intelligence

18   Agency and the 9/11 Commission and confirmed by testimony

19   from former al-Qaeda members, starting in 1992, high-level

20   members of al-Qaeda were either trained in explosives and

21   counterintelligence measures directly in Iran or they

22   traveled to the Bekaa Valley in Lebanon where they received

23   explicit training from Hezbollah.  Expert testimony will

24   confirm that Hezbollah training bases in Lebanon were

25   commonly used by Iran to provide Iranian-sponsored training

1    to terrorist organizations.  Iran supported terrorism

2    training by operatives of terror groups in countries other

3    than Iran as a means of hiding their involvement.

4    In essence, Iran committed terrorism by proxy, using,

5    quote/unquote, cut-outs, such as Hezbollah.

6              Some trainees from these Hezbollah camps included

7    individuals who became prominent in al-Qaeda in later years,

8    including Saif al-Adel, an explosives expert who ran

9    al-Qaeda training camps in Sudan and Afghanistan.

10             Moreover, the evidence will establish that the

11   cooperative relationship between Iran, Sudan and al-Qaeda in

12   perpetuating terrorism continued well throughout the 1990s

13   up to and including the U.S.S. Cole bombing in October 2000.

14             The evidence will prove that Iran provided a safe

15   haven for certain types of activities before 9/11:

16   fundraising and facilitation of meetings and

17   communication.  Indeed, roughly 10 percent of the phone

18   calls intercepted from Osama bin Laden's satellite phone

19   were made to Al-Qaeda members in Iran.

20             Still further, in the mid-1990s, the United States

21   Treasury reports that Al-Qaeda member Mustafa Hamid

22   reportedly negotiated a secret relationship between

23   Osama bin Laden and Iran, allowing many al-Qaeda members

24   safe transit to Iran from Afghanistan.  The testimony will

25   establish that Iran facilitated travel to and from

1  Al-Qaeda's training camps in Afghanistan and that such

2  facilitation occurred prior to the U.S.S. Cole bombing.

3          In essence, the evidence will firmly and

4  conclusively prove that Al-Qaeda, the terror group that

5  perpetuated the bombing of the U.S.S. Cole, did so with the

6  financial and logistical aid and training of Iran and Sudan;

7  and as such, those two countries and their political

8  subdivisions should be held liable by this honorable Court

9  for the murder of Kevin Shawn Rux.

10         Despite the passage of time, this patriotic and

11 faithful family has been devastated and continues to grieve

12 the loss of their favorite son and anchor of stability to

13 this day.  They will testify firsthand regarding the

14 emotional trauma each of them has been forced to endure ever

15 since the attack on the U.S.S. Cole.

16         Despite their intense pain and anguish,

17 Your Honor, Plaintiffs derive a measure of solace from the

18 fact that through this evidentiary hearing, the memory of

19 their beloved Kevin Shawn Rux will not be forgotten.

20         Your Honor, if we may have a moment of indulgence,

21 we have a few preliminary matters to bring up.

22         THE COURT:  Sure.

23         MR. AMBUSH:  Can I have Counsel Jennifer Kent

24 address the Court?

25         THE COURT:  Thank you.

1          MS. KENT:  Good morning, Your Honor.  Thank you so

2     much for your time today.  My name is Jennifer Kent, as

3     Mr. Ambush just mentioned.

4          So there are two preliminary matters before we get

5     into testimony or a few, actually.

6          One is the formality of moving the exhibits into

7     evidence, which we provided Ms. Podger as well as yourself

8     with the very substantial exhibit binder.  And we have

9     provided the Court -- the Courtroom Deputy with the exhibit

10    list.

11         As part of that, as you may recall, Docket 33 we

12    moved and you granted our motion to present certain expert

13    testimony via affidavit.  So the expert affidavits are part

14    of that exhibit binder.  More than -- we'd like to move that

15    those experts be qualified as experts.  And if you'd like me

16    to tell you a little bit about their background or --

17         THE COURT:  Are their CVs in the exhibits?

18         MS. KENT:  Yes, CVs are in there.

19         THE COURT:  There's no need to.  I'll review

20    those.

21         All right.  Based on the CVs and the counsel's

22    representation concerning their expertise, the Court finds

23    that under Rule of Evidence 702, they are qualified by

24    experience, knowledge and training to provide expert

25    testimony.  Their testimony will be accepted.

1              MS. KENT:  Thank you very much, Your Honor.

2              THE COURT:  Now, is there an outstanding motion

3     for judgment of default against one entity?

4              MS. KENT:  Yes, there is, against the Syrian

5     defendants.  So it's the entity of Syria, a political

6     subdivison.  I think everybody is well-aware there is an

7     ongoing and political civil war in Syria, and so we have

8     been unable to serve the Syrian defendants.  The State

9     Department's protective power for service of process is

10    quite limited there, and we have an ongoing communication

11    with The State Department about that.  They have basically

12    told us that for the foreseeable future, we are not going to

13    be able to serve Syria.  So we are only moving today for,

14    you know, an order against the Iranian defendants, as well

15    as the Sudanese defendants.

16             THE COURT:  Thank you.

17             MS. KENT:  Sure.

18             The next oral motion that I would like to

19    respectfully move for now, as Your Honor may be aware, the

20    Republic of Sudan has been already found liable for the

21    U.S.S. Cole bombing in two prior matters.  The main matter

22    is a case called *Rux v. the Republic of Sudan*, which would

23    held in the Eastern District of Virginia.  There's a second

24    matter where it's called *Harrison v. the Republic of Sudan*,

25    where Judge Lamberth, in essence, reaffirmed the Court's

1   findings in *Rux*, and, once again, held the Republic of Sudan

2   liable for the U.S.S. Cole bombing through its material

3   support of Al-Qaeda.

4        We'd like move under Federal Rule of Evidence 201

5   for you to take judicial notice of the proceedings in *Rux*,

6   and that you so acquire the proceedings in *Harrison*.  It's a

7   part of our motion we have the Court's opinion in *Rux*, as

8   well as the transcript of proceedings in *Rux*, which we can

9   give to -- it's not part of your evidentiary binder.

10  We have it separately and we can go ahead and submit that.

11        THE COURT:  That application is granted.

12        MS. KENT:  Okay.  Thank you very much.  Thank you.

13        The next preliminary matter -- I said there was

14  two, but I misspoke, there's three -- is I mentioned with

15  Ms. Podger, we're -- we would like to submit, and it's my

16  understanding you require post-findings of facts and

17  conclusions of law.

18        THE COURT:  Yes.

19        MS. KENT:  So one of the -- we'd like to have

20  certain matters be kept confidential or under seal.

21  You know, the Plaintiffs are victims of terrorism, you know,

22  I'm sure you're aware that this court, you know, regularly

23  grants, you know, measures of confidentiality.  We're going

24  to be submitting -- one of the affidavits that we have

25  there, it's number 4 in evidence, it's Dr. Larry Pastor.

1    He is a psychiatrist who evaluated all of the Plaintiffs,

2    and he's got psychiatric findings in there.  We'd like that

3    exhibit to be placed, if possible, under seal.

4           And in the -- proposed, we'd like to submit the

5    proposed findings of fact and conclusions of law under seal

6    for the purposes of redacting the Plaintiff's identifying

7    information.  We would provide you with an un-redacted

8    version, and then whatever is filed publicly would be,

9    you know, redacted.  In *Khalid v. The Republic of Sudan* they

10   did John and Jane Does, so we're more than happen to do

11   that.

12          THE COURT:  Yeah.  Well, there's another reason

13   for that, which I can't tell you, but --

14          MS. KENT:  No problem.

15          THE COURT:  But I'm sure you could put the pieces

16   together yes.  All right.

17          MS. KENT:  Absolutely.

18          THE COURT:  All right.  I'll take that under

19   advisement as well.

20          MS. KENT:  And their contact information as well.

21   There's already a motion under seal that has been granted to

22   keep their addresses under seal, and we'd just like to make

23   sure -- excuse me -- make sure that anything related to

24   their contact information would be continued to be under

25   seal and protected, again, more for the fear of retaliation

```
 1    and, you know, the victims of terrorism phase.
 2              THE COURT:  All right.  I'll have to -- I had
 3    this -- maybe it was Khalif (phonetic), I don't remember,
 4    but I had another matter --
 5              MS. KENT:  Okay.
 6              THE COURT:  -- that raised this, and I had to
 7    think it through.
 8              MS. KENT:  No problem.
 9              THE COURT:  The redaction should be -- can't be
10    greater than necessary.
11              MS. KENT:  We are absolutely aware of the
12    standard.  Would briefing on this issue be helpful to you?
13              THE COURT:  I'll take it under advisement and give
14    it some more thought.
15              MS. KENT:  Okay.  No. problem.
16              THE COURT:  I don't really exactly recall
17    everything I did in that case.  I think it was seven or
18    eight years ago.
19              MS. KENT:  No problem.  And if you would like us
20    to submit something on the papers, we're more than happy.
21              THE COURT:  Let me take a look.
22              MS. KENT:  No problem.
23              I guess the final, it's not preliminary but
24    transitioning into the evidentiary hearing, would you like
25    me to go over the witnesses who we expect to call today?
```

```
 1              THE COURT:  No.  You can call them.

 2              MS. KENT:  Okay.  Great.  I'm going to transition

 3    to Mr. Ambush now.

 4              THE COURT:  Thank you.

 5              MR. AMBUSH:  I'd like to call Doe Victim A to the

 6    stand.

 7              THE COURT:  Please do so.

 8              (Witness is placed under oath.)

 9                          - - -

10                    DOE VICTIM A,

11    called as a witness on behalf of the Plaintiff,

12    being first duly placed under oath, testified as follows:

13                     DIRECT EXAMINATION

14    BY MR. AMBUSH:

15        Q    Ma'am, could you please state your name for the

16    record.

17        A    Doe Victim A.

18        Q    And are you a U.S. citizen?

19        A    Yes.

20        Q    Are you employed?

21        A    Pardon?

22        Q    Employed.  Where are you employed?

23        A    At the Heritage Nursing Home.

24        Q    And where is that?

25        A    It's in Bridgeport, West Virginia.
```

1    Q    When were you born, ma'am?  When were you born?

2    A    May 24, 1944.

3    Q    And how are you related to Kevin Rux?

4    A    What was that.

5    Q    How are you related to Kevin Rux?

6    A    He's my son.

7    Q    Have you ever been married?

8    A    Have I been married?

9    Q    Yes.

10   A    Yes.

11   Q    Are you currently married?  Are you currently

12   married?

13   A    No.

14   Q    Do you have other children?

15   A    I'm sorry?

16   Q    I'm sorry.  I'll stand closer.

17        Do you have other children?

18   A    Yes.

19   Q    And how many do you have?

20   A    We had six children together.

21   Q    Can you briefly describe your family and the names

22   of them in the order of their birth.

23   A    The first child was Trisha Cheyenne.  She was born

24   in '65.  She lived six days.  And then we had Doe Victim E,

25   who's born in '67.  And Doe Victim D, who was born '68;

1    Kevin in '69.  Doe Victim C in '73.  And Doe Victim B in

2    '76.

3             THE COURT:  And all your sons have the last name

4    Rux?

5             THE WITNESS:  Yes, they do.

6    BY MR. AMBUSH:

7        Q    Okay.  How did Kevin pass away?

8        A    Kevin was murdered.

9        Q    Can you tell us what happened?

10       A    He was on the U.S.S. Cole.  The Cole was in Yemen

11   refueling.  Two men in a small boat came out and detonated a

12   bomb, blew a hole in the ship, and Kevin was one of the

13   victims.

14       Q    I'm going to transition a moment to a few other

15   questions and come back to that.

16            I want to hear about Kevin himself.  Can you tell

17   the Court your first memory of Kevin?

18       A    My first memory.  Kevin was born in Coronado,

19   California.  He was a sweet baby.

20            He had two older brothers, and Kevin just can't

21   seem to come along at the right time.  His brothers loved

22   him, helped take care of him.  And he just was a good baby,

23   a good child.

24       Q    What was Kevin's role in the family as the boys

25   were growing up?

```
 1      A    Kevin was number three.  His younger brothers

 2 looked up to him.  They really admired Kevin.  And the two

 3 older ones also, they -- the boys were all tight.  And Kevin

 4 seemed to be the role model for all of them, though.

 5      Q    Would you say he was a popular boy?

 6      A    Yes, he was.

 7      Q    Did he participate in sports?

 8      A    Pardon?

 9      Q    Did he participate in sports or any activities

10 like that?

11      A    He was a wrestler, yes.  He did well at wrestling.

12 I looked forward to those wrestling meets.

13      Q    And can you describe, ma'am, how he was as an

14 adult?

15      A    How he was?

16      Q    As a grownup, as an adult.

17      A    As a grownup, he was a very kind person, funny.

18 He cared about others before himself.

19      Q    I'm sorry.  Can you describe for the Court how

20 close your family was with Kevin while he was growing up?

21      A    Well, the three oldest sons, when you saw one,

22 you saw the other two.  They were -- We used to call them

23 Three Musketeers.  They were just really close.

24           And as the younger ones got older, they were

25 included with him.  And now that they're adults, it seemed
```

1    like they're all best friends.

2        Q    How is Kevin in the family in terms of his

3    relationship, whether he was a role model or more on the shy

4    side in terms of how he fit in with the family in relation

5    to being a role model?

6        A    As a role model, he was -- he was a child and an

7    adult who did the right thing.  If he saw the younger boys

8    doing something they shouldn't, he'd stop them.  He was

9    honest with me.

10           I remember one time he tried to lie to me.  He led

11   me to believe something and later he said, "Mom," he said,

12   "remember when I told you," whatever it was.  I said, yes.

13   He said, "Well, that wasn't the truth."  And he told me what

14   really happened.

15       Q    When did Kevin leave home to be on his own?

16       A    Kevin was 18 when he left home, left home in 1988.

17       Q    Did he go to school at that point in time or did

18   he go to work?

19       A    Pardon?

20       Q    Where did he work when he left home?

21       A    He joined the Navy.

22       Q    And how long was he in the Navy before he

23   deployed?  How long was he in the Navy before he deployed?

24       A    He was in nine years, and he got out of the Navy

25   for a short time for a few months.  He reenlisted in October

 1   of 1999, and the ship left in August of 2000.

 2       Q    After Kevin left home, did that closeness that you

 3   mentioned earlier, did that continue?

 4       A    Yeah.  It seemed to get better.  I mean, he called

 5   all the time.  He called me every week.  Usually, Sunday,

 6   2:00, I'd expect the phone to ring and it would be Kevin.

 7            He helped me with different situations.  He'd help

 8   me pay bills.

 9            And I -- There's times I even asked him for advice

10   on different things.

11       Q    And what was his relationship like with his

12   siblings at the time, you know, he was deployed and when he

13   came home?

14       A    It was a joy to see them all together.  They --

15   and to hear them joking and laughing.  They were tight; they

16   were really close friends.

17       Q    Can you tell me and tell the Court about the last

18   time Kevin came to visit you.

19       A    The last time I saw Kevin, I knew the ship was

20   leaving and it was in July.  And I had a dream, I had a

21   nightmare.  And the next day I went to my work and I asked

22   for time off, and they gave me a week.  And I went down the

23   last week in July of 2000, spent a week with Kevin, and we

24   had -- we had such fun.  He took us to the beach.  He took

25   us everywhere, just -- we laughed and just played like kids.

1          THE COURT:  Is that Norfolk, ma'am?

2          THE WITNESS:  Pardon?

3          THE COURT:  Was that Norfolk?

4          THE WITNESS:  Yes.

5          THE COURT:  So the beach would have been --

6          THE WITNESS:  He lived in Virginia Beach.

7          THE COURT:  He lived in Virginia Beach.

8          Just so I get a little handle on the logistics,

9  your family and Kevin was born in Coronado, California?

10          THE WITNESS:  Yes.

11          THE COURT:  You then come east or do you stay --

12          THE WITNESS:  Yes.  My husband was Navy, 20 years

13  in it, 21 years in the Navy.

14          THE COURT:  Okay.  So then he's in Norfolk as this

15  last posting?

16          THE WITNESS:  Yes.

17          THE COURT:  And so then the family is living in

18  Virginia Beach?

19          THE WITNESS:  Just he was.

20          THE COURT:  Where were you living?

21          THE WITNESS:  I live in West Virginia.  We've had

22  six kids, and five of them born in different states.

23          THE COURT:  Sound like a Navy family.

24          THE WITNESS:  Retired Navy.

25          THE COURT:  I understand.  So Kevin spent his

```
 1   boyhood where?  A lot of places, you said?
 2            THE WITNESS:  Mainly in North Dakota.
 3            THE COURT:  North Dakota.
 4            THE WITNESS:  He considered Portland,
 5   North Dakota, home.
 6            THE COURT:  So then when he went to the Navy,
 7   something tells me he went to great lengths for training?
 8            THE WITNESS:  Yes, he did.
 9            THE COURT:  Then was he immediately assigned to
10   the Cole?
11            THE WITNESS:  No.
12            THE COURT:  He was on other ships?
13            THE WITNESS:  No.  This was -- He went to the Navy
14   in '88.
15            THE COURT:  In '88?
16            THE WITNESS:  Yes.
17            THE COURT:  Okay.  But he developed his NLS, his
18   training, I assume, over those intervening years.
19            THE WITNESS:  He -- Yeah.  He was electronic
20   warfare.
21            THE COURT:  Electronic warfare.
22            THE WITNESS:  He went to Pensacola, Florida, for
23   training.  And from there, he went aboard the U.S.S. Cole --
24   No.  The U.S.S. Taylor.
25            THE COURT:  Okay.
```

```
 1                THE WITNESS:  That was his first ship.

 2                THE COURT:  And at the point, what is his rank?

 3    He's a Navy Chief Petty Officer?

 4                THE WITNESS:  I believe he was third class on the

 5    Taylor.

 6                THE COURT:  And was that his rank when he passed

 7    away?

 8                THE WITNESS:  Pardon?

 9                THE COURT:  Was that his rank when he died?

10                THE WITNESS:  No.

11                THE COURT:  What was his rank when he died?

12                THE WITNESS:  He advanced to second class.  And

13    after the bombing, the President recognized all the sailors

14    as a level higher.

15                THE COURT:  I see.

16                THE WITNESS:  So he's first class petty officer

17    first class.

18                THE COURT:  Okay.  Thank you.

19                Go ahead.

20    BY MR. AMBUSH:

21        Q     When did you first learn about the terrorist

22    attack?

23        A     Oh, I was at work.  I got a phone call from his

24    wife, Olivia, and she said, "Ma, have you been watching the

25    news?"  And I said, "No."  She said, "The Cole was in Yemen
```

1    and it was bombed.  We don't know any details; we don't know

2    what happened.  We don't know if Kevin was one of the

3    victims or not, if there were victims."  And she gave me the

4    number to Millington, Tennessee, where I could call and get

5    information on him.

