**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAUNDRA FLANAGAN, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No.  1:10-cv-01643-RC-JMF |
| | * | |
| ISLAMIC REPUBLIC | * | |
| OF IRAN, *et al.*, | * | |
| | * | |
| Defendants. | * | |

*************************************************************************

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**REDACTED**

Plaintiffs, Saundra Flanagan, Matthew Rux, Timothy Rux, Thomas Rux, and James Rux, by and through undersigned counsel submit the following Proposed Findings of Fact and Conclusions of Law:

## I.    INTRODUCTION

This case arises out of the October 12, 2000 terrorist bombing of the *U.S.S. Cole* during a temporary refueling stop in the Port of Aden, Yemen. As a result of this terrorist attack, seventeen American sailors stationed aboard the *Cole* were killed, including Electronic Warfare Technician First Class Kevin Shawn Rux ("Kevin").  Plaintiffs here are Kevin's mother and brothers: Saundra Flanagan, Matthew Rux, Timothy Rux, Thomas Rux, and James Rux (collectively, "Plaintiffs"), who have brought solatium claims for intentional infliction of emotional distress resulting from Kevin's death.

Plaintiffs allege that Sudan,[1] and The Islamic Republic of Iran, the Iranian Revolutionary Guard Corps, the Iranian Ministry of Information and Security, and the Iranian Revolutionary Guard Corps –Qods Division (collectively, "The Iranian Defendants") are liable for the *U.S.S. Cole* under 28 U.S.C. § 1605A(a)(1) because of each state's material support of the terrorist group al-Qaeda (the perpetrators of the *Cole* bombing). Specifically, Plaintiffs have established by documentary evidence and expert testimony that Sudan's material support of al-Qaeda, including (i) safe haven from 1991-1996, (ii) financial support, (iii) technical training and support, and (iv) facilitation of travel enabled al-Qaeda to develop the expertise technical knowledge and wide network of contacts to carry out the *U.S.S. Cole* bombing. (*See* Ex. 1, Affidavit of Lorenzo Vidino, PhD at ¶ 81; Hearing testimony of Dale L. Watson, Former Assistant Director of Counterterrorism, Federal Bureau of Investigation [hereinafter "Watson Testimony"] at pp. 110-111:24-1;113:4-15;116-117:4-1). Plaintiffs have also established by documentary evidence and expert testimony that the Iranian Defendants provided material support to al-Qaeda in form of (i) facilitation of travel, (ii) safe haven, and (iii) training, which enabled it to commit the *U.S.S. Cole* bombing. (*See* Ex. 2 Affidavit of Patrick L. Clawson, PhD; Ex. 3 Affidavit of Daniel Byman; Watson Testimony at pp. 123:5-13,126:11-13 ).

Plaintiffs have also provided both their own testimony and expert testimony from Dr. Larry H. Pastor, MD, FAPA, DABAM, detailing their close relationships with Kevin, and the

---

[1] Plaintiffs have sued Sudan and various military, intelligence and security agencies of the government thereof: The Sudanese Ministry of Defense; Sudanese Military Intelligence, Sudanese State Security, the Security of the Revolution, Popular Defense Force, and the Revolutionary Security. Unless otherwise specified, the Court shall refer to these defendants as "Sudan."

permanent traumatic grief they continue to experience in the wake of his death. (*See* Ex. 4 Affidavit of Dr. Larry H. Pastor, MD, FAPA, DABAM).

## II.    PROCEDURAL HISTORY

Plaintiffs validly served the Iranian Defendants through diplomatic service of process authorized by 28 U.S.C. § 1608(a)(4).  (*See* ECF # 14.) Plaintiffs also validly served the Sudan through the mailing procedure authorized by 28 U.S.C. § 1608(a)(3).[2] (*See* ECF # 13.) Although required by 28 U.S.C. § 1608(d) to respond to the Complaint within 60 days of service, to date, neither the Iranian Defendants nor the Sudan has filed any responsive pleading or otherwise appeared in this case.  The time for these defendants to answer or otherwise plead, respond, or defend this action has not been extended.  On October 31, 2012, the Clerk of Court entered default against the Iranian and Sudanese Defendants upon Plaintiffs' properly submitted request under Federal Rule of Civil Procedure 55(a). (*See* ECF ## 27-28.)

Under the FSIA, default judgment is generally entered by the Court after an evidentiary hearing on liability and damages under the FSIA. *See* 28 U.S.C. § 1608(e) (2013). Accordingly, Plaintiffs, in their request for default and in subsequent status reports to this Court, requested a scheduling conference for an evidentiary hearing. (*See, e.g.,* ECF # 28.)  On March 29, 2013, the Court denied Plaintiffs' request for a hearing on damages, without prejudice, and requested this motion for default judgment that "explains the basis of this [C]ourt's jurisdiction."  In briefing to this Court, Plaintiffs reiterated their request for an evidentiary hearing.  (*See* ECF # 29.)

On November 1, 2013, this Court referred the matter to United States Magistrate Judge, The Honorable John M. Facciola. (*See* ECF # 31.)  A hearing on liability and damages occurred

---

[2] Plaintiffs also sued Syria and its various military and security agencies for the role they played in the *U.S.S. Cole* bombing. Because plaintiffs have been unable to serve Syria due to the ongoing civil war, there has been no request for default against any of the Syrian defendants.

before Judge Facciola, on August12, 2014.[3]  Upon the evidence presented, this Court concludes that satisfactory evidence supports the claims made and therefore Plaintiffs are entitled to a judgment as discussed below.

## III.    LEGAL STANDARDS

### A.  Default Judgment

Before plaintiffs can be awarded any relief, this Court must determine whether plaintiffs have established their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Taylor v. Islamic Republic of Iran*, 2011 WL 3796156 at *3 (D.D.C. 2011). The standard articulated under the FSIA mirrors the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e). *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 28 (D.D.C. 2012) (internal quotation and citation omitted). In evaluating a plaintiff's claims, the Court "a court may accept as true the plaintiffs' uncontroverted evidence, including proof by affidavit." *Harrison*, 882 F. Supp. 2d at 28 (internal quotation and citation omitted); *see also Campuzano v. Islamic Rep. of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003).  "Courts are not required to hold an evidentiary hearing, but typically do so as a matter of custom and acknowledgment of the defendants' sovereign status." *Harrison*, 882 F. Supp. 2d at 28, n.5 (internal citation omitted).

On November 1, 2013, this Court referred this case to Magistrate Judge Facciola for a report and recommendation on plaintiffs' motion for a default judgment.  (*See* ECF ## 30-31.) An evidentiary hearing on liability and damages was held before Judge Facciola on August 12 2014. (*See* Line Entry of 06/09/14, Docket, *Flanagan, et al. v. Islamic Republic of Iran, et al.*, Case No. 10-cv-1643 (D.D.C.)). During the hearing, Judge Facciola accepted evidence in form

---

[3] Judge Facciola retired as of January 1, 2015.

of affidavits, expert testimony, and original documentary evidence. The Court has carefully reviewed all of the evidence presented to Judge Facciola.

**B. Subject Matter Jurisdiction and Immunity**

As a preliminary matter, plaintiffs must initially establish that this Court has jurisdiction to hear their claims and that the defendants are not immune from suit. "The FSIA is the sole basis for jurisdiction over foreign states in our courts." *In re Islamic Rep. of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 39 (D.D.C. 2009). Judge Lamberth of this district has explained the elements of Section 1605A of the FSIA:

> (1) money damages are sought (2) against that state for (3) personal injury or death that (4) was "caused by" (5) an act of torture, extrajudicial killing ... or the provision of material support of resources for such an act if such act or provision of material support or resources is engaged in by an official, employee or agent of such foreign state while acting within the scope of his or her office, employment or agency." . . . **With regard to § 1605A's causation requirement, in this Circuit there must be some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.**
>
>               * * *
>
> Furthermore, the FSIA provides that courts "shall hear a claim" under § 1605A of the FSIA if (1) the foreign state was designated as a state sponsor of terrorism at the time the act occurred; (2) the claimant was a United States national, a member of the armed forces, or otherwise an employee or contractor of the Government of the United States, acting within the scope of her employment and (3) the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim, provided that the act occurred in the foreign state against which the claim is brought. 28 U.S.C. § 1605A(a)(2).

*Harrison,* 882 F. Supp. 2d at 29 (emphasis added) (internal quotations and citations omitted).

The element of "material support," has been met when "the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act." *See, e.g., Ben-Rafael v. Islamic Republic of Iran*, 540 F.Supp.2d 39, 46 (D.D.C. 2008). In *Gates v. Syrian Arab Rep.*, 580 F. Supp. 2d 53 67-68

(D.D.C. 2008), Judge Collyer expounded on what types of evidence can establish "material support:"

> The types of support that have been identified as "material" have included, for example, financing and running camps that provided military and other training to terrorist operatives, allowing terrorist groups to use its banking institutions to launder money, and allowing terrorist groups to use its territory as a meeting place and safe haven, Such support has been found to have contributed to the actual terrorist act that resulted in a plaintiff's damages when experts testify that the terrorist acts could not have occurred without such support, or that a particular act exhibited a level of sophistication in planning and execution that was consistent with the advanced training that had been supplied by the defendant state, or when the support facilitated the terrorist group's development of the expertise, networks, military training, munitions, and financial resources necessary to plan and carry out the attack, (expert testimony that the "attack might have been possible, but would not have been as easy" without defendant's support).

Although the Court considers the evidence, it is well aware that nonetheless, "*the defendant bears the burden of proving that that plaintiff's allegations do not bring its case within a statutory exception to immunity.*" *Harrison*, 882 F. Supp. 2d at 29, n.7 (internal alteration and quotation omitted) (emphasis added).

### C.  Personal Jurisdiction

As explained by Judge Bates in *Owens v. Republic of Sudan*, 882 F. Supp. 2d 128, 143 (D.D.C. 2012):

> The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611, is the sole basis for obtaining jurisdiction over a foreign state in the United States. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989); *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 50 (D.D.C.2009). Although the FSIA provides that foreign states are generally immune from jurisdiction in U.S. courts, see 28 U.S.C. § 1604, a federal district court can obtain personal and subject matter jurisdiction over a foreign entity in certain circumstances. A court can obtain **personal jurisdiction over a defendant if the plaintiff properly serves the defendant in accordance with 28 U.S.C. § 1608**. *See* 28 U.S.C. § 1330(b). Moreover, **subject matter jurisdiction exists if the defendant's conduct falls**

**within one of the specific statutory exceptions to immunity**. *See* 28 U.S.C. §§ 1330(a) & 1604.

(emphasis added).

## D.    Choice of Law

In *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004), the

D.C. Circuit held that neither the terrorism exception to foreign sovereign immunity, 28 U.S.C. §

1605(a)(7), nor the Flatow Amendment, Pub.L. No. 104–208, § 589, 110 Stat. 3009 –1, 3007–172

(1996) (codified at 28 U.S.C. § 1605 note), created a private right of action against foreign states for

terrorism related injuries. It further held that 28 U.S.C. § 1605(a)(7) only provided federal courts

with jurisdiction to hear terrorism related claims and that each individual plaintiff must plead the a

cause of action under the particular tort law applicable to their claims. *Id*. at 1036. Following

*Cicippio*, the courts, in most cases, looked to the law of the state in which the plaintiff was domiciled

for the applicable tort law. *See Dammarell v. Islamic Republic of Iran*, 2005 WL 756090 at **17, 20-

21 (D.D.C. 2005). As a result, it was not uncommon for the courts to apply more than one states tort

law in the same case, resulting in inconsistent damage awards to similarly situated plaintiffs. *See,*

*e.g.*, *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 44-45 (D.D.C. 2007).

Recognizing the strong federal interest in creating uniformity in this area of foreign affairs,

Congress repealed 28 U.S.C. § 1605(a)(7) and enacted 28 U.S.C. § 1605A. *See* § 1083, Pub.L. 110-

181; *see also In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 58-59 (D.D.C.

2009).  In so doing, Congress created a comprehensive statutory scheme that provided a federal

private right of action for terrorism related injuries. *See* 28 U.S.C. § 1605A; *Oveissi v. Islamic*

*Republic of Iran*, 573 F.3d 835, 844 (D.C. Cir. 2009) ("[F]or terrorism cases filed under the new §

1605A, plaintiffs whose cases meet the statutory requirements now have a federal cause of action.").

Following its enactment, in cases in which plaintiffs stated a cause of action under 28 U.S.C. §

1605A, the district courts are no longer required to engage in a choice of law analysis, looking

instead to the generally established principles of tort law. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010); *see also Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 176 (D.D.C. 2010); *see also Owens v. Republic of Sudan*, 2011 WL 5966900 at *22 (D.D.C. 2011); *see also Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 772 F. Supp. 2d 218, 224-25 (D.D.C. 2011). Accordingly, in assessing the defendants' liability for the Plaintiffs' 28 U.S.C. § 1605A(c) claims, the Court is guided by the principles of tort law set forth in the Restatement (Second) of Torts (1965) and the relevant decisions of this district. [4] *See Valore*, 700 F. Supp. 2d at 76; *see also Rimkus*, 750 F. Supp. 2d. at 176.

## IV.    PROPOSED FINDINGS OF FACT

### A.    This Court will take Judicial Notice of the Factual Findings Made in *Rux. v. Republic of Sudan*, 495 F. Supp. 2d 541 (E.D. Va. 2007).

During the August 12, 2014 proceedings, Plaintiffs moved for the Court to take judicial notice of the factual findings made in *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541 (E.D. Va. 2007). The *Rux* case also arose out of the bombing of the *U.S.S. Cole* and dealt with identical issues regarding the liability of the Sudan for the attack on the *U.S.S. Co*le. The Sudan appeared in that case and was represented by counsel through all stages of the proceeding.   Although the plaintiffs here are family members of the late Kevin Shawn Rux, they were not plaintiffs in that case.

