# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| SAUNDRA FLANAGAN, et al., | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 10-1643 (RC) |
| | : | | |
| v. | : | Re Document No.: | 29 |
| | : | | |
| ISLAMIC REPUBLIC OF IRAN, et al., | : | | |
| | : | | |
| Defendants. | : | | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### GRANTING PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

This case arises out of the October 12, 2000, terrorist bombing of the U.S.S. Cole ("the Cole") in Yemen, which resulted in the death of seventeen American sailors, including Electronic Warfare Technician First Class Kevin Shawn Rux ("Kevin"). First Amended Complaint [#18] at 1.  The plaintiffs are Kevin's mother ("Doe Victim A") and his four brothers ("Doe Victim B," "Doe Victim C," "Doe Victim D," and "Doe Victim E"). Id. ¶¶ 4-8.  The defendants are:  1) the state of Iran and its agencies and instrumentalities, to include a) the Iranian Ministry of Intelligence and Security, b) the Iranian Islamic Revolutionary Guard Corps, and c) the Iranian Islamic Revolutionary Guard Corps-Qods Division ("the Iranian defendants"); 2) the state of Sudan and its agencies and instrumentalities, to include a) the Sudanese Ministry of the Interior, b) the Sudanese Ministry of Defense, c) the Security of the Revolution, d) the Sudanese Military Intelligence, e) the Sudanese State Security, f) the Sudanese Popular Defense Force, and g) the Revolutionary Security Services ("the Sudanese defendants"); and 3) the state of Syria and its agencies and instrumentalities, to include a) the Syrian National Security Directorate, b) the Syrian Republic Guard, 3) the Syrian Ministry of Interior, 4) the Syrian

Military Intelligence Service, 5) the Syrian Air Force Intelligence, and 6) the Syrian Special

Forces ("the Syrian defendants"). Id. ¶¶ 9-15.  The plaintiffs' claims for intentional infliction of

emotional distress ("IIED") and solatium are brought under section 1605A of the Foreign

Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*[1] Id. ¶¶ 2, 138-144.

On October 31, 2012, defaults were entered against the Iranian and Sudanese defendants.

See Default [#26] at 1; Default [#27] at 1.  According to the plaintiffs, as of March 28, 2013,

they were unable to effectuate service of process against the Syrian defendants.  See Plaintiffs'

Status Report [#28] at 1.  The plaintiffs decided, therefore, to proceed against the Iranian and

Sudanese defendants. Id. at 2.  Thus, currently pending and ready for resolution is Plaintiffs'

Motion for Default Judgment Upon Evidentiary Hearing Against Iranian and Sudanese

Defendants [#29].

An evidentiary hearing on liability and damages was held on August 12, 2014.[2]  At that

hearing, the Court took judicial notice of the evidence presented in Rux v. Republic of Sudan,

495 F. Supp. 2d 541 (E.D. Va. 2007), another case arising out of the same incident.[3]  See

Transcript of Evidentiary Hearing Before the Honorable John Facciola United States

---

[1] All references to the United States Code or the Code of Federal Regulations are to electronic versions that appear in Westlaw or Lexis.

[2] Although now-retired Magistrate Judge Facciola presided over the evidentiary hearing, the current opinion is being issued by the undersigned, following the Rule 63 Certification, which was issued on February 19, 2015.  See Rule 63 Certification [#46].

[3] "[W]hen a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may 'rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced.'"  Harrison v. Republic of Sudan, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) (citation omitted) (taking judicial notice of facts in Rux, which also arose out of the bombing of the Cole). But taking judicial notice of facts in these "one-sided" FSIA default judgment proceedings accords the noticed facts no "preclusive effect," and courts must "endeavor to make . . . additional findings in each case" as needed to render judgment.  Id. (citations omitted).  Here, this Court takes judicial notice only of facts in Rux related to the attack itself and elsewhere makes its "own independent findings of fact," based on evidence presented at the evidentiary hearing, to support its judgment against the defendants.  Id.; see also Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 58 (D.D.C. 2010) (explaining that factual findings in case "decided without the full benefits of adversarial litigation . . . lack the absolute certainty with which they might otherwise be afforded").

[Magistrate] Judge [#40] at 11.  In addition, the Court accepted evidence in the form of live testimony, affidavits, and documentary evidence.

Finally, the Court also accepted testimony from five qualified experts.  As to the Sudanese defendants' relationship with and support for Al-Qaeda, the Court accepted the testimony of:  1) Lorenzo Vidino, PhD, a senior fellow at the Center for Security Studies in Zurich, Switzerland;[4] and 2) Dale L. Watson, former Assistant Director of Counterterrorism for the Federal Bureau of Investigation.[5]  As to the Iranian defendants' relationship with and support for Al-Qaeda, the Court accepted the testimony of:  1) Patrick Clawson, PhD, Director of Research at the Washington Institute for Near East Policy;[6] 2) Daniel Byman, PhD, Professor at Georgetown University's Edmund A. Walsh School of Foreign Service; Research Director, Saban Center for Middle East Policy at the Brookings Institution;[7] and 3) Dale L. Watson, again. Finally, plaintiffs offered the expert testimony of Larry H. Pastor, MD, FAPA, DABAM, a psychiatrist who works in the Office of Medical Services at the Central Intelligence Agency, in support of their claims for damages.[8]

## FINDINGS OF FACT

I.     <u>Osama Bin Laden and Al-Qaeda</u>[9]

1.     During the Afghanistan war against the Soviet Union, from 1979 to 1989, Osama Bin Laden, the son of a Saudi construction magnate, organized and financed the recruitment and

---

[4] <u>See</u> <u>generally</u> Plaintiffs' Exhibit ("PEX") 1:  Vidino Affidavit and Exhibits.
[5] <u>See</u> <u>generally</u> [#40] at 81:23-130:11.
[6] <u>See</u> <u>generally</u> PEX 2:  Clawson Affidavit.
[7] <u>See</u> <u>generally</u> PEX 3:  Byman Affidavit.
[8] <u>See</u> <u>generally</u> PEX 4:  Pastor Affidavit.
[9] The Court will use the spellings "Osama Bin Laden" and "Al-Qaeda" throughout this opinion.  Where the spellings are different, they reflect the spellings used in the source documents, from which the information was taken.

training of Arab nationals to join the Afghan national resistance movement in what was known as the anti-Soviet "jihad" or holy war. PEX 9[10] at 55.[11]

2.      In approximately 1988, Bin Laden founded Al-Qaeda to serve as a base "for future jihad." Id. at 56.  Al-Qaeda's "structure included as its operating arms an intelligence component, a military committee, a financial committee, a political committee, and a committee in charge of media affairs and propaganda.  It also had an Advisory Council (Shura) made up of Bin Ladin's inner circle." Id.

3.      Since its inception, Al-Qaeda has executed or inspired acts of terrorism around the world, including the September 11, 2001, attack on the United States, which have killed or injured thousands of innocent people. Id. at 47-63.

4.      Specifically, "Bin Ladin saw himself as called 'to follow in the footsteps of the Messenger and to communicate his message to all nations,' and to serve as the rallying point and organizer of a new kind of war to destroy America and bring the world to Islam." Id. at 48 (internal citations omitted).  Accord PEX 1 at ¶ 11.

II.      The Bombing of the U.S.S. Cole

5.      "At approximately 8:30 a.m. on October 12, 2000, the Cole entered the Port of Aden, Yemen, to temporarily stop for refueling." Rux, 495 F. Supp. 2d at 544-45.

6.      "The Republic of Yemen is a country of 203,850 square miles located on the southern coast of the Arabian Peninsula.  Aden is a city of approximately 440,000 located on Yemen's

---

[10] PEX 9:  Excerpt from The 9/11 Commission Report, Final Report of the National Commission on Terrorist Attacks upon the United States (2004) (available at http://www.9–11commission.gov/report/911Report.pdf).

[11] Plaintiffs have not numbered, using a Bates stamp, the pages within individual exhibits.  Therefore, *except* for PEX 9, the Court's reference to a page number within an exhibit is to the order in which the page appears in the exhibit.  In other words, even if a page has the number 10 printed on it, if it is the second page of an exhibit, the Court will identify it as page 2.  With respect to PEX 9, because of the length of the exhibit, the Court will identify the page by the page number printed on the top right or left corner of the document.

south coast.  The Port of Aden is a natural harbor with a deep draft in most areas and natural land

protection on all sides." <u>Id.</u> at 545.

7.      "In February 1999, the Navy began using Aden instead of Djibouti as the primary

refueling stop for American ships during their 3,000-mile journey to the Arabian Gulf from the

Mediterranean Sea.  Under a contract entered into between the United States and Yemen, U.S.

Navy vessels could obtain fuel at one of two fueling 'dolphins' located near the mouth of the

harbor without going to the pier." <u>Id.</u>

8.      "The Cole, an Arleigh Burke Class Destroyer, was the twenty-fifth Navy ship to stop in

Aden Harbor for refueling over the previous nineteen months.  As of October 2000, the ship had

a crew of twenty-six officers and 270 enlisted personnel.  The Cole departed from its home port

of Norfolk, Virginia, on August 8, 2000, before patrolling the Mediterranean Sea.  On October 9,

2000, the ship transited the Suez Canal and headed for Yemen.  At the time that the ship entered

the Port of Aden on October 12, 2000, the U.S. Department of Defense terrorist threat level in

Aden was 'Threat Condition (THREATCON) BRAVO,' which indicated an 'increased and more

predictable threat of terrorist activity.'" <u>Id.</u>

9.      "At approximately 8:49 a.m., the Cole moored starboard side to Refueling Dolphin

Seven, near the mouth of the harbor.  The ship began refueling at approximately 10:31 a.m.  At

approximately 11:10 a.m., one of the sailors standing watch over the refueling noticed a small

boat heading 'fast and hard' toward the Cole from the direction of the city.  The boat, painted

white with fire red trim, was about thirty-five feet long and six to seven feet wide and had a

shallow V-hull.  It looked 'brand new.'  The boat was similar in size and shape to many other

small vessels in the harbor, including the service craft that had been alongside the Cole.  The

boat was manned by two males, both of whom appeared to be in their early thirties.  The two

men slowed the boat as they approached the Cole, maneuvered it parallel to the ship and came down the port side headed aft.  As they did so, the two men in the boat were smiling, and waved to the crew.  Some crew members returned the greeting.  Seconds later, the boat exploded." Id.

10.     "The explosion occurred between approximately 11:15 and 11:18 a.m., just as some of the crew was sitting down for lunch.  The blast ripped a thirty-two- by thirty-six-foot hole in the port side. . . . Smoke, dust, and fuel vapors filled the air.  The main engine room, auxiliary machine room, and the dry provisions storeroom were flooded.  Several chambers, including the Crew and Chief Petty Officer's Galley, were structurally destroyed.  The blast and its after-effects killed seventeen Navy sailors, all of them American citizens.  Forty-two others were injured, some of them sustaining serious burns to their faces, hands and arms, as well as lacerations and fractures." Id.

III.     The Sudanese Defendants

        A.     Background

11.     In 1989, General Omar Bashir assumed the presidency of Sudan in a military coup that overthrew the elected government and converted Sudan into an Islamic Arab state. PEX 7[12]; PEX 8[13].  The coup was orchestrated by Hassan al Turabi, head of the Sudanese political party, the National Islamic Front ("NIF"). PEX 6 at 57.  Accord PEX 10[14] at 6.  Turabi was in power from 1989 until his fall in late 1999. PEX 10 at 6.

12.     Following the Soviet withdrawal from Afghanistan in 1989, Bin Laden briefly returned to his home country of Saudi Arabia but had his passport seized by the government due to his

---

[12] PEX 7:  *Profile:  Sudan's President Bashir*, BBC NEWS (Nov. 25, 2003) (available at http://news.bbc.co.uk/2/hi/africa/3273569.stm).
[13] PEX 8:  *Military Coup in Sudan Ousts Civilian Regime*, NEW YORK TIMES (Jul. 1, 1989) (available at http://www.nytimes.com/1989/07/01/world/military-coup-in-sudan-ousts-civilian-regime.html).
[14] PEX 10:  CIA Report:  *Al Qa'ida in Sudan, 1992-96:  Old School Ties Lead Down Dangerous Paths* (Mar. 10, 2003).

relationship with extremists in Afghanistan. PEX 1-A[15] at 2.  At a time when Al-Qaeda found itself without a territory from which it could base its terrorist operations, Turabi offered the organization refuge in Sudan. PEX 9 at 57; PEX 1 at ¶ 15; PEX 1-A at 2.