6              I went -- I was in the office, so I called that

7    number and there was no status on Kevin.  And I tried to

8    work out the day but I couldn't.  I went into the residence

9    room and the TV was on and there was the ship with that hole

10   in it.

11             And my boss told me to leave, to go home.  So I

12   did, and I didn't go back to work.  I -- All that week --

13   That was on a Thursday.  And I was glued to the TV to the

14   news channel watching for Kevin's name.  And they started

15   putting the people's names that were missing and dead, and

16   Kevin was one of them, and it just tore my heart out.

17             When the chief came to tell me -- he came at

18   night.  That's when I saw the uniform walking up the walk.

19   I wouldn't let him in.  I knew what he was going to tell me.

20   I had the door partway opened and I wouldn't let him in.

21   And I can't remember which one of my sons was with me, but

22   the chief said, "Ms." Doe Victim A, he's just missing.

23             And my son said, "He's missing, mom, he's

24   missing."

25             I can deal with missing, so I let him in.

 1            And he gave me the information.  He was my CACO

 2    from then on.  He was the officer in charge of our family.

 3        Q    Was there a time that they gave you official news

 4    that he died?

 5        A    We didn't know until the next Tuesday.

 6            That first day I was at home, I called all my

 7    sons.  They were scattered all over, like in Minnesota and

 8    North Dakota, but they all found the way home.  They were at

 9    my place.  We were all together on Sunday.  And Monday, we

10    rented a van and drove to Norfolk.

11        Q    And do you remember what happened then when Kevin

12    returned to the United States?

13        A    When he was brought?

14        Q    When he was brought back, do you remember that

15    time?

16        A    I wanted to be in Dover but the Navy wouldn't let

17    us go.  A friend of his, Dewey, went up and got his

18    belongings and brought them back.  So I really don't know,

19    actually, when he did get to Dover.  But we didn't find out

20    until Tuesday morning.  Lieutenant Chapman told us.

21        Q    Where was the actual funeral, where did that take

22    place?

23        A    It wasn't that week.  It was the following Friday.

24    Seems like the 21st of the month, but I'm not sure on that

25    date.

```
 1       Q    Was there any significant activity during the
 2  funeral that you remember?
 3       A    Oh, it was chaotic.  It seemed like our family was
 4  put in the background.  Like, for instance, they had a
 5  limousine to take us to the funeral home, and Olivia's
 6  family crawled in and I got separated from my sons, and I
 7  just wanted to scream because they weren't with me.  I felt
 8  like we should have had our own.
 9       Q    Were you able to work after Kevin's funeral?
10  Were you able to get yourself back together?  Or was there
11  issues with that?
12            THE COURT:  First of all, ma'am, are you a nurse?
13            THE WITNESS:  Pardon?
14            THE COURT:  Are you a nurse, ma'am?
15            THE WITNESS:  I'm a nursing assistant.
16            THE COURT:  At, I take it, a home for the aged.
17            THE WITNESS:  Oh, did I go back to work, is that
18  what you said?
19            MR. AMBUSH:  Your Honor asked a question.
20            THE COURT:  And is this home is a hospice?
21            THE WITNESS:  We do have hospice residents, yes.
22            THE COURT:  But it's --
23            THE WITNESS:  But it's a nursing home, VA-approved
24  nursing home.
25            THE COURT:  Is it affiliated with a religious
```

1   organization?

2          THE WITNESS:  Is it a religious organization, no.

3   No.  But I couldn't go back to work.  I couldn't.

4   I couldn't function.  My grandson, Jonathan, lived with us,

5   and I didn't think if it wasn't for him being there with me,

6   I couldn't have made it.  I just wanted to sleep, and I

7   mostly laid in my bed in a fetal position.

8          And the only time I'd get up is when Jonathan

9   needed something, when he had to go to school and he wanted

10  something to eat.  I just couldn't function.

11         So finally after a couple months the administrator

12  and my DON came to the house and she said, "Doe Victim A, we

13  can't hold your job forever, you need to decide what you're

14  going to do."  She recommended that I keep working.  And I

15  did.  I went back the next week, I think it was, and the

16  administrator right down to the housekeeping, they all

17  supported me, were with me and helped me.  And it was -- it

18  was for my good that I did go back to work.

19    Q    Can you tell us about the first Christmas after

20  the attack, how you felt at that time?

21    A    Oh, I dreaded Christmas.  Christmas was coming,

22  and I didn't know -- I didn't know when Kevin died if he was

23  in heaven or not.  And all of November I just agonized and I

24  prayed and I said, "God show me, that's all I want for

25  Christmas, just show me how Kevin is."

1          And then the night of Christmas morning, early in

2     the morning, I was awakened by Kevin's voice.  He said,

3     "Mom, I'm okay.  He said, I'm in heaven and I want you and

4     my brothers with me."

5          And I had peace then, a measure of peace.

6          THE COURT:  If I may, ma'am, walk me through, if

7     you would, now, Kevin is married?

8          THE WITNESS:  Kevin is married, yes.

9          THE COURT:  And what's her name?

10         THE WITNESS:  Her name is Olivia.

11         THE COURT:  How many children did they have?

12         THE WITNESS:  They had none.

13         THE COURT:  They had none.  I'm sorry.

14    You mentioned Jonathan.  Who's Jonathan?

15         THE WITNESS:  He is my son Doe Victim D's son.

16         THE COURT:  Not your Kevin's son?

17         THE WITNESS:  Not -- no.

18         THE COURT:  Thank you.

19    BY MR. AMBUSH:

20         Q    Tell the Court what effect Kevin's death had on

21    you overall now that years have gone by, but what effect has

22    that had on you?

23         A    It's had an intense effect on my life, on me.

24    I've been on Prozac, and they've had to raise it.  Started

25    out on 20, and they have raised it to 40.  Sometimes, I take

1    two a day.  October is a nightmare.  So many times I've said

2    I wish they could just take October off the calendar because

3    that's the month that he was born, it's the month he was

4    married.

5         There's so many times that I can't see -- think

6    straight.  And this past winter, I spent a lot of time in

7    bed sleeping and just not caring about anything.

8    I've gotten cynical.  I don't trust people like I used to.

9    I've gotten diabetes since then.  I've got high blood

10   pressure since then.

11   Q    Have you ever seen a grief counselor or sought

12   professional help?

13   A    Yes.  Marty Levine, I've gone to him several

14   times.

15        There's times, though, when I'm in this

16   depression, I don't even go out and I won't go see him.

17   I just hold it in.

18   Q    How did Kevin's death affect your sons, from your

19   perspective?

20   A    From my respect?

21   Q    How did it affect your other sons?

22   A    Oh, there's been a change in them.  It seems like

23   it's harder for me to talk to them.  They have fun together,

24   but there's not that loud and hilarious laughter that there

25   used to be.  They giggle about something, but it's just so

```
 1   different, it's so changed.
 2        Q    Did preparing for this trial have an effect on
 3   you?
 4        A    Oh, God, yes, yes.  My administrator and my nurses
 5   know and they support me.  They help me.  They ask me when I
 6   come to work, "How are you tonight, Doe Victim A?"  And if I
 7   tell them that I'm not doing too well, then they work with
 8   me.
 9        Q    Have you been to Guantanamo Bay?
10        A    Pardon?
11        Q    Guantanamo Bay?
12        A    Yes.
13        Q    Have you been there?
14        A    I've been there three times.
15        Q    And what was the occasion?
16        A    Scheduled to go.
17        Q    What was the purpose of your trips there?
18        A    Oh.  Al-Nashiri, the one who planned the bombing,
19   is on trial there.  They've been having hearings for years,
20   for at least three years.  I've been down there three times.
21   I'm scheduled to go next month.
22        Q    Have you seen him?
23        A    Yes, I've seen him.
24        Q    Can you elaborate on that, how you felt and what
25   you saw?
```

1      A      He came -- First time I saw him, I was surprised

2  that he wasn't shackled.  But there were several military

3  guardsmen around him.  And he just looked back at the Cole

4  family and just waved like we were friends.  And it just, it

5  hurt so bad.

6      Q      How often are you reminded of the Cole bombing?

7      A      Every day.  Every day, there's something, someone,

8  somehow clicks.  And it's either Kevin or the bombing.

9      Q      And when you're reminded of the Cole bombing, how

10 does that make you feel?

11     A      I still feel that devastation.  I still feel not

12 only the 17 sailors killed but all those men and women have

13 to live with that daily, and my heart just goes out to them.

14     Q      How do you remember Kevin?  What do you do in

15 order to remember Kevin?

16     A      I didn't know the first part.

17     Q      Okay.  I'm just elaborating my question.

18 My question is, what do you do to remember Kevin?

19     A      What do I do?  I'm a Gold Star mother.  There have

20 been times that I have gone to VFWs and spoken -- told my

21 story, and I have a memorial set up in my front room.

22 Kevin's things, his different awards and different things

23 that he had from childhood up.

24            I have a bottle of pop that he gave me in

25 Connecticut that I've never opened, and just different

1    things like that.

2            Most recently, in May, we had a bridge dedication

3    in his honor.

4        Q    I'd like you to explain your living room.

5    You mentioned you have some momentos of his in your living

6    room.

7        A    Yes.  I have a -- I don't know -- it was jewelry

8    case in a store, and I bought it; they were going out of

9    business and I bought it reasonably.

10            I have his medals.  I have pictures, all kinds of

11    pictures with Kevin, with President Clinton, with President

12    Obama, pictures of the ship.  I didn't bring those pictures.

13    I have them, though.

14            Teddy bears that he got me from boot camp.

15    Different times he was on the ship or gone to sea, jewelry

16    that he bought me.

17            My front room is just Kevin.

18            MR. AMBUSH:  Thank you, ma'am, no further

19    questions.

20            THE COURT:  Thank you.  Thank you, ma'am, you may

21    stand down.

22            (Witness excused)

23            THE COURT:  Now, call your next witness.

24            MR. AMBUSH:  Thank you.  The Court's indulgence.

25            MS. KENT:  Your Honor, at this time, we'd like to

1   call Doe Victim E.

2             THE COURT:  Please do so.

3             MS. KENT:  Mr. Doe Victim E.

4             THE COURT:  Come on up.

5             DEPUTY CLERK:  Would you stand right here for me,

6   sir.  Raise your right hand.

7             (Witness is placed under oath.)

8             DEPUTY CLERK:  Thank you.  You may be seated and

9   adjust the microphone.

10                       – – –

11                   DOE VICTIM E,

12  called as a witness on behalf of the Plaintiff,

13  being first duly placed under oath, testified as follows:

14                  DIRECT EXAMINATION

15  BY MS. KENT:

16      Q    Good morning, Mr. Doe Victim E.  Thank you for

17  being here.  Would you mind stating your name for the Court,

18  please.

19      A    Doe Victim E.

20      Q    And do you have a nickname?

21      A    Yeah.  I go by my middle name, Doe Victim E.

22      Q    So, Doe Victim E, would you prefer if I call you

23  Doe Victim E; is that okay?

24      A    Okay.

25      Q    Great.  Thank you so much.

```
 1              So, Doe Victim E, are you a U.S. citizen?

 2       A    Yes, ma'am.

 3       Q    And, Doe Victim E, can you generally describe

 4  your -- Can you generally describe your brothers and

 5  sisters, if you have any, who they are, list your brothers

 6  and sisters?

 7       A    Four younger brothers.

 8       Q    Okay.  And what are their names?

 9       A    Doe Victim D, Kevin, Doe Victim C, and Doe Victim

10  B.

11       Q    Okay.  And are those in their birth order?

12       A    Yeah.

13       Q    And so are you the oldest, sir?

14       A    Yes.

15       Q    I want to talk a little bit about your brother

16  Kevin, some of your memories with him just generally.

17  How would you describe your relationship with Kevin?

18       A    He was more than a brother to me.  He was my best

19  friend.

20       Q    And so were you guys always close, were you always

21  best friends?

22       A    Oh, yeah, yeah, we did a lot together.

23       Q    Okay.  What's your first memory of doing things

24  together or growing up?

25       A    I remember holding him when he was a baby.
```

1    I was probably only two years old.

2         Q     And you remember -- And do you remember other

3    memories of how -- of your relationship when you were

4    growing up together?

5         A     Yeah.  Going hunting and stuff, building tree

6    forts together.  We did a lot.

7         Q     And so you were a teen when Kevin was born.

8    Where were you guys when Kevin was born?

9         A     San Diego, California.

10        Q     And do you remember what year that was that Kevin

11   was born?

12        A     '69, 1969.

13        Q     And how long did you guys live in San Diego?

14        A     Oh, geez.  I'm not -- I can't remember.

15        Q     Okay.  Fair enough.

16              Do you remember the next place you lived after

17   San Diego?

18              Let me ask it another way.  Do you remember where

19   you grew up, like the main geographic location where you

20   grew up?

21        A     We constantly moved with Dad being in the Navy.

22   Mom said all of us were born in a different state.

23        Q     Right, right.  No problem.

24              And do you want to talk just a little bit about

25   Kevin's character, about who Kevin was for the Court?

1      A    Oh.  Kevin would do anything for his brothers or

2  friends.  He'd take the shirt of his back.  He had a heart

3  of gold.

4      Q    He was a kind person then?

5      A    Oh, yeah.

6      Q    And was Kevin considered a popular or a, you know,

7  a good person?

8      A    Oh, yeah, he was very popular in school and with

9  his friends, yeah.

10     Q    And can you talk a little bit about Kevin's role

11 in the family, how he was amongst you and your brothers?

12     A    Oh, any one of us could talk to him about

13 anything.

14     Q    Okay.

15     A    Even if we were having problems between ourselves,

16 he was like a mediator.

17     Q    So he did intervene when you guys were trying to

18 beat each other up or --

19     A    Oh, well, that happened sometimes.

20     Q    Great.  Great.

21          And was that relationship -- did that begin when

22 you guys were children, Kevin's role as kind of the mediator

23 and the go-between of the family?

24     A    Yeah, it could have been.

25     Q    And how did that continue?  How did your

1    relationship continue as adults?

2       A    Oh, we always had good times.  I was staying with

3    him for a few months before he left.  He helped me through

4    truck driver's school.

5       Q    And was this in 2000 before he deployed for the

6    Cole?

7       A    Yeah.  That was before he deployed.  But that

8    summer every weekend, we were at Busch Gardens or Kings

9    Dominion or at Virginia Beach.  We had a great time that

10   whole summer.

11      Q    Okay.  So those were happy memories for you then?

12      A    Yeah.  I tried to keep happy memories in my mind.

13      Q    I understand.

14           So I have to talk to you a little bit about,

15   unfortunately, a very unhappy memory of just the U.S.S. Cole

16   bombing and what you recall from that time.

17           When did you first learn about the Cole bombing?

18      A    I was in North Dakota.  I worked overnights at

19   Target stocking shelves.  I had gotten off work; I was home.

20   I was just about ready to go to bed like at 10:00 or so in

21   the morning and Mom called me, put the news on.

22      Q    Okay.

23      A    You know, that's when they announced about the

24   Cole being bombed.

25      Q    And what was your reaction?

1      A      My reaction, Kevin's all right, Kevin's okay,

2  there's nothing wrong with Kevin.  Mom, Kevin will be all

3  right.

4      Q      And when did you learn that Kevin -- that

5  something had happened to Kevin?

6      A      When they announced that there was a few bodies

7  still missing, and Kevin was one of the names that were

8  missing.

9      Q      Okay.  And did you -- Did anybody from your family

10 or from the Navy contact you at that time?

11     A      It was through my mom.

12     Q      Okay.

13     A      She made all the contacts and called me.

14     Q      And then when did -- Did you eventually go from

15 North Dakota to West Virginia to where your mother was?

16     A      Yeah.

17     Q      And do you remember when that was?

18     A      Well, we had to come up here so we can all go to

19 Norfolk, so ...

20     Q      And so you guys traveled?  So you guys traveled?

21     A      We all traveled together up there, yeah.

22     Q      Okay.  And how -- then how -- what was your mental

23 state?  How were you feeling at that time?

24     A      I was scared.

25     Q      And how did you eventually learn the news that

1    Kevin had been killed?

2         A    His body was missing for two weeks, and they

3    finally found his body.  They had to cut his body out of the

4    hull of the ship.

5         Q    Is that a memory that stays with you?

6         A    Oh, it's not right, brutally murdered like that.

7    But he must have been right there, right beside the blast or

8    something.

9         Q    And do you worry about that?

10             THE COURT:  Rephrase that.  I don't think you mean

11   "worry."

12             MS. KENT:  Sure.

13   BY MS. KENT:

14        Q    Is that something that -- is that something that

15   stays on your mind, that preoccupies you?

16        A    Oh, yeah.

17        Q    That troubles you?

18        A    Yeah.

19             THE COURT:  Mr. Rux, if I may, have you ever seen

20   the Cole?  Does the Cole come home?  You've been on the Cole

21   since your brother's death?

22             THE WITNESS:  Since his death, and I was on there

23   a couple times with them when it came in.

24             THE COURT:  In Norfolk?

25             THE WITNESS:  Yeah.

1          THE COURT:  What kind of ship is she?  Is she a

2   destroyer?

3          THE WITNESS:  It's a DDG67, yeah.  It's a

4   destroyer, right.  Yeah.

5   BY MS. KENT:

6      Q    And so you have a very clear picture in your mind

7   of what the Cole looked like before and what the Cole looked

8   like before it was bombed?

9      A    Yeah.

10     Q    Is that a fair assessment?

11     A    Yeah.  Yes.

12     Q    So I'm just -- I want to transition a little bit

13  to the funeral.  Did you attend Kevin's funeral?

14     A    Yes.

15     Q    Okay.  And what was that like for you?  What was

16  your mental state at that time?

17     A    It seemed like Olivia kind of had it where it was

18  all about her.

19     Q    Right.

20     A    And us, the brothers and that, it was like we were

21  set aside.  And now it was, well, very hurtful, and it

22  bothered us.

23     Q    And what sort of effect did Kevin's death have on

24  you after the funeral?  What has it had on you?

25     A    I've been depressed ever since.

1      Q     And you mentioned that you, that, you know, you

2   mentioned a couple of times just how Kevin -- how you think

3   about how Kevin was killed.  Does that stay -- does that

4   continue to stay with you?

5      A     Oh, yeah.  There isn't a day that goes by that

6   I don't think about Kevin and think about some of the good

7   things we did and -- yeah.

8      Q     And have you talked to anybody?  You mentioned you

9   were depressed.  Have you seen any sort of professional help

10   out?

11      A     A couple of times.  I just couldn't really afford

12   it, to, you know.