---

[4] The Court notes that, in *Rux v. Republic of Sudan*, because the plaintiffs' claims were brought pursuant to state tort law, under 28 U.S.C. § 1605(a)(7), the court was required to discern the specific tort law to be applied and, in so doing, relied on maritime choice of law rules, pursuant to *Lauritzen v. Larsen*, 345 U.S. 571 (1953).  *See Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 558 (2007). Because the Plaintiffs' claims in the instant case were brought pursuant to the statutory cause of action codified in 28 U.S.C. 1605A, which did not exist at the time of the filing and adjudication of the *Rux* plaintiffs' claims, this Court is not forced to employ a choice of law analysis to determine the applicable tort law and need not look to maritime law for that purpose.

This Court, in recognizing it was proper to take judicial notice of the *Rux* opinion in

another *U.S.S. Cole* case, has consistently found that:

> **The statutory obligation found in § 1608(e) was not designed to**
> **impose the onerous burden of re-litigating key facts in related cases**
> **arising out of the same terrorist attack**," *Rimkus v. Republic of Iran,*
> 750 F.Supp.2d 163, 172 (D.D.C.2010). Thus, when a court has found
> facts relevant to a FSIA case involving material support to terrorist
> groups, courts in subsequent, related cases may "rely upon the evidence
> presented in earlier litigation ... without necessitating the formality of
> having that evidence reproduced.

*Harrison,* 882 F. Supp. 2d at 30-31 (emphasis added); *accord Anderson v. The Islamic Republic*

*of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010); *see also Beer v. Islamic Republic of Iran*, 2010

WL 5105174 (D.D.C. 2010).

   In *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010), the Court

found that judicial notice of a prior case is permissible "because the validity of judicial records is

generally 'not subject to reasonable dispute,' and such records are perfectly capable of

establishing the type and substance of evidence that was presented to earlier courts. The

objective issue of what that evidence was — rather than the subjective determination of what that

evidence means — is thus a proper exercise of judicial notice."   In *Murphy v. Islamic Republic*

*of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010), the Court held "'[T]he FSIA does not require this

Court to re-litigate issues that have already been settled' in previous decisions [and] the Court

may review evidence considered in an opinion that is judicially noticed, without necessitating the

re-presentment of such evidence."

   The taking of judicial notice of the *Rux* opinion, therefore, does not conclusively

establish the facts found in *Rux*, or the liability of the defendants in the instant case.[5]   However,

---

[5] For instance, as initially discussed *supra* , at the time of the court's decision in *Rux,* Congress
had yet to enact the current version of 28 U.S.C. § 1605A. Thus the  court in *Rux* ultimately

"the FSIA does not require this Court to relitigate issues that have already been settled" in previous decisions. *Brewer,* 664 F. Supp. 2d at 54. Instead, the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence. *Heiser I,* 466 F. Supp. 2d at 264 (reconsidering evidence presented in *Blais v. Islamic Republic of Iran,* 459 F. Supp. 2d 40 (2006)). In rendering default judgment against Defendants, the Court was therefore required to, and did, find facts and make legal conclusions anew. Upon the evidence presented to the Court at the hearing and having considered the evidence in *Rux*, the Court makes the following findings of fact and conclusions of law.

## B.    The Bombing of the U.S.S. Cole

In *Rux v. Republic of Sudan*, the Court set forth a detailed factual description of the events that led to the bombing of the U.S.S. Cole and the assistance provided to Al-Qaeda by the Defendant. 495 F. Supp. 2d 541. The events occurred as follows:

> At approximately 8:30 a.m. on October 12, 2000, the U.S.S. Cole ("Cole") entered the Port of Aden, Yemen, to temporarily stop for refueling. The Republic of Yemen is a country of 203,850 square miles located on the southern coast of the Arabian Peninsula. Aden is a city of approximately 440,000 located on Yemen's south coast. The Port of Aden is a natural harbor with a deep draft in most areas and natural land protection on all sides. In February 1999, the Navy began using Aden instead of Djibouti as the primary refueling stop for American ships during their 3,000-mile journey to the Arabian Gulf from the Mediterranean Sea. Under a contract entered into between the United States and Yemen, U.S. Navy vessels could obtain fuel at one of two

---

limited those plaintiffs' recovery under the Death on the High Seas Act. However, this part of the *Rux* case should have no bearing on plaintiffs' recovery here. Here, plaintiffs, who are not members of the Rux estate, and who were not parties to *Rux,* bring solatium claims under 28 U.S.C. § 1605A. *See* Va. Code § 64.2-200A(1) (estate passes to surviving spouse first). Examining the impact of *Rux,* Judge Lamberth of this court has recognized that victims of the *U.S.S. Cole* bombing who were not part of the original *Rux* case and who "initiated their action under the new § 1605A, [ ] are entitled to types of damages—i.e. for pain and suffering and solatium—and punitive damages that the *Rux* plaintiffs, who initiated their action before § 1605A was enacted, did not obtain." *Harrison*, 882 F. Supp. 2d at 28.

fueling "dolphins" located near the mouth of the harbor without going to the pier.

The Cole, an Arleigh Burke Class Destroyer, was the twenty-fifth Navy ship to stop  in Aden Harbor for refueling over the previous nineteen months. As of October 2000, the ship had a crew of twenty-six officers and 270 enlisted personnel. The Cole departed from its home port of Norfolk, Virginia, on August 8, 2000, before patrolling the Mediterranean Sea. On October 9, 2000, the ship transited the Suez Canal and headed for Yemen. At the time that the ship entered the Port of Aden on October 12, 2000, the U.S. Department of Defense terrorist threat level in Aden was "Threat Condition (THREATCON) BRAVO," which indicated an "increased and more predictable threat of terrorist activity."

At approximately 8:49 a.m., the Cole moored starboard side to Refueling Dolphin Seven, near the mouth of the harbor. The ship began refueling at approximately 10:31 a.m. At approximately 11:10 a.m., one of the sailors standing watch over the refueling noticed a small boat heading "fast and hard" toward the Cole from the direction of the city. The boat, painted white with fire red trim, was about thirty-five feet long and six to seven feet wide and had a shallow V-hull. It looked "brand new." The boat was similar in size and shape to many other small vessels in the harbor, including the service craft that had been alongside the Cole. The boat was manned by two males, both of whom appeared to be in their early thirties. The two men slowed the boat as they approached the Cole, maneuvered it parallel to the ship and came down the port side headed aft. As they did so, the two men in the boat were smiling, and waved to the crew. Some crew members returned the greeting. Seconds later, the boat exploded.

The explosion occurred between approximately 11:15 and 11:18 a.m., just as some of the crew was sitting down for lunch. The blast ripped a thirty-two- by thirty-six-foot hole in the port side. . . . Smoke, dust, and fuel vapors filled the air. The main engine room, auxiliary machine room, and the dry provisions storeroom were flooded. Several chambers, including the Crew and Chief Petty Officer's Galley, were structurally destroyed. The blast and its after-effects killed seventeen Navy sailors, all of them American citizens. Forty-two others were injured, some of them sustaining serious burns to their faces, hands and arms, as well as lacerations and fractures.

*Id.* at 544-45.

Dale L. Watson, Former Assistant Director of Counterterrorism for the Federal Bureau of Investigation from approximately 1996 through 2002 was accepted by the Court as an "expert in the fields of counterterrorism, the investigation of counterterrorism . . . ."(*See* Watson Testimony at 90:5-8.)[6]   As Assistant Direct of Counterterrorism at the time of the *U.S.S. Cole* attack, Mr. Watson was responsible for the F.B.I.'s response to the incident.  (*See id.* at 90-91:25-2.) Agreeing with the commonly-held assessment that al-Qaeda was responsible for the *U.S.S. Cole* bombing, Mr. Watson explained that, "it was an al-Qaeda attack that bin Laden used for publicity purposes, very similar to the public fatwa that he issued." (*See id.* at 96:17-19.)  The attack was part of a larger conspiracy to "attack American and Western interests."  (*See id.* at 99:9-13.)  And "the conspiracy leading up to the attack on the *U.S.S. Cole* was "without a doubt," a sophisticated conspiracy."  (*See id.*  at 102:4-8.)

Mr. Watson also described the attack as a "sophisticated attack[.]"  (*See id.*  at 93:7.)  He noted that "a billion-dollar U.S. Navy warship that was practically sunk as a result of the bomb blast. . . . **[I]t takes sophisticated planning and the amount of the explosives. . . . They need an infrastructure.**"  (*See id.* at 93:7-13, 17 (emphasis added)).

## C.  Sudan's Material Support of Al-Qaeda throughout the 1990's.

In determining whether Sudan provided material support and assistance to Al-Qaeda in perpetrating the attack on the U.S.S. Cole, the Court accepted credible testimony from well qualified experts. Those experts included: (i)Dr. Lorenzo Vidino, who the Court accepted as an expert witness on terrorism and specifically on the relationship between Al-Qaeda and Sudan

---

[6] Pursuant to Federal Rule of Evidence 702, Judge Facciola accepted Mr. Watson as an expert on a variety of matters based on his knowledge, experience, and training in counterterrorism, counterterrorism investigations, the Sudan, al-Qaeda, and Iran.  Based on the extensive colloquy in the record, this Court sees no reason to disturb Judge Facciola's ruling.  (*See* Watson Testimony at pp. 82-90.)

and how the material support of Sudan allowed Al-Qaeda to plan and carry out its attack on the

*U.S.S. Cole* and (ii) Dale Watson, Former Assistant Director of Counterterrorism for the Federal

Bureau of Investigation, who the Court accepted as an expert witness on counterterrorism and

specifically on the relationship between Al-Qaeda and Sudan and how the material support of

Sudan allowed Al-Qaeda to plan and carry out its attack on the *U.S.S. Cole*. (*See* Watson

Testimony at pp.82-90.) The Court also reviewed unrefuted documentary evidence, and

considered the findings of the District Court in *Rux, supra*. Upon this evidence, the Court makes

the following findings:

1.      **The Bashir/Turabi Regime's Support for Fundamental Islamic Groups, Including al-Qaeda, Throughout the 1990's.**

        In 1989, General Omar Bashir assumed the presidency of Sudan in a military coup that

overthrew the elected government and converted Sudan into an Islamic Arab state. (Ex. 7

*Profile: Sudan's President Bashir*, BBC NEWS (Nov. 25, 2003); Ex. 8 *Military Coup in Sudan*

*Ousts Civilian Regime*, NEW YORK TIMES (Jul. 1, 1989)). Bashir remains Sudan's President

today.[7]  The coup was orchestrated by Hassan Abdallah Turabi, head of the Sudanese political

party the National Islamic Front ("NIF") and leader of the Muslim Brotherhood. (*See* Ex. 9

Excerpt, The 9/11 Commission Report at 57). Turabi was the regime's *de facto* leader from 1989

until late 1999, when he was ousted and later put in jail. (Ex. 10 Report, Central Intelligence

Agency, *al Qa'ida in Sudan 1992-96 Old School Ties Lead Down a Dangerous Path* at 6 (March

10, 2003)). During the 1990s, Turabi and the NIF transformed Sudan into a centralized, radical

Islamic state that openly supported movements and organizations with militant Islamic, anti-

---

[7] Central Intelligence Agency, *The World Fact Book: Sudan*, *available at*

*https://www.cia.gov/library/publications/the-world-factbook/geos/su.html*

American, anti-Western ideologies. (Ex. 10; Ex. 6 at 59; Ex. 1 at ¶¶ 44-46.) Since 1993, the United States has continuously designated Sudan as a state sponsor of terrorism. 58 Fed. Reg. 52523-01 (Oct. 8, 1993).

Al-Qaeda is a worldwide terrorist network, formerly led by Osama Bin Laden, that has declared war against the United States and others who do not share its militant brand of Islam. (Ex. 9 at 47-48; Ex. 1 at Ex. A).  During the Afghanistan war against the Soviet Union, from 1979 to 1989, Bin Laden, the son of a wealthy Saudi construction magnate, organized and financed the recruitment and training of Arab nationals to fight alongside the Afghan mujahidin against the Soviet Union. (Ex. 9 at 55). During the end of the Afghanistan war, Al-Qaeda was founded by Bin Laden in Afghanistan in approximately 1988 to serve as a base "for future jihad." (Ex. 9 at 56).

As is well known today, Al-Qaeda has organized, executed or inspired acts of terrorism around the world that killed or injured thousands of innocent people, including the September 11, 2001, attacks on the United States. (Ex. 9. ) Al-Qaeda has supported terrorists in Afghanistan, Egypt, Bosnia, Chechnya, Yemen, and Kosovo, and has supported terrorists from a variety of countries, including Yemen. (*See* Ex. 9 at 59; Ex. 1 at ¶¶ 47,49,52-64).

Following the Soviet withdrawal from Afghanistan in 1989, Bin Laden briefly returned to his home country of Saudi Arabia but was expelled in 1990 for his support of terrorism. (Ex. 9 at 57.) At a time when Al-Qaeda found itself without a territory from which it could base its terrorist operations, Turabi offered the organization refuge in Sudan. (Ex. 1 at ¶ 15).