13.     Bin Laden moved to Sudan in 1991, and lived there until 1996, when he was expelled from the country under international pressure. PEX 11[16] at 11.

14.     Turabi and Bin Laden shared a common extremist ideological and religious outlook. PEX 9 at 61; PEX 1 at ¶ 43.  Turabi envisioned a pan-Islamic force consisting of both Shiites and Sunnis to counterbalance Western powers militarily, economically, and politically. PEX 1 at ¶ 45.  Bin Laden agreed to help Turabi in the regime's ongoing war against African Christian separatists in southern Sudan, and also to invest his wealth in the country's infrastructure. PEX 9 at 57.  In exchange, Sudan provided Bin Laden's group with a sanctuary within which it could freely meet, organize, and train militants for future operations. Id.; PEX 1 at ¶¶ 12-13, 36, 45.

15.     Starting in the early 1990s, Turabi and the Sudanese regime convened annual conferences in Sudan under the label "the Popular Arab and Islamic Conference." PEX 10 at 6; PEX 1 at ¶ 44.  At these conferences, Bin Laden and other top leaders and operatives from the Palestinian Liberation Organization, Hamas, and Hezbollah, congregated to exchange information and plan terrorist activities. Id.

16.     Since 1993, the United States has designated Sudan a state sponsor of terrorism.  See http://www.state.gov/j/ct/list/c14151.htm (last visited Jan. 27, 2015).

      B.     General Support for Bin Laden and Al-Qaeda

          1.     Overview

---

[15] PEX 1-A:  State Department Fact Sheet:  *Usama Bin Ladin:  Islamic Extremist Financier* (Aug. 14, 1996) (available at http://www2.gwu.edu/~nsarchiv/NSAEBB/NSAEBB343/osama_bin_laden_file01_transcription.pdf).
[16] PEX 11:  State Department Publication: *Patterns of Global Terrorism:  1997* (Apr. 1998) (available at http://www.state.gov/www/global/terrorism/1997Report/1997index.html).

17.     Each year from 1997 through 2000, Sudan continued to serve as a meeting place, safe haven, and training hub for Al-Qaeda and other terrorist groups, including Lebanese Hizballah, Palestinian Islamic Jihad, Abu Nidal Organization, and Hamas. PEX 11 at 12; PEX 12[17] at 10; PEX 14[18] at 11; PEX 15[19] at 10.

18.     Sudan's material support of Al-Qaeda, such as "(1) its provision of sanctuary and safe haven from 1991-1996; and (2) [the] technical training and support Sudanese military and intelligence forces provided al Qaeda throughout the 1990s; was indispensable for al Qaeda not just to survive but also to then develop the expertise, technical knowledge and wide network of contacts that allowed it to flourish as a terrorist organization and carry out the *USS Cole* bombing." PEX 1 at ¶ 83.

19.     Al-Qaeda's time in Sudan from 1991 through 1996 was invaluable to the development of the terrorist organization:

> Q       So, Mr. Watson, as you can tell by the text, the 9/11 Commission has described how al-Qaeda flourished in Sudan.  It says, "Bin Laden moved to Sudan in 1991 and set up a large and complex set of intertwined business and terrorist enterprises.  In time, the former would encompass numerous companies and a global network of bank accounts and nongovernmental institutions."  Later on in the text it says, "Meanwhile, al-Qaeda finance officers and top operatives used their position in bin Laden's businesses to acquire weapons, explosives and technical equipment for terrorist purposes."  And then at 58 it says, "The groundwork for a true global terrorist network was being laid."  Mr. Watson, do you agree with this assessment laid out in the 9/11's Commission's report?
>
> A       I do.

---

[17] PEX 12:  State Department Publication:  *Patterns of Global Terrorism:  1998* (Apr. 1999) (available at http://www.state.gov/www/global/terrorism/1998Report/1998index.html).

[18] PEX 14:  State Department Publication:  *Patterns of Global Terrorism:  1999* (Apr. 2000) (available at http://www.state.gov/www/global/terrorism/1999report/1999index.html).

[19] PEX 15:  State Department Publication:  *Patterns of Global Terrorism:  2000* (Apr. 2001) (available at http://www.state.gov/j/ct/rls/crt/2000).

Q      And the type of support that is described in the 9/11
       Commission's report, what's the significance of having
       intertwined business and terrorist enterprises, allowing, you
       know, training for weapons, also acquiring weapons and
       explosives technical equipment, et cetera?

A      It allowed him to expand the organization, make it better.
       It allowed them to have funds available through legitimate
       businesses.  It gave them some credibility.  It also allowed
       for the organization to be a safe place, because, at that point
       in time, he had been removed from Saudi Arabia.  He had
       no country.  And so he was allowed to operate with
       impunity there in Sudan for a number of years . . . .

Q      And one of the things you mentioned is that you said it
       gave the organization credibility.  What do you mean by
       that?

A      The ability to issue statements; the ability to recruit people;
       the ability to set up training camps; the ability to travel in
       and out of places to identify potential targets, in my
       opinion.

Q      And would having a safe place to meet, the ability to travel
       safely and freely, would this have allowed Al-Qaeda and
       Osama bin Laden -- would this have given them a way of
       shielding their activities from other law enforcement or
       intelligence agencies?

A      Yeah.  It's not like setting up shop in Leesburg, Virginia,
       where, you know, you would come under scrutiny of the
       Bureau or some federal agency.  It's a foreign country, and
       a foreign country that was not the most favored, you know,
       looking toward the United States.  So it was very difficult
       to operate in that environment as a U.S. Government
       representative.

Q      So bin Laden is in a place where it's difficult for the U.S.
       Government to keep tabs on him.  And in terms of the
       Sudanese government, is it accurate to say that bin Laden
       and al-Qaeda are also in a place where they don't have to
       worry about the interference of Sudanese authorities with
       their terrorist activities?

A      That is correct.

[#40] at 108:6-110:11.

20.     Even after Al-Qaeda was expelled from Sudan in 1996, Sudan continued to be a safe

harbor for the organization, allowing the organization to "plan more freely." Id. at 112:5-113:12.

      2.     Financial Support

21.     Bin Laden established several joint business ventures with the Sudanese regime that

flourished upon his arrival in Khartoum in 1991. PEX 1 at ¶ 19; PEX 1-A at 2-3.  He "also

formed symbiotic business relationships with wealthy NIF members by undertaking civil

infrastructure development projects on the regime's behalf." PEX 1 at ¶ 19.  These projects

included:

    *    Al-Hijrah for Construction and Development, Ltd., which built the Tahaddi [ ] road linking Khartoum with Port Sudan, as well as a modern international airport near Port Sudan.

    *    Taba Investment Company Ltd, an investment company.

    *    Wadi al-Aqiq Company, Ltd., an import-export firm that, in conjunction with Bin Laden's Taba Investment Company, Ltd., secured a near monopoly over Sudan's agricultural exports of gum, corn, sunflower, and sesame products in cooperation with prominent NIF members.

    *    Al-Themar al-Mubarak-ah Agriculture Company, Ltd., which grew to encompass large tracts of land near Khartoum and in eastern Sudan.

    *    Khartoum Tannery, a leather company, which was still operating as of May 4, 2004.

    *    Al Themar, a Sudanese agricultural company in which Bin Laden had a financial interest.

    *    The Blessed Fruits Company and al-Ikhlas, two companies that were involved in the production of honey, fruits and vegetables, and in which Bin Ladin also had a financial interest.

    \*      Al Qudurat Transportation.

PEX 1 at ¶ 19; PEX 1-A at 2-3.

22.    These businesses "allowed al-Qaeda to funnel money for terrorist activities through Sudanese banks and Sudanese-based legitimate businesses, therefore overcoming the difficulties in transferring funds the group would have otherwise faced." PEX 1 at ¶ 35.  Accord PEX 1 at ¶¶ 21-35.   Bin Laden maintained those interests even after his expulsion from Sudan. PEX 6[20] at 19-20.

23.    In addition, "Bin Ladin and wealthy NIF members [directly] capitalized Al-Shamal Islamic Bank in Khartoum" with Bin Laden personally investing $50 million in the bank. PEX 1 at ¶¶ 22-23, 25; PEX 1-A at 3.

### 3.   Support for Training

24.    "[B]y January 1994, Bin Laden had begun financing at least three terrorist training camps in northern Sudan—camp residents included Egyptian, Algerian, Tunisian, and Palestinian extremists—in cooperation with the NIF." PEX 1-A at 3.  See also PEX 13[21] at 34.

25.    Bin Laden's main training camp in Sudan was "a 20-acre site near Soba, 10 kilometers south of Khartoum." PEX 1 at ¶ 36.

26.    In addition, "Bin Laden's Al-Hijrah for Construction and Development Company work[ed] directly with Sudanese military officials to transport and provision terrorists training in such camps." PEX 1-A at 3.

27.    While Bin Laden and Al-Qaeda were in Sudan, they "were allowed to operate freely." PEX 1 ¶ 36.

---

[20] PEX 6:  *Sudan and Terrorism:  Hearing Before the Subcomm. on African Affairs of the S. Comm. on Foreign Relations*, 105th Cong. (1997).
[21] PEX 13:  State Department Publication:  *Patterns of Global Terrorism:  1995* (Apr. 1996).

4.      Facilitation of Travel

28.     In 1998, "Al-Zawaheri[22] and leaders of Sudanese, Eritrien, Ugandan, Yemeni and

Egyptian Islamic groups . . . agreed to open Sudan's doors to international Islamic fundraising

organizations and to facilitate the movement of extremists by providing them with Sudanese

diplomatic passports." PEX 17 at ¶ 26.

29.     An individual carrying a diplomatic passport was "immune from [most] laws and

criminal process." [#40] at 116:5-6.  Furthermore, "diplomatic passports have diplomatic

pouches which are not authorized to be examined by the host country . . . [allowing its holder to

transport] materials without government scrutiny or scrutiny at the borders." Id. at 116:19-21,

24-25.

30.     When Bin Laden moved to Sudan, the Sudanese government provided Al-Qaeda

members with Sudanese travel documentation, including 200 passports, which facilitated the

movement of Al-Qaeda operatives in and out of Sudan. PEX 1 at ¶¶ 36, 41-42; PEX 11 at 17;

PEX 12 at 11.

31.     "In addition to providing some al-Qaeda operatives with new passports, Sudanese

officials also made sure that al-Qaeda members traveling to Sudan with different passports could

enter and leave the country without having their passports stamped." PEX 1 at ¶ 42.

32.     "These officials would have been acting with the full knowledge and consent of the

highest levels of the Sudanese government  . . . because a stamp from Sudan (a country known

for its support of terrorism) would have raised the attention of immigration officials in other

countries." Id.

---

[22] Ayman Al-Zawaheri was the one-time leader of the Egyptian Islamic Jihad / Al Jihad ("AJ") a "group [that]
employs terrorism as a part of a wider campaign to root out Western secular influences and create an Islamic state in
Egypt by overthrowing the current government." PEX 17:  Canadian Security Intelligence Services Statement:
Summary of Information Related to Mohamed Zeki Mahjoub, a high-ranking member of the Vanguards of
Conquest, a radical wing of AJ (Federal Court of Canada - June 27, 2000) at ¶¶ 4, 9.

33. Significantly, Sudan also exempted Al-Qaeda and its members from paying any taxes or import duties, thus permitting it to bring containers into the country without inspection by customs officials. PEX 1 at ¶ 20.

C.    Specific Involvement in the Attack

34. Bin Laden and Al-Qaeda would not have been able to carry out the attack on the Cole without the support of the Sudanese defendants:

> [T]he Sudan's material support of al Qaeda including, (1) its provision of sanctuary and safe haven from 1991-1996; and (2) technical training and support Sudanese military and intelligence forces provided al Qaeda throughout the 1990s; was indispensable for al Qaeda not just to survive but also to then develop the expertise, technical knowledge and wide network of contacts that allowed it to flourish as a terrorist organization and carry out the *USS Cole* bombing.

PEX 1 at ¶ 81.

IV.    The Iranian Defendants

A.    Background

35. In approximately 1991, Iran and Sudan wanted to foster coordination between Sunni and Shia Islamists, by forming a "tripartite front" against their common enemies, the United States and Israel. PEX 16[23] at 6-7. "The front would consist of the NIF, Iran, and Usama (Bin Laden)'s Islamic Army." Id. at 6. See also PEX 2 at ¶ 76 (describing the relationship between Iran, Hezbollah, and Al-Qaeda in the 1990s as one of "quite active cooperation").