13      Q     Sure.

14            And you said "a couple of times."  So to the best

15   of your recollection, when's the first time you saw a

16   professional, a mental health professional, about Kevin's

17   death?

18      A     Oh, geez.  I think it was after the trade center

19   got hit by the planes, because I went to see a psychiatrist,

20   Southeast Human Services in North Dakota, yeah.

21      Q     And was there -- other than, you know, this

22   general feeling of depression, can you describe how that

23   affected your relationships with other people?

24      A     I'm not as outgoing as I used to be.

25      Q     Okay.

1     A     I'd rather be by myself.  I'm about to have an

2   anxiety attack now, but I'm trying to manage.

3     Q     And we very much appreciate that, very much so.

4   If you -- there's water there if you need some water or --

5     A     No.  I'm all right.

6     Q     Okay.

7           So I just want to go back.  So you saw a

8   psychiatrist in North Dakota in 2001.  Do you remember, to

9   the best of your recollection, seeing any other

10   mental-health professional?

11     A     Four, five months back when the -- a couple times.

12   A few times, once a week for about a month or so.

13     Q     So, I just -- let's -- I just want to make sure

14   that that's clear.  Who's Levy or Dr. Levine?

15     A     He's just a psychiatrist, I think, or --

16     Q     And where is he located?

17     A     Psychologist.

18     Q     Okay.  He's a psychologist, and where is he?

19     A     In Bridgeport, West Virginia.

20     Q     And is that where you are now?

21     A     Yeah.

22     Q     Okay.  And when you said "we," who went to go

23   see --

24     A     All of us went together, the whole family.

25     Q     Was it fair to say that was -- was that family

1    counseling?

2         A    Yeah.

3         Q    And that was for the purpose of helping to cope

4    with Kevin's death; is that correct?

5         A    Yes.

6         Q    Okay.  And can you just describe just how your

7    family has changed since Kevin's death, how your siblings

8    have reacted, what you've observed in your experience?

9              Do you need me to rephrase?

10        A    Yeah.  What?

11        Q    Basically what I'm asking is how Kevin's -- how

12   you -- you know, how you felt, but how you saw Kevin's death

13   affect your brothers and your mom?

14        A    Oh, it affected us all.

15        Q    And when you say "affected," how so?

16        A    He's dead.  We'll never see him again.

17             I mean, Christmases are hard.  We have a good time

18   and that, but it still is not the same.

19        Q    Okay.  And in terms of your ability to work, was

20   there -- were there any times after Kevin passed away where

21   you felt that you were unable to work or to cope or to

22   function?

23        A    No.  I tried to keep myself busy to, you know,

24   keep up my mind at times.

25        Q    Okay.  And then, just briefly, I just want to talk

1    about how preparing for this trial, what that's been like

2    for you.

3              Can you just tell us what it had been like for you

4    to prepare for this trial?

5         A    Nerve-wracking.  I had a hard time sleeping last

6    night.  It seemed like just when I get dozed off, my brain

7    would start going again and wake me up.

8         Q    Okay.  And are there -- in terms of -- are there

9    any other -- you mentioned September 11th, 2001, you know,

10   the terrorist events of September 11.  Did that have any

11   additional impact, the nerve-racking, the anxiety?

12        A    Oh, yeah, everything on the news about the Middle

13   East, it's just, they're nuts.

14        Q    And is it fair to say that when you see things

15   about the Middle East, that that reminds you of the U.S.S.

16   Cole bombing?

17        A    Oh, yes, it does all the time.

18        Q    And when you think about the U.S.S. Cole bombing,

19   the vivid imagery that you talked about earlier about Kevin

20   and about the ship, does that also come into your mind?

21   Do you think about that as well?  Do you think about your

22   brother when you think -- when you're reminded of the U.S.S.

23   Cole bombing?

24        A    Do I think of my brother?  Yeah.

25        Q    Okay.

```
 1        A     Okay.  Yeah, of course.

 2        Q     And when that happens, how does that make you

 3   feel?

 4        A     Well, the first five years after it happened,

 5   I think I cried every single day.  I think I cried myself

 6   dry.  But a lot of times if -- it brings up anger towards

 7   the Middle East.

 8        Q     Okay.  And when you think about Kevin or when you

 9   speak about Kevin, is that an easy thing for you to do?

10   Does it cause you pain?  Is it difficult for you to speak

11   about Kevin?

12        A     Yeah.

13        Q     And the pain -- You mentioned you cried yourself

14   dry after five years, but the pain associated with Kevin's

15   death and the pain that you feel, is that -- has that

16   changed?  Is it --

17        A     Oh, no.  No.  It hasn't changed a bit.

18        Q     So the pain you feel is still as raw or as --

19        A     Yes.

20        Q     -- as it was when he was first killed?

21        A     Yes.

22        Q     Okay.  Thank you.

23        A     It never gets any easier.

24        Q     Okay.

25        A     Never.
```

1    Q   Okay.  Thank you very much for your time and your

2    testimony.  I have no further questions.

3         THE COURT:  Thank you.  Thank you, sir.  You may

4    stand down.  Call your next witness.

5         (Witness excused)

6         MS. KENT:   I'm sorry, the Court's indulgence.

7    I just need to confer.

8         THE COURT:  Sure.

9         (Discussion held off the record.)

10        MR. AMBUSH:  Your Honor, I'd like to call Doe

11   Victim D.

12        THE COURT:  Mr. Rux, Doe Victim D.

13        DEPUTY CLERK:  Good morning.  Raise your right

14   hand.

15        (Witness is placed under oath.)

16                        – – –

17                        – – –

18                     DOE VICTIM D

19   called as a witness on behalf of the Plaintiff,

20   being first duly placed under oath, testified as follows:

21                  DIRECT EXAMINATION

22   BY MR. AMBUSH:

23    Q   Good morning.

24        Mr. Doe Victim D, can you please tell the Court

25   your full name.

```
 1        A     Doe Victim D.

 2        Q     And what state do you live in?

 3        A     West Virginia.

 4        Q     And are you a U.S. citizen?

 5        A     Yes, I am.

 6        Q     Do you go by a nickname?

 7        A     Yes.  You can call me Doe Victim D.

 8        Q     Okay.  Thank you.

 9              Are you currently employed?

10        A     No, I'm not.

11        Q     And when were you born?

12        A     May 11th, 1968.

13        Q     Of the brothers chronologically, where do you fall

14  in?

15        A     I am the second oldest.

16        Q     And how are you related to Kevin?

17        A     He was my brother.

18        Q     Can you tell the Court your earliest memory of

19  Kevin with you?

20        A     My earliest memory of Kevin was he was probably

21  one years old, I was two -- Kevin was three, and we were

22  playing in a truck hole pit.  We got all black for Easter

23  after mom got us dressed up.  And it's -- That's my earliest

24  memory of him.

25        Q     Growing up, do you have other memories with
```

1   yourself with Kevin?

2       A    Kevin had a little cowboy hat and hobbyhorse and

3   we called him Daniel Boone, because he wouldn't go nowhere

4   without that hat and horse.

5       Q    How old were you about that time?

6       A    Oh, I was probably kindergarten.

7       Q    And Kevin was about?

8       A    He was a little bit younger than me, so he was,

9   like, prekindergarten.

10      Q    How would you describe your childhood growing up?

11      A    It was a good childhood.

12      Q    Do you have good memories of playing with the

13  boys?

14      A    Oh, yeah.

15      Q    Would you say you had a close-knit family at that

16  time?

17      A    Yes, we did.

18      Q    Did you -- Aside from those few memories just in

19  general, can you describe how you interacted with Kevin?

20      A    I didn't do nothing without Kevin.  You know, we

21  were like, me and Kevin, we were attached at the hip.

22  We didn't do nothing without each other.

23      Q    Was there a time that you were in the service as

24  well?

25      A    Yes.  I joined the service in 1986, and me and

1    Kevin ended up being in the station in Charleston,

2    South Carolina.

3         Q    So you were in the Navy as well?

4         A    Yes.

5         Q    Can you tell the Court your relationship with

6    Kevin -- his relationship in the family in terms of being a

7    role model?

8         A    He was -- I'd venture to say he was probably one

9    of the most level-headed of all us boys.  He was the one

10   that thought things through.  He wouldn't jump into things.

11   And we -- I don't know.  I asked him for a lot of advice and

12   he'd give it to me.

13        Q    Would you say he was a father figure or just like

14   an older brother?

15        A    He wasn't really a father figure to me, but he

16   was -- he was my brother, you know, my best friend.

17        Q    Did you have the same type of fondness for sports

18   or ...

19        A    Yes.  We were on the wrestling team together in

20   high school, and, you know, it was just we had done

21   everything together.

22        Q    I'd like to transition to another area.

23             Can you describe for the Court the last time you

24   saw Kevin.

25        A    It was 1997.  He was stationed aboard the Mayo,

1    I believe, and we went on a dependents cruise with him.

2    I did.  I was living in North Carolina at the time and Mom

3    was down there, so we just traveled down to South Carolina

4    and we went on a dependents cruise.

5         Q    Can you describe what that is?

6         A    That's where family members of the sailors can go

7    aboard ship and they go out 50 miles and turn around and

8    come back in.

9         Q    What ship was that at the time?

10        A    Hmm?

11        Q    Do you know what the name was of the ship at that

12   time?

13        A    U.S.S. Mayo.

14        Q    What was your last memory of Kevin?

15        A    Talking to him on the phone right before he

16   deployed, telling me that he's got a feeling that we'll

17   never talk again.  And, you know, that's just something that

18   goes through my head every day.  That's the last words he

19   ever spoke to me.

20        Q    Did he have a premonition?

21        A    Yes.

22        Q    When did you learn about the Cole attack?

23        A    I was living in Minnesota at the time, Fairmont,

24   Minnesota.  I worked in Tyco Plastics, and I was working

25   night shift.  My shift was just about done.  Guys coming in

```
 1    from the next shift were talking about a ship being bombed

 2    in the Middle East.  I knew nothing about this.  So I asked

 3    my supervisor if I can use his phone.  I called my mom, she

 4    told me that, what happened, and I finished off my shift and

 5    went on home.  I was just a nervous wreck.

 6         Q    So what was going through your mind when you heard

 7    that news?

 8         A    I thought Kevin was just trapped.  I thought they

 9    couldn't find him.  He was in somewhere safe, he's alive,

10    he's just trapped.

11         Q    Did you really have a sense that he was gone and

12    you were just in denial?

13         A    Yes.

14         Q    And did you speak to anybody besides your mom?

15         A    Yeah.  I called his wife Olivia.  She, you know,

16    she was in denial, too.  She was like, well, he's just

17    trapped.  He'll be all right.

18              Then I talked to my older brother Doe Victim E and

19    he was driving down from North Dakota and asked him if he

20    could pick me up and he said yes.  He picked me up in

21    Minnesota and we drove down to West Virginia.

22         Q    So it's like -- It was mentioned earlier,

23    everybody gathered together at that point and they came to

24    your mom's house?

25         A    Yes.
```

1      Q     What kind of state of mind were you in at that

2  time?

3      A     Just confused, anticipation, you know.

4  There's just all kinds of different feelings that happen.

5      Q     Before the attack, were you in generally good

6  mental health?

7      A     Yeah.  Yes.  I had a good job, had a job people

8  would kill for, you know, making good money, worked part

9  time, getting paid full time.  Most people would die for a

10  job like that.  Now, I can't even hold a job.

11      Q     What job was that?

12      A     I worked for Tyco Plastics, making pond liners and

13  stuff, you know, worked 14 hours -- 14 days a month and

14  still get full benefits as full time.

15      Q     Do you recall Navy personnel or a chaplain coming

16  to your home?

17      A     Yes.  The Navy chaplain did come to my home and he

18  told me that -- he come in from St. Paul, Minnesota, was

19  three hours away from Fairmont where was living and he told

20  me that I could come there any time I want and see him.

21  But I didn't have no transportation, so, therefore,

22  I couldn't go see him.

23      Q     And it was a period of two weeks before you

24  actually heard the news that Kevin died?

25      A     Yeah.  It was -- The bombing was the 12th of

1    October, and was two weeks before they even found his body.

2            And I've just, you know, it's just a long, it was

3    just -- knowing that my brother sat there that long, it's

4    just --

5        Q    Were you frustrated or angry in terms of not being

6    able to help your brother?

7        A    Yeah.  Yes, I was.  Felt helpless.

8        Q    Can you tell the Court -- At some point there was

9    a funeral.  Can you tell the Court how you were feeling at

10   that point during the funeral?

11       A    The funeral, it was just a show put on by Olivia.

12   She wast just wanted everybody to be about her and we didn't

13   matter.  Kevin's brothers had no -- didn't even matter.

14       Q    Was there a private family funeral or was it a

15   military funeral?

16       A    It was a private family funeral.

17       Q    And where was the funeral?

18       A    It was in Virginia Beach.

19       Q    Is there a military cemetery or was it a private

20   family cemetery?

21       A    I can't remember.  I was drunk.  I just couldn't

22   deal with it, so I got really drunk.

23       Q    When did you actually go back then?

24       A    Oh, I can't remember the exact date we made it

25   back to Minnesota.

1      Q     What effect did Kevin's death have on you?

2      A     Well, as soon as I got back, I found out that I

3   didn't have my job no more because I was gone two weeks

4   instead of two days and they couldn't understand that.

5      Q     Is it fair to say that it ruined your life?

6      A     Yeah, it did.

7      Q     Can you elaborate on that?

8      A     I haven't been able to keep a job longer than

9   maybe a year.  So, you know, I've had union jobs but just

10  quit them.  I've had cushy office jobs, just quit them,

11  you know, I can't deal with it.  Just the mental stress in

12  my head.  I just look at stuff and just can't deal with it

13  the right way a normal person could.

14     Q     Did you seek any professional help?

15     A     I seen Marty Levine a couple times, but that was

16  with the family, and it just didn't seem like it was doing

17  any good.

18     Q     But over the years, have you sought any other

19  grief counseling?

20     A     Yes.  I've seen different psychiatrists and been

21  on different kinds of meds for depression and posttraumatic

22  stress disorder, and I just don't like the way they make me

23  feel, so I don't take the meds.

24     Q     Is it fair to say you've tried self-medication?

25     A     Yeah.  I've tried medication.  I've been able to

```
1   self-medicate.  But I smoke pot, self-medicate myself, and

2   that seems to be the best thing.  Don't send electrical

3   shocks through my head like Prozac and Zoloft like all those

4   others do.

5        Q    And can you tell the Court about the feeling your

6   family has, besides yourself, regarding Kevin's death.

7   How does that appear to you?

8        A    It's like some days we're all like zombies walking

9   around, you know, just don't know what to do.  Don't know if

10  you want to punch somebody in the throat or give them a hug.

11       Q    And what about your mom, how did it affect your

12  mom from your perspective?

13       A    Mom used to be eager to do anything.  Now you got

14  to pretty much talk her into doing stuff.

15            And there's been days where she's telling me, go

16  to the store for me, I don't want to go.  Just for a bag of

17  potatoes or something, she don't even want to go to the

18  grocery store.

19       Q    And when you hear news events such as other

20  attacks from the Middle East, how does that affect you?

21       A    You know, I relive it every day.  You know, the

22  Cole bombing nightmare, I think about that every day, more

23  than once a day.

24       Q    Do you feel that the grief you had then has

25  subsided or it's really something that hasn't gone away at
```

```
 1   all?

 2       A    It hasn't gone away.  You know, the grief will

 3   always be there.  My brother's gone, and I'll never talk to

 4   him again.

 5            MR. AMBUSH:  No further questions, Your Honor.

 6            THE COURT:  Thanks.  You may stand down, sir.

 7            (Witness excused)

 8            THE COURT:  Call your next witness.

 9            MS. KENT:  Your Honor, Plaintiffs call Doe Victim

10   C to the stand.

11            THE COURT:  Doe Victim C, please.

12            (Witness is placed under oath.)

13                           - - -

14                       DOE VICTIM C

15   called as a witness on behalf of the Plaintiff,

16   being first duly placed under oath, testified as follows:

17                     DIRECT EXAMINATION

18

19   BY MS. KENT:

20       Q    Could you state your name for the Court, please.

21       A    Doe Victim C.

22       Q    Mr. Doe Victim C, are you a U.S. citizen?

23       A    Yes, ma'am.

24       Q    And do you have a nickname?

25       A    Doe Victim C.
```

1     Q     Would you prefer that I call you Doe Victim C?

2     A     Yes.

3     Q     Okay.  No problem.

4           And, Doe Victim C, can you tell me the order of

5     who your siblings are and their order?

6     A     Doe Victim E's the oldest.  And there's Doe Victim

7     D.  Then there was Kevin.  Then it was me and my little

8     brother, Doe Victim B.

9     Q     So you're the brother of the late Kevin Shawn Rux;

10    is that correct?

11    A     Yes.

12    Q     And you are the second youngest; is that correct?

13    A     Yes.

14    Q     Like we did before, I want to talk to you a little

15    bit about just your memory and your relationship with Kevin

16    growing up and into adulthood.

17          So can you think back and tell me about some of

18    your early memories of Kevin during childhood?

19    A     See, I'm on disability right now because my memory

20    and my depression is so messed up.

21    Q     Okay.

22    A     My memories of Kevin, you know, it's like patches.

23    But I remember we hunted a lot.  We grew up in North Dakota

24    hunting.  And Dad would, like, sit in one area and us boys

25    would get in the woods and walk.

1          Well, I was a little kid, and I didn't go walk in

2    the woods.  And Kevin would always be over here.

3    Kevin would be, don't tell Dad, you know.  That was cool

4    because I wasn't going to walk by myself and I looked back

5    and Doe Victim B would be behind me.  Before we get to my

6    Dad, they say, hey, you guys -- Doe Victim C, you go that

7    way 50 yards.  I had to go that way 50 yards, and then we'd

8    finish walking.  So dad would catch us walking together

9    because he'd be pissed.

10        Q    So you guys were close growing up?

11        A    Yes.

12        Q    And did you all look out for each other, protect

13   one another?

14        A    Well, when Kevin was a senior, I'd just become a

15   freshman.

16        Q    Okay.

17        A    So everyone knew I was Kevin's little brother and

18   they all treated me like, oh, he's a wrestler, too, oh,

19   cool.