As stated by a 1996 U.S. Department of State report on Bin Laden, Bin Laden "relocated to Sudan in 1991, where he was welcomed by National Islamic Front (NIF) leader Hassan al-Turabi." (*See id.* at Ex. A.). Bin Laden lived in Sudan from 1991 until May 1996, when he was

expelled from the country under international pressure. (*See* Ex. 11 Patterns of Global Terrorism 1997 at 8).  Mr. Watson describes the relationship between Sudan and al-Qaeda from 1991 through 1996 as "[v]ery friendly, probably mutually beneficial. . . . Sudan at that time was inclined to support people such as those organizations that they allowed in there. . . . [Bin Laden] went in there with a lot of money and set up businesses and built roads and set up legitimate businesses. But the idea was that he would have a safe haven there as well as free passage in and out."  (*See* Watson Testimony at 107:6-14.)

Turabi and Bin Laden shared a common extremist ideological and religious outlook. (Ex. 9 at 61; Ex. 1 at ¶ 43). Turabi envisioned a pan-Islamic force consisting of both Shiites and Sunnis to counterbalance Western powers militarily, economically, and politically. (Ex. at ¶¶ 45). Bin Laden agreed to help Turabi in the regime's ongoing war against African Christian separatists in southern Sudan, and also to invest his wealth in the poor country's infrastructure. (Ex. 9 at 57). In exchange, Sudan provided Bin Laden's fledgling terrorist group with a sanctuary within which it could freely meet, organize, and train militants for operations. (Ex. 1 at ¶¶ 12-13, 36, 45).

### i. Joint Business Ventures and Financial Support for al-Qaeda

Bin Laden established several joint business ventures with the Sudanese regime that began to flourish upon his arrival in the Sudanese capital of Khartoum in 1991. (Ex. 1 at ¶ 19; Ex. A.). Bin Laden formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf. (Ex. 1 at ¶ 19.) Bin Laden's businesses in Sudan included: (1) Al-Hijrah for Construction and Development, Ltd., which built the Tahaddi road between Khartoum and Port Sudan on the Red Sea coast, as well as a modern international airport near Port Sudan; (2) An import-export firm, Wadi al-Aqiq

Company, Ltd., which, in conjunction with Bin Laden's Taba Investment Company, Ltd., and with the cooperation of prominent NIF members, secured a near monopoly over Sudan's agricultural exports of gum, corn, sunflower, and sesame products; and (3) Al-Themar al-Mubarak-ah Agriculture Company, Ltd., which acquired large tracts of land near Khartoum and in eastern Sudan. (Ex. 1 at ¶19; Ex. A). These businesses "allowed al-Qaeda to funnel money for terrorist activities through Sudanese Banks and Sudanese-based legitimate businesses, therefore overcoming the difficulties in transferring funds the group would have otherwise faced." (Ex. 1 at ¶ 35.). Bin Laden continued to maintain his substantial business interests and facilities in Sudan even after his departure to Afghanistan in 1996. (Exs. 6, testimony of George E. Moose Former Assistant Secretary of State for Africa at p. 19-20; Ex. 12 Patterns of Global Terrorism, 1998 at 5-6).

Sudan allowed its banking institutions to be used by Al-Qaeda to launder money. (Ex. 1 at ¶¶21-35). Bin Laden and wealthy members of the NIF capitalized Al-Shamal Islamic Bank in Khartoum; Bin Laden personally invested $50 million in the bank. (Ex. 1 at ¶ 22-23, 25; Ex. A.).

### ii. Support for Training

In addition, as reported by the Central Intelligence Agency (C.I.A.), "by January 1994, Bin Laden had begun financing at least three terrorist training camps in northern Sudan—camp residents included Egyptian, Algerian, Tunisian, and Palestinian extremists—in cooperation with the NIF." (*See* Ex. 1 at Ex. A at 3; *see also* Ex. 13 Patterns of Global Terrorism, 1995). Notably, Bin Laden's Al-Hijrah for Construction and Development Company work[ed] directly with Sudanese military officials to transport and provision terrorists training in such camps." (*See* Ex. 1 at Ex. A at 3.)

Starting in the early 1990s, Turabi and the Sudanese regime convened annual conferences in Sudan under the label Popular Arab and Islamic Conference. (Ex. 1 at ¶ 44; Ex. 10 at 6). At these conferences, Bin Laden and other top leaders and operatives from the most violent Islamic terrorist organizations, including Bin Laden's Islamic Army Shura, the Palestinian Liberation Organization, Hamas, and Hezbollah, congregated to exchange information and plan terrorist activities. (*See id.*).  Turabi saw the conferences as a means of bringing together Sunnis and Shiites in the fight against the common enemy, i.e. the United States and other Western powers. (Ex. 10 at 6). Although the conference was closed down in approximately 2000, Sudan continued to be used as a safe haven by Al-Qaeda and other terrorist groups. (Ex. 15, Patterns of Global Terrorism, 2000).

### iii. Travel

Still further, throughout the 1990's, including during the time the organization was expelled from its borders, Sudan provided Al-Qaeda members with Sudanese travel documentation, including "clean" passports, which facilitated the movement of Al-Qaeda operatives in and out of Sudan. (Exs. 1 at ¶¶ 36, 41-42; Ex. 17 at ¶ 26; Exs. 11 and 12). Not only did Sudan issue approximately 200 passports to Al-Qaeda members, but Dr. Vidino explained that "Sudanese officials also made sure that al-Qaeda members traveling to Sudan with different passports could enter and leave the country without having their passports stamped. These officials would have been acting with the full knowledge and consent of the highest levels of the Sudanese government.  This was done because a stamp from Sudan (a country known for its support of terrorism) would have raised the attention of immigration officials in other countries." (Ex. 1 at ¶ 42).  In addition, Sudan exempted Al-Qaeda and its members from paying any taxes

or import duties and permitted it to bring containers into the country without inspection by customs. (Ex. 1 at ¶¶ 17, 20; Ex. C.).

As early as 1998, Sudan provided Al-Qaeda members with Sudanese diplomatic passports as well as regular Sudanese travel documentation that facilitated the movement of Al-Qaeda operatives in and out of Sudan. (*See* Ex. 17 at ¶ 26.) Mr. Watson explained that "if you carry a diplomatic passport you're immune from laws and criminal process, most of them, in a country you're going to. So if you get caught doing something, you can't be prosecuted." Mr. Watson also explained that "diplomatic passports have diplomatic pouches which are not authorized to be examined by the host country." (*See id.* at 116:19-21) In other words, one "could transport types of materials without government scrutiny or scrutiny at the borders." (*See id.* at 116-117: 22-2.) Mr. Watson testified, that "So if someone were giving out diplomatic passports to individuals who were not really entitled to those, that would be a tremendous advantage to have those." (*See id.* at 116:12-13.)

### iv. Sudan's Support of al-Qaeda Continues After Bin Laden's Expulsion from Sudan in 1996 and Lasted at least Until the *U.S.S. Cole* Bombing in October 2000.

As reported in the U.S. Department of State's annual "Patterns of Global Terrorism" reports, **each year from 1997 through 2000 Sudan continued to serve as a meeting place, safe haven, and training hub for Al-Qaeda and other terrorist groups including Lebanese Hizballah, Palestinian Islamic Jihad, Abu Nidal Organization, and Hamas.** (*See* Exs. 15 at 10; Exs. 11-12, 14.) As of 1999 through 2000, this support "included the provision of travel documentation, safe passage, and refuge. Most of the groups maintained offices and other forms of representation in the capital, using Sudan primarily as a secure base for organizing terrorist operations and assisting compatriots elsewhere." (*See* Exs. 14 and 15.)

Ayman Al-Zawahiri, a top-ranking member of Al-Qaeda, reached an agreement in 1998 with Sudan's national Islamic groups to establish budgets to finance terror operations.  (*See* Ex. 17 at ¶¶ 26-28).   In 2000, Canadian Security Intelligence Services reported that training camps in Sudan for Egyptian Islamic Jihad (a once affiliate organization of al-Qaeda that was officially merged into the organization) were "financed by Saudi dissident and terrorist financier, Osama Bin Laden."  (*See* Ex. 17 *Statement of Canadian Security Intelligence Service Summarizing the Information Pursuant to Paragraph 401(4)(b) of the Immigration Act*, In *re: Mohamed Zeki Mahjoub*, The Federal Court of Canada, Case No. DES-1-00 (June 27, 2000)).[8]

The strike against the Cole was part of a decade-long plan conceived and executed by Bin Laden and Al-Qaeda to attack U.S. interests in the Middle East, specifically American military forces. (Ex. 1 at ¶11). The Cole plot was an Al-Qaeda operation supervised directly by Bin Laden. (Ex. 9 at 190). As stated in the 9/11 Commission Report, Bin Laden "chose the target and location of the attack, selected the suicide operatives, and provided the money needed to purchase explosives and equipment." (*Id*.). Dr. Vidino testified that the "one of the key planners of the USS Cole bombing and al-Qaeda chief of operations in Yemen," was Qaed Salim Sinan al-Harethi. Mr. Vidino testified that al-Harethi was "a close companion of Bin Laden when al-Qaeda had its headquarters in Sudan." (Ex. 1 at ¶ 60.)

The explosives used in the Cole attack were sent by Al-Qaeda operatives in Sudan.  This finding is corroborated by the testimony of one of Bin Laden's lieutenants in Sudan, Jamal Al-

---

[8] Mr. Mahjoub has been in detention since the Spring of 2000, when the Solicitor General of Canada and the Minister of Citizenship and Immigration (the Ministers) issued a security certificate qualifying Mr. Mahjoub as inadmissible under section 19 of the *Immigration Act*, R.S.C. 1985, c. I-2 (former Act) in effect at that time. This opinion was based the security intelligence report by the Canadian Security Intelligence Service (CSIS) cited *supra* in text.  The security certificate issued by the Ministers was challenged by Mr. Mahjoub, but was found to be reasonable in *Canada(Minister of Citizenship and Immigration) v. Mahjoub*, [2001] 4 F.C. 644 (T.D.), 2001 FCT 1095.

Fadl, who testified in criminal proceedings against Bin Laden arising out of the 1998 embassy bombings. (Ex. 1 at ¶¶ 49, 55). Mr. Al-Fadl stated in sworn testimony in a trial before the United States District Court for the Southern District of New York that he worked under Bin Laden in Sudan; that he stored four crates of weapons and explosives at a farm in Sudan owned by Bin Laden; and that he shipped the four crates in an Al-Qaeda-owned boat from a facility owned by the Sudanese military in Port Sudan to Yemen, where they were to be used to "fight the Communists." (*See id.*).

Sudan, beginning in the early 1990s and continuing at least until 2000, actively provided Al-Qaeda with the support, guidance, Sudanese diplomatic passports, and resources that allowed it to transform into a sophisticated, worldwide terrorist network, and that such support was critical to Al-Qaeda developing the expertise, networks, military training, munitions, and financial resources necessary to plan and carry out the attack on the Cole. Dr. Vidino testified that **Sudan's material support of al Qaeda including, "(1) its provision of sanctuary and safe haven from 1991-1996; and** (2) **technical training and support Sudanese military and intelligence forces provided al Qaeda throughout the 1990s**; **was indispensable for al Qaeda not just to survive but also to then develop the expertise, technical knowledge and wide network of contacts that allowed it to flourish as a terrorist organization and carry out the *USS Cole* bombing.** Still further, the Sudan's material support through safe haven and training facilitated al Qaeda's development of the expertise, networks, military training, munitions, and financial resources necessary to plan and carry out the *U.S.S. Cole* attack. **Al Qaeda would not have been able to carry out the *U.S.S. Cole* bombing without the material support of the Sudan**." (*See* Ex. 1 at ¶ 83.)  (emphasis added)

In his testimony, Mr. Watson emphasized how invaluable al-Qaeda's time in Sudan from 1991 through 1996 was to the development of the terrorist organization:

> Q  So, Mr. Watson, as you can tell by the text, the 9/11 Commission has described how al-Qaeda flourished in Sudan. It says, "Bin Laden moved to Sudan in 1991 and set up a large and complex set of intertwined business and terrorist enterprises. In time, the former would encompass numerous companies and a global network of bank accounts and nongovernmental institutions." Later on in the text it says, "Meanwhile, al-Qaeda finance officers and top operatives used their position in bin Laden's businesses to acquire weapons, explosives and technical equipment for terrorist purposes." And then at 58 it says, "The groundwork for a true global terrorist network was being laid." **Mr. Watson, do you agree with this assessment laid out in the 9/11's Commission's report?**
>
> **A I do.**
>
> Q And the type of support that is described in the 9/11 Commission's report, what's the significance of having intertwined business and terrorist enterprises, allowing, you know, training for weapons, also acquiring weapons and explosives technical equipment, et cetera?
>
> A **It allowed him to expand the organization, make it better.** It allowed them to have funds available through legitimate businesses. **It gave them some credibility. It also allowed for the organization to be a safe place, because, at that point in time, he had been removed from Saudi Arabia.  He had no country. And so he was allowed to operate with impunity there in Sudan for a number of years** . . . .
>
> Q And one of the things you mentioned is that you said it gave the organization credibility. What do you mean by that?
> A The ability to issue statements; the ability to recruit people; the ability to set up training camps; the ability to travel in and out of places to identify potential targets, in my opinion.
>
> Q And would having a safe place to meet, the ability to travel safely and freely, would this have allowed Al-Qaeda and Osama bin Laden -- **would this have given them a way of shielding their activities from other law enforcement or intelligence agencies?**
>
> A  **Yeah.** It's not like setting up shop in Leesburg,Virginia, where, you know, you would come under scrutiny of the Bureau or some federal agency. **It's a foreign country, and a foreign country that was not the most favored, you know, looking toward the United States. So it was**

> **very difficult to operate in that environment as a U.S. Government representative.**
>
> Q So bin Laden is in a place where it's difficult for the U.S. Government to keep tabs on him. And in terms of the Sudanese government, is it accurate to say that **bin Laden and al-Qaeda are also in a place where they don't have to worry about the interference of Sudanese authorities with their terrorist activities?**
>
> **A That is correct**.