36. "Eventually an agreement was reached to collaborate politically and militarily." PEX 16 at 7. Specifically, the parties agreed that "experience from Hizballah and Iran should be transferred to new nations/extremist groups who lack this expertise . . . [in order to] allow Islamic Army members to gain the necessary experience in terrorist operations." Id. at 8.

---

[23] PEX 16:  CIA Report: *Terrorism:  Establishment of a Tripartite Agreement Among Usama Bin Laden, Iran, and the NIF* (Jan. 31, 1997).

37.     "At that [same] time, the Iranian government was providing very active assistance to the Sudanese government for its fighting in the civil war in the south of the country." PEX 2 at ¶ 41. In addition, "in 1991, the Sudanese government [ ] supported a conference of those resisting the Madrid conference launching Israeli-Arab peace talks, and both Iranian representatives and Bin Laden were active at this event." Id.

38.     Ultimately, the relationship between Sudan and Iran in the 1990s offered Al-Qaeda the opportunity to build ties with Iranian officials, Hezbollah, and other terrorist organizations dedicated to attacking United States personnel, military targets, and citizens in the Middle East. See PEX 27[24] at 2-7; PEX 19[25] at 17-21; PEX 9 at 61.

39.     Since 1984, the United States has designated Iran a state sponsor of terrorism. See http://www.state.gov/j/ct/list/c14151.htm (last visited Jan. 27, 2015).

      B.     General Support for Bin Laden and Al-Qaeda

           1.     Overview

40.     Iran's material support of the Al-Qaeda/Egyptian Islamic Jihad in the 1990s was described by a high level Al-Qaeda operative as follows:

> I was aware of certain contacts between al-Qaeda and al Jihad organization, on one side, and Iran and Hezbollah on the other side. I arranged security for a meeting in the Sudan between Mughaniyah, Hezbollah's chief, and Bin Laden. Hezbollah provided explosives training for al-Qaeda and al Jihad. Iran supplied Egyptian Jihad with weapons. Iran also used Hezbollah to supply explosives that were disguised to look like rocks.

PEX 19 at 19. Accord PEX 3 at ¶ 68 (noting that Iran often used "both its own people and facilities" as well as those of "its close ally Hizballah" to support terrorist operations).

---

[24] PEX 27:  Trial Transcript:  Testimony of Jamal al-Fadl, an Al-Qaeda operative, in U.S. v. Usama bin Laden, No. 98-CR-1023 (S.D.N.Y. Feb. 6, 2001).
[25] PEX 19:  Trial Transcript:  Guilty Plea of Mohammed Ali, an Al-Qaeda operative, in U.S. v. Usama bin Laden, No. 98-CR-1023 (S.D.N.Y. Oct. 20, 2000).

41.     Although Iranians are Shias, they nevertheless supported the terrorist activities of Bin

Laden, a Suni, because of their mutual hatred of "the infidels in the United States." [#40] at

121:10-17.  See also PEX 2 at ¶ 73 (stating that Iran often support the terrorist activities of

organizations "with which it ha[d] some profound differences").

42.     Iranian "[s]upport for militant and terrorist groups [was] almost always done via Iran's

Ministry of Intelligence and Security (MOIS) or the Islamic Revolutionary Guard Corps (IRGC),

a parallel military force that [was] tasked with protecting Iran's revolution at home and spreading

it abroad, among other duties." PEX 3 at ¶ 71.

43.     With respect to the MOIS, "'Iran has used its intelligence services extensively to

facilitate and conduct terrorist attacks . . . [and] Intelligence officers have used the diplomatic

pouch for conveyance of weapons and finances for terrorist groups.'" PEX 2 at ¶ 40 (internal

citation omitted).

44.     In addition, "'MOIS [ ] facilitated the movement of al Qa'ida operatives in Iran and

provided them with documents, identification cards, and passports'" and "'also negotiated

prisoner releases of AQI operatives.'" PEX 3 at ¶ 75 (internal citations omitted).

45.     With respect to the IRGC and the IRGC Qods, they sponsored terrorism in the following

fashion:

> The IRCG was established in the immediate wake of the 1979
> revolution. Its role is built into Iran's constitution as defenders of
> the revolution-- not just defenders of Iran as a country, but
> defenders of the 1979 revolution. The IRGC is one of the major
> organizations through which Iran has historically carried out its
> support for terrorism.
>
> Among its other tasks, the IRGC is dedicated to the spread of
> fundamentalist Islamist principles throughout the world, and the
> establishments of fundamentalist Islamist governments in nations
> other than Iran.  The Qods Force is the branch of the IRGC
> generally charged with "foreign operations."

The foreign operations it supports include foreign insurgents and terrorists such as those fighting U.S. forces and U.S.-backed governments in Afghanistan and Iraq.  It is the principal Iranian organization working with the Lebanese Hizbollah organization's armed elements, which carry out terrorist operations worldwide, engage in military operations in Syria in support of the Assad regime's battle against insurgents, and prepare for battle against Israel.

While in theory the Qods Force is a component element of the IRGC, in practice it operates largely autonomously.  It reports directly to the Supreme Leader, rather than being subordinate to the IRGC command structure.  The IRGC defines itself as an agent and instrumentality of the Supreme Leader, to which it pledges its unflinching loyalty. The IRGC and the Supreme Leader both frequently speak about the IRGC as the guardian of the principles of the Iranian revolution of 1979.

* * *

It [ ] has been well-documented for over twenty years that the IRGC has historically provided funding and/or training for terrorism operations that targeted United States and Israeli citizens. Such activities have included support for Hizbollah of Lebanon, HAMAS, as well as al-Qaeda, with the character of that support being quite different in each case.  Hizbollah of Lebanon (or Hizbollah for short, though not to be confused with similarly named organizations in other countries which have varying degrees of ties with Hizbollah of Lebanon) is a Shiite terrorist organization established in 1982 by Iran as an extension of the Iranian Revolution in Lebanon and elsewhere in the Middle East.  The IRGC's relationship with Hizbollah is extremely close. . .

Although they have a long history of cooperating in a common anti-American agenda, Iran and al-Qaeda have always had serious ideological differences.  In providing support to al-Qaeda and Hizbollah, the IRGC, including the IRGC Qods division, is acting as an official agency whose activities are tightly and carefully controlled by the Iranian government through the Supreme Leader and his representatives.  Iran's relationship with Al-Qaeda continues even in situations where Iran is also supporting those fighting Al-Qaeda.  For instance, the U.S. Treasury Department's February 5, 2014 designation of senior al-Qaeda member Jafar al-Uzbeki described him as part of an al-Qaeda network  which "operates there [in Iran] with the knowledge of Iranian authorities."

The Treasury statement added that this network "uses Iran as a transit point for moving funding and foreign fighters through Turkey to support al Qaeda-affiliated elements inside Syria." This despite the fact that Iran has made a major commitment of men and arms to fight Al-Qaeda in Syria.

In sum, the terrorism training provided to Hizbollah, HAMAS, and al-Qaeda by the IRGC is an official policy of the Iranian government.

PEX 2 at ¶¶ 26-37.

2.  Financial Support

46.   Iran supported Al-Qaeda financially:

There is compelling evidence that radical Islamists are receiving considerable foreign support and assistance. . . . In Afghanistan, AJ [Al Jihad, an Islamist terrorist group controlled by Bin Laden] members are trained at the Al-Khalifah or Caliphate camp by Iranians and equipped with powerful explosives.  AJ leaders Al-Zawaheri and Muhammad Shauqi Al-Islambouli have received large sums of money from Iran and intense secret contacts have taken place between top Iranian intelligence officers, Bin Laden and Al-Zawaheri. . . .

* * *

Both Iran and Osama Bin Laden have played a role in efforts to once again merge the AJ with the AGAI [Al Gama'a al-Islamiya, an Egyptian Islamist terrorist group that had once merged with AJ but then the two fell out]. At a September-October 1996 meeting with the former Iranian intelligence minister, Ali Fallahian, the AJ and the AGAI reportedly endorsed a plan to carry out terrorist operations to be financed by Iran and Osama Bin Laden.  At another meeting in early 1998, the possibility of providing funds and improving training and operation activities was offered by Iran to the two groups if they agreed to cooperate.  The groups agreed to focus on efforts to launch attacks on United States and Israeli targets outside Egypt, to retain separate leadership, organizational and military capacities, and to use a new coalition under the leadership of Osama Bin Laden as their base to achieve these aims.

PEX 17 at ¶¶ 25, 30.

3.   Support for Training

47.     Iran directly trained Al-Qaeda operatives:

> In late 1991 or 1992, discussions in Sudan between al-Qaeda and Iranian operatives led to an informal agreement to cooperate in providing support – even if only training – for action carried out primarily against Israel and the United States.  Not long afterwards, senior al-Qaeda operatives and trainers traveled to Iran to receive training in explosives.
>
> In the fall of 1993, another such delegation went to the Bekaa Valley in Lebanon for further training in explosives as well as in intelligence and security.   Bin Laden reportedly showed particular interest in learning how to use truck bombs such as the one that had killed 241 U.S. Marines in Lebanon in 1983.  The relationship between al-Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations. . . . al-Qaeda contacts with Iran continued in ensuing years.

PEX 9 at 61.  Accord PEX 27 at 2-4.

48.     Iran also supported Hezbollah, which in turn provided training for Al-Qaeda:

> In many of its operations involving terrorist groups, Iran uses Hizballah as a facilitator.  Hizballah plays this role for several reasons.  First, Iran's involvement in Hizballah's creation, large-scale funding, constant provision of training, and role in Hizballah's leadership councils has given Iran an important role in the Lebanese organization.  Iran trusts Hizballah and Hizballah trusts Iran – one of the closest relationships in history between a terrorist group and its sponsor.  Hizballah has a particularly close relationship with the IRGC, with which it has worked since the group's founding in the early 1980s. . . . In the past, however, according to some polls, Hizballah's leader, Hassan Nasrallah, was the single most popular individual in the Arab world because of his organization's repeated and successful defiance of Israel.  Third, Hizballah is highly capable and has a high degree of independence in Lebanon.  Thus the training offered at Hizballah camps is superb, and it can be done without having to hide it from the Lebanese government.  Finally, working through Hizballah offers Iran some degree of deniability if it chooses, as it places one more degree of separation between the group in question and Iran.

PEX 3 at ¶ 49.  <u>Accord</u> [#40] 122:5-9; 121:21-24 (describing the closeness of the relationship between Hezbollah and Iran and thereby affirming Iran's intent to directly support the activities of Al-Qaeda); PEX 3 at ¶ 68 (same).

49.     Ultimately, the training Al-Qaeda received in Iran "was particularly important in the organization's early years, when its operatives had less battle experience and expertise in general." PEX 3 at ¶ 69.  <u>Accord</u> [#40] at 122:25-123:11 (explosives training Al-Qaeda received from Hezbollah in Iran would have enabled Al-Qaeda to build a bomb like that used in the Cole attack).

### 4.     Facilitation of Travel

50.     Finally, Iran has long provided material support to Al-Qaeda in the form of safe passage and facilitation of travel:

> Importantly, Iran also provided important services to al-Qaeda as a transit location through Iran to the outside world once bin Laden and his outfit moved to Afghanistan.  And this happened before the *U.S.S. Cole* attack. . . . Iran permitted at least some Al-Qaeda members and leaders to cross Iranian territory, without stamping their passports.
>
> It was very useful for al-Qaeda to pass through Iran in order to get to the outside world, because if they showed up with Pakistani visas on their passports, then the Saudis or United Arab Emirate authorities were suspicious.  However, if they came through without any stamps on their passport, they had a much easier time. . . . the transit through Iran begins not long after bin Laden shows up in Afghanistan. . . .

PEX 2 at ¶¶ 78-79.

51.     "In the mid-1990s, Mustafa Hamid[, a senior Al-Qaeda operative,] reportedly negotiated a secret relationship between Usama Bin Laden and Iran, allowing many al Qaida members safe transit through Iran to Afghanistan." PEX 20[26] at 1.  <u>Accord</u> PEX 3 at ¶ 52 ("Iran had become an

---

[26] PEX 20:  U.S. Treasury Department Press Release:  *Treasury Targets Al Qaida Operative in Iran* (Jan. 16, 2009).

important route [for Al-Qaeda members] into Afghanistan and al-Qa'ida's training camps

there.").