20        Q    So Kevin was involved in wrestling then?

21        A    Yes.

22        Q    And where was this?

23        A    This was North Dakota.

24        Q    This was still in North Dakota.

25             And so as you guys got older, so you went from

```
 1   hunting, you were in high school together.  Did you continue
 2   to stay close?
 3        A    Yeah.  I called him all the time.  I mean,
 4   I was -- I wasn't the perfect kid, I mean, I got into a
 5   fight, went to prison.
 6             I called Kevin every week.  I was in prison when
 7   he got killed, you know, and that -- then I had to go back
 8   to prison after I went to Norfolk.  And, you know, to me,
 9   it's still crushed me.  I've seen him blown up in my head a
10   thousand times, you know.
11        Q    So I'm going to -- I'm just going to pause and
12   backtrack a little.
13             So you mentioned you called Kevin all the time.
14   Can you just describe for the Court what Kevin's role was in
15   your life?
16        A    He -- I think the first time I called him from
17   prison he called me a dumbass.  After that, he was cool, you
18   know.  He'd say, like, the prison number.  And the first
19   thing out of his mouth would be a new joke every time,
20   you know.
21        Q    So was he a stability figure for you?
22        A    Yes, very much so.
23        Q    A role model -- Is it fair to say that he was a
24   role model to you?
25        A    Yes.  He never bitched about paying the phone bill
```

1    from the prison.  It was expensive.  He never said nothing

2    about it.

3        Q    Was he part of your support system?

4        A    Yeah.

5        Q    Okay.  Would you consider him almost like a father

6    figure to you?

7        A    Yeah.  Still probably to still to this day.

8    I haven't did nothing wrong since then.

9             You know, this guy was -- it was a fight and he

10   got the worst end of it, and I ended up doing time.  But,

11   you know, me and my dad, I don't think we were close, you

12   know.

13       Q    So Kevin fulfilled that role?

14       A    Yes.

15       Q    He was a -- you mentioned he would, you know, kind

16   of coordinate in the woods, he would protect you and Doe

17   Victim B?

18       A    Yeah.

19       Q    He protected you even from childhood; is that

20   right?

21       A    Yes.  You can look at it that way.  I thought it

22   was just cool, you know.

23       Q    Right.  And so that relationship continued into

24   adulthood.  And even before you went to prison, did you talk

25   to Kevin on the phone or in person?

```
 1        A     Can you repeat that.  I was off somewhere.

 2        Q     Oh, it's okay.

 3        A     All right.

 4        Q     Hopefully I can pause.

 5              So we have your childhood, we have high school,

 6   and then we have right before the Cole bombing you were in

 7   prison and you spoke to Kevin once a week.  Before that in

 8   that space of time, were you guys still close emotionally?

 9        A     Yeah, we were close.

10        Q     And did you speak to him?

11        A     Well, Kevin's wife, she wasn't able to have kids.

12        Q     Okay.

13        A     My wife, Susan, and I had talked about it.  Was

14   like, why don't we see if Kevin and Olivia, if -- Well,

15   first I said, would you carry Kevin's kid?  She was like,

16   Oh, yeah.  Her and Kevin got along great.

17        Q     Uh-huh.

18        A     We didn't have the money, he didn't have the

19   money, we didn't have the money to do the artificial

20   insemination, but my ex-wife was going to carry the kid for

21   Kevin but we just didn't have the money.

22        Q     So your bond was very close, you loved each other

23   very much?

24        A     Yes.  I lived in North Dakota, he was stationed in

25   Norfolk.  I can't honestly remember where all he was
```

1    stationed, but he did come to visit me in North Dakota.

2         Q    And to the extent you remember, was that a happy

3    time?  Did you have guys have a good time?

4         A    Yeah, it was a happy time.  I mean, Kevin --

5    actually, Kevin was stationed in Groton, Connecticut,

6    because he was a sub-based police at the time.  The reason I

7    know that, we went to the bar, and when I was backing out,

8    I hit a vehicle and Kevin jumped out.  He's like, I'm a cop,

9    it's okay.  This guy looked at the badge and said,

10   "Where were you a cop from?"  Kevin started joking with the

11   guy and said, "Don't even worry about it."  We got in the

12   car, you know.

13        Q    So is it fair to say -- Can you describe your

14   brother's just general character for the Court.  Do people

15   like him; was he a good person?

16        A    Yeah.  And I don't -- North Dakota, I mean, the

17   farm kids are the popular kids.  Kevin was popular in his

18   click.  The wrestlers, you know, a lot of them looked up to

19   him.  But the farm kids were the real popular kids, you know

20   what I mean?  But Kevin was popular, too, I guess.

21        Q    Okay.  And so we talked about a little bit about

22   your family just generally being close growing up, and we

23   talked a little bit about Kevin's role in the family.

24   I want to transition a little bit to your family experiences

25   during and after the bombing.

1          So you mentioned you learned about the bombing in

2  prison.  Can you tell me a little bit about that?

3      A    Well, I don't think I learned the same time my

4  family did.  A guard came in my cell and said, "We need you

5  down in the counselor's office."  I didn't know what I did

6  wrong.

7          And they got me in there.  Her name was

8  Jean Sullivan.  She was a pretty cool lady.  Go ahead and

9  shut the door and sit down.  Okay so I sat down.  She said

10  "There's been a bombing."  And I was like -- I didn't know

11  what she was talking about.  In prison, you don't know

12  nothing unless you talk to people on the phone.  She said,

13  "The U.S.S. Cole was hit."  Well, to me, I mean, I knew my

14  brother was on a ship.  I don't think I knew the ship name,

15  you know what I mean?

16      Q    Right.

17      A    I honestly don't, because it didn't really click.

18          And she's like -- I was like, well, yeah.

19  She said, "Well, your brother Kevin is on the U.S.S. Cole,"

20  and then I just -- (indicating), like just drained.

21  I didn't want to believe it.  I thought I was going to be

22  stuck there.  I don't know who pulled the strings to get me

23  on the plane.  I have no idea.

24      Q    Okay.  So were you able to be with your family a

25  little bit after you learned the Cole was bombed?

1       A       Yeah.

2       Q       And for -- Were you able to attend Kevin's

3   funeral?

4       A       No, I wasn't.

5       Q       Okay.  And you had to go back to prison then?

6       A       I was out there for a week.  I was out there when

7   the chaplain had told us that they had found his body.

8       Q       Okay.

9       A       And specifically I remember about that is we were

10  in Kevin's apartment and the chaplain come in and said,

11  "We've positively identified Kevin."  And Kevin's wife

12  immediately started banging on the table.  She goes, "I want

13  my goddammed money now."  Boom.  Banging the table, I mean.

14      Q       And do you remember your family's reaction, how

15  you felt?

16      A       We were in shock.

17      Q       Right.

18      A       How could you even act like that?

19              And then she tells, "If you boys want stuff out of

20  our bedroom, go get it."

21              I didn't get nothing of Kevin's.

22              If I could go back in time, I'd steal all their

23  stuff.  If I could take everything in that bedroom, I would

24  have it.

25      Q       Okay.  So you weren't able to attend Kevin's

```
1    funeral?
2         A    No.
3         Q    And afterwards -- So you were eventually released
4    from prison and you've never been in trouble --
5         A    No.
6         Q    -- with the law or anything again?
7         A    I can't get in trouble.
8         Q    Right.
9         A    I won't let myself.
10        Q    Okay.
11             And your mental state.  So you mentioned that
12   you're on disability --
13        A    Yeah.
14        Q    -- because of depression.  Is there -- Do you know
15   what triggers that depression or what that's -- is it
16   related to Kevin's death?
17        A    Yeah.  Dreams.
18             I've dreamt, I couldn't even tell you how many
19   times.  I mean, I've had my head cut off in dreams by people
20   with stuff on their head.  I've seen my brother flying
21   through the air blown apart.  I've seen Kevin fully intact
22   after the bombing.  I've seen it so many different ways, you
23   know.
24        Q    And did you experience these vivid type of dreams,
25   this type of depression before Kevin was killed?
```

1        A     No.

2        Q     So this started after, after the Cole bombing?

3        A     Yes.

4        Q     And have you been able -- You mentioned you're on

5    disability now.  Have you been able to -- Have you been able

6    to hold any sort of steady employment since the bombing?

7        A     No.  I've had jobs that pay $30 an hour in

8    West Virginia.  I'll have a real messed-up dream and it will

9    mess me up for a couple days and I'll just quit.  I'm done.

10   You know.  They're good -- good-paying jobs.

11       Q     And does the fear from the dream or the impression

12   from the dream, is that what causes you to quit your job;

13   is that what causes you to retreat?

14       A     Yeah.  Yeah.

15             I don't like to go outside now.

16             I was down there by the security guard getting

17   ready to come in, and I hate to say it but I see with the

18   guy with the turban walk right through and it shot through

19   me.  Like I could believe it.  I know I racial profile, but

20   I can't help it.  I've been killed by them in my dreams too

21   many times.

22       Q     Is it fair to say that you're always feeling

23   afraid and anxious --

24       A     Yes.

25       Q     -- when you're in --

1          MS. KENT:  Okay.  All right.  Thank you very much.

2     I have no further questions for you.

3          THE WITNESS:  Okay.

4          THE COURT:  I do.

5          According to the report, did you think for a while

6     that Kevin was still alive?

7          THE WITNESS:  Yeah, I did.

8          THE COURT:  Explain that to me.

9          THE WITNESS:  I thought maybe he was just like

10    laying under metal.

11         THE COURT:  This was in the two-week period when

12    your family didn't know if Kevin was -- they couldn't find

13    Kevin's body?

14         THE WITNESS:  Right.  I've dreamt about it.

15         One dream, I believe, is Kevin was in line with

16    his friend, Scott Owens, he's one of the ones that got

17    killed.  They were just sitting there probably hitting each

18    other.  Kevin probably told a joke.  They're laughing, and,

19    boom, they're just flying through the air with the hole in

20    his shoulder.

21         I've read his autopsy report.  I know how he was

22    killed, you know.  And I don't think it was an instant.

23    I just don't.  I think he laid there and suffered for a bit.

24         THE COURT:  Thank you.  You may stand down.

25         (Witness excused)

```
 1              THE COURT:  You may call your next witness.

 2              MR. AMBUSH:  Your Honor, I'd like to call Doe

 3    Victim B.

 4              THE COURT:  Doe Victim B.

 5              DEPUTY CLERK:  Raise your right hand.

 6         (Witness is placed under oath.)

 7

 8              DEPUTY CLERK:  Thank you.  You may be seated, sir.

 9                       -  -  -

10                      DOE VICTIM B

11    called as a witness on behalf of the Plaintiff,

12    being first duly placed under oath, testified as follows:

13                    DIRECT EXAMINATION

14    BY MR. AMBUSH:

15         Q    Sir, can you state your full name for the Court,

16    please.

17         A    Doe Victim B.

18         Q    And do you go by Doe Victim B?

19         A    Yeah.

20         Q    Okay.  And are you a U.S. citizen?

21         A    Yes.

22         Q    And what state do you live in?

23         A    West Virginia.

24         Q    All right.  Are you married?

25         A    Yes.
```

```
 1        Q    Are you employed?

 2        A    Yes.

 3        Q    And where do you work?

 4        A    Bruce Allen Pipeline.

 5        Q    And what is that?

 6        A    We lay gas pipeline for the Marcellus shale.  Like

 7   the international gas.  Everybody's got it.  We got a pipe

 8   in some layers with a three-layer pipes.

 9        Q    Are you a machine operator?

10        A    No.  I'm labor.

11        Q    Labor.  Okay.  And where were you born?

12        A    I was born in Charleston, South Carolina.

13        Q    And what year was that?

14        A    1976.

15        Q    How are you related to Kevin Rux?

16        A    He was my brother.

17        Q    Where are you on the totem pole, so to speak?

18        A    I'm the youngest.

19        Q    You're the youngest?

20        A    Uh-huh.

21        Q    And can you describe your relationship with Kevin?

22        A    Kevin was -- he was my brother, but he's also my

23   best friend.  He was my confidante.  He was like a father

24   figure to me.

25        Q    When your parents separated, how old were you?
```

1      A      I was 11.

2      Q      And did Kevin take a role, like a father figure,

3   at that time?

4      A      Yeah, pretty much.  He took me under his wing and

5   took care of me.

6      Q      What is your first memory of him?

7      A      My first memory of Kevin is, we used to share a

8   bedroom, me and Kevin and Doe Victim C all in the same

9   bedroom.

10            And I can remember just being a little kid and

11  going and playing with Kevin's stuff and, you know, trying

12  to get me out of his stuff.

13     Q      As kid you were buddies, essentially?

14     A      Uh-huh.

15     Q      Were there other fond memories that you have of

16  Kevin?

17     A      Kevin, he always had a new joke, and he never,

18  never forgot the jokes that he did know.

19     Q      Were you athletic yourself?

20     A      Me?  Yeah.

21     Q      Yeah.  Did you do sports with Kevin?

22     A      No.  He was older than me, so not really with him,

23  but I wrestled and he wrestled.  He taught me how to

24  wrestle.

25     Q      Essentially, he was a good role model for you?

1        A       Yes.

2        Q       Okay.  Can you describe him as a person, how he

3    was, his nature?

4        A       His nature.  I've seen -- I've seen people do

5    stuff to him and he forgive them and never say another word

6    about it, you know.

7        Q       And how would you describe your family in terms of

8    relationship between your other brothers and yourself and

9    with Kevin together, with your mom?

10       A       Kevin was like the glue that held us all together,

11   I think.  Because he was -- he was just always fun to be

12   around, and he kept the life of the party going, you know.

13   He'd have parties on Halloween, and there would be hundreds

14   of people that would show up, you know.

15       Q       Is it fair to say that your family was close?

16       A       Yeah.

17       Q       And he was the catalyst to keep everybody close?

18       A       Yeah, I think so.

19       Q       And now that he's gone, how have things been?

20       A       We're still close, but it's not like it was

21   before.  You know, we all still love each other and stuff,

22   but when he was alive, he was like, come on, let's go,

23   you know.  It was different.

24       Q       At some point Kevin went into the Navy.

25   Do you recall that time in your life --

1        A     Yeah.

2        Q     -- when he went away?

3        A     Yeah.

4        Q     Can you describe that?

5        A     For me, it was hurtful just being that he had to

6    leave.

7             And I still got to see him -- or I see him on

8    leave when he'd come in and stuff, and we'd go down there to

9    visit him, you know, every few months or whatever.  But he

10   was always giving me stuff, you know.  Every time I see him,

11   he's giving me shoes or underwear or socks or pants, shirt.

12   He -- I needed stuff for school and he bought it.

13       Q     When he was away, did you communicate with him?

14            (Court reporter interrupted for sound-system

15   issue.)

16            (Recess)

17            THE COURT:  Could you read the last question and

18   answer, please.

19            (Requested testimony read)

20            THE COURT:  Why don't you answer that question, if

21   you can, sir.

22            THE WITNESS:  Yeah.  He would call, probably once

23   a week, and I'd talk to him and Mom would talk to him and

24   I'd talk to him.

25       Q     Was there a time when he came home and just had to

1    discipline you?

2         A    Yeah.

3         Q    Could you describe that incident?

4         A    He disciplined me a few different times, but one

5    time I was probably 14 and I was being real disrespectful

6    towards Mom and stuff and he snatched me up by the collar

7    and, you know, shook me and straightened me out.  I mean, it

8    helped for a little while, but I was a pretty bad kid.

9         Q    So when he lived in Virginia Beach, did you have a

10   chance to see him?

11        A    Yeah, I saw him.  We went up there for the

12   Super Bowl.  It was after my son, Levi, was born.  He was,

13   I think, two weeks old, and we drove to Virginia Beach and

14   watched the Super Bowl, and that was the last time I seen

15   him.

16        Q    You mentioned you had one son, Levi?

17        A    Yeah.

18        Q    Do you have other children?

19        A    Yeah.  I have a daughter named Kailey and a

20   stepdaughter named Megan.

21        Q    So that last memory that you have was you were

22   watching the Super Bowl together?

23        A    Yeah, that's the last time we was together.

24   I talked to him after that, but that was the last time we

25   was actually together.

1        Q    And at the moment when you heard about the

2    explosion on the Cole, can you describe that?

3        A    Yeah.  I was in truck driving school; it's like a

4    two-week school where you get your CDLs and the instructor

5    come in and stopped everything and told me that I had to go

6    to my mother's immediately.  And I was like, well, I'll

7    just -- I think we're just taking a quiz or something.  I'll

8    go ahead and finish this quiz and then I'll go.  He said

9    "No, put your pencil down and go now."

10           So that was about, I don't know, about a 20-minute

11   drive to Ma's house from there.  And once I got there, she

12   told me that the Cole had been bombed and Kevin was missing.

13       Q    What went through your mind at that point?

14       A    At that point, we were all holding on to the

15   belief that he was still alive, because he was only missing

16   at that time and we thought he was just, you know, covered

17   up by metal or, you know.  We was holding on to the thought

18   that he was still alive.

19       Q    And how were you emotionally at that point when

20   you heard about the Cole?

21       A    At that point it was, you know, I -- all kinds of

22   things running through my head.  But I was just praying to

23   God that, you know, don't let it be true, don't let it be

24   Kevin, you know, because he's a hell of a guy.

25       Q    So did you pack up and gather your family, head

```
 1    down to your mom's at that point or --

 2        A    Yeah.

 3        Q    -- something else happened?

 4        A    Yeah.  I think I went home and we packed up and

 5    went to Virginia Beach and met my other brothers there.

 6             I think me and Mom was there first, and then Doe

 7    Victim E and Doe Victim D showed up, and we picked him up at

 8    the airport.

 9        Q    And what's -- What was your mental state at that

10    point when you got to your mom's house?

11        A    Before we left for Virginia Beach?

12        Q    Throughout that time period.

13        A    Just nerve-racking and, you know, still holding on

14    to the thought that he was still alive.  And, you know,

15    after a few days of that, you know, we're worried about him,

16    you know, starving to death or something like that,

17    you know, if he's trapped somewhere on the ship.  That was

18    going through my mind, worrying about him getting

19    dehydrated, not having nothing to drink, you know.

20        Q    Were you anxious or depressed during that time?

21        A    Yeah.  More anxious and trying to be optimistic,

22    you know, during that time.  It was really a hard time.

23        Q    And were you there when the chaplain came to the

24    house?

25        A    Yes.
```

1     Q    And can you describe what happened in your

2  experience?

3     A    It was probably about the worst moment in my

4  entire life, I'd say, because, it's like my mother and Doe

5  Victim C said, the chaplain come in and told -- got us all

6  together and told us that his body had been positively

7  identified.  And like he said, Olivia just started hitting

8  the table, I want my money now, and blah, blah, blah.  And

9  to us, we were just in shock.

10     Q    Was there a time that -- were you there when the

11  chaplain first came and said he was missing?

12     A    Yes.

13     Q    And then it was a few weeks later when,

14  apparently, he came back and said he was gone at that point?

15     A    It was ten to 14 days later probably.  We was

16  there a long time before he finally -- before they finally

17  told us that his body was identified.

18     Q    When the chaplain came the first time and said he

19  was missing, was that in some ways worse than if he had said

20  he was gone?