(*See id.* at 108-110.) (emphasis added).

Mr. Watson also explained the importance of Sudan continuing itself to be used as a safe harbor even after expelling al-Qaeda: "It was an escape mechanism for terrorist activities probably conducted anywhere.  If they could get back to the Sudan,  . . . elsewhere they might get in trouble for.  It was a protection of the organization mainly."  (*See id.*  at 113:4-10) He opined that having Sudan available as a safe harbor "helped the organization plan more freely." (*See id.*  at 113:11-12.)

The Court is satisfied that there is sufficient evidence to conclude that as a result of its support in facilities, as a safe haven, and of materials including radios, weapons and explosives, the Republic of Sudan caused Al-Qaeda to be able to plan and execute its attack against the *U.S.S. Cole*, which led to the injuries sustained by the Plaintiffs named herein. As a result, the Court finds that the Republic of Sudan is liable, under 28 U.S.C. § 1605A, for the injuries sustained by all plaintiffs as a result of the terrorist attack on the *U.S.S. Cole*.

## D.  The Iranian Defendants' Material Support of al-Qaeda

In determining whether the Iranian Defendants provided material support and assistance to Al-Qaeda in perpetrating the attack on the *U.S.S. Cole*, the Court accepted credible testimony from well qualified experts. Those experts included  Dr. Patrick Clawson, Director of Research of The Washington Institute for Near East Policy, who, in addition to his extensive experience

researching Iran, has also been accepted to testify as an expert on Iranian-sponsored terrorism numerous times before this Court (*See* Ex. 2 at pp. 1-7).  Dr. Daniel Byman, Professor at Georgetown University's Edmund A. Walsh School of Foreign Service and Senior Fellow and Research director, Saban Center at the Brookings Institution. (*See* Ex. 3  at Ex. A.) Dr. Byman was also staff to the 9/11 Commission. (*See id.* at Ex. A). He has been accepted to testify as an expert in Terrorist Attacks on September 11, 2001, Case No. 03-MDL-1570 (S.D.N.Y. 2011). Dale L. Watson, Former Assistant Director of Counterterrorism, Federal Bureau of Investigation 1996-2002, and who was chief of the Iran Hezbollah Unit within the FBI until 2002. (*See* Watson Testimony at 90; 119:8-9.) The Court also reviewed unrefuted documentary evidence. Upon this evidence, the Court makes the following findings:

> 1. **Iran Sponsors Acts of Terrorism through the IRGC, the IRGC-Qods, MOIS, and through Hezbollah.**

The Islamic Republic of Iran is now, and since 1985, has been continuously listed on the U.S. State Department list of state sponsors of terrorism.  (*See* Ex. 2 at ¶ 41.)  Dr. Byman explains, "Support for militant and terrorist groups is almost always done via Iran's Ministry of Intelligence and Security (MOIS) or the Islamic Revolutionary Guard Corps (IRGC), a parallel military force that is tasked with protecting Iran's revolution at home and spreading it abroad, among other duties.  **If Iran is linked to a terrorist group overseas, it is a safe assumption that the IRGC, the MOIS, or both are involved**." (*See* Ex. 3 at ¶ 71.)   Dr. Clawson states, "Furthermore, **Iranian support of al-Qaeda through the IRGC, IRGC Qods, and MOIS, is consistent with its foreign policy of supporting terrorism against the United States.**"  (*See* Ex. 2 at ¶ 100.)  Dr. Clawson opines, "**[I]t is my opinion, based on all I have articulated in this affidavit, to a reasonable degree of certainty, that Iran's (and by "Iran" I also include IRGC, IRGC Qods, and MOIS) material support of al-Qaeda contributed to al-Qaeda's**

ability to carry out the *U.S.S. Cole* bombing.  It is also my opinion, . . . to a reasonable degree of certainty, that the *U.S.S. Cole* attack could not have occurred without such support and that such material support facilitated al-Qaeda's development of the expertise, networks, military training, munitions, and financial resources necessary to plan and carry out the *U.S.S. Cole* attack." (*See* Ex. 2 at ¶ 101). Dr. Byman agrees, "there is strong support that Iran has provided material support for al-Qa'ida as defined in 18 U.S.C. Section 2339A(b)(1),  including transit assistance, safe haven, and training.  Iran supported al-Qa'ida as an organization and made it stronger overall, and this made al-Qa'ida better able to carry out terrorist attacks such as the *USS Cole* bombing. This support is not consistent or unqualified, but over the years it has helped make al-Qa'ida a formidable organization."  (*See*  Ex. 3 at 81).

     i.       **The IRCG and The IRCG Qods**

Dr. Clawson details at length, how the IRGC and the IRGC Qods have sponsored terrorism:

> The IRCG was established in the immediate wake of the 1979 revolution. Its role is built into Iran's constitution as defenders of the revolution-- not just defenders of Iran as a country, but defenders of the 1979 revolution. **The IRGC is one of the major organizations through which Iran has historically carried out its support for terrorism.**
>
> Among its other tasks, the IRGC is dedicated to the spread of fundamentalist Islamist principles throughout the world, and the establishments of fundamentalist Islamist governments in nations other than Iran.  **The Qods Force is the branch of the IRGC generally charged with "foreign operations."**
>
> The foreign operations it supports include foreign insurgents and terrorists such as those fighting U.S. forces and U.S.-backed governments in Afghanistan and Iraq.  **It is the principal Iranian organization working with the Lebanese Hizbollah organization's armed elements**, **which carry out terrorist operations worldwide**, engage in military operations in Syria in support of the Assad regime's battle against insurgents, and prepare for battle against Israel.

While in theory the Qods Force is a component element of the IRGC, in practice it operates largely autonomously. It reports directly to the Supreme Leader, rather than being subordinate to the IRGC command structure. The IRGC defines itself as an agent and instrumentality of the Supreme Leader, to which it pledges its unflinching loyalty. The IRGC and the Supreme Leader both frequently speak about the IRGC as the guardian of the principles of the Iranian revolution of 1979.

* * *

**It that has been well-documented for over twenty years that the IRGC has historically provided funding and/or training for terrorism operations that targeted United States and Israeli citizens. Such activities have included support for Hizbollah of Lebanon, HAMAS, as well as al-Qaeda,** with the character of that support being quite different in each case. Hizbollah of Lebanon (or Hizbollah for short, though not to be confused with similarly named organizations in other countries which have varying degrees of ties with Hizbollah of Lebanon) is a Shiite terrorist organization established in 1982 by Iran as an extension of the Iranian Revolution in Lebanon and elsewhere in the Middle East. The IRGC's relationship with Hizbollah is extremely close. . .

Although they have a long history of cooperating in a common anti-American agenda, Iran and al-Qaeda have always had serious ideological differences. **In providing support to al-Qaeda and Hizbollah, the IRGC, including the IRGC Qods division, is acting as an official agency whose activities are tightly and carefully controlled by the Iranian government through the Supreme Leader and his representatives.** Iran's relationship with Al-Qaeda continues even in situations where Iran is also supporting those fighting Al-Qaeda. For instance, the U.S. Treasury Department's February 5, 2014 designation of senior al-Qaeda member Jafar al-Uzbeki described him as part of an al-Qaeda network which "operates there [in Iran] with the knowledge of Iranian authorities." The Treasury statement added that this network "uses Iran as a transit point for moving funding and foreign fighters through Turkey to support al Qaeda-affiliated elements inside Syria." This despite the fact that Iran has made a major commitment of men and arms to fight Al-Qaeda in Syria.

**In sum, the terrorism training provided to Hizbollah, HAMAS, and al-Qaeda by the IRGC is an official policy of the Iranian government.**

(See Ex. 2 at ¶¶ 26-37)

**ii. MOIS**

In addition to the IRGC, the other principal organization Iran has used to carry out its terrorist support activities has been MOIS, Iran's foreign and domestic intelligence service.  (*See* Ex. 2 at ¶ 38.)  Dr. Clawson notes, "U.S. Department of State reports have frequently referred to Iranian intelligence services – that is, MOIS's –role in facilitating terrorist attacks.  In "Patterns of Global Terrorism 1990," the State Department wrote that, 'Iran has used its intelligence services extensively to facilitate and conduct terrorist attacks . . . . Intelligence officers have used the diplomatic pouch for conveyance of weapons and finances for terrorist groups.'"  (Ex. 2 at ¶ 40.)  Dr. Byman states, "The MOIS has been directly involved with al-Qa'ida. In 2012 the U.S. Department of the Treasury found the 'MOIS has facilitated the movement of al Qa'ida operatives in Iran and provided them with documents, identification cards, and passports.'  A Library of Congress report found that 'MOIS has facilitated the movement of al-Qaeda operatives in Iran and has provided them with documents, identification cards, and passports. MOIS has also negotiated prisoner releases of AQI operatives.'" (*See* Ex. 3 at ¶ 75.)

### 2.    The Iran-al-Qaeda-Relationship Dates Back to the Early 1990's When al-Qaeda's Home Base was Sudan.

Al-Qaeda found safe haven in Sudan "largely because [it] shared Khartoum's interests in promoting pan-Islamic unity, toppling moderate Arab governments deemed hostile to Islamist movements, and countering Western influence in the Islamic world." (*See* Ex. 10 at 6.)  Dr. Byman explained, that Turabi "also sought to bridge this gap [between Sunni and Shia Muslims] to fight what he saw as the enemies of Islam, such as the United States and its allies in the Arab world such as Egypt." (*See* Ex. 3 at ¶ 25.)   Therefore, "**Turabi's Sudan became a home to Sunni militants from around the world, and his government brokered meetings with Iran to help militants receive training.**"  (*See id.*)

Iran's presence in Sudan can be documented to as far back as 1992. The State Department's

Patterns of Global Terrorism from 1992 documents the presence of the IRGC in Sudan: "**Sudan continues to strengthen its ties to Iran, a leading state sponsor of terrorism.** Following Iranian President Rafsanjani's December 1991 visit to Khartoum, a high-level Sudanese military delegation visited Tehran during the summer of 1992 to seek increased support for the government's campaign against insurgents in the south. **Iranian Revolutionary Guard Corps personnel are involved in training the NIF-controlled national militia, the Peoples Defense Forces (PDF), which is used as an adjunct to the Sudanese Armed Forces.**" (*See* Ex. 22 Patterns of Global Terrorism 1992 at 2.) (emphasis added). **The Iranian ambassador to Sudan, Majid Kamal, "guided Iranian efforts in developing the Lebanese Hizbollah group** while he served as Iran's top diplomat in Lebanon during the early 1980's." (See Ex. 18 Patterns of Global Terrorism 1993 at 13). The State Department observed, "[h]is presence illustrated the importance Iran places on Sudan." (*See id.*)

Recently declassified C.I.A. reports shed light on the two nations' terrorist goals. On or about this time, the C.I.A. reports that Iran and Sudan wanted to foster coordination between Sunni and Shia Islamists, by forming a "tripartite front" against their common enemies (the U.S. and Israel) consisting of "the NIF, Iran, and Usama (Bin Laden)'s Islamic Army." (*See* Ex. 16 *Terrorism: The Establishment of a Tripartite Agreement Among Usama Bin Laden, Iran, and the NIF* at 2.) "Eventually an agreement was reached to collaborate politically and militarily." (*See id.* at 3.) The C.I.A. reports that "experience from Hizballah and Iran should be transferred to new nations/extremist groups who lack this expertise. **This would then allow Islamic Army members to gain the necessary experience in terrorist operations**." (*See id.*)

High level officials of Al-Qaeda have admitted to coordinating with the Iranians before 9/11. In a 2008 interview with the al-Qa'ida news organization As-Sahab,  Ayman Zawahiri, the "then number two leader of al-Qa'ida," admitted that before 9/11, Iran and al-Qa'ida worked together "on

confronting the American-led Zionist/Crusader alliance." (*See* Ex. 3 at ¶ 27.)  Dr. Byman explained

why al-Qaeda, a sunni jihadist terrorist organization, would be amenable to such help: "From al-

Qa'ida's point of view, the logic of Iranian help is even more straightforward. . . . Although al-

Qa'ida is a formidable terrorist organization, it lacks the resources of a major state like Iran. . . . In

addition, al-Qa'ida's capabilities, especially in the past, were limited, and assistance from Iran could

improve the organization's capabilities."  (*See id*. at ¶ 34.)

Dr. Clawson, who was in Sudan during this time, testified, "The Iran-Al-Qaeda-Sudan relation

dates to 1991, when Osama bin Laden and a large team of his followers settled in Sudan in 1991.  At

that time, the Iranian government was providing very active assistance to the Sudanese government

for its fighting in the civil war in the south of the country. I had made more than 20 trips to Sudan in

my work for the IMF and World Bank in the 1980s and early 1990s, and I was following

developments there with great interest. **At the time, there was a lot of evidence of active Iranian-**

**Al-Qaeda activities in Sudan.**   For instance, in 1991, the Sudanese government proudly supported

a conference of those resisting the Madrid conference launching Israeli-Arab peace talks, and both

Iranian representatives and Bin Laden were active at this event." (Ex. 2 at ¶ 41.) The C.I.A.

documents that "Iranian Government representatives" and "Hizballah" would also attend the Popular

Arab and Islamic Conference hosted in Sudan during the 1990's.  (*See* Ex. 10 at 6.)    During   these

years, the nexus materially supported and created by Sudan and Iran offered al-Qaeda the

opportunity to associate and build a relationship with Iranian officials, Hezbollah, and other terrorist

organizations dedicated to attacking United States personnel, military targets, and citizens in the

Middle East. (*See*, Ex. 27 Al-Fadl Test. (Feb. 6, 2001); Ex. 19 Ali Mohamed Guilty Plea (Oct. 20,

2000); and Ex. 9, Chap. 2, pg. 61.  Indeed, the C.I.A., looking back at al-Qaeda's time in Sudan,

concludes, "[t]he capabilities and **contacts al-Qa'ida forged in Sudan, including with Iran and**

**Iraq, may give it more flexibility in designing creative responses to the loss of its safehaven in Afghanistan."** (*See* Ex. 10 at 10.)  (emphasis added).