52.     In order to facilitate the travel of Al-Qaeda members through Iran, Iran let the

organization set up guest houses:

> Iran let Al-Qaeda establish a series of guest houses for its fighters
> making the long journey through its territory.  After Pakistan
> began to tighten up transit routes in the years before 9/11, one of
> al-Qa'ida's key military commanders, Seif al-Adl, told an
> interviewer that al-Qa'ida began "building good relations with
> some virtuous people in Iran to pave the way [for travel] and
> coordinate issues of mutual interest."  The al-Qa'ida-linked Saudi
> dissident al-Faqih noted that "before 9/11 many Saudis used Iran to
> access Afghanistan" because "the Iranians kept a blind eye to this."

PEX 3 at ¶ 53 (internal citations omitted).

53.     "Al-Qaeda also deliberately established training camps on the western border of

Afghanistan to make it easier for recruits to travel through Iran." Id. at ¶ 53.

54.     Ultimately, Iran's facilitation of travel had a significant impact on Al-Qaeda's efforts:

> Such travel assistance is invaluable for groups like al-Qa'ida.  If
> visas had an Iranian stamp or showed a link to Afghanistan, they
> would be far more likely to attract the attention of border security
> officials in Saudi Arabia, the United States, or other countries that
> are hostile to al-Qa'ida.  In addition, established lines of transit
> make recruitment and training easier, as individuals can travel to
> and from training camps without fear of interference.  This is
> particularly important for facilitating the flow of new recruits, who
> lack training in clandestine travel.  Finally, travel facilitation
> enables better communication and coordination among the far-
> flung strands of the global jihad of which al-Qa'ida is a part.  Even
> before 9/11, al-Qa'ida and its affiliate groups were aware that the
> United States and other hostile powers monitored phones and other
> forms of communication and recognized that many sensitive
> deliberations are best done face-to-face.  Doing so, however,
> requires individuals who can travel freely from one area to another.

PEX 3 at ¶ 58.  Accord [#40] at 124:9-127:3.

        C.     Specific Involvement in the Attack

55.     At the time of the bombing of the Cole, the links between the Iranian defendants and Bin

Laden and Al-Qaeda were firmly established:

> Iran was actively tied to al-Qa'ida in the years when the attack on
> *USS Cole* was being planned and when it was executed.  The 1999
> State Department report on terrorism that year noted Iran's support
> in training and logistics for extremist groups like al-Qa'ida in the
> Gulf, among other activities.  Iran reportedly contributed to
> helping al-Qa'ida set up a network in Yemen:  Zawahiri wrote to
> thank the Iranians for their assistance.  Ali Abdul Aziz Ali,
> identified as one of the *USS Cole* bombing masterminds, was
> radicalized in Iran after hearing Ramzi Yousef, who masterminded
> the 1993 World Trade Center bombing, speak about jihad there
> (the exact date is unclear).  Al-Qa'ida facilitator and financier
> Muhsin al-Fadhli is Iran-based and he helped finance the 2002
> attack on *MV Limburg* off Yemen—many of those involved in Al
> Qaeda's [sic] operations in Yemen were also involved in the
> *Limburg* attack.  In addition, initial reports indicated the bomb
> used for the *USS Cole* attack bears similarities to shaped bombs
> designed by Hizballah, and it is possible that al-Qa'ida learned
> such techniques when training in Lebanon in the early 1990s.
>
> * * *
>
> . . . Iran supported al-Qa'ida as an organization and made it
> stronger overall, and this made al-Qa'ida better able to carry out
> terrorist attacks such as the *USS Cole* bombing.  This support is not
> consistent or unqualified, but over the years it has helped make al-
> Qa'ida a formidable organization. . . .

PEX 3 at ¶¶ 70, 81 (internal citations omitted).

56.     As a result of Iran's complicity, it is likely that Abd Rahim Hussayn Muhammad al

Nashiri, one of the masterminds of the attack on the Cole, travelled through Iran when moving

between Yemen and Afghanistan both before and after the bombing. PEX 2 at ¶¶ 80, 81

("Certainly, during the late 1990s and through 2000, Iran was the common route that al-Qaeda

members used when traveling from gulf countries such as Yemen to Afghanistan.  Iran was also

the common route used by al-Qaeda members when returning from Afghanistan to gulf countries

such as Yemen.").

V.      The Plaintiffs

        A.      Doe Victim A

57.     Doe Victim A is Kevin's mother. [#40] at 15:5-6.

58.     Doe Victim A had a troubled childhood and an abusive father, who was an alcoholic.

PEX 4 at ¶ 4.  Her husband, the father of her children, was also an alcoholic. Id.  They were

married in 1964 and divorced in 1990 or 1992. Id.

59.     Doe Victim A enjoyed an especially close relationship with her son. [#40] at 19:2-6.  He

also helped financially support his mother. Id. at 19:7-8.

60.     After Kevin died, Doe Victim A stated:  "I couldn't function. . . . I just wanted to sleep,

and I mostly laid in my bed in a fetal position." Id. at 26:4-7.  It took her months to return to her

job. Id. at 26:11-18.

61.     Describing the impact of Kevin's death, Doe Victim A stated:

> It's had an intense effect on my life, on me.  I've been on Prozac
> and they've had to raise it.  Started out on 20, and they have it
> raised to 40.  Sometimes, I take two a day. October is just a
> nightmare.  So many times I've said I wish they could just take
> October off the calendar because that's the month he was born, it's
> the month he was married.
>
> There's so many times that I can't . . . think straight.  And this past
> winter, I spent a lot of time in bed sleeping and just not caring
> about anything.

Id. at 27:23-28:7.  She also stated that she had seen a grief counselor on several occasions. Id. at

28:11-14.

62.     Dr. Larry Pastor, a clinical psychiatrist, described Doe Victim A's condition as follows:

> [She] experienced a catastrophic loss upon the death of her son
> Kevin Rux in October 2000.  Due to the sudden, violent nature of
> the incident, Doe Victim A experienced psychological trauma in
> addition to massive psychological loss.  The trauma involved
> particular qualities that were additive to the loss itself, including

suddenness, violence, evil intent, gruesomeness and disfigurement, and inability to anticipate the incident. . . .  It is my medical opinion that the examinee suffers from traumatic grief (a condition that has been conceptualized under various names including traumatic grief, complicated grief, unresolved grief, prolonged grief, pathological grief, and in the current edition of the DSM, "persistent complex bereavement-related disorder.").  Findings elicited in examination included yearning for the deceased, intense pangs of grief associated with triggering stimuli, prolonged and intense grief, a dramatically altered view of one's world and one's future, anhedonia, feeling worse when reminded of the deceased, and doing things to please the deceased (examinee stated that she wants to change her name back to Rux, because Kevin didn't like that his last name was different from hers, but at present she doesn't have the $200 in court fees that a name change would cost).  Doe Victim A continues to exist in a chronic, heightened state of mourning, recurrently upset by horrific, intrusive images of the bombing, pre-occupied with sorrow and other negative emotions related to her son's death (anger, bitterness, sense of injustice), and trouble getting through her day and carrying out normal life routines.  Contemplation of the mangled and dismembered remains of her son and 16 others is a trigger for intense, raw feelings of horror and distress.  In contrast to the course of normal ("uncomplicated", or non-traumatic) grief, the passage of years does not diminish the pain of loss.  Indeed, the passage of time can serve to heighten the pain of loss, as the sufferer cannot resolve the feeling of a loved one unjustly taken away, and the ongoing inability to restore a sense of fairness or justice to the world. . . . There is also marked social withdrawal and diminished interest in social interaction and meeting new people, which cannot definitively be attributed to the traumatic loss of her son but I believe is most likely due to this trauma, because diminished social interaction is routinely associated with prolonged grief, sadness, and negative emotions associated with traumatic grief (and seen in this examinee) such as anger and survivor's guilt.  Social withdrawal, or avoidance, a form of emotional self-protection, is a feature of PTSD,[27] traumatic grief, and other trauma-related disorders.  It is a defense mechanism used by individuals with these syndromes, including the examinee, in an effort to avoid triggering painful emotional states and it results in an impoverishment of interpersonal relationships.  Examinee also meets the diagnostic criteria for a mental disorder related to stress and trauma in the DSM-V, 309.89.   As the most successful, highly functioning of the five children and in the absence of a father, Kevin served as a crucial support person for Doe Victim A and the

---

[27] Post-Traumatic Stress Disorder. PEX 4 at ¶ 9 n.2.

> other four sons (I am reminded of, but hesitate to use, the cliché
> "father figure").  It is my opinion that the death of Kevin Rux is
> the direct cause of the pain, suffering, and functional impairment
> evidenced in the examination of Doe Victim A.

PEX 4 at ¶ 9.

> B.  <u>Doe Victim B</u>

63.    Doe Victim B is Kevin's youngest brother. [#40] at 68:15-18.

64.    Doe Victim B stated that Kevin was his "best friend" and also "like a father figure" to

him. <u>Id.</u> at 68:21-24.  He further stated that when their parents separated, when Doe Victim B

was eleven, Kevin "took [him] under his wing and took care of [him]." <u>Id.</u> at 68:25-69:5.  Doe

Victim B also stated that Kevin disciplined him on several occasions. <u>Id.</u> at 72:4-8.

65.    After his parents got divorced, Doe Victim B "got into trouble" and "spent 19 months in

prison for arson." PEX 4 at ¶ 14.

66.    Doe Victim B described his brother Kevin as "the glue that held [the family] together."

[#40] at 70:7-10.  He stated that the moment he learned that Kevin had been killed was "the

worst moment in [his] entire life." <u>Id.</u> at 75:1-4.

67.    Since Kevin's death, Doe Victim B has become withdrawn, has suffered from debilitating

depression, and has had difficulty holding down a job. <u>Id.</u> at 76:18-77:13.

68.    Doe Victim B's wife stated:

> [Doe Victim B is] backward, he don't want to speak to anybody,
> he won't go into the store now, he won't -- I have to beg him to go
> anywhere with me.  And so I'm pretty much have to do everything
> myself, pretty much raised the kids myself, because he won't do
> anything.  I feel that my kids have lost their father of what he could
> have been, you know."

<u>Id.</u> at 139:1-6.

69.    Dr. Pastor described Doe Victim B's condition as follows:

> [F]indings from the examination of [Doe Victim B] meet the
> criteria for traumatic grief and Persistent Complex Bereavement
> Disorder, coded as the DSM-5 diagnosis 309.89, Other Specified
> Trauma- and Stressor-Related Disorder (Persistent Complex
> Bereavement Disorder).   Findings include yearning or longing for
> the deceased, difficulty accepting the loss, bitterness or anger,
> prolonged sadness, feelings of horror and pain from contemplating
> the manner of death, and difficulty trusting others.  Doe Victim B
> continues an internal, mental relationship with Kevin in his mind
> that is evidence of a close relationship with Kevin, whom he
> looked up to as a significant support person and role model.
> Finding a co-worker who looks "exactly like" and reminds him of
> his deceased brother is considered a result of yearning or longing
> for the deceased.  To date Doe Victim B continues to experience
> intense sadness and emotional pain related to the death of his
> brother.

PEX 4 at ¶ 17.

### C.   Doe Victim C

70.   Doe Victim C is Kevin's second youngest brother. [#40] at 56:4-13.

71.   Doe Victim C was close with Kevin growing up. Id. at 57:10-11.  As adults, the brothers

spoke once a week, even though they lived in different states. Id. at 58:1-6; 60:24-25.  Kevin was

a figure of stability and a role model for Doe Victim C. Id. at 58:21-25.

72.   Doe Victim C testified that he was in prison when Kevin was killed. Id. at 58:6-7.

73.   After Kevin was killed, Doe Victim C began to experience nightmares of Kevin's death

and became severely depressed. Id. at 64:11-65:3.  As a result, Doe Victim C has not been able

to work and is on disability for his depression. Id. at 65:4-14.