21     A    Yeah, I think so, because they gave us the false

22  hope that he was still alive, you know.  When he -- I --

23  He was dead when the bomb went off, I think.

24     Q    Were you at the funeral?

25     A    Yes.

1     Q    Can you tell us about the funeral from your

2  experience?

3     A    It was -- It was horrible.  I mean, they had a

4  limousine set aside for the family and stuff, but none of

5  us, immediate family, got to ride in it.  They had the seats

6  reserved in the front row, two for -- front-row seats

7  reserved for the family, but none of us immediate family got

8  to sit there.  We had to sit five rows back.  It was a

9  disrespect to my brother, I believe.

10    Q    Did you have feelings at that point of anger or

11  frustration or --

12    A    Oh, yeah.  Yeah, toward Olivia and towards the

13  United States Navy and the U.S. Government, for that matter.

14    Q    What did you do after the funeral?

15    A    After the funeral, we -- that was our last day in

16  Virginia.  We went on home and tried to put the pieces back

17  together.

18    Q    Well, since then, were you able to put your own

19  life back together?

20    A    I mean, I try, you know.  I try to hold down a

21  job.  I probably have had ten, 15 jobs since then, you know.

22  But I got a family to support, and I try to, you know, push

23  through it and go to work every day, try to.

24    Q    Is there something that prevents you from keeping

25  a job?

1    A    I think so.  I mean, the depression and, you know,

2  lot of times I don't even want to be around people; I don't

3  want to see people.

4         You know, I used to be real outgoing back before

5  this happened, and now I just have a hard time even wanting

6  to be around people now.  Like I'll send my wife in the

7  store and I don't even want to go in the store to get

8  cigarettes or pop, you know.

9    Q    Have you sought treatment or grief counseling?

10   A    Just when we all went there probably, what, six

11  months ago or so.  It was the only time I ever went.

12  And I really didn't see no -- see how it was helping or

13  anything like that, so I just quit going.

14   Q    And from your perspective, how has that affected

15  the rest of your family?

16   A    It's affected us all, you know, horribly.

17  I don't think any of us are the same as we were before this

18  happened.

19   Q    It's been said here previously that you stem from

20  a Navy family.

21   A    Yeah.

22   Q    Okay.  What are your feelings now about the Navy?

23   A    The Navy killed my brother, and that's how I feel

24  about it.  And it hurts me because, you know, I was proud of

25  the Navy.  My dad was Navy, and I was proud to be part of

```
 1    the Navy, you know, being a son of the Navy, but I just
 2    don't feel like that ship should have been there by itself.
 3    I, you know, I think it could have went a thousand different
 4    ways and he'd still be alive.
 5         Q    And specifically regarding your mother, what is
 6    your perspective in terms of how the death of your brother
 7    affects your mother?
 8         A    I think if it wasn't for us boys and Jonathan,
 9    I don't think she'd be alive today.  I think she would have
10    died of a broken heart.
11         Q    Was it difficult for you preparing for today's
12    trial?
13         A    Yeah.  It's been a battle the past four years.
14    It's been really tough.
15         Q    What about the past 14 years when you hear news
16    events of terrorist attacks around the world, how does that
17    affect you?
18         A    It affects me.  I think about Kevin every single
19    day; I think about the bombing every single day.  I mean,
20    when somebody that's a part of you is ripped from you the
21    way he was, it's a really traumatic experience.
22              MR. AMBUSH:  No further questions.
23              THE COURT:  Thank you very much.  You my stand
24    down, sir.
25              (Witness excused)
```

1          THE COURT:  So then we'll -- It would be very

2    helpful to me, Counsel, if you would give me the dates of

3    births of all the brothers in birth order, beginning with

4    Doe Victim E.  They're right here.  Or maybe Ms. Doe Victim

5    A can give them to me.

6          Gentlemen, why don't you give me your date of

7    birth, please, Doe Victim E?

8          DOE VICTIM E:  March 2nd, 1967.

9          THE COURT:  Doe Victim D.

10         DOE VICTIM D:  May 11th, 1968.

11         THE COURT:  Doe Victim C.

12         DOE VICTIM C:  October 14th, 1973.

13         THE COURT:  doe Victim B.

14         DOE VICTIM B:  August 11th, 1976.

15         THE COURT:  And Doe Victim E.

16         DOE VICTIM E:  October 31st, 1969.

17         THE COURT:  Thank you very much.

18         All right.  We'll stop there, and the expert will

19   be here at 2:00.

20         MR. AMBUSH:  Yes, Your Honor.

21         THE COURT:  We'll reconvene in this room at 2:00.

22         MR. AMBUSH:  Thank you, Your Honor.

23         The Court will be in recess till 2:00.

24         (Recess from 12:43 p.m. to 2:00 p.m.)

25         THE COURT:  All right.  The Court is back in

 1    session.   You may be seated, everyone.

 2              Please call your next witness.

 3              MS. KENT:   Your Honor, before I re-call our next

 4    witness, there's just a few preliminary matters relating to

 5    this witness that I'd like to advise you on, if that's okay.

 6              THE COURT:   Sure.

 7              MS. KENT:   So Mr. -- Our next witness is an expert

 8    witness, he is Mr. Dale Watson.   He's a former employee of

 9    the FBI, the head of counterterrorism there during the

10    relevant times in this case.   And because he's going to be

11    testifying and hopefully opining in his personal capacity,

12    the FBI has limited the scope of his testimony, the direct,

13    and there are certain things that he cannot talk about.

14    That letter is in evidence as Exhibit 30.   It's called the

15    Touhy letter, under the Touhy relations the government has.

16              THE COURT:   Yes.

17              MS. KENT:   So we wanted to talk to Mr. Watson

18    directly about this, but we wanted to advise you that in

19    terms of the particulars of the U.S.S. Cole investigation,

20    in terms of types of sources that he might have in his

21    personal experience, he just is not allowed to testify to

22    those types of matters.   We wanted to advise you about that.

23              The second thing relates to his qualifications as

24    an expert.   We are planning on, again, through colloquy,

25    establishing that he has the training and experience to

1    testify as to material support of the terrorist

2    organization, al-Qaeda, by Iran, and by the Sudanese, as

3    well as the U.S. -- as the particulars of -- some of the

4    particulars of the U.S.S. Cole bombing.

5             However, at this time, we do not have a copy of

6    his CV.  So I know that you referred to the other experts'

7    CVs in determining whether they would be admitted as an

8    expert under Rule 702.  We believe colloquy would be

9    sufficient, but we'd like to in advance seek leave, if we

10   need it, to provide you with a copy of his CV.

11             THE COURT:  Great.

12             MS. KENT:  Wonderful.

13             At this time, we'd like to call Mr. Dale Watson to

14   the stand.

15             THE COURT:  Mr. Watson.

16             THE WITNESS:  Yes, sir.

17             DEPUTY CLERK:  Raise your right hand.

18        (Witness is placed under oath.)

19             DEPUTY CLERK:  Thank you.  Please be seated, sir.

20   You can adjust the mic.

21             THE WITNESS:  Okay.  That fine.

22                        -  -  -

23             D A L E   L.   W A T S O N

24   called as a witness on behalf of the Plaintiff,

25   being first duly placed under oath, testified as follows:

```
 1                      DIRECT EXAMINATION
 2    BY MS. KENT:
 3        Q    Good afternoon, Mr. Watson.  Thank you for
 4    appearing today.
 5             May I ask, can you state your name for the Court
 6    today.
 7        A    Dale L. Watson.
 8        Q    And are you a former employee of the
 9    U.S. Government?
10        A    Yes, I am.
11        Q    And are you testifying here today as a private
12    citizen?
13        A    As a private citizen, correct.
14        Q    So you are not testifying in any sort of
15    government capacity here?
16        A    No, I am not.
17        Q    Okay.  And are there limits to the types of
18    matters that you are allowed to testify to?
19        A    Yes.
20             Based on your conversation with the Judge,
21    Your Honor -- I'm sure Your Honor is familiar -- I'm sure
22    you're familiar with -- normally, it would be much easier
23    testimony if I was representing the FBI or the government
24    and testifying about the facts.  But the limit here, I will
25    be providing my opinion based upon nothing sensitive out of
```

1    the case work but what has been reported in open-source

2    material.  And there might be some questions or areas you

3    might ask me that I will not be able to discuss around the

4    sensitivity of the case.

5         Q    Okay.

6              THE COURT:  Thank you.

7         Q    Thank you.

8              So we'll talk about the particulars of your

9    opinion in a minute, but I'd like to talk a little bit about

10   your experience in the field of counterterrorism.

11             So you mentioned that you were a former employee

12   of the U.S. Government.  Where were you employed in the

13   U.S. Government?

14        A    Two locations.  I graduated from college and

15   immediately went into the United States Army in 1972 as an

16   infantry officer.  I spent five and a half years in the

17   military.  Based upon that, I was discharged on a Sunday and

18   came into the FBI the following Monday morning; spent 25

19   years with the FBI.  So my total government service time is

20   probably 30 and a half years.

21        Q    Okay.  And did you work for -- Were you detailed

22   during your time in the FBI to any other agencies other than

23   the Federal Bureau of Investigation?

24        A    Yes.

25             In 1996, I rotated back from Kansas City as a

1    result of the Oklahoma City bombing case and was assigned

2    the first deputy chief of the counterterrorism center at the

3    Central Intelligence Agency as an operational assignment.

4         Q    And how long were you deputy chief of

5    counterterrorism at the CIA?

6         A    1996 to early 1997.

7         Q    Which was that your first experience in the

8    field -- in the field of counterterrorism, working in the

9    U.S. Government?

10        A    No, it was not.  I was -- briefly, the FBI career

11   started out in Birmingham, Alabama.  Spent four and a half

12   years there working general criminal matters.

13             From there, the Bureau elected to transfer me to

14   New York City where I worked foreign counterintelligence

15   against the eastern block countries in Soviet Union.

16   From there, I was transferred to headquarters and

17   counterintelligence and over to WFO as a field supervisor.

18   And at that point, after the Berlin wall came down, I was

19   transferred over to the counterterrorism program at FBI

20   headquarters, which would have been 1991.

21        Q    So just to make sure that I heard that --

22        A    Okay.

23        Q    -- you started in counterterrorism in 1991;

24   is that correct?

25        A    That is correct.

1          Q     Okay.

2          A     And mainly, the Bureau did the right thing.

3    They selected individuals that had both criminal experience,

4    foreign counterintelligence experience, because we found --

5    or, excuse me, in my opinion that terrorism investigations

6    were a combination of foreign counterintelligence and

7    terrorism and criminal all blended together with an

8    intelligence term.

9          Q     Okay.  And of your years in the FBI, how many of

10   those did you spend in the field of counterterrorism or in

11   the --

12         A     From approximately 1991 until I retired as

13   executive assistant director in charge of all the

14   counterterrorism and counterintelligence entities and the

15   intelligence program at the FBI.

16         Q     And what year was that?

17         A     2002, November -- October, late, October 2002.

18         Q     And you mentioned that you, the position that you

19   were retired in.  Can you just reiterate that for the Court.

20         A     Sure, I'll be glad to.

21         Q     Sure.

22         A     Initially, terrorism back in the early '90s was a

23   small program within the FBI.  Mainly it surrounded around

24   Hezbollah, old highjacking cases, Robert Stethem case, the

25   killing of American citizens by Hezbollah in Lebanon, et

1  cetera, et cetera.

2          So the Bureau elected to move it forward from --

3  the nomenclature is probably going to get fuzzy.  So it went

4  from a small unit to a section, and it kept growing with

5  number of cases.

6          A separate division was formed.  I was the first

7  assistant director in charge of all the counterterrorism.

8  And after 9/11, I was responsible in 9/11, spent 11 and a

9  half hours under oath in the 9/11 Commission.

10          Then Director Mueller at that time decided to make

11  executive assistant directors, and that's where I picked up

12  the additional duty of counterintelligence.  And so that

13  would have been late -- early '02.

14      Q    Okay.

15      A    If that answers your question.  I'm sorry it's

16  kind of a rambling question.

17          THE WITNESS:  Sorry, Your Honor.

18      Q    No, no.  It fully answers my question.

19          And as the former executive's assistant to

20  counterterrorism, did you have to observe -- or not observe

21  but was looking at the operations of Osama bin Laden and

22  al-Qaeda part of your job?

23      A    Certainly was after I was assigned over at the

24  agency at that point in time.  There was a wide-open --

25  well, yes, to answer your question.

1      Q    Okay.  And then I just want to hit your

2    educational background a little bit.

3      A    Sure.

4      Q    You graduated from college, just for the record,

5    what university?

6      A    I received a scholarship to go to Florida State

7    University and was a member of the ROTC program and

8    commissioned through there.

9      Q    And did -- you, when you entered into the

10   United States Government and into the FBI, did -- and the

11   agency, the CIA -- when you say "the agency," I assume you

12   mean the CIA?

13     A    That is correct.

14     Q    The Central Intelligence Agency.

15          Did you receive any training or take any

16   specialized courses in the areas of counterintelligence or

17   counterterrorism?

18     A    Yeah.

19          Without being very specific, there's always

20   training that goes along with the criminal programs or the

21   intelligence programs you're in.  Numerous in-services

22   around countries in the Middle East, techniques, methods of

23   operation, you know, that sort of thing, as well as at the

24   agency.

25          Spent some time at some State Department schools

1    to try to learn geopolitical relationships and looking and

2    focusing at different areas.

3           So that and then national executive -- I mean,

4    there are lots of developmental programs that are attached

5    to the FBI.

6    Q    Okay.  And then just generally, what FBI or CIA

7    investigations into al-Qaeda-related terrorism were you

8    involved in?  If you can, to the extent you can answer.

9    A    I'll hit some of the highlights here, but

10   certainly any involvement that al-Qaeda had between '96

11   going forward to '02 I was involved with it and had ultimate

12   responsibility for.

13   Q    Okay.

14   A    So it's a little different in the relationship is

15   that this headquarters, those are national programs run by

16   the FBI.  So if an event happened in Kansas City in

17   terrorism, it would be directed out of FBI headquarters.

18   So in this case -- So to answer your question, Khobar Towers

19   was not an al-Qaeda deal, but the embassy bombings,

20   U.S.S. Cole, obviously, 9/11.

21   Q    Okay.  And how did you become involved in the

22   U.S.S. Cole investigation for the FBI?

23   A    I was at the time the assistant director in charge

24   of all the counterterrorism.  So anything that happened was

25   under my responsibility, and you try to put resources on

```
 1    that to figure out who did it.
 2           Also, very proactive program around Al-Qaeda
 3    trying to prevent them from doing things.
 4       Q    Okay.  And then finally, have you ever testified
 5    as an expert witness on counterterrorism -- on
 6    terrorism-related matters before in a civil proceeding?
 7       A    Yes, I have.  In the District here, Your Honor,
 8    with the Khobar Towers families.
 9       Q    Okay.
10           THE COURT:  Before what judge was it?
11           THE WITNESS:  Sir?
12           THE COURT:  Before what Judge?
13           THE WITNESS:  I do not recall, Your Honor.
14           THE COURT:  It wasn't me?
15           THE WITNESS:  No, sir.
16    BY MS. KENT:
17       Q    Do you recall if it was Judge Royce Lamberth?
18       A    No.  I know Judge Lamberth and that --
19           THE COURT:  He's quite unforgettable, isn't he?
20    I had lunch with His Excellence today.
21           THE WITNESS:  No.  I don't think you can forget
22    him.
23           And then on Oklahoma City, some preliminary
24    investigation out in Denver before Judge Matsch.
25           MS. KENT:  Okay.
```

```
 1              I can go into a little bit more about the
 2   particulars as to --
 3              THE COURT:  I think I've heard enough to satisfy
 4   the requirements for the 702, and I'll admit Mr. Watson as
 5   an expert in the fields of counterterrorism, the
 6   investigation of counterterrorism and the other topics which
 7   he's just described for us that make up such a large part of
 8   his experience and knowledge.
 9              MS. KENT:  Thank you so much, Your Honor.
10              THE COURT:  One final question, Mr. Watson.
11   My language proficiency --
12              THE WITNESS:  Southern dialect English.
13              I have a hard time with English.
14              THE COURT:  Okay.
15              THE WITNESS:  I don't have any others.
16   My colleagues -- or my friends from West Virginia probably
17   detected that.  I took some Spanish, but years ago.
18              THE COURT:  But not Arabic?
19              THE WITNESS:  No, sir.
20   BY MS. KENT:
21       Q    And, Mr. Watson, can you generally discuss your
22   role in the investigation of the bombing attack on the
23   U.S.S. Cole?
24       A    Sure.
25              It was my responsibility to respond to that
```

1    incident, not me personally, but through the organization,

2    the FBI that I work for.  There are thousands of things that

3    have to be done once something like that happens.  And so it

4    was gathering resources -- Without going into anything else,

5    it was gathering resources, information, providing what we

6    needed to do to try to figure out what had happened.

7              MS. KENT:  Okay.

8              And, Your Honor, there are some documents that I'm

9    going -- I'm going to ask your indulgence if I could

10   approach --

11             THE COURT:  Sure.

12             MS. KENT:  -- that I'd like Mr. Watson just to

13   comment on.

14             So this is Exhibit 5 in evidence, and this is a

15   quote from the CRS report for Congress updated January 30th,

16   2001, and it's on the second page of that document labeled

17   CRS-2.

18   BY MS. KENT:

19        Q    And, Mr. Watson --

20             THE COURT:  This is it number 5?

21             MS. KENT:  Yes, Exhibit 5, second page, CRS-2.

22   BY MS. KENT:

23        Q    And, Mr. Watson, the CRS report states,

24   "The attack" -- meaning the U.S.S. Cole -- "have been widely

25   characterized as a quote/unquote boat bomb adaptation of the

1    truck bomb tactic used to attack the U.S. Marine Corps

2    barracks in Beirut in 1983 and the Khobar Towers U.S.

3    military residence in Saudi Arabia in 1996."

4            Do you agree with that statement?

5        A    That is correct, I agree.

6        Q    And can you just generally describe what the basis

7    is of your agreement with that statement?

8        A    Sure.

9            From personal experience and my opinion is that

10   terrorist organizations between the late '80s and '90s

11   developed techniques around car bombs and still -- which are

12   still in use today.

13           On this particular instance that you were talking

14   about, they went from car bombs to truck bombs at the

15   American embassies in Africa to a boat bomb, so to speak, on

16   the U.S.S. Cole.

17       Q    Okay.

18       A    And then after that, obviously followed by

19   airplane attacks and so on.

20       Q    And so the other matter that I want to ask:

21   In your opinion, was the attack on the U.S.S. Cole, again,

22   using your adaptation of the truck bomb tactic in Beirut in

23   1983, do you believe that that was a sophisticated attack,

24   in your opinion?