> ### 3.  al-Qaeda Receives Training in Explosives and Operations from the Iranian Defendants and Hezbollah.

Testimony from Jamal Ahmed al-Fadl during the trial of Osama bin Laden and others for the 1998 bombings of the U.S. embassies in the East African cities of Dar es Salaam and Nairobi corroborates this existence and execution of cooperation between Iran and al-Qaeda.  Al-Fadl attended a meeting between Sudanese officials, Osama bin Laden and Shekih Nomani, an Iranian official in Khartoum where "they talk[ed] about we have to come together and we have to forget the problem between each other and each one he should respect the other because our enemy is one and because there is no reason to fight each other."  (*See* Ex. 27 Testimony, Jamal al-Fadl, *U.S. v. Usama bin Laden, et al.*, case no. 98-cr-1023 (Feb. 6, 2001) at 288-289).  The enemy was "westerns." (*Id.* at 289.)  Soon after, members of al-Qaeda went to South Lebanon to receive training from "Hezbollah" about "how to explosives [sic] big buildings." (*Id.* at 290.)

Similarly, The 9/11 Commission reported that,

> In late 1991 or 1992, discussions in Sudan between al-Qaeda and Iranian operatives led to an informal agreement to cooperate in providing support – even if only training – for action carried out primarily against Israel and the United States. **Not long afterwards, senior al-Qaeda operatives and trainers traveled to Iran to receive training in explosives.**
>
> **In the fall of 1993, another such delegation went to the Bekaa Valley in Lebanon for further training in explosives as well as in intelligence and security.   Bin Laden reportedly showed particular interest in learning how to use truck bombs such as the one that had killed 241 U.S. Marines in Lebanon in 1983.**  The relationship between al-Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations.  . . .  **al-Qaeda contacts with Iran continued in ensuing years.**

(Ex. 9 at 190).  Mr. Watson explained the significance of the Bekaa Valley:  "It is an isolated place. **And it's -- It's a haven for people that want to train and want to conduct terrorist acts**, because the country of Lebanon it's been highjacked. . . . **It's a known training area**." (*See* Watson Testimony at 127-128:17-6.) Mr. Watson also noted that Hezbollah, the IRGC, and the IRGC Quds Division were all very active in the Bekaa Valley.  (*See* Watson Testimony at 122:17-24.)

Members of al-Qaeda were trained in explosives by both the Iranian Defendants and Hezbollah. Dr. Byman testified that "In the early 1990s, individuals linked to al-Qa'ida received training in **explosives in Iran itself**." (*See* Ex. 3 at ¶ 68.)   Dr. Byman also testified that. "[i]n 1993, more individuals trained in Hizballah facilities in Lebanon – facilities that were set up by Iran and regularly host Iranian paramilitary personnel.  Some of these figures included individuals who became prominent in al-Qa'ida in later years, including Saif al-Adl." (*Id.*)   He also explained that the training included, "explosives training **but also instruction on how to collect intelligence and ensure operational security.** *(Id.)*  (emphasis added).  Dr. Clawson characterizes the relationship between Iran, Hezbollah and al-Qaeda in the 1990's as one of "**quite active cooperation."** (*See* Ex. 2 at ¶ 76.)

In his October 20, 2000, guilty plea before the Honorable Leonard Sand of the U.S. District Court for the Southern District of New York, in *United States of America v. Ali Mohamed*, Case No. S(7) 98 Cr. 1023 (LBS), Ali Mohamed, a high level operative within al-Qaeda and its affiliate organization, Egyptian Islamic Jihad, which was later folded into al-Qaeda, described Iran's material support of al-Qaeda/Egyptian Islamic Jihad in the 1990's as follows

> **I was aware of certain contacts between al-Qaeda and al Jihad organization, on one side, and Iran and Hezbollah on the other side.** I arranged security for a meeting in the Sudan between Mughaniyah, Hezbollah's chief, and Bin Laden. **Hezbollah provided explosives**

**training for al-Qaeda and al Jihad.** Iran supplied Egyptian Jihad with weapons. Iran also used Hezbollah to supply explosives that were disguised to look like rocks.

(*See* Ex. 19).

Commenting on Ali's guilty plea, Dr. Byman stated, "[t]his follows Iran's common approach of using both its own people and facilities and "outsourcing" to its close ally Hizballah." (*See* Ex. 3 at ¶ 68.) Dr. Clawson also testified, the **agreement that Mr. Mohamed describes . . . fits well with a pattern of how Iran has worked with other terrorist organizations,** including with some terrorist organizations with which it has some profound differences." (*See* Ex. 2 at ¶ 73 (emphasis in original)). Mr. Watson explains, "So if they [Iran] funds Hezbollah and Hezbollah trains al-Qaeda members, it would not be beyond the scope of Iran to do that under the umbrella of the evil empire, all the infidels in the United States." (See Watson Testimony at 121:13-17.) Dr. Byman also testified that, "[t]**his training was particularly important in the organization's early years, when its operatives had less battle experience and expertise in general**." (*See* Ex. 3 at ¶ 69.) (emphasis added). Mr. Watson also stated that explosives training received by Hezbollah "would enable . . . or assist [a terrorist organization] in the efforts" to construct a bomb like that used in the *U.S.S. Cole*. (*See* Watson Testimony at 123:5-13.)

There is no doubt that the training provided by Hezbollah is directly linked to Iran. Dr. Byman explained,

> **In many of its operations involving terrorist groups, Iran uses Hizballah as a facilitator.** Hizballah plays this role for several reasons. First, Iran's involvement in Hizballah's creation, large-scale funding, constant provision of training, and role in Hizballah's leadership councils has given Iran an important role in the Lebanese organization. **Iran trusts Hizballah and Hizballah trusts Iran – one of the closest relationships in history between a terrorist group and its sponsor.**[9]

---

[9] For more on this, see Byman, *Deadly Connections.*

> **Hizballah has a particularly close relationship with the IRGC, with which it has worked since the group's founding in the early 1980s.** . . . . In the past, however, according to some polls, Hizballah's leader, Hassan Nasrallah, was the single most popular individual in the Arab world because of his organization's repeated and successful defiance of Israel. **Third, Hizballah is highly capable and has a high degree of independence in Lebanon. Thus the training offered at Hizballah camps is superb, and it can be done without having to hide it from the Lebanese government.** Finally, working through Hizballah offers Iran some degree of deniability if it chooses, as it places one more degree of separation between the group in question and Iran.

(*See* Ex. 3 at ¶ 49.) (emphasis added). Moreover, Mr. Watson testified that the relationship between Hezbollah and Iran is "very close. It's set up by them, sponsored by them, fundraising by them, . . . in order to advance the cause of what they perceive." (*See* Watson Testimony at 122:7-9.) He also testified that, "**if Hezbollah trained al-Qaeda members, then that very clearly has a fingerprint back to Iran through the financial and the support they give to Lebanon and the Bekaa Valley or Lebanon**." (*See* Watson Testimony at 121:21-24.) (emphasis added).

### 4. Iran Continues to Provide Financing and Support to al-Qaeda throughout the 1990's.

Moreover, the relationship Iran and al-Qaeda continued well throughout the 1990's up to and including the *U.S.S. Cole* bombing. In June of 2000 Canadian Security Intelligence Services (CSIS) reported,

> There is compelling evidence that radical Islamists are receiving considerable foreign support and assistance… In Afghanistan, AJ [Al Jihad, an Islamist terrorist group controlled by Bin Laden] members are trained at the Al-Khalifah or Caliphate camp by Iranians and equipped with powerful explosives. **AJ leaders Al-Zawaheri and Muhammad Shauqi Al-Islambouli have received large sums of money from Iran and intense secret contacts have taken place between top Iranian intelligence officers, Bin Laden and Al-Zawaheri…**
>
> Both Iran and Osama Bin Laden have played a role in efforts to once again merge the AJ with the AGAI [Al Gama'a al-Islamiya, an Egyptian

Islamist terrorist group that had once merged with AJ but then the two fell out]. **At a September-October 1996 meeting with the former Iranian intelligence minister, Ali Fallahian, the AJ and the AGAI reportedly endorsed a plan to carry out terrorist operations to be financed by Iran and Osama Bin Laden.** At another meeting in early 1998, the possibility of providing funds and improving training and operation activities was offered by Iran to the two groups if they agreed to cooperate. **The groups agreed to focus on efforts to launch attacks on United States and Israeli targets outside Egypt, to retain separate leadership, organizational and military capacities, and to use a new coalition under the leadership of Osama Bin Laden as their base to achieve these aims.**

(*See* Ex. 2at ¶ ¶ 71-72 (quoting Canadian Security Intelligence Services Statement Summarizing the Information Related to Mohamed Zeki Mahjoub filed in the Federal Court of Canada on June 27, 2000) (alterations in exhibit); *accord* Ex. 17 at ¶¶ 26, 28.) Dr. Clawson, evaluating this information states, "Especially noteworthy is that . . . **the effort that the CSIS describes fits well with a pattern of how Iran has worked with other terrorist organizations,** including with some terrorist organizations with which it has some profound differences." (*See* Ex. 2 at ¶ 73.) (emphasis added).

### 5. Iran Provides Safe Passage/Facilitation of Travel to al-Qaeda from the 1990's up to and Including the *U.S.S. Cole* Bombing.

Most importantly, Iran has also long provided material support to al-Qaeda in the form of **safe passage and facilitation of travel.** (*See* Ex. 3 at ¶¶ 50-52; Ex. 2 at ¶¶ 77-82.) Dr. Clawson testified, "Importantly, Iran also provided important services to al-Qaeda as a transit location through Iran to the outside world once bin Laden and his outfit moved to Afghanistan. **And this happened before the *U.S.S. Cole* attack.**" (*See* Ex. 2 at ¶ 78.) It continues today. (*See* Ex. 3 at ¶ 55.)

The 2009 designation of Mustafa Hamid as a terrorist by the U.S. Treasury expressly states, "In the mid-1990s, Mustafa Hamid reportedly negotiated a secret relationship between

Usama Bin Laden and Iran, allowing many al Qaida members safe transit through Iran to

Afghanistan." (*See* Ex. 20).    Commenting on the 2009 Treasury designation, Dr. Byman notes,

"[o]ther sources corroborate this travel assistance and **suggest that Iran had become an**

**important route into Afghanistan and al-Qa'ida's training camps there."**    (See Ex. 3 at ¶

52.)  Dr. Byman expounded on the role Iran played in facilitating transit:

> Iran let Al-Qaeda establish a series of guest houses for its fighters
> making the long journey through its territory.  After Pakistan began to
> tighten up transit routes in the years before 9/11, one of al-Qa'ida's key
> military commanders, Seif al-Adl, told an interviewer that al-Qa'ida
> began "building good relations with some virtuous people in Iran to pave
> the way [for travel] and coordinate issues of mutual interest."  The al-
> Qa'ida-linked Saudi dissident al-Faqih noted that "before 9/11 many
> Saudis used Iran to access Afghanistan" because "the Iranians kept a
> blind eye to this."

(*See id.* at ¶ 53.)  In fact, "Al-Qaeda also deliberately established training camps on the western

border of Afghanistan to make it easier for recruits to travel through Iran." (*See id.*  at ¶ 54.)

The 9/11 Commission describes Iran's facilitation of travel for al-Qaeda operatives

starting in the mid-1990's and continuing well beyond the *U.S.S. Cole* bombing:

> **Intelligence indicates the persistence of contacts between Iranian**
> **security officials and senior al-Qaeda figures after Bin Laden's**
> **return to Afghanistan.**  Khallad has said that Iran made a concerted
> effort to strengthen relations with al-Qaeda after the October 2000 attack
> on the USS Cole, but was rebuffed because Bin Laden did not want to
> alienate his supporters in Saudi Arabia.  **Khallad and other detainees**
> **have described the willingness of Iranian officials to facilitate the**
> **travel of al-Qaeda members through Iran, on their way to and from**
> **Afghanistan. For example, Iranian border inspectors would be told**
> **not to place telltale stamps in the passports of these travelers. Such**
> **arrangements were particularly beneficial to Saudi members of al-**
> **Qaeda.**

(*See* Ex. 9 at 190)        Mr. Watson explained the significance of the facilitation of travel:

> The significance of being able to travel to, say, Afghanistan to attend
> some of the training bases there to seek indoctrination training or signing

up for, so to speak, to promise your support and loyalty to bin Laden, **the significance of that is the ability to get there and get out without being detected.**

And so, again, my opinion -- and I hesitate -- I'll be careful about this. **My opinion was, it's very important if someone wanted to be recruited out of Yemen to get into Afghanistan to receive that training and come back without any stamps associated with their passport.**

And so all you have to do is look at the 9/11 crew to see that all of those passports when they came in the U.S. were clean passports or the majority of them.