74.   Dr. Pastor described Doe Victim C's condition as follows:

> It is my medical opinion that Doe Victim C is severely impaired
> and merits the diagnosis of PTSD, with nightmares,
> hypervigilance, re-experiencing, avoidance, chronic insomnia,
> stress-intolerance and reduced role functioning.  The PTSD-
> inducing stressor was the sudden loss of his brother Kevin.  There
> is an implication of cognitive distortion as a defense mechanism in
> order to block out what would be an even more painful reality; i.e.,

> despite evidence for an overwhelmingly lethal blast that mangled
> bodies and encased sailors in between massively twisted metal
> hulls, examinee finds solace in the improbable case that his brother
> was able to remain conscious and experience a peaceful, thoughtful
> last few moments before death.

PEX 4 at ¶ 25.

D.    <u>Doe Victim D</u>

75.    Doe Victim D is one of Kevin's older brothers. [#40] at 47:7-9.

76.    Doe Victim D has struggled with depression his entire life and attempted suicide prior to

Kevin's death. PEX 4 at ¶ 18.  While he was in high school, his father kicked him out of the

house. <u>Id.</u>  He later "spent three years in prison on a charge of probation violation/drug

possession." <u>Id.</u>

77.    Doe Victim D and Kevin were very close. [#40] at 47:18-22.  Doe Victim D thought of

Kevin as his "best friend." <u>Id.</u> at 48:16.

78.    Doe Victim D also joined the Navy and they were both stationed in Charleston, South

Carolina. <u>Id.</u> at 47:23-48:4.

79.    After Kevin died, Doe Victim D began experiencing nightmares on a daily basis, and

began using recreational drugs to cope with his depression. PEX 4 at ¶ 20.  Doe Victim D has

struggled with depression both before and after Kevin's death and has been prescribed a variety

of psychotropic medications. <u>Id.</u> at ¶ 18.

80.    Dr. Pastor described Doe Victim D's condition as follows:

> [Doe Victim D suffers from] chronic, debilitating emotional pain
> related to the sudden death of Kevin Rux.  Symptoms include
> feelings of sadness, loss, helplessness, avoidance behaviors,
> sudden grief intruding into otherwise enjoyable moments, and
> impaired self-care.  Doe Victim D meets the DSM criteria for
> Persistent Complex Bereavement Disorder with significant
> personal distress and functional impairment in ability to work and
> health-related behavior: according to the DSM-5, "Persistent

> complex bereavement disorder is associated with deficits in work and social functioning and with harmful health behaviors, such as increased tobacco . . . use." (p.792)  Examinee also reports a history of prior depression.  Recovery from depression is negatively impacted by stressful life events and it is my opinion that Doe Victim D also merits a psychiatric diagnosis of residual depression (depressive disorder, in partial remission, DSM code 296.25) with lack of full remission resulting from the stressor of Kevin's sudden and violent death.

Id. at ¶ 21.

    E.    Doe Victim E

81.    Doe Victim E is Kevin's oldest brother. [#40] at 33:3-14.

82.    Doe Victim E and Kevin had a very close relationship. Id. at 33:15-22.

83.    Doe Victim E testified that they moved around a lot as a family because their father was in the Navy. Id. at 34:21.

84.    After Kevin died, Doe Victim E fell into a deep depression and cried regularly in the five years following his brother's death. PEX 4 at ¶ 21.  He is constantly preoccupied by images of his brother's death, and imagines him suffering.  Id.  His pain is just as intense today as it was the day he learned that Kevin was killed. Id.

85.    Dr. Pastor described Doe Victim E's condition as follows:

> It is my medical opinion that Doe Victim E had a close and loving relationship with his brother Kevin Rux and suffered severe sadness, anger, and grief following Kevin's death, including years of significant emotional distress and depression.  Ken meets the criteria for the diagnosis of DSM 309.89, Other Trauma and Stress-Related Disorder (persistent complex bereavement disorder). Doe Victim E's feelings of loss and emotional pain continue to the present day.  He may be at risk of using alcohol from time to time to deaden the emotional pain.

PEX 4 at ¶ 28.

## CONCLUSIONS OF LAW

I.      Standing

In order to have standing in an action under 28 U.S.C. § 1605A, either "the claimant or the victim [must be] a national of the United States" at the time of the terrorist act. 28 U.S.C. § 1605A(a)(2)(A)(ii)(I).  Pursuant to the United States Code, a "national of the United States" is defined as "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22).  In this case, each of the five plaintiffs is a United States citizen, and therefore each has standing to bring suit under the FSIA.  See [#18] ¶¶ 4-8.

II.     Jurisdiction

        A.      Subject Matter Jurisdiction

                1.      Legal Standard

The FSIA provides generally as follows:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604.  See also Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434-35 (1989) (holding that the FSIA provides the sole basis for a district court to assert jurisdiction over a foreign state).

Under section 1605A, no foreign sovereign immunity exists where:

> money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).

Under the FSIA, the term "extrajudicial killing" is defined as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Torture Victim Protection Act of 1991, Pub. L. No. 102–256, § 3(a), 106 Stat. 73, 73 (1992); § 1605A(h)(7). The term "material support or resources" is defined as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials." 28 U.S.C. § 1605A(h)(3) (citing 18 U.S.C. § 2339A(b)(1)).  See also Gates v. Syrian Arab Republic, 580 F. Supp. 2d 53, 67-68 (D.D.C. 2008) (providing examples of material support).

        2.    Analysis

In this case, the Court may assert jurisdiction over the subject matter because money damages are sought for an extrajudicial killing that was caused by the provision of material support or resources (financial support, support for training, and facilitation of travel) to Bin Laden and Al-Qaeda by the Sudanese and Iranian defendants, acting within the scope of their official employment.  See generally [#18].

    B.    Personal Jurisdiction

        1.    Legal Standard

Under the FSIA, personal jurisdiction exists if the defendants have been properly served pursuant to section 1608.  Subsection (a) governs service upon a foreign state or political subdivision of a foreign state, while subsection (b) provides for service upon an agency or

instrumentality of a foreign state.  See 28 U.S.C. § 1608(a) and (b); I.T. Consultants Inc. v. Republic of Pakistan, 351 F.3d 1184, 1188 (D.C. Cir. 2003).

In determining whether a foreign entity is to be treated as the state itself or as an agency or instrumentality, courts employ the "core functions" test articulated in Roeder v. Islamic Republic of Iran, 333 F.3d 228 (D.C. Cir. 2003).  Pursuant to this "categorical approach," if the core functions of the entity are governmental, it is considered to be a foreign state but if its core functions are commercial, it is considered to be an agency or instrumentality of that state. Id. at 234.

2.      Analysis

Sudan and Iran are clearly foreign states.  With respect to the seven remaining Sudanese defendants, because they are each subdivisions of the Sudanese government and perform governmental functions, they will be treated as the foreign state of Sudan.  See [#18] ¶¶ 12, 15; Owens v. Republic of Sudan, 374 F. Supp. 2d 1, 25-26 (D.D.C. 2005) (treating Sudan's Ministry of the Interior as a foreign state).  With respect to the three remaining Iranian defendants, because they too are each subdivisions of the Iranian government, they will be treated as the foreign state of Iran.  See [#18] ¶¶ 9, 10; Nikbin v. Islamic Republic of Iran, 471 F. Supp. 2d 53, 59 (D.D.C. 2007) (treating Iran's MOIS and the Revolutionary Guards as foreign states).  Having determined that each of the Sudanese and Iranian defendants is, under the FSIA, a foreign state, the next issue is whether service of process was perfected.

With respect to the Sudanese defendants, service was perfected on January 30, 2011, under 28 U.S.C. § 1608(a)(3), through courier delivery of the summonses, complaints and attachments to Ahmed Ali Karti, the Sudanese Minister of Foreign Affairs, in Khartoum, Sudan. See Return of Service [#15].  With respect to the Iranian defendants, because the United States

does not maintain diplomatic relations with Iran, service was perfected on February 15, 2010, under 28 U.S.C. § 1608(a)(4), through delivery of the summonses, complaints and notices of suit to the Foreign Interests Section of the Embassy of Switzerland in Tehran, for conveyance to the Iranian Ministry of Foreign Affairs.  See April 19, 2011 and April 20, 2011 letters from William Fritzlen, Attorney Advisor at the State Department's Office of Policy Review and Interagency Liaison, to Angela Caesar, Clerk of the United States District Court for the District of Columbia [#16].  Because plaintiffs properly served the Sudanese and Iranian defendants, this Court may assert subject matter jurisdiction.  See 28 U.S.C. § 1330(b); TMR Energy Ltd. v. State Property Fund, 411 F.3d 296, 327 (D.C. Cir. 2005).

III.    Default Judgment

    A.    Legal Standard

Under Rule 55 of the Federal Rules of Civil Procedure, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a).  After the party's default is entered, plaintiffs must move the court for the entry of a default judgment. Fed. R. Civ. P. 55(b).

Before plaintiffs can be awarded any relief, however, plaintiffs must establish their claims by "evidence satisfactory to the court." 28 U.S.C. § 1608(e).  See also Taylor v. Islamic Republic of Iran, 811 F. Supp. 2d 1, 6-7 (D.D.C. 2011); Roeder v. Islamic Republic of Iran, 195 F.Supp.2d 140, 159 (D.D.C. 2002).  This requirement "imposes a duty on FSIA courts to not simply accept a complaint's unsupported allegations as true, and obligates courts to 'inquire further before entering judgment' against parties in default." Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (internal citations omitted).

In evaluating plaintiffs' proofs, a court may "accept as true plaintiffs' uncontroverted evidence, which may take the form of sworn affidavits or prior transcripts." Estate of Botvin v. Islamic Republic of Iran, 510 F. Supp. 2d 101, 103 (D.D.C. 2007).  Such evidence may also include judicial notice of the evidence presented in related proceedings. Id.

B.    Analysis

There are five elements of liability under the FSIA's state-sponsored terrorism exception: "(1) 'an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or provision of material support or resources for such an act' where (2) the act was committed, or the provision provided, by the foreign state or agent of the foreign state, and the act (3) 'caused' (4) 'personal injury or death' (5) 'for which the courts of the United States may maintain jurisdiction under this section for money damages.'" Bodoff v. Islamic Republic of Iran, 907 F. Supp. 2d 93, 101 (D.D.C. 2012) (quoting 18 U.S.C. § 1605A(1), (c)).  In order to satisfy the third and fourth elements, plaintiffs must "prove a theory of liability under which defendants cause the requisite injury or death." Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 73 (D.D.C. 2010).  "In other words, plaintiffs in § 1605A actions—whether seeking solely punitive damages or pursuing compensatory relief as well—must articulate the justification for such recovery, generally through the lens of civil tort liability." Rimkus, 750 F. Supp. 2d at 175-76.

In this case, it has been established, with evidence satisfactory to the Court, that the defendants, through the provision of material support and resources (the financial support, support for training, and facilitation of travel) to Bin Laden and Al-Qaeda, facilitated the planning and execution of the attack on the Cole, which resulted in the extrajudicial killing of Kevin Rux.  See Findings of Fact supra ¶¶ 17-34 (Sudanese defendants); ¶¶ 40-55 (Iranian

defendants).  The next issue, therefore, is whether plaintiffs have proven an appropriate theory of liability.

Plaintiffs claim that the defendants are liable upon a theory of IIED and solatium.  See [#18] ¶¶ 138-144.  Under the Restatement of Torts, a defendant shall be liable for IIED to family members of an injured person if the defendant engaged in extreme and outrageous conduct which 1) was directed at persons other than plaintiffs and 2) intentionally or recklessly caused severe emotional distress, but not necessarily bodily harm, to such persons' immediate family members, who were present at the time such conduct occurred.  RESTATEMENT (SECOND) OF TORTS § 46(1)-(2)(a) (1965).  "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress."  Belkin v. Islamic Republic of Iran, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) (citing Stethem v. Islamic Republic of Iran, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).  Notably, in terrorism actions brought pursuant to section 1605A of the FSIA, the requirement of presence at the time of the incident is waived.  Valore, 700 F. Supp. 2d at 80 ("One [ ] need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result.").

Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED. Spencer v. Islamic Republic of Iran, No. 12-CIV-42, --- F. Supp. 3d ---, ---, 2014 WL 5141429, at *2 (D.D.C. Oct. 14, 2014) (citing Valore, 700 F. Supp. 2d at 85).  "A claim of solatium is a claim for the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort."  Belkin, 667 F. Supp. 2d at 22 (citing Dammarell v. Islamic Republic of Iran, 281 F. Supp. 2d 105, 196–97 (D.D.C. 2003); Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 110 (D.D.C. 2000)).  However, because plaintiffs can only recover

once for their claims of IIED and solatium and "[b]ecause section 1605A explicitly makes damages for solatium available, the Court will proceed [solely] under this theory of recovery." Belkin, 667 F. Supp. 2d at 22.