25       A    The one in '83 that killed U.S. --

```
1        Q    No.  I'm sorry.  My apologies, no.

2             The U.S.S. Cole bombing, was that a sophisticated

3    attack?

4        A    Yes.

5        Q    Okay.  And what's the basis?  Why do you believe

6    that that's the case?

7        A    It was a sophisticated attack because it was a

8    U.S. warship, a billion-dollar U.S. Navy warship that was

9    practically sunk as a result of the bomb blast.  That's not

10   something three people decided to do, you know, in a bar or

11   wherever they're at or in the mosque and decided to go out,

12   let's go bomb the ship.  I mean, it takes sophisticated

13   planning and the amount of explosives.

14       Q    So would you need a sophisticated organization or

15   group, a group of infrastructure to commit such a task?

16       A    That's not two guys blowing up a Navy ship by

17   themselves.  They need an infrastructure.  You need a whole

18   myriad of things to support that activity.

19       Q    Okay.  Thank you.

20            THE COURT:  The way the attack was carried out --

21            THE WITNESS:  Yes, sir.

22            THE COURT:  -- did the perpetrators driving the

23   boat, did they die?

24            THE WITNESS:  Yes.

25            THE COURT:  And that was part of the plan:  It was
```

1    understood that they would give their lives?

2            THE WITNESS:  Yes, sir.

3    BY MS. KENT:

4        Q    The next thing that -- The next thing that I would

5    want to draw your attention to is an --

6            MS. KENT:  And, Your Honor, this is not in

7    evidence.  We're simply -- Some of what we need to do is

8    just open-source material to kind of just give Mr. Watson a

9    foundation.

10           THE COURT:  I understand.

11           MS. KENT:  But it's an article in the Philadelphia

12   Tribune dated October 17th, 2000, and it quotes one of the

13   officials investigating the U.S.S. Cole attack saying the

14   power of the blasts suggests more than just TNT, and that

15   same article reports that the blast punched a 40-foot by

16   40-foot hole in the hull at the water line, immediately

17   causing the ship to fill with water.

18           The article goes on to report the impact retched

19   open hatches and buckled parts of the deck and that sailors

20   had to work to keep the ship afloat.

21           The article further states that terrorism and

22   explosive experts combed through the scenes described by

23   U.S. officials as utter devastation.  And also, according to

24   the article, floors and walls were bent wildly by the blast,

25   and it also reported confetti-size pieces from the wooden

1    attack boat collected from the deck.

2    BY MS. KENT:

3        Q    Based on your investigation of the Cole, do you

4    agree with the depiction of the devastation to the boat

5    reported in the attack?

6        A    Yes, I do.

7        Q    Okay.  Then does the damage to the -- the damage

8    that the bomb caused to the boat signify anything to you

9    about the nature of the terrorist attack?

10       A    It signified that this was, again, not a simple

11   act that was carried out by two individuals.  And so you

12   have to assume that in order to do that and where the device

13   was placed and how they got access to that ship and when the

14   ship was there, you know, et cetera, et cetera.

15            And it's been widely reported that they tried to

16   sink the U.S.S. Sullivan on January 2nd of that year, and

17   they put the boat in the water and it sunk with the

18   explosives.  So it was not -- Again, it was not two

19   individuals acting alone to carry out this act.

20       Q    And some of your testimony has suggested that the

21   size of the blast -- again, the prior attempt by, to sink

22   the U.S.S. Sullivan, the intent of the individuals on the

23   boat, that they knew they were going -- they were going to

24   die; they had planned it out this way.

25            Did all of these things, do they suggest to you

1  that this was a conspiracy to do -- to engage in this act of

2  the bombing of the U.S.S. Cole?

3      A    Yes.

4      Q    Is there anything else, again, that you're at

5  liberty to discuss that would have suggested that this was

6  not just an isolated act of terrorism?

7      A    Well, it's been clearly reported outside of any

8  investigative techniques or information that they wanted to

9  film the event.  And they didn't do it but they reenacted

10  that as reported by the news at some point in time to say,

11  look, this is what we did, this is what happens to all

12  infidels and et cetera, et cetera.

13          So it was an al-Qaeda attack that bin Laden used

14  for publicity as well.

15          THE COURT:  I'm sorry.  You dropped your voice.

16          THE WITNESS:  Yes, sir, I'm sorry.

17          It was an al-Qaeda attack that bin Laden used for

18  publicity purposes, very similar to the public fatwa that he

19  issued.

20  BY MS. KENT:

21      Q    And then --

22          THE COURT:  Was the attack preceded by an

23  announcement by al-Qaeda that something was going to happen

24  so that it would draw even more publicity?

25          If you can't answer that question because of

1    security matters, just say so.

2            THE WITNESS:  Yeah, I can't answer.  We always

3    hear chatter, so to speak.

4    BY MS. KENT:

5        Q    So I want to --

6            THE WITNESS:  Well, I don't know if I can say

7    this, Your Honor, but there was no pre -- I mean, no one had

8    any insight prior to about the U.S.S. Cole specifically, for

9    your information.

10           THE COURT:  I understand.

11   BY MS. KENT:

12       Q    Okay.  And the next article I want to draw your

13   attention to -- and, again, this isn't in evidence, it's

14   simply to just --

15           THE COURT:  I understand.

16       Q    Yeah.

17           Mr. Watson, the Florida Sun Sentinel dated

18   October 14, 2000, two days after the attack, reported that a

19   team of some 50 government agents from the FBI, Justice

20   Department and State Department arrived in Aiden to

21   supplement the first wave of some ten FBI agents already in

22   the city, and soon thereafter they were joined by an

23   additional 100 FBI agents who were experts in explosives and

24   in gathering evidence.

25           Is it fair to say that the FBI and U.S. Government

1  expended significant resources investigating the attack on

2  the U.S.S. Cole?

3       A    I'm not real sure of the numbers of the accuracy

4  of that.  I don't think it's right.  I think my recollection

5  and public opinion is there's probably more involved.

6            It was a significant attack when you think about

7  it.  It was an attack on the U.S. Government.  It was an

8  attack on the U.S. Navy.  And it almost sunk the Navy

9  warship.  And so someone has to figure that out.

10           So, Your Honor, we were committed to doing that,

11  as with any terrorist investigation.  And the pressure was

12  on to try to figure out to make sure you find out who did

13  this, because there will be consequences for that.  So it

14  was -- All the resources needed by my former government

15  employees were placed in this situation not only at the site

16  but around the world.

17       Q    So not just in Yemen but around other places in

18  the world as well; is that correct?

19       A    So it's been reported.

20       Q    Yeah.  So it's been reported.  Absolutely.

21           And is it, in essence, accurate to say that the

22  bombing site became a massive crime scene?

23       A    Yes, as always.

24       Q    And is it also accurate to say that there was a

25  very significant, thorough investigation by the FBI and

1    other agencies of the U.S. Government in response to this

2    terrorist attack?

3         A    Yes.

4         Q    And as a result -- in your opinion personally, not

5    as a former FBI employee -- as a result of this attack, is

6    it your -- or not this attack, of this investigation -- is

7    it your opinion that al-Qaeda perpetrated the bombing of the

8    U.S.S. Cole?

9         A    That is correct.

10        Q    And is it also your opinion that al-Qaeda's

11   perpetration of the bombing at the U.S.S. Cole was part of a

12   larger conspiracy to attack American and Western

13   interests -- Western military and political --

14        A    Yes.

15             And if you follow the history of that

16   organization, it started out many different things at

17   smaller levels.

18             Public statements were, the U.S. should get out of

19   the holy sites in Saudi Arabia.  From there, fatwas were

20   issued that U.S. military should leave the Middle East.

21   It followed from there that, kill any American wherever you

22   can find them because they were all infidels.

23             So the escalation of that organization toward the

24   United States was undeniable.

25        Q    And these public statements that you refer to, are

1  these the public statements issued by bin Laden at various

2  points in time in the 1990s, like the 1992 fatwa, the 1996

3  fatwa?  Are these the type of public statements you're

4  referring to?

5      A    That is correct.  They were all public statements

6  that he issued that said, you know, kill all Americans

7  wherever you find them.

8          THE COURT:  Mr. Watson, for the purpose of the

9  record, please explain --

10          THE WITNESS:  Okay.

11          THE COURT:  -- the word "fatwa."

12          THE WITNESS:  Fatwa is a religious edict that's

13  issued by a "religious leader."  And so he was classified as

14  a religious leader that could issue fatwas.  If -- The good

15  example, I don't know if you remember Salman Rushdie wrote

16  the book *Satanic Evil* or something and they issued a fatwa

17  on him, they said to kill him.  So those are non-retractable

18  once they're issued.  So it is a religious order.

19          And these fatwas were issued by bin Laden to --

20  for Muslims anywhere around the world to kill Americans,

21  American soldiers, American men, women and children.

22  And they always -- you know, you always question the fact,

23  Well, one of your -- Well, I can understand you're mad at

24  the American military, American government, but why innocent

25  civilians?  And the question was, they're all part of the

1    infidels.  So regardless, if you pay taxes, you're part of

2    the infidels supporting that regime.

3              I don't know, was that a good enough answer?

4              THE COURT:  Superb answer.

5              THE WITNESS:  Okay.

6              THE COURT:  When the fatwa was issued and after

7    the Cole is bombed, did bin Laden, on behalf of al-Qaeda,

8    take responsibility for it and warn the infidels that that

9    is what he was facing?

10             THE WITNESS:  By memory, if my memory serves me

11   correct, yes, he did.

12             I don't know exactly when, but there were a whole

13   series of those things that, after attacks, you can go back

14   to the embassy bombings, you would always see him standing

15   and saying, this is what happens or this is a result of the

16   brothers carrying out the fatwa.  And he always had the

17   dagger, and there was always clues attached.  Excuse me.

18   BY MS. KENT:

19        Q    And the recreation of that bombing by Al-Qaeda,

20   would that have been something that they would have used in

21   part to have taken responsibility for the U.S.S. Cole, even

22   if only indirectly?

23        A    Sure.

24             I mean, my opinion is you never do that without

25   wanting to take credit.  So -- particularly around any

1  specific criminal act.

2          I mean, they all want to take credit for it.

3  So you treat it like a thug.

4      Q    So we've talked about -- We talked about al-Qaeda

5  as a group and as part of a conspiracy.  In your opinion,

6  was the conspiracy leading up to the attack on the U.S.S.

7  Cole a sophisticated conspiracy?

8      A    Yes.  Without a doubt.

9      Q    And generally -- and we'll get into all of this in

10  a couple of minutes, but in your opinion, could al-Qaeda

11  have developed the ability as a terrorist organization to

12  carry out an attack like the U.S.S. Cole bombing without

13  state support?

14      A    Without what?

15      Q    State support.

16      A    State support.  You mean foreign-country support?

17      Q    Yes, foreign countries.

18      A    Specifically on this attack, they probably could

19  have carried it out, but they had -- you know, looking back

20  over it, it would have been more difficult to do that.

21          There was a pattern here around state sponsors,

22  if you recall your history, where, when they took Americans

23  in Lebanon, Hezbollah did, that Iranians were pretty upfront

24  about that.

25          But after the Libyan incident, state sponsors of

1   terrorism -- and they're named by the State Department,

2   Iranian, and, you know, North Korea, I mean, the countries

3   that are listed there do not want their fingerprints

4   attached to that because they were afraid that the

5   United States Government might, in fact, try to do something

6   about it.  So they kind of went into a mode of trying to

7   hide their fingerprints associated with it.

8        Q    So it would have been more difficult for al-Qaeda

9   to have commissioned the U.S.S. Cole bombing without state

10  support.  Is that, in essence, what you're saying?

11  Making sure I understand your --

12       A    Rephrase that question.

13       Q    It would have been more -- your answer to my

14  question was probably that it wouldn't have been as easy.

15  So another way just to make sure I understand --

16       A    It was helpful.  If they had state-sponsor

17  support, then it would definitely advance their cause and be

18  able to carry out more attacks.

19       Q    And just generally in your opinion, what types of

20  support would an organization need in order to have the

21  capability to carry out an attack like the U.S.S. Cole

22  bombing from a nation state?

23       A    Well, I mean, there's all kind of things involved

24  in carrying out an attack like that.  You have to have the

25  explosives; you have to have the mechanism to deliver the

1    explosives; you have to have the infrastructure to support

2    that, whether it's a boat or an apartment or whatever, you

3    have to have people to be able to tell you when the next

4    ship comes in or goes out or whatever, and you have to have

5    some degree of sophistication to know where you could do the

6    most damage, like the Khobar Towers case, where they were

7    set in place for probably a month before they decided that

8    this is the time to do it, because this is when the most

9    U.S. military people are inside the Khobar Towers deal.

10          So if you look at this, this is not any less

11   sophisticated -- probably more sophisticated than -- well, I

12   won't say that.  In my opinion, it was probably as

13   sophisticated as any attacks carried out by them, to include

14   probably the 9/11.

15          Q    Okay.

16          A    So if you understand the planning and all that

17   around 9/11, there were various -- it was very

18   sophisticated.  They don't leave anything to chance.

19          Q    Okay.  So I want to --

20          A    Even though the Sullivan was a chance, you know, a

21   slip-up on their part.

22          Q    But they -- And they worked for --

23          A    They learned from that, and then they made it

24   right, yeah.

25          Q    And just to clarify, the U.S.S. Sullivan, that was

1    sunk in January of 2000; right?

2        A    It was not attacked.

3        Q    Right.  Sorry.  Let me rephrase.

4             The boat that attempted --

5        A    The mechanism for it --

6             THE COURT REPORTER:  You guys, I cannot take two

7    at a time.  I'm sorry.

8             (Court reporter clarification.)

9             THE WITNESS:  My apologies for talking over you.

10   I'll do better.  It's not my first testimony.  I've

11   testified many times.  Go ahead.

12   BY MS. KENT:

13       Q    Okay.  So let me rephrase.  My apologies.

14            The vessel that attempted to sink the

15   U.S.S. Sullivan by members of al-Qaeda, that vessel, that

16   mission did not -- that mission failed in January of 2000;

17   is that correct?

18       A    That is -- 2000, that is correct.

19       Q    And then the U.S.S. Cole was eventually sunk ten

20   months later?

21       A    That is correct.

22       Q    In October of 2000.

23            So the time between attempts in that time span,

24   would that have been time that they would have, as you just

25   mentioned, they would have taken to learn from their

1    mistakes and figure out what they needed to do in order to

2    fully -- to properly advocate this attack?

3         A    Yes.

4         Q    Okay.  Thank you.

5              I want to transition now and I want to talk about

6    al-Qaeda's relationship with the Republic of Sudan.

7    And just as a brief foundational question as part of what

8    you did for the U.S. Government either for the Central

9    Intelligence Agency or for the FBI, were you -- did you

10   monitor either the activities of Osama bin Laden in Sudan or

11   the activities of the state of Sudan in relation to its --

12   to terrorist organizations?

13        A    Yes.

14        Q    Okay.

15             And as part of your job, were you aware of any

16   activities of the -- I'm going to refer to it as the

17   al-Turabi regime or the NIF regime of the Republic of Sudan

18   relating to terrorism?

19        A    Yes, I was.

20        Q    Okay.  Were certain terrorists groups allowed to

21   reside in Sudan?

22        A    My opinion is that that whole country was

23   highjacked by terrorist organizations, particularly

24   al-Qaeda.

25        Q    Okay.  So that -- So al-Qaeda was one of those

 1    groups that was allowed -- that as you say highjacked the

 2    nation of Sudan, the Republic of Sudan?

 3         A     That is correct.

 4         Q     And how would you describe the relationship

 5    between Sudan and al-Qaeda from 1991 to 1996?

 6         A     Very friendly, probably mutually beneficial.

 7    I think they're -- Sudan at the time was inclined to support

 8    people such as those organizations that they allowed in

 9    there.

10              The al-Qaeda organizations been reported.  He went

11    in there a with a lot of money and set up business and built

12    roads and set up some legitimate businesses.  But the idea

13    was that he would have a safe haven there as well as free

14    passage in and out.

15         Q     And, again, I'd like to turn your attention to the

16    words of the 9/11 Commission.

17              MS. KENT:  And this is Exhibit 9, Your Honor, and

18    it is pages 57 and some of 58 in the 9/11 Commission.

19    And it has described how Al-Qaeda flourished in Sudan.

20    BY MS. KENT:

21         Q     And, Mr. Watson, if you need, I can provide --

22    Would you like to see a hard copy of this?

23         A     Sure.

24              THE COURT:  This is No. 9?

25              MS. KENT:  Yes, No. 9, pages 57 and 58.

1          And, Your Honor, may I approach the witness?

2          THE COURT:  Certainly.

3          MS. KENT:  Thank you.

4          (Pause)

5   BY MS. KENT:

6      Q    So, Mr. Watson, as you can tell by the text, the:

7   9/11 Commission has described how al-Qaeda flourished in

8   Sudan.

9          It says, "Bin Laden moved to Sudan in 1991 and set

10  up a large and complex set of intertwined business and

11  terrorist enterprises.  In time, the former would encompass

12  numerous companies and a global network of bank accounts and

13  nongovernmental institutions."

14         Later on in the text it says, "Meanwhile, al-Qaeda

15  finance officers and top operatives used their position in

16  bin Laden's businesses to acquire weapons, explosives and

17  technical equipment for terrorist purposes."

18         And then at 58 it says, "The groundwork for a true

19  global terrorist network was being laid."

20         Mr. Watson, do you agree with this assessment laid

21  out in the 9/11's Commission's report?

22     A    I do.

23     Q    And the type of support that is described in the

24  9/11 Commission's report, what's the significance of having

25  intertwined business and terrorist enterprises, allowing,

1    you know, training for weapons, also acquiring weapons and

2    explosives technical equipment, et cetera?

3         A    It allowed him to expand the organization, make it

4    better.  It allowed them to have funds available through

5    legitimate businesses.  It gave them some credibility.

6              It also allowed for the organization to be a safe

7    place, because, at that point in time, he had been removed

8    from Saudi Arabia.  He had no country.  And so he was

9    allowed to operate with impunity there in Sudan for a number

10   of years until 1996, if I recall.

11        Q    And one of the things you mentioned is that you

12   said it gave the organization credibility.  What do you mean

13   by that?

14        A    The ability to issue statements; the ability to

15   recruit people; the ability to set up training camps; the

16   ability to travel in and out of places to identify potential

17   targets, in my opinion.

18        Q    And would having a safe place to meet, the ability

19   to travel safely and freely, would this have allowed

20   Al-Qaeda and Osama bin Laden -- would this have given them a

21   way of shielding their activities from other law enforcement

22   or intelligence agencies?