* * *

And, you know, if West Virginia was the next country over, if I could get in there, get training, come back here, somebody says, **let me see your passport, it shows no record, then it's more difficult to detect and be able to prevent. So that's the value of traveling in a country without getting stamps.**

* * *

**So, I mean, think about it. If you're trying to organize and plan something, it's very important and it's very helpful for a country or for the terrorist to have a country that says, well, we'll look the other way if you want to come through. And then it makes it very difficult. for anybody in the U.S. intelligence or law enforcement to try to figure that out post-training, or even before training.**

**Q  And how would facilitation of travel like describe -- like that described in the 9/11 Commission report and the way you just expounded upon, how would this have facilitated or enabled Al-Qaeda to commit terrorist operations like the U.S.S. Cole?**

**A  It would have allowed for the infrastructure support to be non-visible, and you want to be invisible in all of this. You would be allowed to go and obtain whatever you needed to do or live in a country that you're not a citizen of for a period of time in order to surveille and see things or activities that you're interested in and be able to come and go.** Because if you come and go very often, even to Canada, Canada is going to grab you and say, hey, Mr. Watson, why have you been here five times the last six months? Are you working here? It's about a tax deal, or, you know, or whatever the situation is. **So the passports are kind of a key here to try to be able to figure out what's going on.**

* * *

> If you can protect your passport and not get it stamped, you're not there. And if anybody says you're there, it's very difficult to prove that you were there.

(*See* Watson Testimony at 124-126.) (emphasis added).

Dr. Byman also explains why facilitation of travel is so important to an organization like al-Qaeda:

> **Such travel assistance is invaluable for groups like al-Qa'ida.** If visas had an Iranian stamp or showed a link to Afghanistan, they would be far more likely to attract the attention of border security officials in Saudi Arabia, the United States, or other countries that are hostile to al-Qa'ida. In addition, established lines of transit make recruitment and training easier, as individuals can travel to and from training camps without fear of interference. This is particularly important for facilitating the flow of new recruits, who lack training in clandestine travel. Finally, travel facilitation enables better communication and coordination among the far-flung strands of the global jihad of which al-Qa'ida is a part. **Even before 9/11, al-Qa'ida and its affiliate groups were aware that the United States and other hostile powers monitored phones and other forms of communication and recognized that many sensitive deliberations are best done face-to-face. Doing so, however, requires individuals who can travel freely from one area to another**.

(*See* Ex. 3 at ¶58.) (emphasis added).

Dr. Clawson also points out that several of the charging documents related to the *U.S.S. Cole* bombing, from the criminal indictment of al-Qaeda members Jamal Mohammed al-Badawi and Fahd al-Quso in *United States of America v. Jamal Mohammed al-Badawi and Fahd al-Quso* to the Charges and Specifications issued by the Office of Military Commission in the case of *U.S.A. v. Abd Rahim Hussayn Muhammad al Nashiri* on September 16, 2011 note that both Khallad (a.k.a. Walid Muhammed Saleh bin Attash, former bodyguard to Bin Laden and high-level al-Qaeda operative) and Abd Rahim Hussayn Muhammad al Nashiri (the mastermind of the *Cole* bombing) transited from Yemen to Afghanistan while planning the *U.S.S. Cole* bombing. (*See* Ex. 2 at ¶ 81; Ex. 28 Charges and Specifications, SUMMARY OF EVIDENCE

FOR COMBATANT STATUS REVIEW TRIBUNAL - BIN 'ATTASH, WALID MUHAMMAD SALIH (Feb. 8, 2007.); Ex. 29 Charges and Specifications for Abd Rahim Hussayn Muhammad al Nashiri; Ex. 1 at Ex. L.)

Opining on the significance of the travel *Cole* conspirators' travel patterns, Dr. Clawson emphasizes, "**Certainly, during the late 1990s and through 2000, Iran was the common route that al-Qaeda members used when traveling from gulf countries such as Yemen to Afghanistan. Iran was also the common route used by al-Qaeda members when returning from Afghanistan to gulf countries such as Yemen.** By not stamping al-Qaeda members' passports, and by providing safe passage through Iran and into Afghanistan, Iran further provided material support to al-Qaeda." (*See* Ex. 2 at ¶ 82.) (emphasis in original).

The Court is satisfied that there is sufficient evidence to conclude that as a result of its support in training, as a safe haven, and of facilitation of travel, the Iranian Defendants caused al-Qaeda to be able to plan and execute its attack against the *U.S.S. Cole*, which led to the injuries sustained by the Plaintiffs named herein. As a result, the Court finds that the Iranian Defendants are liable, under 28 U.S.C. § 1605A, for the injuries sustained by plaintiffs as a result of the terrorist attack on the *U.S.S. Cole*.

### E. The Plaintiffs[10]

**Doe Victim A** is the mother of the late Kevin Shawn Rux, who was killed at the *U.S.S. Cole* bombing. (*See* hearing transcript at 15:6; Ex. 26.) **Doe Victim A** enjoyed an especially close relationship with her son. (*See id.* at 19:3-8.) He also helped financially support his mother. (*See id.* at 7-8.) After Kevin died, **Doe Victim A** "couldn't function. . . . I just wanted to sleep, and I mostly laid in my bed in a fetal position." (*See id.* at 26:4-7.) It took her months to return

---

[10] Pursuant to Judge Facciola's order of November 5, 2014, the Court shall refer to plaintiffs by their Doe designations when discussing their damages.

to her job.  (*See id.* at 26:11-12.)  **Doe Victim A** has suffered from extreme depression since

Kevin's death, and is currently on Prozac. (*See id.*  at 27:23-25.)  She has sought counseling for

the depression.  (*See id.* at 28:13-14.) She describes the impact of Kevin's death on her life as

follows, "It's had an intense effect on my life, on me. I've been on Prozac and they've had to

raise it.  Started out on 20, and they have it raised to 40. Sometimes, I take two a day. October is

just a nightmare. So many times I've said I wish they could just take October off the calendar

because that's the month he was born, it's the month he was married. There's so many times that

I can't . . . think straight. And this past winter, I spent a lot of time in bed sleeping and just not

caring about anything."  (*See* hearing transcript at 27-28:23-7.)

Dr. Larry Pastor, a clinical psychiatrist, provided his expert opinion that **Doe Victim A**

has:

> **experienced a catastrophic loss upon the death of her son Kevin Rux in October 2000.**  Due to the sudden, violent nature of the incident, **Doe Victim A** experienced psychological trauma in addition to massive psychological loss.  The trauma involved particular qualities that were additive to the loss itself, including suddenness, violence, evil intent, gruesomeness and disfigurement, and inability to anticipate the incident. . . .  **It is my medical opinion that the examinee suffers from traumatic grief (a condition that has been conceptualized under various names including traumatic grief, complicated grief, unresolved grief, prolonged grief, pathological grief, and in the current edition of the DSM, "persistent complex bereavement-related disorder.").**  Findings elicited in examination included yearning for the deceased, intense pangs of grief associated with triggering stimuli, prolonged and intense grief, a dramatically altered view of one's world and one's future, anhedonia, feeling worse when reminded of the deceased, and doing things to please the deceased (examinee stated that she wants to change her name back to Rux, because Kevin didn't like that his last name was different from hers, but at present she doesn't have the $200 in court fees that a name change would cost).  **Doe Victim A continues to exist in a chronic, heightened state of mourning, recurrently upset by horrific, intrusive images of the bombing, pre-occupied with sorrow and other negative emotions related to her son's death (anger, bitterness, sense of injustice), and trouble getting through her day and carrying out normal life routines.**

Contemplation of the mangled and dismembered remains of her son and 16 others is a trigger for intense, raw feelings of horror and distress. In contrast to the course of normal ("uncomplicated", or non-traumatic) grief, the passage of years does not diminish the pain of loss. Indeed, the passage of time can serve to heighten the pain of loss, as the sufferer cannot resolve the feeling of a loved one unjustly taken away, and the ongoing inability to restore a sense of fairness or justice to the world. . . . There is also marked social withdrawal and diminished interest in social interaction and meeting new people, which cannot definitively be attributed to the traumatic loss of her son but I believe is most likely due to this trauma, because diminished social interaction is routinely associated with prolonged grief, sadness, and negative emotions associated with traumatic grief (and seen in this examinee) such as anger and survivor's guilt. Social withdrawal, or avoidance, a form of emotional self-protection, is a feature of PTSD[11], traumatic grief, and other trauma-related disorders. It is a defense mechanism used by individuals with these syndromes, including the examinee, in an effort to avoid triggering painful emotional states and it results in an impoverishment of interpersonal relationships. Examinee also meets the diagnostic criteria for a mental disorder related to stress and trauma in the DSM-V, 309.89.[12] **As the most successful, highly functioning of the five children and in the absence of a father, Kevin served as a crucial support person for Doe Victim A and the other four sons (I am reminded of, but hesitate to use, the cliché "father figure"). It is my opinion that the death of Kevin Rux is the direct cause of the pain, suffering, and functional impairment evidenced in the examination of Doe Victim A.**

(See Ex. 4 at ¶ 9) (emphasis added).

**Doe Victim B** is the youngest brother of the late Kevin Shawn Rux. (*See* transcript at 68:19.) **Doe Victim B** explains that Kevin took him under his wing when their parents separated when he was eleven, and that he was like "a father figure to me." (*See id.* at 68:23-24.) He remembers Kevin as a role model and disciplinary figure when he was growing up. (*See id.* at 72:3-8.) That relationship continued after he came of age, and the two even lived together for a while. (*See id.* at pp. 132-133.) He recalls, "Kevin was the glue that held us all together[.]" (*See*

---

[11] Post-Traumatic Stress Disorder.

[12] "Other Specified Trauma- and Stressor-Related Disorder," DSM-5 p. 275.

*id.* at 70:10-11.) Learning that Kevin had been killed aboard the *Cole* was "the worst moment in my entire life[.]" (*See id.* at 75:3-4.) Since Kevin's death, **Doe Victim B** has become withdrawn, suffered from debilitating depression, and had difficulty holding down a job. (*See id.* at 75-76.) His wife testified, "He's backward, he don't want to speak to anybody, he won't go into the store now, he won't -- I have to beg him to go anywhere with me. And so I'm pretty much have to do everything myself, pretty much raised the kids myself, because he won't do anything. I feel that my kids have lost their father of what he could have been, you know." (*See id.* at 139:1-6.)

Dr. Larry Pastor, a clinical psychiatrist, provided his expert opinion that **Doe Victim B** suffers from:

> **traumatic grief and Persistent Complex Bereavement Disorder,[13] coded as the DSM-5 diagnosis 309.89, Other Specified Trauma- and Stressor-Related Disorder (Persistent Complex Bereavement Disorder).[14]** Findings include yearning or longing for the deceased, difficulty accepting the loss, bitterness or anger, prolonged sadness, feelings of horror and pain from contemplating the manner of death, and difficulty trusting others. **Doe Victim B continues an internal, mental relationship with Kevin in his mind that is evidence of a close relationship with Kevin, whom he looked up to as a significant support person and role model.** Finding a co-worker who looks "exactly like" and reminds him of his deceased brother is considered a result of yearning or longing for the deceased. To date **Doe Victim B** continues to experience intense sadness and emotional pain related to the death of his brother.

**Doe Victim D** is one of Kevin's older brothers. He and Kevin were very close. He recalls that growing up he, "didn't do nothing without Kevin. You know, we were like, me and Kevin, we were attached at the hip. We didn't do nothing without each other." (*See* Transcript at 47:20-22.) He describes Kevin as "he was my brother, you know, my best friend." (*See id.* at

---

[13] As defined in the DSM-5, subtype "with traumatic bereavement."

[14] P.289, DSM-5.

48:16.) After Kevin died, he began, "to experience daily nightmares of 'Kevin all blown up and nothing I could do about it.'" (*See* Ex. 4 at ¶ 20.) He began using recreational drugs to avoid the nightmares. (*See id.*)  In 2001, he was arrested on drug charges and incarcerated. (*See id.*)  Since his release in 2003, he has worked to keep his record clean. (*See id.*)  Struggling with depression since before Kevin was killed, he has been on a variety of psychotropic drugs, including Zoloft, Celexa, and Wellbutrin both before and after his death.  (*See id.* at ¶ 18.)

Dr. Larry Pastor, a clinical psychiatrist, provided his expert opinion that **Doe Victim D** suffers from:

> chronic, debilitating emotional pain related to the sudden death of Kevin Rux.  Symptoms include feelings of sadness, loss, helplessness, avoidance behaviors, sudden grief intruding into otherwise enjoyable moments, and impaired self-care.  **Doe Victim D meets the DSM criteria for Persistent Complex Bereavement Disorder with significant personal distress and functional impairment in ability to work and health-related behavior:** according to the DSM-5, "Persistent complex bereavement disorder is associated with deficits in work and social functioning and with harmful health behaviors, such as increased tobacco … use." (p.792)  Examinee also reports a history of prior depression.  Recovery from depression is negatively impacted by stressful life events and it is my opinion that **Doe Victim D also merits a psychiatric diagnosis of residual depression (depressive disorder, in partial remission, DSM code 296.25) with lack of full remission resulting from the stressor of Kevin's sudden and violent death.**

(*See id.* at ¶ 21.)

**Doe Victim C** is one of Kevin's younger brothers.  (*See* Transcript at 56:7-8.)  **Doe Victim C** was close with Kevin growing up, and as adults they spoke once a week although they lived in different states. (*See id.* at 58:6.) Kevin was a figure of stability and a role model for Mr. Rux. (*See id.* at 59:22, 25.)  After Kevin was killed, **Doe Victim C** began to experience nightmares of Kevin's death and spiraled into a deep depression. (*See id.* at 64.) He has not been able to work because "I'll have a real messed-up dream and it will mess me up for a couple days

and I'll just quit." (*See id.* at 65:8-9.) He is currently on disability for his depression. (*See id.* at 56:19-20.)