In this case, it has been established, with evidence satisfactory to the Court, that the defendants enabled Bin Laden and Al-Qaeda to perpetrate the attack on the Cole, thereby causing Kevin's death and the resulting mental anguish, bereavement, and grief of his immediate family members, the plaintiffs.  See Findings of Fact supra ¶¶ 57-85 (detailing injury caused to Kevin's mother and brothers as a result of his death).

IV.   Damages

In any action brought under section 1605A of the FSIA, "damages may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c).  In this case, plaintiffs seek both compensatory and punitive damages, and the Court will consider each in turn after a preliminary discussion of joint and several liability.

A.   Joint and Several Liability

1.   Legal Standard

In section 1605A actions against foreign states or their instrumentalities, the court may assess damages jointly and severally against defendants that conspired to provide material support for terrorist activity.  See Wultz v. Islamic Republic of Iran, 864 F. Supp. 2d 24, 30, 34 (D.D.C. 2012) (making Iranian and Syrian defendants jointly and severally liable for all damages, where Palestinian Islamic Jihad ("PIJ") received "substantial logistical, financial, and technical support" from and "act[ed] as agents for" the defendants); Oveissi v. Islamic Republic

of Iran, 879 F. Supp. 2d 44, 59 (D.D.C. 2012) (holding the Islamic Republic of Iran and the Iranian Ministry of Information and Security jointly and severally liable for all damages).[28]

2.    Analysis

Because the record supports a finding that the Iranian and Sudanese defendants conspired to support Al-Qaeda, which in turn carried out the bombing of the Cole, the Court concludes that all defendants shall be jointly and severally liable for all damages.  This conspiracy can be traced back at least to 1991, when Iran and Sudan decided to form a "tripartite front" against the United States and Israel, agreeing to collaborate both "politically and militarily."  PEX 16 at 6–7.

Iran took primary responsibility for transferring, via Lebanese Hizballah, extensive technical expertise to Al-Qaeda and other terrorist organizations.  See id. at 8; PEX 27 at 2–7; PEX 9 at 61.  In the 1990s, Al-Qaeda was able to deepen relationships with Iranian officials and Hizballah.  See PEX 27 at 2–7; PEX 9 at 61.  Al-Qaeda also used Iran as a "transit point" for moving money and fighters.  PEX 2 at ¶ 36; cf. Wultz, 864 F. Supp. 2d at 35 ("[T]he Iranian Defendants funneled money through the Syrian Defendants to the PIJ in order for the PIJ to carry out terrorist attacks.").  In the years leading up to the Cole bombing, Iran was directly involved in establishing Al-Qaeda's Yemen network and supported training and logistics for Al-Qaeda in the Gulf region.  See PEX 3 at ¶ 70.  Throughout, Iran used Lebanese Hizballah, long-trusted yet easily distanced in public, as its primary "facilitator" for providing training and communications support.  PEX 3 at ¶ 49.

---

[28] Cf. Blue v. Rose, 786 F.2d 349, 352–53 (8th Cir. 1986) ("[W]here an award of punitive damages is based upon actions by one or more partners acting within the scope of authority and in further[a]nce of the partnership business, . . . under the general principles of agency and partnership law, all the partners could be held jointly liable for the punitive damages, and a single sum verdict is warranted.").  As an alternative to joint and several liability, the majority of U.S. jurisdictions allow courts to apportion punitive damages according to the culpability of individual defendants.  See 2 John J. Kircher & Christine M. Wiseman, Punitive Damages: Law and Practice §§ 16:8–16:9 (2014) (reviewing cases).  Here, however, the record provides no clear rationale for apportionment, and the plaintiffs do not request such a remedy.  See Plaintiffs' Proposed Findings of Fact and Conclusions of Law Redacted [#44] at 55 (seeking final judgment against defendants "jointly and severally").

For its part, Sudan served as a meeting place, safe haven, and training ground for Al-Qaeda and others, including Lebanese Hizballah in the 1990s and into 2000.  See PEX 12 at 10; PEX 15 at 10; cf. Wultz, 864 F. Supp. 2d at 35("[T]he safe haven, advice, encouragement, assistance, and facilities provided by Syrian Defendants substantially contributed to the PIJ's ability to train suicide bombers.").  In exchange, Bin Laden agreed to support Turabi, head of Sudan's NIF, in his war against Christian separatists in southern Sudan.  See PEX 9 at 57.  Additionally, Bin Laden established business ventures with the NIF elite that facilitated the transfer of funds for terrorist activities.  See PEX 1 at ¶¶ 19, 35.  In sum, Sudan's support was "indispensable" in enabling Al-Qaeda to acquire expertise and contacts for carrying out the Cole bombing.  PEX 1 at ¶ 81.

Lastly, there is ample evidence that Al-Qaeda carried out the final act of bombing the Cole and proximately causing the injury suffered by the plaintiffs.  See PEX 3 at ¶¶ 70, 81.  In light of the evidence of the Iranian and Sudanese defendants' conspiracy to support the terrorist activities of Al-Qaeda, which ultimately executed the Cole bombing, joint and several liability for all damages is appropriate.

B.     Compensatory Damages

1.     Legal Standard

In determining the appropriate amount of compensatory damages, courts may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium.  See Acosta v. The Islamic Republic of Iran, 574 F. Supp. 2d 15, 29 (D.D.C. 2008) (citing Haim v. Islamic Republic of Iran, 425 F. Supp. 2d 56, 71 (D.D.C. 2006)).  In Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229 (D.D.C. 2006), the court, following an extensive survey of other decisions of the District Court for the District of Columbia, noted that

"courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse[,] approximately $5 million to a parent whose child was killed[,] and approximately $2.5 million to a plaintiff whose sibling was killed." Id. at 269.  It is also true, however, that courts "award greater amounts in cases with 'with aggravating circumstances,' . . . indicated by such things as '[t]estimony which describes a general feeling of permanent loss or change caused by decedent's absence' or '[m]edical treatment for depression and related affective disorders,'" Valore, 700 F. Supp. 2d at 85-86 (internal citations omitted).  With respect to such enhancements, the court in Oveissi v. Islamic Republic of Iran, 768 F. Supp. 2d 16 (D.D.C. 2011), noted the following:

> Factors pertinent to the determination of damage enhancements are largely derived from common sense, and generally fall into one of three categories: evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing.

Id. at 26-27.  Accord Spencer, 2014 WL 5141429, at *3.

    2.    Analysis

In this case, the evidence demonstrates that Kevin was the center of his family. See Findings of Fact supra ¶¶ 57-85.  His unexpected death was devastating to his mother and brothers. Id.  Furthermore, the violent nature in which he died further exacerbated their grief and mental suffering, with several of his family members tortured by the fact that he may have suffered before he died.  See generally PEX 4.  Finally, the medical evidence shows that each plaintiff experienced extraordinarily severe pain and suffering following Kevin's death. Id. at ¶¶ 9-12 (concluding that Plaintiff A suffers from "traumatic grief" or "persistent complex

bereavement-related disorder"); <u>Id.</u> at ¶ 17 (concluding that Plaintiff B suffers from "traumatic

grief" or "persistent complex bereavement-related disorder"); <u>Id.</u> at ¶ 25 (concluding that

Plaintiff C suffers from PTSD); <u>Id.</u> at ¶ 21 (concluding that Plaintiff D suffers from "traumatic

grief" or "persistent complex bereavement-related disorder"); <u>Id.</u> at ¶ 28 (concluding that

Plaintiff E suffers from "traumatic grief" or "persistent complex bereavement-related disorder").

Under these circumstances an upward departure of 25% [29] of the baseline is warranted.

Accordingly, each plaintiff shall be awarded the following damages for solatium:

|    | Plaintiff | Relationship to Kevin | Baseline Award | 25% Enhancement | Total Solatium Damages |
|----|-----------|----------------------|----------------|-----------------|------------------------|
| 1. | Plaintiff A | Mother | $5,000,000 | $1,250,000 | $6,250,000 |
| 2. | Plaintiff B | Brother | $2,500,000 | $625,000 | $3,125,000 |
| 3. | Plaintiff C | Brother | $2,500,000 | $625,000 | $3,125,000 |
| 4. | Plaintiff D | Brother | $2,500,000 | $625,000 | $3,125,000 |
| 5. | Plaintiff E | Brother | $2,500,000 | $625,000 | $3,125,000 |

### C.   <u>Punitive Damages</u>

#### 1.   <u>Legal Standard</u>

"[T]he purpose of punitive damages is 'to punish' a defendant for 'outrageous conduct,'

and 'to deter him and others like him from similar conduct in the future.'" <u>Baker</u>, 775 F. Supp.

2d at 84 (citing RESTATEMENT (SECOND) OF TORTS § 908(1) (1977)).   In calculating an award of

punitive damages under section 1605A of the FSIA,[30] courts evaluate four factors:   "'(1) the

character of the defendant's act, (2) the nature and extent of harm to the plaintiffs that defendants

---

[29] Although plaintiffs seek an upward departure of 50%, the Court finds this to be excessive.   In this case, although each family member appears to have had an extremely close relationship with Kevin, the Court notes that not all of the emotional harm and dysfunction currently being experienced by the plaintiffs is necessarily attributable to the attack.   As noted above, Kevin's mother's father was an alcoholic and she married an alcoholic.   <u>See</u> Findings of Fact <u>supra</u> ¶¶ 57-85.   After her divorce from him, she raised five boys on her own.   <u>Id.</u>   Of those five boys, two of them served time in prison prior to the attack and one of them was in prison at the time of the attack.   <u>Id.</u>   Thus, without diminishing the pain and anguish felt by the plaintiffs, the Court simply notes that an enhancement of 25% is more appropriate in this instance.   <u>See</u> <u>Baker v. Socialist People's Libyan Arab Jamahiriya</u>, 775 F. Supp. 2d 48, 83 (D.D.C. 2011) (approving an upward departure of 25% from the baseline for solatium damages); <u>Valore</u>, 700 F. Supp. 2d at 86 (same).

[30] Punitive damages against state sponsors of terrorism first became available in 2008.   <u>See</u> <u>Valore</u>, 700 F. Supp. 2d at 87.

caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants.'"

Acosta, 574 F. Supp. 2d at 30 (internal citations omitted).  Courts have found these factors to be

satisfied when a defendant has provided material support to a terrorist organization in carrying

out an act of terrorism.  See, e.g., Baker, 775 F. Supp. 2d at 85 (finding that an award of punitive

damages was warranted where "defendants supported, protected, harbored, aided, abetted,

enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus

operandi included the targeting, brutalization, and murder of American citizens and others");

Cronin v. Islamic Republic of Iran, 238 F. Supp. 2d 222, 235 (D.D.C. 2002) (finding that an

award of punitive damages was warranted where "[t]he defendant organized, trained, and funded

[terrorist organizations] so that [they] could torture and take individuals like the plaintiff

hostage").

   2. <u>Analysis</u>

   In this case, punitive damages are clearly warranted.  First, when the Cole was bombed, it

was manned by 26 officers and 270 enlisted personnel.  See Findings of Fact supra ¶ 8.  The

result of the bombing was the death of 17 American sailors and the injury of 42 others. Id. ¶ 10.

This was, without a doubt, a heinous act.  The defendants' provision of material support to the

perpetrators of that bombing was no less heinous.  See Harrison, 882 F. Supp. 2d at 50 (finding

that "[w]hile Sudan's support of Al Qaeda [in the bombing of the Cole] does not rise to level of

direct involvement in the attacks, it was nonetheless intentional, material and, as a result,

reprehensible").

   Second, in supporting Bin Laden and Al-Qaeda, the defendants' intention was clearly to

further their own Anti-Western, Anti-American agenda.  See Findings of Fact supra ¶¶ 11-16

(Sudanese defendants); ¶¶ 35-39 (Iranian defendants).