23        A    Yeah.  It's not like setting up shop in Leesburg,

24   Virginia, where, you know, you would come under scrutiny of

25   the Bureau or some federal agency.  It's a foreign country,

1    and a foreign country that was not the most favored,

2    you know, looking toward the United States.  So it was very

3    difficult to operate in that environment as a

4    U.S. Government representative.

5         Q    So bin Laden is in a place where it's difficult

6    for the U.S. Government to keep tabs on him.

7              And in terms of the Sudanese government, is it

8    accurate to say that bin Laden and al-Qaeda are also in a

9    place where they don't have to worry about the interference

10   of Sudanese authorities with their terrorist activities?

11        A    That is correct.

12             And just for historical value, it's been proven

13   many times again and again in public source information,

14   where countries would actually tip off individuals, tell

15   them to leave or hide out if they thought the

16   U.S. Government was involved in trying to locate them.

17        Q    Okay.

18             And then even if you -- I think you have touched

19   on some of this but I'll ask you, how would this type of

20   support, you know, safe haven, the ability to stay one step

21   ahead of law enforcement, credibility, the acquisition of

22   these types of materials and training, how does this enable

23   al-Qaeda to commit the U.S.S. Cole bombing?  Or how did?

24        A    It gave them free access -- Well, since he left in

25   '96, it developed the organization so that he could continue

1    his activities as he left.  So planning for the embassy

2    bombings or planning for the Cole was probably years in the

3    making.

4         Q    Okay.  Thank you.

5              And then I want to turn your attention to, again,

6    we've provided you with a copy and I can approach and give

7    this to you, the U.S. Departments of State Havens of Global

8    Terrorism for the year 2000.

9              And my apologies.  I do not have the exhibit

10   number in front of me.

11             MS. KENT:  Ms. Coln, do you mind just letting,

12   reminded me of the --

13             DEPUTY CLERK:  Do you want to take a look at this

14   then?

15             MS. KENT:  Sure.  Thank you.

16             Your Honor, that's Exhibit 15.

17             THE COURT:  15.  Thank you.

18   BY MS. KENT:

19        Q    Mr. Watson, would you like me to provide you with

20   a copy?

21        A    I've read it, but, yeah, if you have an extra

22   copy, that would be great, thank you.

23        Q    And in that section governing Sudan, it says,

24   "Sudan continued to be used as a safe haven for members of

25   the various groups, including associates of Osama bin

1   Laden's al-Qaeda organization.  Egyptian el-Ghad, el Ghad's

2   Islamia, Egyptian Islamic Jihad, the Palestine Islamic Jihad

3   and Hamas.  Most of the groups use Sudan primarily as a

4   security interest for assisting operations elsewhere."

5           So in 2000, had Osama bin Laden and al-Qaeda been

6   expelled from the Sudan?

7       A    Yes.

8       Q    They no longer -- They no longer had safe haven

9   there?

10      A    That is correct, in 1996.

11      Q    So --

12      A    And that was as a result of tremendous pressure

13  being placed by the Saudis to do something based upon other

14  activities.

15      Q    Okay.  And so after -- Is it your opinion that

16  after he was -- after bin Laden and Al-Qaeda was expelled

17  from Sudan that the Sudanese continued to support bin Laden

18  in some way -- and Al-Qaeda in certain respects of the

19  relationship?

20      A    That's correct.

21      Q    And the relationship was this -- again, "Sudan

22  continued to be used as a safe haven as referred to in

23  Patterns of Global Terrorism."

24          What is the significance of the relationship laid

25  out in the Patterns of Global Terrorism of 2000?

1           What is it?

2           How is it important that Sudan continue to allow

3    itself to be used as a safe haven by members of al-Qaeda?

4        A    Well, it was a ready-made -- in my opinion, it was

5    a ready-made safe harbor.  It was an escape mechanism for

6    terrorist activities probably conducted anywhere.  If they

7    could get back to the Sudan, they felt, you know, at least

8    it wasn't, you know, it's a more -- elsewhere, they might

9    get in trouble for.  It was a protection of the organization

10   mainly.  And the availability of passports, too.

11       Q    Did it help the organization plan more freely?

12       A    Yeah, sure.

13           And I think I mentioned that even '91 to '96 and

14   then even post-'96 planning it, they used that country,

15   so --

16       Q    So the next document that I'd like to turn your

17   attention to -- and this is Exhibit 17.  This is the

18   statements that were filed by the Canadian Security and

19   Intelligence Service that I'll refer to as CSIS, C-S-I-S, in

20   the Federal Court Trial Division in the Matter of

21   Certificate Issued Pursuant to Section 40.1 of the

22   Immigration Act and the application of

23   Mohammad Zeki Mahjoub.

24           And the statement that I'd like to refer to you

25   can be found on page 22 of the fax letterhead.  If you look

1    it says, "Page 22 of 41."  So that's paragraph 26 that I'm

2    going to ask you to take a look at.

3            And, Mr. Watson, would you like me to provide you

4    with a hard copy of that?

5        A    I have it here.

6        Q    Okay.  So, first of all, have you ever heard of

7    CSIS?

8        A    Yes.  It stands for Canadian Intelligence and

9    Security Service.

10       Q    Are its reports something that you in your

11   experience would consider reliable and accurate?

12       A    In my opinion, they're a very reliable and very

13   professional organization.

14       Q    And so the CSIS --

15           And is it something that you, in your works for

16   the FBI or the CIA, would you have seen intelligence from

17   CSIS or reports from CSIS?

18       A    I have a lot of experience with CSIS.

19       Q    Okay.  So the statement that I'm going to read to

20   you in relevant part, it says, "A 1998 agreement between

21   al-Zawahiri and leaders of Sudanese" --

22           THE COURT REPORTER:  You're reading too fast.

23   Can you start that over, please?

24           THE COURT:  When you read, you are reading

25   entirely too fast.  Please go slower.

1          MS. KENT:  I apologize, Your Honor.

2          THE COURT:  Or either that or give the reporter a

3     copy of the --

4          MS. KENT:  "A 1998 agreement between al-Zawahiri

5     and leaders of Sudanese, Eritrean, Ugandan, Yumeni, and

6     Islamic -- and Egyptian Islamic groups established budgets

7     for financing international terrorist operations and plans

8     to mobilize officials in Sudan's embassies in London, Sanaa,

9     New York, Rome, Karachi and Mogadishu.  These leaders also

10    agreed at the meeting to open Sudan's doors to international

11    Islamic fundraising organizations and to facilitate the

12    movement of extremists from providing them with Sudanese

13    diplomatic passports."

14          In this type of statement, this type of

15    intelligence, is this something that would, again, be

16    considered a reliable statement if issued by CSIS?

17     A     Yeah.  I'm not familiar with this court process

18    that was stated here, but my experience, personal experience

19    with CSIS is if they presented something in court, it would

20    be very reliable.

21     Q     And the CSIS statement mentions Sudanese

22    diplomatic passports.  What would be the significance of

23    using Sudanese embassies and providing Sudanese diplomatic

24    passports?

25     A     Well, for history, a real quick summary of that,

1    there are two types of passports.  Basically, there are

2    tourist passports, Government -- three types.

3    U.S. Government official business and diplomatic passport.

4           But the diplomatic passport, if you carry a

5    diplomatic passport, you're immune from laws and criminal

6    process, most of them, in a country that you're going to.

7    So if you get caught doing something, you can't be

8    prosecuted.  You can be deported, or P&G is the official

9    document.

10          So if someone were giving out -- if a country were

11   giving out diplomatic passports to individuals that were not

12   really entitled to those, that would be a tremendous

13   advantage to have those.

14       Q    And a tremendous advantage, basically, because

15   they might be immune from prosecution?

16       A    Diplomatic immunity, that's correct.

17       Q    Would it facilitate travel easier or enable them

18   to carry things on with them?

19       A    An association with diplomatic passports have

20   diplomatic pouches which are not authorized to be examined

21   by the host country.

22       Q    So somebody who had a diplomatic passport would be

23   able to have -- would have the access to a diplomatic pouch

24   where they could transport types of materials without

25   government scrutiny or scrutiny at the borders; is that

1  accurate?

2      A    That's accurate enough, yes.

3      Q    So I'd like to move on to discussing al-Qaeda and

4  just the Islamic Republic of Iran.  And, Mr. Watson, I have

5  a few foundation questions for you.

6      A    Okay.

7      Q    Mr. Watson, at one point you were chief of the

8  Iran Hezbollah unit within the FBI; is that correct?

9      A    That's correct.

10     Q    And did you become familiar with the Iranian

11 Ministry of Intelligence and Security and the Islamic

12 Revolutionary Guard Corps and its Quds division during your

13 time as the chief of the Iran unit?

14     A    Yes.

15     Q    Could you briefly explain the relationship between

16 the ministry of intelligence and security, the Islamic

17 Revolutionary Guard Corps and the IRG Quds Division and the

18 Government of Iran, so how these entities relate to the

19 Government of Iran.

20     A    Sure.

21         The Iranian Government has an intelligence

22 service, it's called the ministry MOIS, and they're

23 responsible for external security of the Islamic regime

24 there in Iran.  It goes way back in history back to the days

25 of the Shah, when that was set up and helped train by our

1   Government, certain government agencies.

2          When that fell, they were taken -- I mean, they

3   were all kicked out, the U.S. representatives were, so the

4   MOIS went off on their own.  And basically, they carried out

5   different acts and did different things as a true

6   intelligence service, even though they did commit some acts

7   of violence.

8          There was a murder here up in Maryland in,

9   I think, the '80s.  Judge, you might remember that.

10         THE COURT:  I do.

11   A     And it was carried out by the MOIS.  U.S. postal

12   worker was shot and killed.  So you have to think of them as

13   bad guys working for the State of Iran.

14         Separate from that, you have the IRGC, the

15   revolutionary guard, which is a quasi-military organization

16   and the Quds force, which are basically more influenced by

17   the religious sectors of Iran.  And so you have those forces

18   working mainly in the region of the Middle East.  They don't

19   go much beyond Pakistan or the North Africa rim.  So I've

20   studied and understand this.  So their relationships all

21   intertwine with the government.

22         Sometimes the government has direct access and

23   control over these folks, sometimes they don't.  And then

24   it's all reliant upon the religious sectors to try to police

25   those out.

1        THE WITNESS:  Does that answer the question,

2    Judge?

3        THE COURT:  I think so.

4        THE WITNESS:  Okay.

5    BY MS. KENT:

6    Q    And just to make sure, for the record.

7        And so from the time you were chief of the Iran

8    unit until 2002 when you left the FBI, it's your

9    understanding that IRGC Quds, the Administrative

10    Intelligence and Security and the IRGC, they were agencies

11    of the government of Iran just to --

12    A    Absolutely.

13    Q    Okay.

14        So the next document that I'd like you to take a

15    look at -- again, this is referring back to Exhibit 9, which

16    I'm going to read slowly on page 61 of the 9/11 Commission

17    report.  So -- and, Mr. Watson, I will read this and then I

18    can provide you -- I can give you a hard copy --

19    A    Okay, that's fine.

20    Q    -- to answer.

21        On page 61 of that report it says, "Turabi sought

22    to persuade Shiites and Sunnis" --

23        THE COURT:  What page are you on?

24        MS. KENT:  Page 61.  It's on the top right corner.

25    Exhibit 9 is an excerpt of the commission.

1          THE COURT:  I see it.

2          MS. KENT:  Okay, great.  And it's the second

3    paragraph.

4          THE COURT:  Starts with the word "Turabi," right?

5          MS. KENT:  Yes, that's correct.

6    BY MS. KENT:

7      Q    "Turabi sought to persuade Shiites and Sudanese to

8    put aside their divisions and join against the common enemy.

9    In late 1991 or 1992, discussions with Sudan between

10   al-Qaeda and Iranian operatives led to an informal agreement

11   to cooperate in providing support, even if only training for

12   actions carried out primarily against Israel and the

13   United States.  Not long afterwards, senior al-Qaeda

14   operatives and trainers traveled to Iran to receive training

15   in explosives.  In the fall of 1993, another such delegation

16   went to the Bekaa Valley in Lebanon for further training in

17   explosives, as well as in intelligence and security.

18   Bin Laden reportedly showed particular interest in learning

19   how to use truck bombs such as the one that killed 241

20   U.S. Marines in Lebanon in 1983.  The relationship between

21   Al-Qaeda and Iran demonstrated that Sunni-Shia divisions did

22   not necessarily pose an insurmountable barrier to

23   cooperation in terrorist operations."

24          Mr.  Watson, I will provide you with a copy of

25   that.

1          So part of that report mentions members of

2    al-Qaeda; A, being trained by Iran; and B, traveling to the

3    Bekaa Valley to be trained by Hezbollah.  Is using Hezbollah

4    to train terrorist groups something that Iran commonly does?

5      A    It's very clear public source and public knowledge

6    about Iran.  I mean, Hezbollah.  It's clearly sponsored

7    monetarily by the government of Iran.

8          So the dilemma, though, that you have with this

9    statement -- not dilemma, the problem -- not the problem

10   either.  The kind of underlying catch here is the Iranians

11   are Shias, and bin Laden was a Sunni.  So I come out by

12   saying or thinking that certainly Iran's hatred of mutual

13   enemies that al-Qaeda had are the same.  So if they fund his

14   Hezbollah and Hezbollah trains Al-Qaeda members or -- it

15   would not be beyond the scope for Iran to do that under the

16   umbrella of the evil empire, all the infidels in the

17   United States.

18         So to answer the question here, I'm not

19   specifically, you know, going to comment about did they

20   train or not train.  It makes sense to me.  And if they did

21   train, if Hezbollah trained Al-Qaeda members, then that very

22   clearly has a fingerprint back to Iran through the financial

23   and the support that they give Hezbollah and the Bekaa

24   Valley or Lebanon.  And we saw that time and time and time.

25   It's been reported time and time again about the Americans

1    kidnapped and killed by Hezbollah, so that's kind of where I

2    come out on that.

3        Q    And generally, you mentioned the relationship

4    between Hezbollah and Iran in the Bekaa Valley.

5    Can you discuss a little bit of your understanding of the

6    relationship between Hezbollah and Iran?

7        A    It's very close.  It's set up by them, sponsored

8    by them, fundraising by them, fundraising, you know, to, in

9    order to advance the cause of what they perceive.

10           And Hezbollah was a very active terrorist

11   organization against Americans for a long period of time in

12   the late '70s and '80s, and through their own recognition

13   that they quit killing Americans and kidnapping Americans,

14   and they kind of fell off the scope for American interests.

15   But when they do that again, it gets the attention of the

16   Americans.

17       Q    And in terms of any Iranian agencies that would

18   have been involved with Hezbollah and the Bekaa Valley,

19   would the IRGC or the IRGC Quds Division have been involved

20   in the -- not necessarily in the training of Al-Qaeda

21   operatives but just based on your general knowledge, are

22   those Iranian agencies that are active in that area or

23   active with Hezbollah in that area?

24       A    All three of them, very much so.

25       Q    Okay.  And is training terrorists organizations on

1   the capabilities, the weapons capabilities of how to destroy

2   large structures, is that something that Hezbollah is

3   capable of doing?

4        A    It's been proven time and time again it is.

5        Q    And would the explosives training -- Would

6   explosives training received by Hezbollah enable a terrorist

7   organization to construct a bomb like that used in the

8   U.S.S. Cole?

9        A    Would it enable them or assist them in the

10   efforts?

11        Q    Yes.

12        A    Yes, it would.

13        Q    Okay.

14             And I want to turn now to page 240 of the 9/11

15   Commission report which discusses Iran's material support or

16   support of al-Qaeda in -- relating to freedom of travel.

17   And it's -- I'd like to draw your attention to the middle

18   part of -- this is on page 240 -- the middle part of the

19   second paragraph that begins with "Khallad."

20   And, Mr. Watson, I'll read this and then I can provide you

21   with a copy.

22             It says, "Khallad and other detainees have

23   described the willingness of Iranian officials to facilitate

24   the travel of al-Qaeda members through Iran on their way to

25   and from Afghanistan.  For example, Iranian border

1   inspectors would be told not to place telltale stamps in the

2   passports of these travelers.  Such arrangements were

3   particularly beneficial to Saudi members of al-Qaeda.

4          "Our knowledge of the international travels of the

5   al-Qaeda operatives selected for the 9/11 operations remains

6   fragmentary, but we now have evidence suggesting that eight

7   to 10 of the Saudi muscle operatives traveled in or out of

8   Iran between October 2000 and February 2001."

9          Mr. Watson, what is the significance of the

10  facilitation of travel of individual members of al-Qaeda?

11  A     The significance of being able to travel to, say,

12  Afghanistan to attend some of the training bases there to

13  seek indoctrination training or signing up for, so to speak,

14  to promise your support and loyalty to bin Laden, the

15  significance of that is the ability to get there and get out

16  without being detected.

17         And so, again, my opinion -- and I hesitate --

18  I'll be careful about this.  My opinion was, it's very

19  important if someone wanted to be recruited out of Yemen to

20  get into Afghanistan to receive that training and come back

21  without any stamps associated with their passport.

22  And so all you have to do is look at the 9/11 crew to see

23  that all of those passports when they came in the U.S. were

24  clean passports or the majority of them. The ringleader of

25  that, the Egyptian who died in the plane, his passport was

1    just recently issued by the Egyptian government, which we

2    know -- which has been reported that he had a passport

3    before.  So if you're a terrorist, you want to get in and

4    you want to swear allegiance.

5          And, you know, if West Virginia was the next

6    country over, if I could get in there, get training, come

7    back here, somebody says, let me see your passport, it shows

8    no record, then it's more difficult to detect and be able to

9    prevent.

10          So that's the value of traveling in a country

11   without getting stamps.  And you see that all the time in

12   the Middle East.  So a lot of people either dump their

13   passports and get clean passports or whatever they do in

14   order to avoid the stamps of where they've been.  And

15   so it's very common in narcotics matters, too.

16   Q    And, Mr. Watson, just to clarify.  When you say

17   "clean passport," do you mean a passport without stamps?

18   A    You can have stamps, but it won't show a Pakistani

19   stamp or an Afghan -- or an Iranian passport.  So how do you

20   get in there?