Dr. Larry Pastor, a clinical psychiatrist, provided his expert opinion that:

> It is my medical opinion that **Doe Victim C is severely impaired and merits the diagnosis of PTSD,** with nightmares, hypervigilance, re-experiencing, avoidance, chronic insomnia, stress-intolerance and reduced role functioning. **The PTSD-inducing stressor was the sudden loss of his brother Kevin.** There is an implication of cognitive distortion as a defense mechanism in order to block out what would be an even more painful reality; i.e., despite evidence for an overwhelmingly lethal blast that mangled bodies and encased sailors in between massively twisted metal hulls, examinee finds solace in the improbable case that his brother was able to remain conscious and experience a peaceful, thoughtful last few moments before death.

(*See* Ex. 4 at ¶ 25.)

**Doe Victim E** is Kevin's oldest brother. **Doe Victim E** and Kevin had a very close relationship. (*See* Transcript at pp. 33-36.) After Kevin died, **Doe Victim E** fell into a deep depression. He cried every day for five years. He is constantly preoccupied of images of his brother's death, and imagines him suffering. His pain is just as intense today as it was the day he learned that Kevin was killed.

Dr. Larry Pastor, a clinical psychiatrist, provided his expert opinion that **Doe Victim E** suffers from:

> It is my medical opinion that Doe Victim E had a close and loving relationship with his brother Kevin Rux and suffered severe sadness, anger, and grief following Kevin's death, including years of significant emotional distress and depression. Ken meets the criteria for the diagnosis of DSM 309.89, Other Trauma and Stress-Related Disorder (persistent complex bereavement disorder). **Doe Victim E's feelings of loss and emotional pain continue to the present day.** He may be at risk of using alcohol from time to time to deaden the emotional pain.

## V. CONCLUSIONS OF LAW

**A. Subject Matter Jurisdiction is Proper and the Defendants are not Immune from Suit.**

The Court finds that the plaintiffs' have met the FSIA's multi-factor test for subject matter jurisdiction and waiver of immunity discussed *supra* in Part III(B).  At all times relevant hereto, both Sudan and Iran have been designated state sponsors of terrorism, and all of the plaintiffs are natural-born U.S. citizens.  (*See* Transcript at 14:18;33:1;46:5;55:23;67:21.) As for the § 1605A(a)(2)(A)(iii) arbitration requirement, Plaintiffs were not required to extend an offer to arbitrate because the FSIA only requires as much when the alleged terrorist act occurred in the foreign state against which the claim is brought. *Id.*

Additionally, plaintiffs solely seek "money damages." 28 U.S.C. § 1605A(a)(1).  Second, the defendants are all foreign states.  Sudan and Iran are clearly foreign states.  As the other Sudanese entities are military, security, and intelligence agencies, they are also foreign states. *See, e.g., Owens*, 826 F. Supp. 2d at 148  (Sudanese military and intelligence agencies part of foreign state).  Similarly, the IRGC, the IRGC Qods, and MOIS are all political organs of the state who are amenable to suit under the FSIA.  *See, e.g., Valore*, 700 F. Supp. 2d at 65 (holding MOIS is subject to suit under 1605A); *see also Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 180 (D.D.C. 2010) (holding under FSIA, "MOIS is a division of the state of Iran, while IRGC is an instrumentality of Iran that acts as a military arm of the government. In such circumstances, both entities constitute integral parts of Iran's political structure, and thus constitute a foreign state"); *Blais v. Islamic Rep. of Iran*, 459 F. Supp. 2d 40, 60–61 (D.D.C. 2006) (Lamberth, J.) (concluding that both MOIS and IRGC are liable under terrorism exception to jurisdiction of the FSIA); *Salazar v. Islamic Rep. of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (same).

Third, the plaintiffs have all presented evidence sufficient to establish they have suffered solatium damages.  Fourth, the evidence presented shows that the defendants aided al-Qaeda in executing the bombing and in developing the infrastructure to be capable of executing the *U.S.S. Cole* bombing.  On the evidence presented, there is "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered."  *Valore*, 700 F. Supp. 2d at 66 (internal quotations omitted).

Plaintiffs have ably brought forth sufficient evidence as to jurisdiction to meet the standard under Federal of Civil Procedure 55(e) for all defendants. As discussed extensively above, the Iranian Defendants provided material support in the form of travel assistance, weapons training, and safe haven.  The Republic of Sudan is and has been held liable under 1605A of the FSIA for the *U.S.S. Cole* bombing. Plaintiffs also adduced evidence of the direct support that the Sudanese military and security agencies provided to al-Qaeda and of their close relationship with Iran. (*See* Ex. 1 at ¶¶ 49,55,83, Ex. A at 3; Ex. 22).  As each of these defendants was properly served, did not appear in this action, and "bears the burden of proving that that plaintiff's allegations do not bring its case within a statutory exception to immunity," the Court finds that jurisdiction has been established.   *Harrison*, 882 F. Supp. 2d at 29, n.7 (internal alteration and quotation omitted).

**B.    Personal Jurisdiction**

Furthermore, all defendants have been validly served under 28 U.S.C. § 1608(a). (*See* ECF ## 15,16, 29.) To determine whether an entity was properly served under the FSIA, a court examines whether "the core functions of the foreign entity are predominantly governmental or commercial[.]" *Transaero*, *Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 152(D.C. Cir. 1994). If the entity's functions are predominantly governmental, then a plaintiff must proceed with

service of process under the methods outlined in 28 U.S.C. § 1608(a), in the order they are listed in under that section of the statute. *Id.* at 154. The defendants here are either the state itself or various military, security, and intelligence apparatuses of the state, which are considered the state itself under the FSIA. [15] *See, e.g., Transaero*, 30 F.3d at 153 ("core functions" of military apparatus of foreign sovereign are governmental, accordingly service of process under 28 U.S.C. 1608(a) proper); *Owens*, 826 F. Supp. 2d at 148 (holding service of process proper under 28 U.S.C. § 1608(a) upon defendants Republic of Sudan and its Ministry of the Interior, the Islamic Republic of Iran and its intelligence service, the Ministry of Information and Security (MOIS), and the Iranian Revolutionary Guards Corps (IRGC) in 1605A action); *Blais v. Islamic Rep. of Iran*, 459 F. Supp. 2d 40, 60–61 (D.D.C. 2006) (Lamberth, J.) (concluding that both MOIS and IRGC must be treated as the state of Iran itself); *Salazar v. Islamic Rep. of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (same).

## C.    Liability for Intentional Infliction of Emotional Distress Solatium

Plaintiffs have stated causes of action for intentional infliction of emotional distress and loss of solatium against the defendants. A defendant shall be liable for intentional infliction of emotional distress to family members of an injured person if the defendant (1) engaged in extreme and outrageous conduct (2) which was directed at persons other than plaintiffs (3) which intentionally or recklessly caused severe emotional distress, but not necessarily bodily harm, (4) to such persons' immediate family members, who were present at the time such conduct occurred. *Restatement (Second) of Torts* § 46(1)-(2)(a) (1965). In terrorism actions brought pursuant to 28 U.S.C. § 1605A, the requirement of presence at the time of the incident is waived.

---

[15] If the entity's functions are predominantly commercial, then it is considered an "agency or an instrumentality" of the state, and service proceeds under 28 U.S.C. § 1608(b). *See id.* at 151-52.

*Valore*, 700 F. Supp. 2d at 80 ("One therefore need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result.*"); Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 75 (D.D.C. 2011). The Plaintiffs have proven all elements necessary to establish the liability of the defendants for intentional infliction of emotional distress. "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin*, 667 F.Supp.2d at 22.

A claim of solatium is a claim for the mental anguish, bereavement and grief that those with a close personal relationship to an injured or killed family member experience as the result of that persons injury or death, as well as the harm caused by the loss of that person's society and comfort. *Baker*, 775 F. Supp. 2d at 88; *Belkin*, 667 F.Supp.2d at 22. Immediate family is "defined as one's spouse, parents, siblings, and children." *Heiser*, 659 F. Supp. 2d at 28.  A solatium claim under the FSIA is nearly indistinguishable from a claim for intentional infliction of emotional distress. *Valore*, 700 F.Supp.2d at 85 (citing *Heiser*, 659 F.Supp.2d at 27 n. 4). As such, where both claims are stated, the damages that are awarded are the same under either theory and are not cumulative of each other. *Id.* Accepting the uncontroverted evidence that the Plaintiffs, who are close family members of the late Kevin Shawn Rux, suffered severe emotional and physical injury, the Court concludes that the defendants are liable to them for intentional infliction of emotional distress and loss of solatium.

## VI.    DAMAGES

### A.  **Amount of Solatium Damages**

Courts generally award baseline solatium damages under 1605A as follows: "approximately $5 million to a parent whose child was killed and approximately $2.5 million to

a plaintiff whose sibling was killed." *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006). However, the United States District Court for Columbia has directed that courts may award greater solatium damage amounts in cases "'with aggravating circumstances,' **indicated by such things as testimony which describes a general feeling of permanent loss or change caused by decedent's absence or medical treatment for depression and related affective disorders[.]"** *Valore v. Islamic Rep. of Iran*, 700 F. Supp. 2d 52, 85-86 (D.D.C. 2010) (emphasis added).

Factors pertinent to the determination of damage award enhancements "are largely derived from common sense, and generally fall into one of three categories: (1) evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; (2) medical proof of severe pain, grief or suffering on behalf of the claimant; and (3) circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Rep. of Iran*, 768 F. Supp. 2d 16, 26-27 (D.D.C. 2011). For instance, courts have found that when the decedent, "like a second father," was a constant and supportive presence to his/her family member(s), an upward departure of 50% from the baseline was warranted. *See Oveissi v. Islamic Rep. of Iran*, 768 F. Supp. 2d 16, 28 (D.D.C. 2011); *see also Valore*, 700 F. Supp. 2d at 86. (upwardly departing from baseline when "emotional suffering stands out as particularly devastating" including evidence of grief-induced drug and alcohol abuse and nervous breakdowns).

Here, the evidence has shown that Kevin was the center of his family. His violent, unexpected death was devastating to his mother and his brothers. The violent nature in which he died further exacerbated their grief and mental suffering, with several of his family members

tortured by the fact that he may have suffered before he died. (*See generally* Ex. 4.) **Doe Victim A** has suffered at least one mental breakdown, as she was unable to get out of bed for several months after Kevin died. She has required Prozac to function since Kevin died.  His brother **Doe Victim B**, who considered Kevin a second father, has suffered from debilitating depression since his death, unable to hold down steady employment.  Kevin's death caused **Doe Victim D** to relapse into depression "with lack of full remission."  He turned to drugs to escape the nightmares of Kevin's death, eventually leading to prison.  Medication has been unable to help him.  **Doe Victim E** was similarly affected by Kevin's death.  He is constantly preoccupied with images of his brother's death and imagines him suffering. His pain is just as intense today as it was the day Kevin died. **Doe Victim C** is now "severely impaired," suffers from disabling Post-Traumatic Stress Disorder and is forced to subsist on disability.   Under such circumstances an upward departure of 50% of the baseline is warranted. Accordingly, each plaintiff's solatium damages are as follows:

| Plaintiff | Baseline Award | 50% Enhancement | Total Solatium Damages |
|-----------|----------------|-----------------|------------------------|
| **Doe Victim A** | 5 million | 2.5 million | 7.5 million |
| **Doe Victim B** | 2.5 million | 1.25 million | 3.75 million |
| **Doe Victim D** | 2.5 million | 1.25 million | 3.75 million |
| **Doe Victim C** | 2.5 million | 1.25 million | 3.75 million |
| **Doe Victim E** | 2.5 million | 1.25 million | 3.75 million |

**B.  Punitive Damages**

"[T]he purpose of punitive damages is 'to punish' a defendant for 'outrageous conduct,' and 'to deter him and others like him from similar conduct in the future.' " *Baker v. Socialist*

*People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 84 (D.D.C. 2011) (citing *RESTATEMENT (SECOND) OF TORTS* § 908(1) (1977)). In determining an award of punitive damages under 28 U.S.C. § 1605A, courts evaluate four factors: "'(1) the character of the defendant's act, (2) the nature and extent of harm to the plaintiffs that defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants.'" *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008) (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 32 (D.D.C. 1998)).

Courts have found these factors to be satisfied when a defendant has provided material support and sponsorship to a terrorist organization in carrying out an act of terrorism. *See, e.g., Baker*, 775 F. Supp. 2d at 85 (finding that the character of defendant's actions in providing material support and sponsorship to terrorist organization merited award of punitive damages). In this case, the evidence shows that the defendants supported, harbored, aided, abetted, sponsored, and conspired with al-Qaeda in order to allow the organization to carry out the attack on the U.S.S. Cole. These egregious acts, which resulted in the extrajudicial killing of 17 American sailors and the serious injury of 39 others who were not engaged in battle, are certainly of the character that gives rise to a strongest need for deterrence. Further, the Republic of Sudan and the Islamic Republic of Iran have continued to harbor terrorist organizations, including al-Qadea, after the bombing of the *U.S.S. Cole*, and as of this date are still designated by the U.S. Secretary of State as a State Sponsors of Terrorism. (*See generally* Exs. 1-3). The Court finds that the outrageous character of these acts, the damage the defendants intended to cause and caused to the Plaintiffs, and the need for deterrence merits an award of punitive damages.