Third, numerous courts have acknowledged that the need to deter these defendants from committing future terrorist acts is great.  See, e.g., Onsongo v. Republic of Sudan, No. 08-CIV-1380, --- F. Supp. 2d ---, ---, 2014 WL 3702875, at *5 (D.D.C. July 25, 2014) (awarding punitive damages against Sudan following the bombings of the U.S. embassies in Tanzania and Kenya, upon a finding that the need for deterrence was great); Wultz, 864 F. Supp. 2d at 41-42 (awarding punitive damages against Iran following the suicide bombing of a Tel Aviv restaurant, upon an implicit finding that the need for deterrence was great); Harrison, 882 F. Supp. 2d at 50-51 (awarding punitive damages against Sudan following the bombing of the U.S.S. Cole, upon a finding that the need for deterrence was great); Haim v. Islamic Republic of Iran, 784 F. Supp. 2d 1, 13-14 (D.D.C. 2011) (awarding punitive damages against Iran following the suicide bombing of an Israeli bus, upon an implicit finding that the need for deterrence was great).

Furthermore, it appears as though Iran is acutely aware of these U.S. lawsuits:

> Iranian leaders pay close attention to civil suits about terrorism.  In 2000/01, the issue was a major controversy in Iran. . . . Former Iranian President, now chairman of the powerful Expediency Council (charged with resolving disputes among the various organs of government), Ali Akbar Hashemi Rafsanjani complained at length about the suits, as did numerous members of Iran's Parliament.  Of particular concern was the large punitive damage awards assessed against Iran, which they acknowledged exceeded a billion dollars. . . .

> * * *

> While Iranian leaders do pay close attention to the court judgments against Iran for its material support of terrorism, the effort to dissuade Iran from providing financial support for terrorism against Americans encountered several significant obstacles until recently.  First, from 2005-2013, the president of Iran was Mahmoud Ahmadinejad, [ ] a right-wing extremist who enjoyed attacking the United States and mocking its power.  Second, Iran's much higher oil income after 2005 because of higher oil prices made it easier for Iran to allocate more funds for the support of terrorism during the years until the additional U.S. and European

Union sanctions of 2013 sharply reduced Iran's oil [income].
Third, the perceived success of major terrorist groups that receive
material support from Iran, namely, Hizbollah's performance in its
2006 confrontation with Israel, followed up by its 2009-2010
success in keeping a role in the Lebanese government despite
doing poorly in the elections, and HAMAS' 2006 takeover of Gaza
(though that has been tarnished by its poor showing in the 2008-
2009 confrontation with Israel). Fourth, the perception in recent
years has been that the United States has been unable to exercise
power in the Middle East: it was tied down by Iraqi and Afghan
insurgents until it decided to scale back or end its military role, it
announced that it would pivot to Asia with an implicit reduced role
in the Middle East, and it was unable to put into effect President
Barak Obama's 2012 call for Syrian President Assad to leave
office. Iranian leaders have often proclaimed these developments
as evidence that Islamist resistance movements and their terrorist
activities can defeat the United States.  In consideration of these
factors, the financial pressure to abandon terrorism against U.S.
citizens and entities as a result of past court judgments was not
sufficient[ ] to induce Iran to change course.

But that pressure, in my opinion, certainly remains, and should not
be underestimated as an element in Iran's calculation about
whether and how to support terrorism against Americans. For one
thing, Iran is less confident in 2014 than it was some years ago, in
no small part because of the U.S. success since 2012 in persuading
other countries to join in tougher sanctions against Iran.  A factor
which could make court judgments more effective at leading Iran
to reconsider its policy of terrorism against Americans is Iran's
active pursuit of a nuclear accord with the United States.  In the
2013 Iranian presidential elections, all of the candidates except the
one most associated with hardliners argued that Iran must
compromise with the international community in order to secure
relief from international sanctions.  Indeed, the heart of winning
candidate Hussein Rouhani's campaign was that the only way to
improve Iran's dreadful economic situation was to obtain sanctions
relief and that required compromising with the United States about
the nuclear program.  To the extent that the Iranian government is
focused on how to obtain sanctions relief, that government will be
more sensitive to pressure related to Iran's support for terrorism
against Americans.  To be sure, Supreme Leader Khamenei is
skeptical about the nuclear negotiations and counsels adopting an
"economy of resistance" which does not rely on sanctions relief.
Yet the issue of how to improve the economy and how much to
compromise with the West is in my expert opinion a matter being
vigorously debated in Iran, and court judgments which highlight

the cost for terrorism support could be an important element in that debate.

That is especially the case since recent legal actions suggest that substantial Iranian assets could be at risk. While I am not at liberty to discuss a number of actions in which I am an expert witness and where the proceedings are under seal, I can note that the Wall Street Journal has reported that in one case, more than one billion dollars is at stake. In 2013, a federal court ordered the surrender of the assets of the Alavi Foundation of New York – worth in excess of $600 million -- on the grounds that the Foundation was controlled by the Iranian government. Furthermore, Canada revised its laws in [ ] to allow seizure of Iranian assets to satisfy court judgments against Iran. In March 2014, a Canadian court ordered the seizure of more than $7 million in Iranian assets under the Justice for Victims of Terrorism Act to satisfy court judgments in the United States. Iranian media have extensively reported on this case. The prospect that Iran must contemplate is that additional countries may permit seizure of Iranian assets to satisfy the U.S. court judgments, which could considerably complicate Iranian trade and put at risk substantial Iranian assets abroad.

Iran has recently been taking a more active stance on terrorism-related lawsuits brought against it. Although Iran has had a long history of failing to appear in these lawsuits, Iran has entered several recent suits. For instance, as I mentioned earlier, in 2004, plaintiffs holding judgments against Iran filed a property claim for ancient Iranian tablets held by the University of Chicago's Oriental Institute. The suit was initially ignored by Iran. However, in 2009, after the district court finally ruled that the case could proceed, Iran intervened in the case. Indeed, Iran has vigorously defended a Canadian wrongful death suit against it, Estate of the Late Zahra (Ziba) Kazemi, and Stephan (Salman) Hashemi v. Islamic Republic of Iran, et al., Case No. 500-17-031760-062 (Sup. Ct. Montreal), since suit was filed in 2009. And since 2011, the Alavi Foundation of New York has vigorously but so far unsuccessfully contested in federal court the U.S. seizure of its assets.

. . . Here, Iran has not decreased its support for terrorism, but instead has dramatically increased and widened its support for terrorists, terrorist organizations, and terrorist activities throughout the world. Punishment can be measured, in large part, by assessing significant financial damages for Iran's continued and wide-ranging worldwide support for terrorism, both directly and through its governmental arms (MOIS, IRGC, and IRGC Qods) and through Hizbollah. Iran is blatant in its support of terrorism. As

to deterrence, there [are] two factors to consider: deterring similar
conduct by others and making further  efforts to deter Iran in its
bold and increasing support for terrorism, which Iran uses to
expand its influence, its reach, and its force by terrorist means.

It is my opinion, to a reasonable degree of certainty, that Iranian
officials pay extremely close attention to what the outside world
has to say about the Iranian government and its policies, and they
generally assume that whatever is written about Iran – whether by
judges, by independent newspapers, by non-governmental
organizations, or by foreign ministries – is a direct product of a
unified policy by the government of the country from which the
comment originates.  Further, as I noted earlier, the Iranians have
shown themselves to be sensitive to punitive damages levied
against them, and they are well aware that such damages have been
a common feature in actions against Iran for its support of
terrorism against Americans.  Were this Court not to impose
punitive damages for what was a spectacular terrorist act, this
would be read by Iranian government officials as indicating a
significant weakening of U.S. pressure on Iran to end its support
for terrorism against Americans.  On the other hand, were this
Court to impose substantial punitive damages, this would be read
by Iranian officials as indicating that U.S. policy remains firmly
opposed to Iranian support for terrorism against Americans.

PEX 2 at ¶¶ 92-99.

The degree to which Sudan is concerned about these U.S. lawsuits is unclear, as none of

plaintiffs' experts addressed this issue.  However, the state has, on occasion, participated in

litigation brought in U.S. courts.  See Owens v. Republic of Sudan, 531 F.3d 884 (D.C. Cir.

2008) (full participation); Kumar v. Republic of Sudan, No. 2:10-CIV-171, 2011 WL 4369122

(E.D. Va. Sept. 19, 2011) (limited participation); Rux v. Republic of Sudan, 672 F. Supp. 2d 726

(E.D. Va. 2009) (limited participation).

Finally, the wealth of Sudan and Iran supports an award of punitive damages.  In 2014,

Sudan's GDP was estimated at $85.3 billion.  See http://www.heritage.org/index/country/sudan

(last visited Jan.26, 2015).  Iran's GDP in 2014 was estimated at $999.2 billion.  See

http://www.heritage.org/index/country/iran (last visited Jan. 26, 2015).  In light of the foregoing

analysis, the Court concludes that an award of punitive damages is warranted.

The next step, then, is to quantify punitive damages.  Courts have adopted two primary

approaches to calculating punitive damages against foreign states under section 1605A of the

FSIA, but both approaches seem ill-suited to this case.

Many courts apply the Flatow method, multiplying the defendant state's annual

expenditures on terrorism (the multiplicand) by a factor usually ranging from three to five (the

multiplier).  See, e.g., Beer v. Islamic Republic of Iran, 789 F. Supp. 2d 14, 26 (D.D.C. 2011)

(using multiplier of three); Valore, 700 F. Supp. 2d at 89 (using multiplier of five); Flatow v.

Islamic Republic of Iran, 999 F. Supp. 1, 32–34 (D.D.C. 1998) (articulating punitive damages'

dual purposes of retribution and deterrence, and applying multiplier of three).  Applying the

Flatow method here could send a strong message of deterrence, but strikes this Court as

potentially excessive.  Iran's support for terrorism was estimated in 2008 to amount to $200

million.  See PEX 2 at ¶ 91 (citing 2008 Patterns of Global Terrorism report).[31]  Plaintiffs ask

this Court to multiply this sum by a multiplier of five (5), render a total punitive award of $1

billion, and allocate this amount to each plaintiff according to his or her share of compensatory

damages.[32]  See Plaintiffs' Proposed Findings of Fact and Conclusions of Law Redacted [#44] at

---

[31] In applying the Flatow method, courts disagree on whether terrorism spending should reflect, on the one hand, spending at the time of the attack at issue (or at least in years immediately prior to the attack) or, on the other, annual spending at the time of litigation.  Compare Roth v. Islamic Republic of Iran, No. 11-cv-1377 (RCL), 2015 WL 349208, at *18 (D.D.C. Jan. 27, 2015) (using Iran's "annual material support to Hamas during the 1990s" as Flatow multiplicand for damages in case arising from 2001 terror attack), with Sutherland v. Islamic Republic of Iran, 151 F. Supp. 2d 27, 44, 53 (D.D.C. 2001) (finding that Iran "currently spends approximately $100 million per year or more on terrorist activities," in calculating damages in connection with captivity spanning from 1985 to 1991).  Additionally, some courts focus on spending directed at the terrorist organization that perpetrated the attack at issue, rather than total support of terrorism.  Compare Roth, 2015 WL 349208, at *18 (isolating support to Hamas); Valore, 700 F. Supp. 2d at 88 (isolating support to Hizballah), with Haim, 784 F. Supp. 2d at 14 (using "annual support for international terrorism" as Flatow multiplicand).

[32] Tellingly, in asking the Court to apply a $200 million multiplicand, the plaintiffs decline to adopt their own expert's "highly conservative estimate" of Iran's annual terrorism support as ranging from $300 to $500 million.  See PEX 2 at ¶ 91.  Additionally, the plaintiffs justify the use of the higher multiplier of five with cursory references

55.  But under this approach, each of the five plaintiffs in this case would receive punitive

damages amounting to approximately fifty-three (53) times his or her compensatory damages.[33]

Under the second approach, some courts impose a fixed $300 million punitive award.

This approach is based on courts' perception that punitive awards are converging toward this

figure, and on the theory that consistent, foreseeable punishment serves as a better deterrent for

the rational bad actor.  See, e.g., Bodoff, 907 F. Supp. 2d at 106 (awarding $300 million in

punitive damages and explaining that a punitive damage award should be "reasonably

predictable in its severity" so that a "bad man can look ahead with some ability to know what the

stakes are in choosing one course of action or another" (quoting Exxon Shipping Co. v. Baker,

554 U.S. 471, 502 (2008))); Wultz, 864 F. Supp. 2d at 42 (same).  But this approach, even more

so than the Flatow method, limits courts' discretion to tailor a punitive award appropriate for the

magnitude of the underlying injury.  Compare Bodoff, 907 F. Supp. 2d at 106 (awarding $300

million in punitive damages to five plaintiffs whose compensatory damages totaled

approximately $17 million), with Oveissi, 879 F. Supp. 2d at 59 (awarding $300 million in

punitive damages to one plaintiff whose compensatory damages totaled $7.5 million); see also

Acosta, 574 F. Supp. 2d at 30 (considering "the character of the defendant's act" and "the nature

---

to "new terrorist threats such as Bokom Haram [sic] and ISIS," without explaining any purported linkages between these groups and the Iranian or Sudanese defendants.  See Plaintiffs' Proposed Findings of Fact and Conclusions of Law Redacted [#44] at 55.