21          So, I mean, think about it.  If you're trying to

22   organize and plan something, it's very important and it's

23   very helpful for a country or for the terrorist to have a

24   country that says, well, we'll look the other way if you

25   want to come through.  And then it makes it very difficult

```
 1   for anybody in the U.S. intelligence or law enforcement to

 2   try to figure that out post-training, or even before

 3   training.

 4       Q    Right.

 5            And you've touched on this, but just to kind of

 6   tie it together.  And how would facilitation of travel like

 7   describe -- like that described in the 9/11 Commission

 8   report and the way you just expounded upon, how would this

 9   have facilitated or enabled Al-Qaeda to commit terrorist

10   operations like the U.S.S. Cole?

11       A    It would have allowed for the infrastructure

12   support to be non-visible, and you want to be invisible in

13   all of this.

14            You would be allowed to go and obtain whatever you

15   needed to do or live in a country that you're not a citizen

16   of for a period of time in order to surveille and see things

17   or activities that you're interested in and be able to come

18   and go.  Because if you come and go very often, even to

19   Canada, Canada is going to grab you and say, hey,

20   Mr. Watson, why have you been here five times the last six

21   months?  Are you working here?  It's about a tax deal, or,

22   you know, or whatever the situation is.  So the passports

23   are kind of a key here to try to be able to figure out

24   what's going on.

25            And so if you look back -- not -- I'm not going to
```

1    get into the investigative part.  If you don't see a lot of

2    stamps on a passport, you kind of -- you're kind of chewed

3    up and take notice.

4            So this wasn't -- this was an organized thing and

5    they were very good at it.  Still are, so I've been told.

6    Q    So you've been told.

7            MS. KENT:  The Court's indulgence.  May I just

8    confer with co-counsel for a minute before?

9            THE COURT:  Sure.

10           While you're doing that --

11           THE WITNESS:  Yes, sir.

12           THE COURT:  Why don't we explain for the record

13   where and what is the Bekaa Valley and why it's so

14   significant in the terms of trying to understand terrorist

15   activity in the Mideast.  Physically I understand it is an

16   isolated place.

17           THE WITNESS:  It is an isolated place.

18   And it's -- It's a haven for people that want to train and

19   want to conduct terrorist acts, because the country of

20   Lebanon -- and I've been there and -- it's been highjacked.

21   I mean, the country is divided.  So you have an area where

22   no one really goes in and penetrates that place.  You see a

23   lot of the attacks coming out into Israel through that

24   location.  So it's kind of the wild west without being in

25   the west and in the wild.  But it's very difficult, and the

1    host government really doesn't have much control over that.

2             THE COURT:  So --

3             THE WITNESS:  It's a known training area.

4    It's been reported in the indictment on Khobar Towers that

5    they train there, and they got explosives and smuggle that

6    into Saudi Arabia through the Bekaa valley.

7             THE COURT:  To outline your other point, if I am

8    interested in training in the Bekaa Valley, what stamp would

9    my passport contain in the ordinary course when I arrived in

10   Lebanon?

11            THE WITNESS:  It would be stamped into Lebanon.

12            THE COURT:  So then I go to the Bekaa Valley and

13   come out and I go on my way home.

14            THE WITNESS:  On your exit, you don't get stamped

15   going out.

16            THE COURT:  But what you were explaining to us is

17   that if I'm carrying a clean passport, a diplomatic

18   passport, it will not be stamped in that direction.

19   So you as an FBI officer would never know that this

20   particular gentleman had been to the Bekaa Valley?

21            THE WITNESS:  It would not be necessarily a

22   diplomatic passport but any type of passport.  If you can

23   protect your passport and not get it stamped, you're not

24   there.  And if anybody says you're there, it's very

25   difficult to prove that you were there.  And so that's a

1    value of that.

2              So you look at these guys that came in here,

3    you know, red flags would have gone up on a lot of those

4    guys if it had shown, hey, you went to Pakistan, you got

5    stamped into Pakistan, you were -- and then you came back

6    out of Pakistan three months later.  What were you doing

7    there?  I mean, it would have led to suspicion.

8              You get an Egyptian passport that has no stamps on

9    it that come in here and get stamped in the U.S. on

10   September or August 22nd, you say, what's the story here?

11   The story is, well, I'm an engineer and I'm here to apply to

12   a plastic plant, or he's dumped his passport before and all

13   the stamps are gone now.

14             THE COURT:  Now, in order to -- as you explained,

15   in order to do that and travel freely in and out of the

16   Bekaa Valley, you have to have the complicity of the

17   government there --

18             THE WITNESS:  Yes, sir.

19             THE COURT:  -- so that you can go in and out

20   without your presence being detected?

21             THE WITNESS:  Yes, sir.  Or you can get through --

22   I mean, there are ways to get in and out of there and

23   there's coyotes that can run people, but they're all paid

24   off.  Kind of like coming through Mexico a little bit but

25   not.

1          THE COURT:  But the Bekaa Valley in many of the

2    cases, as you know, before the courts has been a crucial

3    place to understand.

4          THE WITNESS:  Yes, sir.  Without a doubt.

5    And I would not want to emphasize that.

6          The Judge is exactly right on that, because there

7    was a long time big counterfeit case that was going on

8    but -- okay.

9          MS. KENT:  I have no further questions,

10   Your Honor, at this time, thank you.

11         THE COURT:  Thank you, Mr. Watson.

12         THE WITNESS:  Yes, sir.  Thank you.  Good luck.

13         (Witness excused)

14         THE COURT:  Yes, Counsel.

15         MR. AMBUSH:  Thank you, Your Honor.

16         Your Honor, I'd like to call Hannah Rux.

17         THE COURT:  Sure.

18         DEPUTY CLERK:  Raise your right hand.

19         (Witness is placed under oath.)

20                        - - -

21                     HANNAH L. RUX

22   called as a witness on behalf of the Plaintiff,

23   being first duly placed under oath, testified as follows:

24                  DIRECT EXAMINATION

25   BY MR. AMBUSH:

1     Q     Can you please state your name for the record.

2     A     Hannah L. Rux.

3     Q     And what state do you live in?

4     A     West Virginia.

5     Q     Are you an American citizen?

6     A     Yes.

7     Q     Are you married?

8     A     Yes.

9     Q     Who's your husband?

10    A     Doe Victim B.

11    Q     How many children do you have?

12    A     I have three children, two with Doe Victim B.

13    Q     Are you employed?

14    A     No.

15    Q     Are you going to school?

16    A     Yep.  I'm starting next week.  I'm going to be

17    going to Fairmont State University.

18    Q     And how do you know Kevin Rux?

19    A     He was my brother-in-law, Doe Victim B's brother.

20    Q     When did you first meet Doe Victim B?

21    A     When did we first meet?  We went to school

22    together.  When he come in, I think, '88, we were in grade

23    school together.

24          And in high school we dated.

25          And then after we dated, we still became -- we

1    stayed best friends after that and hung out all the time,

2    till he went back to North Dakota.  I think I was a senior

3    when he left.

4         Q    And having met Doe Victim B and dated Doe Victim

5    B, you at some point in time met his family?

6         A    When?  What was it?

7         Q    You met his family in the course of the time you

8    were dating?

9         A    I had met Doe Victim D and his Mom.  They lived

10   together with Doe Victim B.  I never -- I briefly met Doe

11   Victim C, but not very -- not really.

12        Q    Okay.  And Kevin, when did you meet Kevin?

13        A    That was in 1999, in April.

14        Q    Were you living with Doe Victim B at that time?

15        A    Yes.

16        Q    And did you know Kevin at the time he passed away?

17        A    Yes.

18        Q    And from your observation, did you see the

19   brothers together?

20        A    Yes.

21        Q    And your husband Doe Victim B with his brother

22   Kevin?

23        A    Yeah.  I -- They were together every day.

24   He was living with Doe Victim A for a brief time, him and

25   Olivia separated.  And every day, Doe Victim B and Kevin was

1    together, basically, every day.

2         Q    Did they --

3         A    They would go out.  He would come over.  We'd have

4    cook-outs.  They would go places together and go to Doe

5    Victim A's and just have a good time.

6         Q    And how long did that go on for?

7         A    Until he re-enlisted and went back to the Navy.

8    He moved to Norfolk at that time.

9         Q    And can you describe what kind of a person Kevin

10   was?

11        A    He was a good-hearted person.  He would give me

12   advice about Doe Victim B.  And Doe Victim B was having a

13   hard time transitioning from -- he had spent a couple years

14   in prison, and he just got out and following -- the year

15   before that, and Kevin would give me advice about how to

16   give Doe Victim B time to adjust to the outside again and

17   told me how good Doe Victim B was.  And just give me

18   positive -- that he was always positive, always looking

19   positive.  And he was always there for Doe Victim B, trying

20   to lead him in the right way.

21        Q    Was Kevin more of a thoughtful-type person?

22        A    Oh, yeah, yeah.

23             He was a very respectful person.  Like if I was

24   home alone and Doe Victim B wasn't home, he wouldn't come

25   inside, he would talk to me at the door.

1          He had a lot of respect for women in general and

2     just everybody.  He had a lot of respect for everybody.

3          Yeah, he was very thoughtful and respectful, very

4     kind.

5     Q     And did you have occasion to see Kevin interact

6     with the other family members besides Doe Victim B?

7     A     Doe Victim E, I saw him interact with him.

8          And I don't remember -- I don't remember anybody

9     else really maybe, because Doe Victim D was in Minnesota.

10    And during that summer basically was just Doe Victim E and

11    Doe Victim B, because he had lived with Kevin for a while

12    before he left.

13    Q     Is it fair to say that Kevin was the same whether

14    he was with Doe Victim B or with other people or -- he was

15    the same person wherever he was, the same type of thoughtful

16    person?

17    A     Yeah.  He treated everybody good, yeah.

18    Q     When did you first learn about the Cole attack?

19    A     I was at the house and Doe Victim B had left to go

20    to truck driving school that morning, and I was in my living

21    room and I heard it come across the news.  And then it

22    wasn't long after that and Doe Victim B had called.

23    Q     So you heard about it before Doe Victim B did or

24    after?

25    A     I heard about it briefly before Doe Victim B

1    called.  And I guess it was maybe a couple hours before I

2    saw Doe Victim B, he come home and got us and then we went

3    back over to Doe Victim A's.

4        Q    And what was Doe Victim B's mental state at that

5    time?

6        A    Oh, when he got home, he was -- seemed confused

7    when -- he was crying, and he didn't seem to be very

8    responsive.

9            Like when he come in the door, he told me about

10   it, and he had sat down on my couch and he had become

11   unresponsive for about an hour.

12           And I had seen this type of action before,

13   you know.  And I went over and got my mom and my dad, they

14   live beside of us, and my dad come over and was talking to

15   Doe Victim B.  And about an hour before he started to

16   respond.

17           And then after he, I guess, come back to reality,

18   we drove over there to his mom's.  I drove him over there.

19       Q    When you say he was not responsive, do you mean he

20   was in shock?

21       A    I would imagine you might say that, because, like,

22   if you were -- would talk -- if I were to talk to you, you

23   were just -- if you would just stare into space and you

24   can't hear or see or respond to anything.

25           He don't even remember this at all.  I've asked

1   him before.  He didn't remember sitting there, he didn't

2   remember my dad coming and talking to him.  And he didn't --

3   It was almost like he wasn't there.

4        Q    And when did you see Doe Victim A after you heard

5   the news?

6        A    I suppose altogether maybe four or five hours

7   after.

8        Q    And what was her mental state?

9        A    She was crying, and pretty much hysterically

10  crying and worried.  You could see worry on her face.

11            I remember telling -- I remember telling her

12  that -- because at that point he was just missing.

13  And I remember telling her that he's missing.  He's probably

14  okay.  And she looked at us -- at me and said, "He's not

15  okay.  He's gone."  And I said, I said, "How do you know

16  that he's gone?"  And she said, "Because he's my son.

17  I know because I'm his mother" is what she said; that she

18  just knew, because she had that mother feeling that she

19  wasn't going to see him.

20       Q    Were you there when the master chief came to the

21  door?

22       A    Yeah.

23       Q    And what was your impression of that incident?

24       A    Of course, Doe Victim A was upset when she saw

25  him.  She started screaming.  That she didn't want him to

1    come in.  She was pretty much hysterical.  And after he

2    eventually did come in and he told her, she just cried.  And

3    Doe Victim B held her on his lap.  And they sat there for a

4    good hour probably.  And he just -- he just held her like a

5    baby for about an hour.

6         Q    Did you see Doe Victim E and Doe Victim D at that

7    time or did they come later?

8         A    Doe Victim E and Doe Victim D, no, they came a

9    little bit later.

10        Q    And what was their reaction?

11        A    They -- You can tell they were worried and maybe

12   anxious, you could say, like whether or not he was -- where

13   he was, you know, because they couldn't find him at the

14   time.  So you could see a lot of worry on their face, that

15   they were almost, like, in a panic.

16        Q    Would you say they were worried or more like

17   distraught?

18        A    Probably distraught.

19        Q    And did they exhibit any behaviors that you

20   noticed?

21        A    Well, if you -- they looked sort of nervous and --

22   I don't know.  The unknowing was pretty rough on them.

23   You could tell, because they didn't know for so long.

24   They had -- You could tell they had hope; but in the inside,

25   you knew that there wasn't a hope.

1     Q     And then at some point maybe two weeks later the

2  chaplain came; is that correct?

3     A     I believe they met him at Kevin's apartment when

4  they told him -- told him the news.

5     Q     And what was the reaction at that point?

6     A     I remember because I was standing afar further off

7  from them.

8          And when the chaplain come and he actually told

9  Doe Victim A that he was gone, she literally collapsed on

10  the floor.  And I remember Doe Victim C coming over and

11  picking her up, and he held her on his lap until she could

12  function.  She wasn't able to function at all.  None of them

13  were.

14          And then when Olivia threw that fit like she did

15  and wanted her money and their family, our family was just

16  in shock and collapsing and crying.  It was just chaos,

17  you know?  We had a total different reaction.  They had a

18  total different reaction than what Olivia did.

19     Q     And what was the effect, in your opinion, of

20  Kevin's death on Doe Victim B after that time period?

21     A     Well, from the day the ship got bombed, Doe Victim

22  B completely changed.  He changed right away.  He was a fun,

23  outgoing guy that there was never a bad day with Doe Victim

24  B, you know.  He was always, come on, let's go here; come

25  on, let's go there, you know.  And after that day, he's

1   totally changed.  He's backward, he don't want to speak to

2   anybody, he won't go into the store now, he won't -- I have

3   to beg him to go anywhere with me.  And so I'm pretty much

4   have to do everything myself, pretty much raised the kids

5   myself, because he won't do anything.  I feel that my kids

6   have lost their father of what he could have been, you know.

7        Q    Before that, your kids had a good relationship

8   with their father?

9        A    Well, my third one wasn't born at that time.

10  But Levi, he was born in January of 2000.  So he was ten

11  months old when Kevin died.  But he did everything with Levi

12  as a baby.  But as if -- My kids didn't get the chance to

13  know who Doe Victim B really was, you know what I'm trying

14  to say, because he was only ten months old and Kailey wasn't

15  born.  And so I believe that they missed out on who he was.

16  He was a fun, outgoing person.  And life of the party, you

17  know, outgoing.  But now he's not.  He sleeps all the time.

18  He -- I mean, there's been I don't even know how many days

19  that he would sleep until 2:00 or 3:00.  And he would have

20  good jobs, and then all of a sudden he would go into this

21  sleeping mode, you know, and he wouldn't get up out of bed

22  to go to work and then he would get fired.  And then one

23  right after the other.  And then it just was a cycle, a

24  never-ending cycle of sleeping.

25       Q    And that pattern of behavior is continuing still

1   to this day?

2       A    Oh, yeah.  He just recently got hired about two

3   weeks ago or so.  But before that, it's been off and on.

4   If it wasn't for unemployment, I don't even know what

5   we would do, you know.  I've had a couple jobs, but -- and

6   that's one reason I went back to school, so I would have

7   something to rely on.

8       Q    And before the attack, how often did you interact

9   with Doe Victim A, was it on a daily, weekly basis?

10      A    Well, every week for sure, if not two or three

11  times a week, because Kevin was living over there at the

12  time, so Doe Victim B went over after work or whenever we

13  had a chance, we would go over.

14      Q    And since Kevin died, how has Doe Victim A been?

15  How's her -- what's your impression of how her emotional

16  state is?

17      A    She's totally changed, too.  She's a lot -- she

18  was an outgoing person that would go on a spur of the moment

19  just take a trip to North Dakota or take a trip whenever,

20  you know.  Now she won't -- she don't do that anymore.

21  And when you talk to her, she's slow at responding.

22  She's still like that.  Before she was real fast at

23  responding.  She would be very lively before.  And now it's

24  totally different, so ...

25      Q    How long have you known Doe Victim D?

1       A     Since 1992 probably.

2       Q     And do you recall how Doe Victim D was before the

3    murder of Kevin?

4       A     He was a lot like Doe Victim B, never had a bad

5    day.  And they acted a lot alike, him and Doe Victim D.

6    They were always happy, and they basically was always happy.

7    I mean, if I was in a bad mood or sad or anything, you

8    wouldn't stay sad around him too long, you know.

9       Q     And after the attack and after Kevin was killed,

10   what is your impression of Doe Victim D's mental status or

11   emotional state?

12      A     I see a lot of anger.  You can't hardly talk to

13   him.  He gets angry a lot.  And I think he's -- you could

14   see the sadness in him.  I think that's why he's angry,

15   because of the attack.

16            He used to be easy to talk to, but he's not

17   anymore.  He's definitely changed.

18            MR. AMBUSH:  No further questions, Your Honor.

19            THE COURT:  Thank you.  You may stand down.

20            (Witness excused)

21            MR. AMBUSH:  That concludes our evidentiary part

22   of our case.  We have no further witnesses to call today.

23            THE COURT:  Okay.

24            MR. AMBUSH:  Although this was scheduled for a

25   two-day hearing, apparently, we're ahead of schedule, so we

1    can close out.

2              THE COURT:  Well, you still have that time if you

3    want to call additional witnesses, but you don't have to.

4              MR. AMBUSH:  No.  I don't think we have other

5    witnesses to call.  The rest have been submitted into

6    evidence.  And we would like to, once we have a transcript,

7    present a proposed findings of fact and conclusions of law.

8              THE COURT:  Yeah.

9              Why don't you schedule that if you can.  If you

10   can get that done, I'd like to have them 30 days after you

11   get the transcript, okay?  If you need more time, just tell

12   me.

13             MR. AMBUSH:  All right.  Thank you.  Thank you,

14   Your Honor.

15             THE COURT:  Thank you very much.

16             Any other business to come before the Court,

17   Madam Clerk?

18             DEPUTY CLERK:  No.  That was all that you had

19   today.

20             THE COURT:  The Court will be in recess.

21   Thank you very much.

22                            - - -

23             Thereupon, at 3:25 p.m., the further proceedings

24   of this cause were concluded.

25                            - - -

1

2                    C E R T I F I C A T E

3              I, William P. Zaremba, RMR, CRR, certify that

4    the foregoing is a correct transcript from the record of

5    proceedings in the above-titled matter.

6

7

8

9    Date: November 6, 2014_____   /S/__William P. Zaremba_____

10                                  William P. Zaremba, RMR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25