The wealth of the Republic of Sudan and the Islamic  Republic of Iran also supports an award of punitive damages. Sudan's gross domestic product is estimated to be $85.3 billion for

2014. http://www.heritage.org/index/country/sudan .   Moreover, it must be noted that Sudan's economy directly benefited from Bin Laden and Al Qaeda's capital and infrastructure investments, which contributed to Sudan's economy's rapid growth from the time of his arrival in 1991, when its gross domestic product was a meager $23.33 billion.  Iran's GDP in 2014 was $999.2 billion. http://www.heritage.org/index/country/iran Moreover, it should also be noted "that a highly conservative estimate of the financial material support provided by Iran in support of terrorism is within the range of **three-hundred-million dollars to five-hundred-million dollars per year.**"  (*See* Ex. 2 at ¶ 91.) Indeed, Iran provides at least two hundred million dollars in funding to Hezbollah alone. (*See id.* at ¶ 90.)

As for deterrence, over the last several years, the Republic of Sudan has begun to participate more actively in litigation in the United States. *See Owens v. Republic of Sudan*, 531 F.3d 884, 885 (D.C. Cir. 2008); *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541 (E.D. Va. 2007). As for Iran, Dr. Clawson explains,

> **Iranian leaders pay close attention to civil suits about terrorism.**  In 2000/01, the issue was a major controversy in Iran.  . . .  Former Iranian President, now chairman of the powerful Expediency Council (charged with resolving disputes among the various organs of government), Ali Akbar Hashemi Rafsanjani complained at length about the suits, as did numerous members of Iran's Parliament.  **Of particular concern was the large punitive damage awards assessed against Iran, which they acknowledged exceeded a billion dollars**.
>
> While Iranian leaders do pay close attention to the court judgments against Iran for its material support of terrorism, the effort to dissuade Iran from providing financial support for terrorism against Americans encountered several significant obstacles until recently.  **First,** from 2005-2013, the president of Iran was Mahmoud Ahmadinejad, was a right-wing extremist who enjoyed attacking the United States and mocking its power.  **Second,** Iran's much higher oil income after 2005 because of higher oil prices made it easier for Iran to allocate more funds for the support of terrorism during the years until the additional U.S. and European Union sanctions of 2013 sharply reduced Iran's oil incomne.  **Third,** the perceived success of major terrorist groups that receive

material support from Iran, namely, Hizbollah's performance in its 2006 confrontation with Israel, followed up by its 2009-2010 success in keeping a role in the Lebanese government despite doing poorly in the elections, and HAMAS' 2006 takeover of Gaza (though that has been tarnished by its poor showing in the 2008-2009 confrontation with Israel).  **Fourth,** the perception in recent years has been that the United States has been unable to exercise power in the Middle East: it was tied down by Iraqi and Afghan insurgents until it decided to scale back or end its military role, it announced that it would pivot to Asia with an implicit reduced role in the Middle East, and it was unable to put into effect President Barak Obama's 2012 call for Syrian President Assad to leave office. Iranian leaders have often proclaimed these developments as evidence that Islamist resistance movements and their terrorist activities can defeat the United States.  **In consideration of these factors, the financial pressure to abandon terrorism against U.S. citizens and entities as a result of past court judgments was not sufficiently as to induce Iran to change course.**

**But that pressure, in my opinion, certainly remains, and should not be underestimated as an element in Iran's calculation about whether and how to support terrorism against Americans.** For one thing, Iran is less confident in 2014 than it was some years ago, in no small part because of the U.S. success since 2012 in persuading other countries to join in tougher sanctions against Iran.  A factor which could make court judgments more effective at leading Iran to reconsider its policy of terrorism against Americans is Iran's active pursuit of a nuclear accord with the United States.  In the 2013 Iranian presidential elections, all of the candidates except the one most associated with hardliners argued that Iran must compromise with the international community in order to secure relief from international sanctions.  Indeed, the heart of winning candidate Hussein Rouhani's campaign was that the only way to improve Iran's dreadful economic situation was to obtain sanctions relief and that required compromising with the United States about the nuclear program.  To the extent that the Iranian government is focused on how to obtain sanctions relief, that government will be more sensitive to pressure related to Iran's support for terrorism against Americans.  To be sure, Supreme Leader Khamenei is skeptical about the nuclear negotiations and counsels adopting an "economy of resistance" which does not rely on sanctions relief.  Yet the issue of how to improve the economy and how much to compromise with the West is in my expert opinion a matter being vigorously debated in Iran, and court judgments which highlight the cost for terrorism support could be an important element in that debate.

**That is especially the case since recent legal actions suggest that substantial Iranian assets could be at risk.**  While I am not at liberty to

discuss a number of actions in which I am an expert witness and where the proceedings are under seal, I can note that the *Wall Street Journal* has reported that in one case, more than one billion dollars is at stake. In 2013, a federal court ordered the surrender of the assets of the Alavi Foundation of New York – worth in excess of $600 million -- on the grounds that the Foundation was controlled by the Iranian government. Furthermore, Canada revised its laws in 201 to allow seizure of Iranian assets to satisfy court judgments against Iran. In March 2014, a Canadian court ordered the seizure of more than $7 million in Iranian assets under the Justice for Victims of Terrorism Act to satisfy court judgments in the United States. Iranian media have extensively reported on this case. **The prospect that Iran must contemplate is that additional countries may permit seizure of Iranian assets to satisfy the U.S. court judgments, which could considerably complicate Iranian trade and put at risk substantial Iranian assets abroad.**

**Iran has recently been taking a more active stance on terrorism-related lawsuits brought against it.** Although Iran has had a long history of failing to appear in these lawsuits, Iran has entered several recent suits. For instance, as I mentioned earlier, in 2004, plaintiffs holding judgments against Iran filed a property claim for ancient Iranian tablets held by the University of Chicago's Oriental Institute. The suit was initially ignored by Iran. However, in 2009, after the district court finally ruled that the case could proceed, Iran intervened in the case. Indeed, Iran has vigorously defended a Canadian wrongful death suit against it, *Estate of the Late Zahra (Ziba) Kazemi, and Stephan (Salman) Hashemi v. Islamic Republic of Iran, et al.,* Case No. 500-17-031760-062 (Sup. Ct. Montreal), since suit was filed in 2009. And since 2011, the Alavi Foundation of New York has vigorously but so far unsuccessfully contested in federal court the U.S. seizure of its assets.

**Here, Iran has not decreased its support for terrorism, but instead has dramatically increased and widened its support for terrorists, terrorist organizations, and terrorist activities throughout the world.** Punishment can be measured, in large part, by assessing significant financial damages for Iran's continued and wide-ranging worldwide support for terrorism, both directly and through its governmental arms (MOIS, IRGC, and IRGC Qods) and through Hizbollah. **Iran is blatant in its support of terrorism.** As to deterrence, there two factors to consider: deterring similar conduct by others and making further efforts to deter Iran in its bold and increasing support for terrorism, which Iran uses to expand its influence, its reach, and its force by terrorist means.

It is my opinion, to a reasonable degree of certainty, that Iranian officials pay extremely close attention to what the outside world has to say about the Iranian government and its policies, and they generally assume that

whatever is written about Iran – whether by judges, by independent newspapers, by non-governmental organizations, or by foreign ministries – is a direct product of a unified policy by the government of the country from which the comment originates. Further, as I noted earlier, the Iranians have shown themselves to be sensitive to punitive damages levied against them, and they are well aware that such damages have been a common feature in actions against Iran for its support of terrorism against Americans. Were this Court not to impose punitive damages for what was a spectacular terrorist act, this would be read by Iranian government officials as indicating  a significant weakening of U.S. pressure on Iran to end its support for terrorism against Americans. **On the other hand, were this Court to impose substantial punitive damages, this would be read by Iranian officials as indicating that U.S. policy remains firmly opposed to Iranian support for terrorism against Americans.**

(*See* Ex. 2 at ¶¶ 90-98.)

The Court now turns to the appropriate measure of the punitive damages. This is the first case to assess punitive damages against Sudan and Iran for the *U.S.S. Cole* bombing.[16]  In several of this Court's prior decisions, punitive damage awards were calculated by multiplying the average annual sum that the defendant state sponsor of terrorism expended in support of terrorist activities by a discretionary factor, i.e. x 5. *See, e.g.*, *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 13 (D.D.C. 2011).

In *Valore*, the Court adopted Dr. Clawson's rationale for increased punitive damages in cases involving Iran and Hezbollah as follows:

> **In the past, "[i]n the interest of remaining neutral in the debate on the complicated topic of terrorism financing," the Court has adopted the mean of the range of Dr. Clawson's estimates**. *See, e.g.*, *Heiser II, 659 F. Supp. 2d at 30* (adopting $ 100 million-the mean of $ 50 million and $ 150 million-as the multiplicand). Because the subject of these consolidated cases is terrorism by

---

[16] The Court notes that in *Harrison*, another *U.S.S. Cole* bombing case against the Sudan (and not Iran), the court was forced to "use the compensatory damages value as the multiplicand."*See Harrison*, 882 F. Supp. 2d at 50.  However, the plaintiffs there did not provide "evidence relating to Sudan's actual expenditures on terrorist activities." (*Id.*) By contrast, here, plaintiffs have established evidence regarding Iran's actual expenditures on terrorism, and that much of the terrorism sponsored was done in conjunction with the Sudan.  Thus, *Harrison's* calculation of punitive damages is not appropriate here.

Iran through Hezbollah, the Court does not simply adopt the mean of Dr. Clawson's estimated range of Iran's funding of terrorism generally. Instead, the Court adopts $ 200 million as the multiplicand. This value is based on the known amount of Iran's annual cash assistance specifically to Hezbollah and does not require the Court to waver from its neutrality concerning terrorism financing by hazarding a guess as to the value of any non-cash assistance also provided to Hezbollah.

As to the multiplier, Dr. Clawson testified in *Flatow* that a factor of three times Iran's annual expenditures on terrorism "would be the minimum amount in punitive damages that would affect the conduct of the Islamic Republic of Iran, and that a factor of up to ten times its annual expenditure for terrorism must be considered to constitute a serious deterrent to future terrorist activities aimed at United States nationals." *999 F. Supp. at 32*. In *Heiser*, however, he recommended a factor between three and five, as opposed to three and ten. *659 F. Supp. 2d at 30*. In both cases, the Court conservatively adopted the lower multiplier of each range: three. **Today, however, the Court adopts five as the multiplier.**

**This higher number is based on the suggestion by Dr. Clawson that Iran has recently begun to more actively participate in litigation in the United States and elsewhere.** (*See* Clawson Aff. P 6.) For example, in *Rubin v. Islamic Republic of Iran*, Iran intervened to assert sovereign immunity in a case it had previously ignored after the Court ruled that plaintiffs could attach Iranian archeological artifacts on loan to the University of Chicago. *No. 03-cv-9370, 2006 U.S. Dist. LEXIS 53284, 2006 WL 2024247, at *1 (N.D. Ill. July 14, 2006)*; (*see* Clawson Aff. P 6). Additionally, in the Canadian case of *Estate of Kazemi v. Islamic Republic of Iran*, Iran has actively contested the jurisdiction of the Montreal Superior Court, where the case has been filed. Irwin Block, *Quash Lawsuit*: *Tehran; Iran Has Immunity, Superior Court Told*, GAZETTE (Montreal), Dec. 3, 2009, at A6; (*see* Clawson Aff. P 6). **In the hopes that Iran is paying more attention to the cases that have been brought against it, the Court seeks to send the strongest possible message that Iran's support of terrorism against citizens of the United States absolutely will not be tolerated by the courts of this nation. By adopting five as a multiplier, this Court will hold Iran to account.**

This award, like previous awards made under similar methodology, "seems likely to have a deterrent effect." *Id. at 31* (multiplying $ 100 million by three); *Brewer, 664 F. Supp. 2d at 59* (same). **Although this level of punitive damages is significantly higher than any previously rendered against Iran, the award is justified by the continuing need to punish and deter Iran from its increasing support of terrorism, and is further justified as the product of well settled case law on the methodology by which punitive-damages awards in FSIA cases are calculated. Accordingly, this $ 1 billion punitive-damages award shall be apportioned among the plaintiffs in proportion to their relative compensatory-damages awards.**

*Valore*, 700 F. Supp. 2d at 89-90.  The same rationale is applicable to the present matter.  As plaintiffs have established, Iran and Sudan continue to be blatant in their support for terrorism. Moreover, these states' alliance to commit terrorist acts through al-Qaeda, including the *U.S.S. Cole*, dates back to the 1990's.  In a world where new terrorist threats such as Bokom Haram and ISIS exist, it is even more imperative to send a strong message to Iran and Sudan that their continued material assistance to terrorist organizations will not be tolerated, and in accordance with this Court's prior opinion in *Valore*, this Court finds that a multiplier of five is appropriate in this case. Because this case involves assistance through Hezbollah, the Court finds the appropriate multiplicand is two.  The Court thus awards plaintiffs one billion dollars, five times the sum of 200 million dollars, as punitive damages, to be distributed in proportion to each plaintiff's share of the compensatory award.

## VII. CONCLUSION

For the forgoing reasons, final judgment will be entered against the defendants, jointly and severally, in the amounts set forth above, plus any applicable post-judgment interest allowed by law.

Respectfully submitted,

_____/s/ *Joshua M. Ambush*_____
Joshua M. Ambush
Bar No. MD 27025
Law Offices of Joshua M. Ambush, LLC
1726 Reisterstown Road, Suite 206
Baltimore, Maryland 21208
Phone: (410) 484-2070
Facsimile: (410) 484-9330
joshua@ambushlaw.com

_____/s/ Jennifer L. Kent
Jennifer L. Kent
*Pro Hac Vice*
Bar No. 28870 (MD)

Law Offices of Joshua M. Ambush,  LLC
1726 Reisterstown Road, Suite 206
Baltimore, Maryland 21208
Phone: (410) 484-2070
Facsimile: (410) 484-9330
jkent@ambushlaw.com

Dated: January 16, 2015                    Attorney for Plaintiffs.