[33] By way of further illustration, plugging into the Flatow formula (with a multiplier of 3) an annual terrorism spending figure of $400 million would yield a total punitive award of $1.2 billion and a per-plaintiff punitive-compensatory ratio of sixty-four (64), and spending of $500 million would correspond with a total punitive award of $1.5 billion and a punitive-compensatory ratio of eighty (80).  If the Due Process Clause governed these proceedings (which it does not, see infra note 37), ratios of 53, 64, and 80, might all be unconstitutional.  See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) ("Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 or, in this case, of 145 to 1." (internal citation omitted)).

and extent of harm to the plaintiffs that defendants caused or intended to cause," among other

factors, in calculating punitive damages (internal quotation marks omitted)).[34]

Most crucially, both approaches fail to account for a relatively unique feature of this case:

This Court has already rendered a punitive award against the Republic of Sudan in connection

with the very same bombing of the Cole.  See Harrison v. Republic of Sudan, 882 F. Supp. 2d 23

(D.D.C. 2012).  The Harrison court applied the Flatow method, but explained that in light of the

absence of "evidence relating to Sudan's actual expenditures on terrorist activities," it would

"use the compensatory damages value as the multiplicand."  Id. at 50.  The court then used a

multiplier of three, in the absence of any "exceptional circumstances" justifying an upward

adjustment.  Id.[35]  The eighteen plaintiffs, who are not in this case, were awarded punitive

damages in the amount of $236,029,422.  Id. at 51.

---

[34] See also 2 John J. Kircher & Christine M. Wiseman, Punitive Damages: Law and Practice § 18:8 (2014) (reviewing cases and explaining that courts calculating punitive damages consider the "'nature and enormity of the wrong,' the 'magnitude and flagrancy' of the offense, [and] the 'blameworthiness and harmfulness' of the misconduct" (internal citations omitted)); Robert J. Rhee, A Financial Economic Theory of Punitive Damages, 111 Mich. L. Rev. 33, 36–37 (2012) ("[P]unitive damages should equal the harm multiplied by the reciprocal of the injurer's chance of being found liable for wrongful activities." (emphasis added)).

 Other courts prefer a fixed punitive award for each immediate victim harmed directly by the terrorist act (i.e., those whom the terrorists killed, tortured, kidnapped, etc.).  See, e.g., Baker, 775 F. Supp. 2d at 86 (awarding $150,000,000 in punitive damages against Syria for each of three Americans shot in execution-style by terrorist hijackers, for a total punitive award of $450,000,000); Gates, 580 F. Supp. 2d at 75 (awarding $150,000,000 in punitive damages against Syria for each of two civilian contractors beheaded by Al-Qaeda in Iraq operatives, for a total punitive award of $300,000,000).  But this immediate-victim approach cannot fully account for the foreseeable effects of terrorism on secondary victims such as family members or other potential claimants.  The more numerous these secondary victims, the greater the likelihood that the immediate-victim methodology could under-punish and under-deter the perpetrator, relative to the actual magnitude of resultant harm.  A further complication is that, insofar as duplicative punishment is to be avoided, courts instating immediate-victim punitive awards assume that all potential plaintiffs are before the court and that no other secondary victims have brought or will bring claims related to the same immediate victim.  See Baker, 775 F. Supp. 2d at 86 (awarding punitive damages to "each of the victims of the hijacking and their families"); Gates, 580 F. Supp. 2d at 75 (awarding punitive damages to estates of two victims).  But this case illustrates the limits of such an assumption: Kevin's wife is not in this case and, in fact, was unable to obtain punitive damages in the earlier Rux case.  See infra note 35.

[35] As already discussed, see supra note 2, Rux arose out of the same attack on the Cole (and even involves the same decedent, though not the same plaintiffs as this case).  But because the Rux court awarded only compensatory and not punitive damages, that case does not present the problem of duplicative punitive damages.  The newly enacted section 1605A authorizing punitive damages had no retroactive application to the Rux plaintiffs' suit, and the district court denied their motion to amend their complaint to request punitive and other damages under that section.  See Rux, 495 F. Supp. 2d at 566–67 (describing compensatory damages); Rux v. Republic of Sudan, 672 F. Supp. 2d

This Court's prior assessment in Harrison of punitive damages against Sudan for the same attack on the Cole presents two additional challenges.  First, the Court should avoid imposing a duplicative punishment against the Sudanese defendants for the same conduct, given that they are jointly and severally liable for all damages in this case.  See supra Part IV.A.[36] Second, the Court is concerned for consistency on an individual plaintiff level; a punitive award should minimize any disparities between the Harrison plaintiffs and the plaintiffs in this case, whose injuries are similar in "nature and extent" and thus warrant comparable levels of punishment and deterrence.  See Acosta, 574 F. Supp. 2d at 30.

Fortunately, the shortcomings of the Flatow and fixed-award approaches and the duplication and consistency challenges presented by Harrison's prior punitive award all find a reasonably elegant solution in Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51 (D.D.C. 2010).  In Murphy, the plaintiffs' injuries arose from the 1983 bombing of a U.S. Marine Corps barracks in Lebanon.  Id. at 55.  In calculating the punitive award, the court acknowledged a "quandary": It had already awarded punitive damages against Iran in Valore for precisely the same bombing.  See id. at 81.  "Recurrent awards in case after case arising out of the same facts," the Court reasoned, "can financially cripple a defendant, over-punishing the same conduct through repeated awards with little additional deterrent effect, and awards . . . can differ, creating anomalous results."  Id.

---

726, 730–34, 738 (E.D. Va. 2009) (explaining section 1605A's lack of automatic retroactive effect and denying motion for leave to supplement complaint).

[36] Here, various Sudanese ministries and agencies are defendants alongside the Republic of Sudan, whereas in Harrison, the Republic of Sudan was the sole defendant.  But this formal distinction does not alleviate the Court's concerns about duplicative punishment: Because both Harrison and this case arise out of the bombing of the Cole, any Sudanese government officials or entities that must be punished and deterred are ultimately identical.

Following the Supreme Court's teaching that punitive damages are "personal" to injured plaintiffs in a specific case,[37] the Murphy Court concluded that "[w]here there is more than one case arising out of the same facts, an analysis of the amount of punitive damages awarded compared with the amount of compensatory damages awarded [in the prior case] can be used to gauge the amount of punishment and deterrence the Court considered necessary based on the injuries plaintiffs to that case suffered." Id. at 81–82. Because Valore's punitive-to-compensatory-damages ratio was 3.44-to-1, the Murphy court applied this same ratio to calculate punitive damages with respect to each individual plaintiff. Id. at 82–83; see also Estate of Brown v. Islamic Republic of Iran, 872 F. Supp. 2d 37, 44–45 (D.D.C. 2012) (following Murphy and applying 3.44-to-1 ratio from Valore in case arising out of same bombing); Davis v. Islamic Republic of Iran, 882 F. Supp. 2d 7, 17 (D.D.C. 2012) (same); Estate of Bland v. Islamic Republic of Iran, 831 F. Supp. 2d 150, 158 (D.D.C. 2011) (same); Goldberg-Botvin v. Islamic Republic of Iran, 938 F. Supp. 2d 1, 11–12 (D.D.C. 2013) (following Murphy and applying punitive damages-compensatory damages ratio from Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258 (D.D.C. 2003), which arose out of same bombing).

Here, following Murphy, this Court finds guidance in the ratio between the punitive and compensatory awards rendered in Harrison, which arose out of the same bombing of the Cole. The Harrison court awarded $236,029,422 in punitive damages and $78,676,474 in compensatory damages. See Harrison, 882 F. Supp. 2d at 51. Accordingly, Harrison's ratio of

---

[37] In Philip Morris USA v. Williams, 549 U.S. 346 (2007), the Supreme Court held that a jury instruction not expressly limiting a punitive award to the plaintiffs in the case, thereby permitting jurors to consider harm done to other individuals not before the court, constituted an unconstitutional taking without due process, in violation of the Fourteenth Amendment. See id. at 349. Here, this Court, like the Murphy court, is mindful that the Due Process Clause (of the Fifth Amendment) does not apply to foreign states and their instrumentalities. See Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 99 (D.C. Cir. 2002); accord Murphy, 740 F. Supp. 2d at 67–68; see also Haim, 784 F. Supp. 2d at 14 ("Due Process principles play no role in limiting punitive damages in terrorism-related FSIA suits . . . ."). Nonetheless, like the Murphy court, this Court finds the due process principles articulated in Philip Morris instructive, insofar as they embody general concerns for fairness and consistency.

punitive damages to compensatory damages is 3-to-1, and in this case, the Court shall apply the same ratio to derive punitive damages.

Plaintiffs contend that "Harrison's calculation of punitive damages is not appropriate here" because "plaintiffs there did not provide evidence relating to Sudan's actual expenditures on terrorist activities . . . [whereas] here, plaintiffs have established evidence regarding Iran's actual expenditures on terrorism, and that much of the terrorism sponsored was done in conjunction with the Sudan." Plaintiffs' Proposed Findings of Fact and Conclusions of Law Redacted [#44] at 53 n.16 (internal citations and quotations omitted). But this argument misses the mark. At issue is not whether Harrison is correct, but rather, whether Murphy provides a sound methodology for calculating punitive damages. In opting to follow Murphy, this Court relies on Harrison only insofar as that case arises from the same incident and similar injuries (the bombing of the Cole), and supplies a ratio between compensatory and punitive damages. As a doctrinal matter, therefore, this case is governed not by Harrison, but by Murphy.[38]

Accordingly, the Court will award punitive damages to each plaintiff in this case in an amount three times greater than his or her respective compensatory damages:

|  | Plaintiff | Relationship to Kevin | Total Solatium Damages | Punitive-to-Compensatory-Damages Ratio | Total Punitive Damages |
|---|---|---|---|---|---|
| 1. | Plaintiff A | Mother | $6,250,000 | 3 : 1 | $18,750,000 |
| 2. | Plaintiff B | Brother | $3,125,000 | 3 : 1 | $9,375,000 |
| 3. | Plaintiff C | Brother | $3,125,000 | 3 : 1 | $9,375,000 |
| 4. | Plaintiff D | Brother | $3,125,000 | 3 : 1 | $9,375,000 |

---

[38] Here, directly adopting Harrison's calculation would yield the same punitive award as following Murphy's extrapolation of ratios, because it just so happens that the Harrison court, lacking data on Sudan's terrorism spending, opted simply to multiply compensatory damages by a factor of three (3) in calculating punitive damages. See Harrison, 882 F. Supp. 2d at 50–51. But this is mere happenstance: Even if the Harrison court had applied the Flatow method by multiplying Sudan's terrorism spending by a multiplier, Murphy would still instruct this Court to extrapolate the punitive-compensatory ratio from the resulting figures. In fact, the Murphy court did precisely this vis-à-vis Valore. The Valore court had multiplied Iran's terrorism spending ($200 million) by a multiplier of five (5) to calculate a total punitive award of $1 billion, which the Murphy court then divided by total compensatory damages to obtain the average punitive-compensatory ratio of 3.44. See Murphy, 740 F. Supp. 2d at 82–83; Valore, 700 F. Supp. 2d at 89.

| 5. | Plaintiff E | Brother | $3,125,000 | 3 : 1 | $9,375,000 |
|----|-------------|---------|------------|-------|------------|

V.    Conclusion

For the forgoing reasons, Plaintiffs' Motion for Default Judgment Upon Evidentiary Hearing Against Iranian and Sudanese Defendants [#29] will be granted.  Furthermore, final judgment will be entered against the defendants, jointly and severally, in the amounts set forth above, along with post-judgment interest at the statutory rate, 28 U.S.C. § 1961(a).[39]

Dated:  March 31, 2015                                RUDOLPH CONTRERAS
                                                      United States District Judge

---

[39] See Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea, 962 F. Supp. 2d 152, 165 (D.D.C. 2013) (allowing post-judgment interest against a foreign sovereign under the FSIA).