# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| SAUNDRA FLANAGAN, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 10-1643 (RC) |
| | : | | |
| v. | : | Re Document No.: | 55 |
| | : | | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART THE REPUBLIC OF SUDAN'S MOTION TO SET ASIDE THE DEFAULT JUDGMENT

## I. INTRODUCTION

Plaintiffs in this case are the family members of Electronic Warfare Technician First Class Kevin Shawn Rux, who was killed along with sixteen other American sailors in the 2000 terrorist bombing of the U.S.S. Cole in Yemen, carried out by Al-Qaeda. In 2010, Plaintiffs filed a lawsuit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, against Syria, Iran, Sudan, and several of those foreign states' agents and political subdivisions, alleging that those defendants provided material support to Al-Qaeda which caused the U.S.S. Cole bombing. Although they were served with process in January 2011, the Iranian and Sudanese defendants never appeared. The Clerk of Court entered default against those parties on October 31, 2012, and this Court held an evidentiary hearing on August 12, 2014, to determine whether Plaintiffs had "establishe[d] [their] claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). The Court concluded that the Plaintiffs had and, on March 31, 2015, issued a lengthy opinion setting forth the Court's Findings of Fact and Conclusions of Law. *See generally Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015). The

Court awarded Plaintiffs $18,750,000.00 in compensatory damages and $56,250,000.00 in punitive damages.

Two months later—and over four years after Sudan had been served with process—Sudan finally entered an appearance and filed a motion to set aside the default judgment. *See* Sudan's Mot. to Set Aside Default J., ECF No. 55 [hereinafter "Sudan's Mot."].  Sudan now raises several belated defenses which, it claims, establishes "good cause" under Federal Rule of Civil Procedure 55(c) to set aside the default judgment.  Several of these arguments were recently considered by another judge in this district in seven related cases in which Sudan sought to set aside default judgments arising out of the 1998 bombings of the United States embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania. *See Owens v. Republic of Sudan*, --- F. Supp. 3d ----, No. 01-2244 *et al.*, 2016 WL 1170919 (D.D.C. Mar. 23, 2016), *appeal docketed*, No. 16-7048 (D.C. Cir. Apr. 22, 2016).  In many respects the Court finds the opinion in *Owens* instructive, and will rely on that decision's analysis where persuasive and relevant.  As explained below, the Court will grant in part and deny in part Sudan's motion, and will vacate the portion of the default judgment awarding punitive damages, without definitively determining, at this stage, whether punitive damages are available to Plaintiffs in this case.

## II.  FACTUAL BACKGROUND

The Court made substantial Findings of Fact and Conclusions of Law when entering a default judgment against Iran and Sudan.  *See generally Flanagan*, 87 F. Supp. 3d at 93–127.  The Court assumes familiarity with its prior opinion and revisits only those facts and statutory provisions particularly relevant for present purposes.

### A.  Statutory Background

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country."  *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 393 (2015) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)).  The FSIA starts with a general presumption of immunity for foreign states.  *See, e.g.*, *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 299 (D.C. Cir. 2005).  That presumption of immunity controls unless one of several statutorily prescribed exceptions applies.  *See* 28 U.S.C. § 1604 ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of [Title 28].").  Federal district courts' jurisdiction over FSIA claims are similarly tied to the question of immunity: 28 U.S.C. § 1330(a) provides that district courts "shall have original jurisdiction . . . of any nonjury civil action against a foreign state" only insofar as the plaintiff asserts a claim for relief "with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of [Title 28] or under any applicable international agreement."  28 U.S.C. § 1330(a).  As a result, this Court's "[s]ubject matter jurisdiction is . . . intertwined with immunity," *Owens*, 2016 WL 1170919, at *2, because "subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity," *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983).

One of those exceptions, first enacted by Congress in 1996, is referred to as the "terrorism exception" to foreign sovereign immunity.  *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221, 110 Stat. 1214, 1241–43.  Although that exception was previously codified as one of the many exceptions to foreign sovereign immunity listed in 28 U.S.C. § 1605(a), *see* 28 U.S.C. § 1605(a)(7) (2006 ed.), in 2008 Congress amended

the terrorism-related provisions as part of the National Defense Authorization Act,[1] *see* National

Defense Authorization Act of 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44.  The

immunity exception was recodified in section 1605A, which is entitled "Terrorism exception to

the jurisdictional immunity of a foreign state."  *See* 28 U.S.C. § 1605A.  The exception is

substantially similar to the prior version, and states that:

> A foreign state shall not be immune from the jurisdiction of courts of the United
> States or of the States in any case not otherwise covered by this chapter in which
> money damages are sought against a foreign state for personal injury or death that
> was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage
> taking, or the provision of material support or resources for such an act if such act
> or provision of material support or resources is engaged in by an official,
> employee, or agent of such foreign state while acting within the scope of his or
> her office, employment, or agency.

*Id.* § 1605A(a)(1).  A claim may only be heard under section 1605A, however, if, among other

requirements, the foreign state was "designated as a state sponsor of terrorism at the time the act

described in paragraph (1) occurred, or was so designated as a result of such act."  *Id.* §

1605A(a)(2)(A)(i)(I).

Subsection (c) also created a federal private right of action against "[a] foreign state that

is or was a state sponsor of terrorism" or "any official, employee, or agent of that foreign state"

while acting in an official capacity.  *Id.* § 1605A(c).  Those foreign states or individuals may be

liable to "a national of the United States," or her "legal representative" (among other classes of

individuals) "for personal injury or death caused by acts described in subsection (a)(1) [the

immunity provision] . . . , for which the courts of the United States may maintain jurisdiction

---

[1] The pre-2008 statute is not particularly relevant in this case, except to the extent that it
provides useful guidance in interpreting the scope of the term "extrajudicial killing," as
explained below.  For further background see *Owens*, 2016 WL 1170919, at *2–3.

under this section for money damages." *Id.* A plaintiff suing under that provision may recover "economic damages, solatium, pain and suffering, and punitive damages." *Id.*

## B.  Factual & Procedural Background

In September 2010, Plaintiffs filed this lawsuit, invoking section 1605A(c)'s cause of action. *See generally* Compl., ECF No. 3. The plaintiffs are Kevin Rux's mother ("Doe Victim A") and his four brothers ("Doe Victim B," "Doe Victim C," "Doe Victim D," and "Doe Victim E"). *See* First Am. Compl. ¶¶ 4–8, ECF No. 18. Plaintiffs alleged that each of the Defendants, including Sudan and its agencies and instrumentalities,[2] provided material support to Al-Qaeda, "including but not limited to providing, financing, lodging, training, and safehouses" as a result of which Al-Qaeda "was able to plan and execute its attack against the U.S.S. Cole." *Id.* ¶¶ 79, 136. Plaintiffs sued the foreign states of Iran, Sudan, and Syria, as well as several agents and instrumentalities of each state, *see id.* ¶¶ 9–15, and sought to recover under section 1605A for intentional infliction of emotional distress and loss of solatium, *id.* ¶¶ 134–44.

The Clerk entered defaults against the Iranian and Sudanese defendants on October 31, 2012. *See* Clerk's Entry of Default, ECF No. 26; Clerk's Entry of Default, ECF No. 27. At that time—and to date—Plaintiffs claim that they have been unable to effectuate service of process against the Syrian defendants, and therefore elected to proceed only against the Iranian and Sudanese defendants. *See* Pls.' Status Report, ECF No. 28; *see also* Pls.' Status Report on the Syrian Defs., ECF No. 51. The FSIA prohibits an entry of a default judgment "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Consequently, the Court held an evidentiary hearing regarding liability and damages

---

[2] For ease of reference, the Court will refer to the Sudanese defendants collectively as "Sudan."

on August 12, 2014, and accepted evidence in the form of live testimony, affidavits, and

documentary evidence.[3]   The Court also took judicial notice of the evidence presented in another

case arising out of the U.S.S. Cole bombing, *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541

(E.D. Va. 2007).   *See* Tr. of Evidentiary Hr'g at 11, ECF No. 40 [hereinafter "Hr'g Tr."].

Specific to the Sudanese defendants, the Court accepted expert testimony in the form of an

affidavit and supporting documents from Lorenzo Vidino, PhD, a senior fellow at the Center for

Security Studies in Zurich, Switzerland, *see* Pls.' Ex. 1 (affidavit and exhibits) [hereinafter

"Vidino Aff."], and live testimony from Dale L. Watson, a former Assistant Director of

Counterterrorism for the Federal Bureau of Investigation, *see* Hr'g Tr. at 81:23–130:11.

Following that evidentiary hearing, the Court issued its Findings of Fact and Conclusions

of Law.   Relying in large part on the expert testimony, the Court found that Hassan al Turabi, the

head of the Sudanese political party the National Islamic Front, offered Osama Bin Laden and

Al-Qaeda refuge in Sudan from 1991 until 1996, when Bin Laden was expelled from Sudan.   *See*

*Flanagan*, 87 F. Supp. 3d at 99.   The Court also found that even after 1996, and in "[e]ach year

from 1997 through 2000, Sudan continued to serve as a meeting place, safe haven, and training

hub for Al-Qaeda and other terrorist groups."   *Id.*   The Court found that Sudan's safe haven

allowed the organization to "'plan more freely.'"   *Id.* at 101 (quoting Hr'g Tr. at 112:5–113:12

(testimony of Dale L. Watson)).

---

[3] Now-retired Magistrate Judge Facciola presided over the evidentiary hearing.
Following Judge Facciola's retirement, however, the undersigned issued Findings of Fact and
Conclusions of Law after certifying under Federal Rule of Civil Procedure 63 that the
undersigned had "reviewed the docket, the pleadings, and the evidentiary hearing transcript and
[was] familiar with the record in this case," that the Court could "issue findings of fact and
conclusions of law without prejudice to the plaintiffs, the only participating parties in this case,
nor to the defendants who did not appear," and that there was no need to recall any witnesses.
*See* Rule 63 Certification, ECF No. 46; *see also* Fed. R. Civ. P. 63.

Beyond providing a safe haven for Bin Laden and Al-Qaeda, generally, the Court found that Sudan had provided material support in three more concrete ways. First, Bin Laden had "established several joint business ventures with the Sudanese regime," which he maintained "even after his expulsion from Sudan." *Id.* These business interests flourished and allowed Al-Qaeda "to funnel money for terrorist activities through Sudanese banks and Sudanese-based legitimate businesses, therefore overcoming the difficulties in transferring funds the group would have otherwise faced." *Id.* (quoting Vidino Aff. ¶ 35). Second, the Court found that Sudan had provided support for training, in part because Bin Laden had financed at least three terrorist training camps in Sudan and because the Sudanese had allowed his organization to operate freely in the country. *Id.* at 102. Finally, the Court found that Sudan had facilitated Bin Laden's and Al-Qaeda's travel by providing its members with Sudanese travel documentation and passports, avoiding stamping non-Sudanese passports with a stamp from Sudan (which "would have raised the attention of immigration officials in other countries"), and exempted Al-Qaeda and its members from paying taxes or import duties (which permitted the organization to bring containers into Sudan without inspection). *Id.* (quoting Vidino Aff. ¶ 42) (internal quotation mark omitted). Ultimately, the Court concluded that "Bin Laden and Al-Qaeda would not have been able to carry out the attack on the Cole without the support of the Sudanese defendants," *id.* at 103, because Sudan's material support "was indispensable" for Al-Qaeda "not just to survive but also to then develop the expertise, technical knowledge and wide network of contacts that allowed it to flourish as a terrorist organization and carry out the USS Cole bombing," *id.* at 103 (quoting Vidino Aff. ¶ 81).

Based on Plaintiffs' allegations and the evidence provided, the Court concluded that it could assert jurisdiction over Sudan and Iran because Plaintiffs sought money damages "for an

extrajudicial killing that was caused by the provision of material support or resources (financial support, support for training, and facilitation of travel) to Bin Laden and Al-Qaeda." *Flanagan*, 87 F. Supp. 3d at 113.   The Court similarly found that Plaintiffs had established, "with evidence satisfactory to the Court," that Sudan and Iran, "through the provision of material support and resources . . . facilitated the planning and execution of the attack on the Cole, which resulted in the extrajudicial killing of Kevin Rux." *Id.* at 115.   Consistent with the Court's Findings of Fact and Conclusions of Law, the Clerk entered a judgment for Plaintiffs against the Iranian and Sudanese defendants, awarding Plaintiffs an aggregate of $18,750,000.00 in compensatory damages and $56,250,000.00 in punitive damages.   *See* Am. Judgment, ECF No. 50.

Nearly two months later—and over four years after being served with a copy of the summons and complaint in this case—Sudan belatedly appeared in this action.   Sudan has now filed a motion to vacate the default judgment.[4]

---

[4] Local Civil Rule 7(g) provides that a "motion to vacate an entry of default, or a judgment by default, or both, shall be accompanied by a verified answer presenting a defense sufficient to bar the claim in whole or in part." Local Civ. R. 7(g).   Plaintiffs do not directly argue that Sudan's motion is infirm for failure to comply with this rule, so the Court will not consider the issue.   *See* Pls.' Opp'n at 13, ECF No. 60.   In any event, Sudan points out that courts in this district have questioned how this rule operates when a party seeks to vacate an entry of default on jurisdictional grounds, and courts have excused strict compliance with the rule when a foreign state defendant expressly sought to modify the requirement and proposed to file an answer if the default judgment was vacated.   *See* Sudan's Mot. at 29; *see also Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 9 (D.D.C. 2005) (noting that Federal Rule of Civil Procedure 12(b) allows a party to submit a motion to dismiss in lieu of an answer, and that courts "routinely allow defendants to file a motion to dismiss in place of an answer despite a prior entry of default, and this Court is unaware of any decision in which a court has struck a motion to dismiss following an entry of default because the motion to vacate the default was filed without an answer"); *Acree v. Republic of Iraq*, 658 F. Supp. 2d 124, 128 (D.D.C. 2009) (noting that Iraq had both requested that the court modify the Local Rule's application in that case and proposed a schedule to file a dispositive motion if the default was set aside).   Here, Sudan requested that it be permitted "to file an answer within seven business days of any order vacating the Default Judgment."   Sudan's Mot. at 29.

## III.  ANALYSIS

As a threshold matter, the Court must determine whether Rule 55's "good cause" standard or the more stringent requirements of Rule 60 govern the Court's consideration of Sudan's motion.  Although the resolution of this issue is somewhat uncertain, particularly in the FSIA context, the Court ultimately concludes that Sudan has the better argument and that Rule 55(c) applies here.  The Court then proceeds to apply that test.  Although the Court rejects the bulk of Sudan's motion, the Court will grant Sudan's motion with respect to the punitive damages award.

### A.  Whether Rule 60 or Rule 55 Applies

The parties first dispute whether the Court should consider Sudan's motion under Federal Rule of Civil Procedure 60(b) or Rule 55(c).  Plaintiffs argue that the standard under Rule 60(b) for setting aside a final judgment applies, while Sudan contends that Rule 55(c)'s "good cause" standard applies.

Under Rule 55(c), a defendant's default may be set aside for "good cause."  *See* Fed. R. Civ. P. 55(c).  Although that rule speaks only of a defendant's default, "even after a judgment is entered . . . the rule 55(c) standard should apply unless the default judgment is final and appealable."  *Jackson v. Beech*, 636 F.2d 831, 836 n.7 (D.C. Cir. 1980).  A district court exercising its discretion to set aside an entry of default or a non-final default judgment must consider, and balance: "whether (1) the default was willful, (2) a set-aside would prejudice plaintiff, and (3) the alleged defense [is] meritorious."  *Keegel v. Key W. & Caribbean Trading Co.*, 627 F.2d 372, 373 (D.C. Cir. 1980); *see Mohamad v. Rajoub*, 634 F.3d 604, 606 (D.C. Cir. 2011).  When determining whether a defendant's proffered defense is meritorious, the "[l]ikelihood of success is not the measure."  *Keegel*, 627 F.2d at 374.  Instead, a defendant's

"allegations are meritorious if they contain 'even a hint of a suggestion' which, [if] proven at trial, would constitute a complete defense." *Id.*

A *final* default judgment, by contrast, can be set aside only under the more stringent standard of Rule 60(b). *See* Fed. R. Civ. P. 60(b); Fed. R. Civ. P. 55(c) ("The court . . . may set aside a final default judgment under Rule 60(b)."); *accord Jackson*, 636 F.2d at 835. Rule 60(b) states that a district court "may relieve a party . . . from a final judgment" in six identified circumstances, including where there has been "mistake, inadvertence, surprise, or excusable neglect," where "the judgment is void," or if the court identifies "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(1)–(6). The standard is a more rigorous one because it more deeply implicates issues of finality even though, under certain prongs, a court must consider some of the same factors as under Rule 55. *See Jackson*, 636 F.2d at 835; *Int'l Painters & Allied Trades Union & Indus. Pension Fund v. H.W. Ellis Painting Co.*, 288 F. Supp. 2d 22, 26 (D.D.C. 2003); *see also Shatsky v. Syrian Arab Republic*, 795 F. Supp. 2d 79, 82 (D.D.C. 2011) ("The Rule 55(c) standard is notably less strict than the standard for vacating a default judgment under Rule 60(b).").

The largest hurdle for a defendant seeking to set aside a default judgment under Rule 60(b) is that a defendant is, for the most part, foreclosed from challenging the underlying merits of the plaintiff's claims. For example, the Supreme Court has held that a judgment is not void under Rule 60(b)(4) "'simply because it is or may have been erroneous'"; instead, the judgment must be "so affected by a fundamental infirmity that the infirmity may be raised even after the judgment becomes final." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270 (2010) (quoting *Hoult v. Hoult*, 57 F.3d 1, 6 (1st Cir. 1995)). The D.C. Circuit has likewise explained— in the FSIA context, no less—that a defendant who fails to appear may assert a jurisdictional

objection under Rule 60(b).  *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1547 (D.C. Cir. 1987).  But, as a consequence of his default, the defendant "ordinarily forfeits his right to defend on the merits," and if he "loses on the jurisdictional issue . . . his day in court is normally over."  *Id.*

Sudan argues that the more lenient Rule 55(c) "good cause" standard applies here because the default judgment entered against it is not final and appealable, as it did not "adjudicate all claims of all parties, namely those against Defendant Syrian Arab Republic and the Agencies and Instrumentalities of the Syrian Arab Republic."  Sudan's Mot. at 4.  Federal Rule of Civil Procedure 54(b) instructs that, typically, an order or decision that adjudicates the liabilities of fewer than all parties "does not end the action *as to any* of the claims or parties." Fed. R. Civ. P. 54(b) (emphasis added).  Here, although the Plaintiffs named Syria and several of its agents and instrumentalities as defendants, Plaintiffs claim that they have been unable to serve those parties to date.  *See* Pls.' Status Report on Service of Process Upon the Syrian Defs., ECF No. 64; Pls.' Status Report on the Syrian Defs., ECF No. 51; Pls.' Status Report, ECF No. 28; Pls.' Status Report, ECF No. 25; Pls.' Status Report on Service of Process, ECF No. 23; Pls.' Status Report on Service of Process, ECF No. 22.

In response, Plaintiffs point to an exception that the D.C. Circuit has recognized for unserved defendants.  As the Circuit has explained, "defendants that have not been subject to effective service are not 'parties' within the meaning of Rule 54(b)."  *Cambridge Holdings Grp., Inc. v. Fed. Ins. Co.*, 489 F.3d 1356, 1360 (D.C. Cir. 2007); *see* 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3914.7, at 553–54 (2d ed. 1992) ("It is widely agreed that defendants who have not been served with process are not counted; a disposition as to all those who have been served is final.").  In such circumstances, "a

district court order disposing of all claims against all properly served defendants satisfies the requirements of Rule 54(b), even if claims against those not properly served remain unresolved." *Cambridge Holdings Grp.*, 489 F.3d at 1360–61.  Plaintiffs urge that because the judgment entered against Iran and Sudan resolved the claims against all defendants who had been served, the Court's judgment was final and appealable when entered, and Sudan must now meet the Rule 60(b) standard to set that judgment aside.

At first blush, then, it would seem that Rule 60(b) continues to apply.  In its Reply, however, Sudan raises two grounds for concluding otherwise.  *See* Sudan's Reply at 1–4, ECF No. 61.

First, Sudan claims that "unbeknownst to Plaintiffs, they have in fact effectuated service against the Syrian Defendants."  *Id.* at 1.  Specifically, they note that Plaintiffs attempted to serve Syria under 28 U.S.C. § 1608(a)(3), which provides for service "by sending a copy of the summons and complaint . . . , by any form of mail requiring a signed receipt, . . . to the head of the ministry of foreign affairs of the foreign state concerned."  28 U.S.C. § 1608(a)(3).  Sudan notes that when Plaintiffs thereafter requested that the Clerk provide documents to the State Department for diplomatic service under section 1608(a)(4), Plaintiffs attached notifications from DHL which state that the "Recipient refused delivery" of the Syria documents.  *See* ECF No. 19, Ex. A.  Sudan cites several cases for the proposition that, when a defendant has refused delivery of the summons, service has nevertheless been effectuated and personal jurisdiction has been acquired.  *See, e.g.*, *Nikwei v. Ross Sch. of Aviation, Inc.*, 822 F.2d 939, 945 (10th Cir. 1987) (citing cases and explaining that "courts view service by registered or certified mail as being complete when such is refused though the act of the defendant").

The Court rejects this contention.  For one thing, the statute is silent on whether a refused mailing is sufficient to effectuate service under the FSIA.  Whatever the applicability of the principle that refused service is effective service in a typical case, the Court is reticent to read one into the FSIA context.  The Supreme Court has cautioned that, because "foreign sovereign immunity is a matter of grace and comity rather than a constitutional requirement," it has "'consistently . . . deferred to the decisions of the political branches . . . on whether to take jurisdiction' over particular actions against foreign sovereigns and their instrumentalities." *Republic of Austria v. Altmann*, 541 U.S. 677, 689 (2004) (first omission in original) (quoting *Verlinden*, 461 U.S. at 486).  In part out of this deference in the delicate area of international affairs, courts have held that, "[w]hen serving a foreign sovereign, 'strict adherence to the terms of 1608(a) is required.'"  *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994)).  Indeed, the D.C. Circuit has noted that, although actual notice may suffice for service of a foreign state's *agent* under section 1608(b), nothing in the statute indicates that Congress was similarly "concerned with substance rather than form" when codifying the requirements for service on a foreign state or its political subdivisions under section 1608(a).  *See Transaero*, 30 F.3d at 154.  To the contrary, the circuit concluded that section 1608(a) mandated service on a foreign state's Ministry of Foreign Affairs, "the department most likely to understand American procedure."  *Id.*  Thus, "neither substantial compliance, nor actual notice" suffices under section 1608(a)(3).  *Barot*, 785 F.3d at 27.  In light of these concerns, the Court thinks it unlikely that Congress intended a United States court's exercise of jurisdiction over a foreign sovereign to rise and fall on whether a low-level employee at the Ministry of Foreign Affairs accepted the summons and complaint.  *Cf.* Fed. R. Civ. P. 4 advisory committee's note to 1993 amendment

(explaining that the United States government is "not expected to waive service for the reason that its mail receiving facilities are inadequate to assure that the notice is actually received by the correct person in the Department of Justice," and noting that the same principle applies to "other governments," including foreign governments, subject to service under Rule 4(j)).

Furthermore, Sudan has pointed to no case applying this principle in the FSIA context. In fact, the weight of authority cuts decisively against Sudan.  There exist at least half a dozen cases in which courts note that service under section 1608(a)(3) was ineffective precisely because service was refused.  *See Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008) (noting that service under section 1608(a)(3) was "not possible here" because "[p]laintiffs attempted service on August 18, 2006, under § 1608(a)(3), but the recipients refused delivery on August 26, 2006, and the package was returned"); *Opati v. Republic of Sudan*, 978 F. Supp. 2d 65, 67 (D.D.C. 2013) (explaining that "Plaintiffs were unsuccessful in effecting service under section 1608(a)(3)" because "[e]ach mailing was refused by the defendants, and the summonses returned unexecuted"); *see also, e.g.*, *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 67 (D.D.C. 2010); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 70 (D.D.C. 2010); *Nikbin v. Islamic Republic of Iran*, 471 F. Supp. 2d 53, 60 (D.D.C. 2007); *Doe v. Holy See*, No. 13-128, 2014 WL 3909136, at *3 (E.D. La. Aug. 11, 2014).

Although these cases do not explicitly discuss the issue, in each case the court noted that service was effectuated only after the Secretary of State served the defendant through diplomatic channels pursuant to section 1608(a)(4).  *See, e.g.*, *Valore*, 700 F. Supp. 2d at 70 (noting that, after "service was refused" under § 1608(a)(3), plaintiffs requested that "the Secretary of State transmit[] one copy of the documents to Iran via a diplomatic note though the Embassy of the Swiss Confederation while returning the other copy to the clerk," and therefore that plaintiffs had

"properly served defendants under § 1608(a)(4)"); *Nikbin*, 471 F. Supp. 2d at 60 ("The Ministry

refused these documents. . . . Having failed to complete service against the Iranian sovereign

defendants through the preferred method, Nikbin resorted to the procedures described in §

1608(a)(4)."). Because section 1608(a)(4) specifically provides that diplomatic service may only

be used if "service cannot be made within 30 days under paragraph (3)," 28 U.S.C. § 1608(a)(4),

these cases imply that each court believed the refused-service was ineffective. Furthermore, the

State Department advises in a circular that it "will not accept a request for service under Section

1608(a)(4) if the other methods for service in Section 1608(a) have not been exhausted."

*Foreign Sovereign Immunities Act*, U.S. Dep't of State, Bureau of Consular Affairs,

https://travel.state.gov/content/travel/en/legal-considerations/judicial/service-of-process/foreign-

sovereign-immunities-act.html (last visited June 2, 2016). Thus, it would be exceedingly odd if

the State Department was regularly using its limited resources to serve defendants in FSIA cases

where those defendants had already been effectively served—and acting contrary to the statute

and its own guidance.

In the face of this implicit authority—and absent any contrary indication in the statute—

the Court believes it unlikely that Congress envisioned service would be accomplished under

section 1608(a)(3), and personal jurisdiction would attach over a foreign state, when service is

returned as refused. *See Cambridge Holdings Grp.*, 489 F.3d at 1361 ("[U]nless the procedural

requirements of effective service of process have been satisfied, the court lacks personal

jurisdiction to act with respect to that defendant at all."). In such circumstances it is, at best, a

tenuous assumption that the relevant foreign official even has actual notice of the lawsuit.

Accordingly, the Court finds that Syria remains unserved, and turns to Sudan's second

contention. Sudan highlights a footnote in the D.C. Circuit's decision in *Cambridge* in which the

court noted that it took "no position" on a limitation the Ninth Circuit has added to the rule that

an unserved defendant should be discounted for finality purposes.  489 F.3d at 1360 n.2.  In that

footnote, the D.C. Circuit explained that the Ninth Circuit has "qualified the other circuits'

approach by holding that an order disposing of all claims only against served parties is not final

if 'it is clear from the course of proceedings that further adjudication is contemplated' by the

district court."  *Id.* (quoting *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d

861, 871–72 (9th Cir. 2004)).  As evidence that additional proceedings are anticipated in this

case, Sudan points to the Plaintiffs' express intention to reserve their claims against Syria until

they are able to properly serve them in the future.[5]  *See* Sudan's Reply at 2; *see also* Pls.' Status

Report on the Syrian Defs. ¶ 4, ECF No. 51 ("[P]laintiffs respectfully request that this Court hold

plaintiffs' claims against the Syrian defendants in abeyance until service of process is

achieved.").  Recently, Plaintiffs advised the Court that the State Department is now accepting

documents for service through the Government of the Czech Republic, and Plaintiffs represent

that they are in the process of resubmitting the requisite service documents to the State

Department.  *See* Pls.' Status Report on Service of Process Upon the Syrian Defs. ¶ 5, ECF No.

64.

    With misgivings—and without the guidance of any on-point authority discussing

unserved defendants in the FSIA context—the Court finds that Sudan's argument controls.

---

[5] Sudan also points out that the Court's default judgment "d[id] not include a Rule 54(b) certification that the judgment was final as to Sudan."  Sudan's Mot. at 4.  Like other courts, the Court does not consider this fact determinative.  *Accord, e.g.*, *Gomez v. Gov't of the Virgin Islands*, 882 F.2d 733, 736 (3d Cir. 1989); *Nagle v. Lee*, 807 F.2d 435, 438 (5th Cir. 1987); *see* 10 James W. Moore, *Moore's Federal Practice* § 54.25[2], at 54-81–82 (3d ed. 2016) ("[I]f the unadjudicated claims relate only to defendants who were not served with process . . . , it is generally held that an order disposing of the interests of the parties who actively participated in the litigation is final despite the absence of a Rule 54(b) certificate.").

While the D.C. Circuit did not expressly endorse that exception in *Cambridge*, it did rest its interpretation of Rule 54(b) on the fact that a court's "failure to dispose of a claim against a served party renders an order unappealable because such a claim *will necessarily involve further action* by the parties or the district court." 489 F.3d at 1361 (emphasis added). The circuit contrasted that situation with those circumstances in which "only an unserved defendant remains" because, in the latter circumstance, "there is generally no reason to anticipate additional proceedings before the district court."[6] *Id.* Thus, the circuit's interpretation of Rule 54(b) depended, in some respect, on distinguishing between cases in which a case has been completed at the district court level and those in which future action is anticipated. And, in the absence of D.C. Circuit precedent, the Ninth Circuit's is instructive. In the limited number of cases applying the exception for future proceedings, that circuit has asked whether there is a possibility of future service on the unserved defendants. *See Disabled Rights*, 375 F.3d at 871 (finding that additional proceedings were anticipated in part because the plaintiff was "free to serve" the remaining defendant "if it wished to do so," and had informed the district court that it planned to do so); *accord Martinez v. Aero Caribbean*, 577 F. App'x 682, 683 (9th Cir. 2014) (relying on the fact that *Disabled Rights* had noted that plaintiffs remained free to serve the unserved defendants, and finding that a judgment was not final because plaintiffs continued attempting to,

---

[6] Cautioning, again, that the D.C. Circuit expressly noted it would not resolve whether to apply an exception for cases in which additional district court proceedings are clearly envisioned, the Court notes that other circuits have rejected such a rule. For example, the Fifth Circuit has held that "[t]he status of all remaining defendants as unserved and nonappearing is dispositive," and has rejected a "likelihood of further adjudication test." *Fed. Sav. & Loan Ins. v. Tullos-Pierremont*, 894 F.2d 1469, 1473 (5th Cir. 1990). As that circuit explained, such an exception would "necessarily swallow the rule" because "in nearly every case it is almost certain that at *some* time *some* further district court action will be taken in the case respecting the claim against that defendant, *viz.*: either the case will be dismissed prior to service, whether voluntarily or [due to] failure to prosecute or under Fed. R. Civ. P. 4(j) for failure to serve, or service will be effected and there will then be some district court disposition." *Id.* (emphasis in original).

and later succeeded in, serving the unserved defendants).  In this case, there is every indication that additional proceedings before the district court will be forthcoming.  Plaintiffs have plainly told the Court as much.  As a result, the Court's default judgment was not final because it did not dispose of Plaintiffs' claims against Syria, a party against whom future proceedings are contemplated.

At the same time, the Court notes that it may well be appropriate to apply a different rule in the FSIA context.  It is well established that "the requirement of finality is to be given a 'practical rather than a technical construction.'"  *Gillespie v. U.S. Steel Corp.*, 379 U.S. 148, 152 (1964) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)); *accord United States v. Legal Servs. for N.Y.C.*, 249 F.3d 1077, 1081 (D.C. Cir. 2001) ("The considerations we employ to evaluate finality are more practical than technical and do not require that the order appealed be the last order possible in the matter.").  Under Federal Rule of Civil Procedure 4(m), a party typically has only ninety days[7] to serve a defendant, although that time period can be extended for good cause.  *See* Fed. R. Civ. P. 4(m).  Thus, in many cases, it may be that by the time the court has entered final judgment as to all served defendants, service on the unserved defendants would be untimely.  In those circumstances, the court's judgment as to all served defendants "'effectively terminates' the plaintiff's litigation."  *Manley v. City of Chicago*, 236 F.3d 392, 395 (7th Cir. 2001) (quoting *United States v. 8136 S. Dobson St., Chicago, Ill.*, 125 F.3d 1076, 1081 (7th Cir. 1997)) (applying Seventh Circuit rule that the presence of a unserved defendant does not defeat finality when a plaintiff's attempt to serve an unserved defendant would remain timely under Rule 4(m)).

---

[7] Until recently, Rule 4(m) provided a plaintiff with 120 days to serve a defendant.  *See* Fed. R. Civ. P. 4 advisory committee's note to 2015 amendment ("The presumptive time for serving a defendant is reduced from 120 days to 90 days.").

But because service on a foreign state is expressly exempted from Rule 4(m)'s time limit, *see* Fed. R. Civ. P. 4(m) ("This subdivision (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1)."), it is more likely in a FSIA case that a plaintiff will retain the option of serving an unserved defendant by the time a default judgment is entered, or even thereafter.  And because default judgments appear to be a frequent phenomenon in FSIA cases— particularly those seeking to waive immunity under § 1605A(a)(1)—this temporal reality has practical consequences for FSIA plaintiffs and defendants alike.  For plaintiffs, whether Rule 55(c) or Rule 60 applies, and therefore the ease with which a foreign state who has defaulted (even willfully) may set aside the default judgment, will on occasion depend on the fortuitous and somewhat arbitrary fact that the plaintiffs have named a foreign co-defendant against whom they are unable to effectuate service for a period of time.  Unlike many situations in which a plaintiff fails to serve a defendant under Rule 4, the plaintiff's ability (or inability) to serve a foreign state may be out of her control.  *See* Pls.' Status Report ¶ 1, ECF No. 23 (explaining that the State Department informed Plaintiffs that, "due to the 'deteriorating security situation' in Syria, Poland, the United States' protecting power in Syria, has suspended its embassy operations there").

The difference may also be outcome determinative: as the Court indicates below, it would rule against Sudan on all fronts if Rule 60(b) applies, *see infra* notes 21 & 27, and another court has rejected the same argument on which Sudan succeeds here, largely because that court applied Rule 60(b), *see Owens*, 2016 WL 1170919, at *34 (rejecting Sudan's argument that the punitive damages awards should be vacated because Sudan "completely failed to explain why" those claims of "nonjurisdictional legal error," "even if persuasive, come within the ambit of Rule 60(b)(6)").  For defendants, on the other hand, the ability to immediately appeal a FSIA

19

judgment is implicated.  Indeed, there is considerable irony in that fact that, under Sudan's

preferred rule, a foreign state that *does* appear and defend on the merits will be precluded from

appealing any adverse decision so long as an unserved foreign state remains in the case, unless

the district court issues a Rule 54(b) certification.  *See* Fed. R. Civ. P. 54(b) (". . . [T]he court

may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only

if the court expressly determines that there is no just reason for delay.").

These practical realities may lead one to question whether a court should consider the

possibility of future adjudication as heavily in a FSIA case.  Nevertheless, the Court at present

will adhere to the spirit of the D.C. Circuit's logic in *Cambridge*.  Plaintiffs indicate that they

plan to serve the Syrian defendants when diplomatic service under section 1608(a)(4) becomes

possible, and now represent that they are in the process of seeking such service; future action in

this case is therefore likely, and the Court's default judgment against Iran and Syria was not final

and appealable.[8]  As a result, the Court will proceed to consider whether Sudan has shown "good

cause" to set aside the default judgment, balancing "whether (1) the default was willful, (2) a set-

aside would prejudice plaintiff, and (3) the alleged defense [is] meritorious."  *Keegel*, 627 F.2d at

373.

### B.  The Willfulness of Sudan's Default

The Court first considers whether Sudan's default was willful.  "The boundary of

willfulness lies somewhere between a case involving a negligent filing error, which is normally

considered an excusable failure to respond, and a deliberate decision to default, which is

generally not excusable."  *Int'l Painters*, 288 F. Supp. 2d at 26.  Sudan presents two basic

---

[8] In light of these concerns, however, the Court will issue a Rule 54(b) certification for the default judgment entered against Iran.

arguments for why its default should be excused as not willful: it claims (1) that it was preoccupied by civil unrest and political turmoil at home and (2) that it lacked an understanding of the United States litigation process and the gravity of the consequences that might follow from its failure to appear. *See* Sudan's Mot. at 27–28. Yet, Sudan was absent from this action for an exorbitant period of time. Coupled with Sudan's history of litigating, and abandoning, other FSIA actions against it, the record paints a decidedly different picture. As a result, the Court concludes that Sudan's default in this case constituted a "deliberate decision to default." *Int'l Painters*, 288 F. Supp. 2d at 26.

First, Sudan has identified no case in which a court found a defendant's default not willful after the defendant was absent for such a lengthy period of time. Service was effectuated on Sudan on January 30, 2011. *See* Return of Service Aff., ECF No. 15. For over four years Plaintiffs' case continued apace. The Clerk entered default against Sudan on October 31, 2012. *See* ECF No. 27. The Court then held an evidentiary hearing on August 12, 2014, three-and-a-half years after Sudan was served, and issued a lengthy opinion on March 31, 2015. Only after two more months had elapsed did Sudan finally appear and file the present motion. This time period is not comparable to those that were excused in the cases Sudan cites—in many of which the court, in any event, found the defendant's default willful but set aside the entry of default for other reasons. *See, e.g.*, *Shatsky*, 795 F. Supp. 2d at 81–82 (finding default willful, but nevertheless setting aside default, when motion was filed two and a half years after default was entered, but before a default judgment was entered); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 675 F. Supp. 2d 104, 108–09 (D.D.C. 2009) (finding default willful, but nevertheless setting aside default, where defendants filed a motion to vacate the Clerk's entry of default six months after default was entered); *Biton v. Palestinian Interim Self Gov't Auth.*, 233 F. Supp. 2d

31, 32–33 (D.D.C. 2002) (resolving "doubt" in favor of defendants, and finding default not

willful, where defendants filed a motion to set aside default "shortly after" Clerk's entry of

default, and within five months of when plaintiffs had filed a second amended complaint).

Simply put, the Court finds the length of Sudan's absence from this case different in kind.  *Cf.*

*Owens*, 2016 WL 1170919, at *7 (finding Sudan's conduct did not constitute excusable neglect

under Rule 60(b) where Sudan "was absent from this litigation for just over *four years*, and it

was only after nearly *five years* that Sudan filed the first of these motions to vacate" (emphasis in

original)).

Second, Sudan's explanation that it was preoccupied by troubles at home is unpersuasive.

Sudan has provided a declaration from its ambassador to the United States, Ambassador Maowia

O. Khalid, which explains that its failure to appear was "principally during periods of well-

known civil unrest and political turmoil in Sudan, in addition to times of natural disaster."  Decl.

of Ambassador Maowia O. Khalid ¶ 4, ECF No. 55-2 [hereinafter "Khalid Decl."].  In addition,

Ambassador Khalid asserts that "the cession of [S]outh Sudan and the attendant and protracted

diplomatic moves and negotiations completely pre-occupied the Government of Sudan and

necessitated the diversion of all meager legal and diplomatic personnel to that process."  *Id.*

Courts have considered whether domestic circumstances hindered a foreign state's ability to

respond in a timely manner, and have held in foreign states' favor when the failure to file a

response "was in considerable measure out of the [foreign state]'s control."  *FG Hemisphere*

*Assocs., LLC v. Democratic Republic of Congo*, 447 F.3d 835, 840 (D.C. Cir. 2006).  Yet, even

absolving Sudan of any responsibility for its domestic turmoil,[9] nothing in the record indicates

---

[9] A proposition that might be doubtful in some respects, as Plaintiffs point out.  *Accord Owens*, 2016 WL 1170919, at *8.

that Sudan attempted, but was unable, to converse with attorneys, its counsel, or the Court, during this extended period of time. *Cf. id.* at 841 (noting that the Democratic Republic of the Congo was "hampered by its devastating civil war," which was "accompanied by substantial confusion over responsibilities in the Foreign Ministry" and which explained defendants' two-month delay in responding to plaintiffs' motion). Nor does Sudan argue that it was unaware of this lawsuit (which, given the fact that service was effectuated in January 2011, would be difficult). At most, Sudan's memorandum and the affidavit of its ambassador indicate that Sudan was preoccupied with pressing domestic matters and, thus, affirmatively *chose* to deprioritize its response in this case. The domestic realities Sudan faced may have been a reason to seek an extension of Sudan's filing deadlines, or a stay of this case. *See Owens*, 2016 WL 1170919, at *8. But, without more, they do not absolve Sudan from its decision to wholly abdicate any defense in this case for a period of several years. *Id.* ("The idea that the relevant Sudanese officials could not find the opportunity over a period of *years* to send so much as a single letter or email communicating Sudan's desire but inability to participate in these cases is, quite literally, incredible." (emphasis in original)).

Finally, the Court also finds unavailing Sudan's claims that it had "a fundamental lack of understanding . . . about the litigation process in the United States, in particular surrounding the limits of foreign sovereign immunity and developments in that area of law," and that it "failed to appreciate the gravity of the potential consequence of its absence." Khalid Decl. ¶ 5. Those contentions are specious in light of Sudan's litigation of similar issues in other cases before its default here. *See Shatsky*, 795 F. Supp. 2d at 83 (considering "defendants' conduct in parallel cases"); *see also Owens*, 2016 WL 1170919, at *7–11. Prior to 2006, Sudan had hired U.S. counsel and did appear in several cases in this and other courts. In those actions Sudan asserted

jurisdictional defenses under the FSIA as grounds for dismissal.  *See, e.g.*, *Owens v. Republic of Sudan*, 531 F.3d 884 (D.C. Cir. 2008); *Rux v. Republic of Sudan*, 461 F.3d 461 (4th Cir. 2006); *Owens v. Republic of Sudan*, 412 F. Supp. 2d 99 (D.D.C. 2006).  This fact fatally undermines Sudan's claim that it lacked the understanding or ability to navigate the United States' legal system or defend against civil litigation involving sovereign immunity issues.  Moreover, although Sudan notes, accurately, that it has not previously appeared or sought to have a default judgment vacated in *this* particular action, Sudan's Reply at 19, it did previously default and then seek to set aside that default in another case involving the U.S.S. Cole and the very same decedent as in this case, only to turn around and default a second time after the court denied Sudan's motion to dismiss.  *See Rux v. Republic of Sudan*, No. Civ. A. 2:04-cv-428, 2005 WL 2086202, at *2–3, *12–13 (E.D. Va. Aug. 26, 2005) (explaining procedural history, including Sudan's default, and motion to vacate entry of default, and denying Sudan's motion to dismiss for want of subject matter jurisdiction); *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 543 (E.D. Va. 2007) (noting that, "[a]fter failing to have Plaintiffs' Complaint dismissed in its entirety, Sudan notified the Court by letter on October 25, 2006, that it would 'not defend or otherwise participate in this proceeding on the merits'").  Sudan did the same in a similar case involving the 1998 bombing of the United States embassies in Kenya and Tanzania, *see Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 8–10 & n.5 (D.D.C. 2005); *see also Owens*, 2016 WL 1170919, at *9 (finding Sudan's argument unpersuasive on this ground, as applied to several separate actions in addition to the *Owens* case, because "the fundamental-ignorance card cannot convincingly be played a second time, especially not after hiring sophisticated U.S. legal counsel, as Sudan did in 2004").  Given that Sudan has already seen the consequences of

defaulting, it is difficult to credit Sudan's claim that it did not appreciate the gravity of its absence.

Sudan also contends that, because the FSIA was amended in 2008 to allow plaintiffs to collect punitive damages for the first time, "Sudan could not possibly have anticipated or understood the ramifications of these unprecedented amendments." Sudan's Reply at 21. Yet, for purposes of this Court's *jurisdiction* or Sudan's *immunity*, the 2008 Amendments did not herald the dramatic change Sudan claims. The FSIA immunity exception Plaintiffs rely upon here previously existed in subsection 1605(a)(7). When that subsection was recodified in section 1605A, the immunity exception was not substantially changed except that it created a new federal cause of action, provided for punitive damages, and provided for recovery by military service members and government contractors. Moreover, Sudan had already participated in litigation claiming, and courts had issued opinions holding, that Sudan lacked immunity under section 1605(a)(7) for providing material support for other acts of terrorism by Al-Qaeda. In fact, one of those decisions was issued after the 2008 FSIA amendments and expressly relied on, and found jurisdiction under, section 1605A. *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 147 (D.D.C. 2011) (explaining repeal of 1605(a)(7) and replacement with section 1605A); *id.* at 148–51 (finding jurisdiction under section 1605A). To be sure, Sudan may have not appreciated that punitive damages might now be available for its conduct. Sudan cannot seriously contend, however, that it failed to understand the possibility that immunity would be unavailable or that subject-matter jurisdiction would be found.

In sum, the Court concludes that Sudan's default in this case was willful.[10]

---

[10] Sudan notes that under Rule 55(c) "all doubts are resolved in favor of the party seeking relief," *Jackson*, 636 F.2d at 836, and identifies cases in which courts have accorded foreign state defendants the benefit of the doubt despite strong evidence that the defendant defaulted willfully,

## C.  The Prejudice to Plaintiffs

Sudan's willful abdication also posed not-insubstantial costs for Plaintiffs.  To set aside the default judgments now would cause prejudice to Plaintiffs.  In assessing prejudice, courts consider the possible, tangible harms that may flow from a party's delayed appearance in the case, including the "'loss of evidence, increased difficulties of discovery, and an enhanced opportunity for fraud or collusion.'"  *Gilmore*, 675 F. Supp. 2d at 110 (quoting *Fed. Dep. Ins. Corp. v. Francisco Inv. Corp.*, 873 F.2d 474, 479 (1st Cir. 1989)).  As Sudan notes, "delay in and of itself does not constitute prejudice."  *Haskins*, 755 F. Supp. 2d at 130–31.  But there is more than delay apparent in this case.

Plaintiffs posit that, during Sudan's absence, "critical witnesses have died or been killed, numerous personnel at all levels of the government have left their positions, and undoubtedly governmental records have been destroyed."  Pls.' Opp'n at 14, ECF No. 60.  Plaintiffs therefore argue that there "can be no doubt that the Plaintiffs will be materially and actually prejudiced in their effort to take discovery."  *Id.*  Sudan casts this argument as conclusory—and in some respects, it is.  But, as the movant seeking to demonstrate "good cause," Sudan has the burden to

---

*see Biton*, 233 F. Supp. 2d at 33.  Based on the totality of the factors discussed above, however, the Court here perceives no doubt.

The Court also notes that a court may "deny a motion to vacate based solely on a finding that the default was willful."  *Shatsky*, 795 F. Supp. 2d at 82.  At the same time, courts may elect to set aside an entry of default or a default judgment even if there is some evidence indicating that the defendant defaulted willfully.  *See, e.g.*, *Haskins v. U.S. Transp. LLC*, 755 F. Supp. 2d 126, 131 (D.D.C. 2010); *Owens*, 374 F. Supp. 2d at 10 n.5; *see also Knox v. Palestine Liberation Org.*, 248 F.R.D. 420, 425–26 (S.D.N.Y. 2008).  Thus, Sudan is correct to argue that its motion may still be granted even if Sudan's default is deemed willful.  *See* Sudan's Mot. at 28.  But this simply confirms that whether to grant a motion to set aside a default judgment is a discretionary decision to be made by balancing each of the relevant factors.  And here, as explained below, Sudan has also not proffered a meritorious defense with respect to three of the arguments it presses.  The Court emphasizes that where it denies Sudan's motion, it does not do so solely because Sudan's default was willful.

show that setting aside the default judgment will pose no prejudice for Plaintiffs.  And Sudan's

complaint that Plaintiffs "identify no such witnesses or personnel," Sudan's Reply at 22, is rich.

Of course Plaintiffs cannot identify particular, relevant personnel; as a consequence of Sudan's

default, they have had no access to relevant discovery in this case for over four years.  In

addition, the Court takes judicial notice that, even among those officials Plaintiffs *have*

identified, at least one critical individual has died: Hassan al Turabi, the head of the National

Islamic Front who offered Bin Laden and Al-Qaeda refuge in Sudan, was alive in 2010 when

Plaintiffs filed this lawsuit, but passed away a mere three months ago on March 5, 2016.[11]  That

Plaintiffs retain access to their own evidence, and none of the witnesses or experts that they

proffered in the evidentiary hearing appear to be unavailable, does not gainsay the real risk that

some discovery available from or in Sudan may have become unavailable.

Furthermore, two additional types of prejudice are apparent in this case.  First, Plaintiffs,

who testified at the evidentiary hearing, would be forced to testify once again concerning the loss

they suffered at the hands of Al-Qaeda.  *See Gilmore*, 675 F. Supp. 2d at 111 (finding prejudice

where Plaintiffs would face an "enormous emotional cost" in being forced to testify again about

their loss).  Second, Plaintiffs would be prejudiced by the fact that the time and resources they

expended litigating this case, preparing for and presenting evidence at the evidentiary hearing,

and seeking a default judgment will be wasted.  *See Owens*, 2016 WL 1170919, at *10 (noting

that "much of the plaintiffs' efforts preparing for and conducting the 2010 liability hearing will

have been for naught—a serious waste that could have been avoided by Sudan's timely

---

[11] *See, e.g.*, Associated Press, *Hassan al-Turabi, Islamist Who Championed Bin Laden, Dies at 84*, N.Y. Times, Mar. 5, 2016, http://www.nytimes.com/2016/03/06/world/africa/ hassan-al-turabi-islamist-who-championed-bin-laden-dies-at-84.html; Greg Botelho, *Sudanese Islamist Leader, Bin Laden Ally Hassan al-Turabi dies*, CNN (Mar. 5, 2016, 2:36 PM), http://www.cnn.com/2016/03/05/africa/sudan-hassan-al-turabi-dies/.

participation").  Sudan's response that setting aside the default judgment against it would not disturb the default judgment against Iran (unless or until Iran appears, of course), *see* Sudan's Mot. at 29, does not mitigate the fact that Plaintiffs have expended considerable effort litigating this case in Sudan's absence.  Unlike other cases in which courts have found limited prejudice, this case has proceeded further than a nascent procedural stage.  *See Acree v. Republic of Iraq*, 658 F. Supp. 2d 124, 129 (D.D.C. 2008) (finding no risk of prejudice in FSIA case where plaintiffs had "not yet expended any significant efforts to satisfy their burden of proof for default judgment"); *see also Biton*, 233 F. Supp. 2d at 33 (finding no prejudice where case was "procedurally in its early stages" and no discovery had been conducted or motions filed).  As a result, Plaintiffs would suffer prejudice were the court to set aside the default judgment entered against Sudan.

### D.  Sudan's Proffered Defenses

Sudan identifies several arguments that it claims constitute "meritorious defenses" warranting setting aside the default judgment.  It casts three of these arguments as jurisdictional, claiming that the default judgment should be vacated for lack of subject-matter jurisdiction.  The fourth ground relates to the availability of punitive damages under section 1605A for conduct that took place before that provision was enacted in 2008.  As explained below, the Court finds that Sudan's jurisdictional arguments lack merit.  But the Court will vacate the portion of the default judgment awarding Plaintiffs punitive damages.

### 1.  Extrajudicial Killing

Sudan first argues that the Court lacks subject-matter jurisdiction over Plaintiffs' claims because the bombing of the U.S.S. Cole did not constitute an extrajudicial killing, as defined in

28 U.S.C. § 1605A.  *See* Sudan's Mot. at 6–11; Sudan's Reply at 4–9.  The Court is not convinced.

As noted above, the FSIA removes a foreign state's immunity if a plaintiff seeks money damages "for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1).  The FSIA further defines "extrajudicial killing" by cross-referencing the definition contained in the Torture Victim Protection Act ("TVPA").  *See id.* § 1605A(h)(7) ("[T]he terms 'torture' and 'extrajudicial killing' have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991.").  And the TVPA, in turn, defines an "extrajudicial killing" as:

> [A] deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (codified at 28 U.S.C. § 1350 note) [hereinafter "TVPA"].

Sudan claims that both the language and the context of the TVPA indicate that, when Congress defined "extrajudicial killing," it "intended to adopt the international law meaning of the term," which is synonymous with a "summary execution."  Sudan's Mot. at 7.  As a result, Sudan claims that there is no basis "for the term 'extrajudicial killing' to include a general act of terrorism."  *Id.* at 8.

The Court acknowledges that various portions of the TVPA's legislative history indicate that Congress sought to closely align the TVPA's definition of "extrajudicial killing" with the prevailing meaning of "summary execution" under international law.  For example, a House Report on the legislation notes that the TVPA "defines 'torture' and 'extrajudicial killing' in

accordance with international standards," and that the "concept of 'extrajudicial killings' is derived from article 3 common to the four Geneva Conventions of 1949." H.R. Rep. No. 102-367, at 4, 5 (1991). Similarly, a Senate Report states that the TVPA "incorporates into U.S. law the definition of extrajudicial killing found in customary international law," and that the "definition conforms with [the definition] found in the Geneva Convention." S. Rep. No. 102-249, at 6 (1991). Indeed, the TVPA's definition closely tracks the definition found in the Geneva Convention. *Compare* TVPA § 3(a) (defining an extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples"), *with* Geneva Convention Relative to the Treatment of Prisoners of War, art. 3, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 (prohibiting "the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples").

As explained momentarily, Sudan does not cogently explain what features of a bombing like that of the U.S.S. Cole would render the event anything other than a deliberated killing, unauthorized by the judgment of a regularly constituted court affording indispensable judicial guarantees. But to the extent there is any difference between the TVPA's definition and the prevailing international law definition, the Court rejects Sudan's effort to abandon Congress's explicit definition, or otherwise graft extra-statutory limitations onto the language of the statute. Although the TVPA's legislative history provides useful background in determining Congress's intent, it cannot displace the specific statutory definition that Congress actually chose to employ. Congress specifically defined "extrajudicial killing." Absent any ambiguity—in which case considering the international law definition might be instructive—the statute's explicit definition

must control, even if that definition may not prove coextensive with the international law concept. *See, e.g., Colautti v. Franklin*, 439 U.S. 379, 392 n.10 (1979) ("As a rule, a definition which declares what a term 'means' . . . excludes any meaning that is not stated." (ellipses in original) (internal quotation marks, alteration, and citation omitted)); *see also Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, [a court] must follow that definition, even if it varies from that term's ordinary meaning."); *cf. Evans v. United States*, 504 U.S. 255, 261 (1992) (noting that, in the Hobbs Act, "Congress has unquestionably expanded the common-law definition of extortion to include acts by private individuals" (emphasis omitted)).

Had Congress wanted to anchor its definition exclusively to the international law definition, it knew how to expressly invoke that body of law. In fact, it did so in the very next sentence of the TVPA's definition. *See* TVPA § 3(a), 106 Stat. at 73 (stating that the statutory definition "does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation"). And in other contexts, Congress has expressly incorporated international law definitions of certain terms, without qualification. *See* 18 U.S.C. § 1651 (criminalizing "the crime of piracy as defined by the law of nations"). The fact that Congress chose not to do so when defining extrajudicial killing in the TVPA—and instead codified a more precise definition—adds further confirmation to the conclusion that Congress explicitly chose not to mirror the international law definition exactly or incorporate that definition by reference, even if Congress's own definition was derived from international law. *See, e.g., Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 919 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another."); *cf. Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003) (finding it instructive that

the statute at issue referred only to "ownership" while "[v]arious federal statutes refer to 'direct and indirect ownership'" as demonstrating that "[w]here Congress intends to refer to ownership in other than the formal sense, it knows how to do so").

Moreover, reading the TVPA's definition to exactly mirror the international law definition would render the second sentence of the TVPA's definition mere surplusage.  It is a "cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute."  *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (internal quotation marks and citation omitted).  Yet, if Congress intended its definition of "extrajudicial killing" to be coterminous with the international law understanding of "summary execution," then there would have been no need for Congress to, in effect, create a safe harbor for "any such killing that, under international law, is lawfully carried out under the authority of a foreign nation."  TVPA § 3(a), 106 Stat. at 73.  That is because, under Sudan's reading, a killing "lawfully carried out" under "international law" could never be encompassed by the definition's first sentence.  The Supreme Court has "cautioned against reading a text in a way that makes part of it redundant."  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007).

Accordingly, the Court concludes that the statutory definition of "extrajudicial killing" must control, regardless of whether that definition diverges from the international law understanding in certain respects.  And that definition is met here.  The bombings were "killing[s]," and the coordination and planning required to carry them out indicate that they were "deliberated."  *See Mamani v. Berzain*, 654 F.3d 1148, 1155 (11th Cir. 2011) (considering in FSIA case whether the killing was "undertaken with studied consideration and purpose," in order to be "deliberated"); *cf., e.g.*, *People v. Wright*, 703 P.2d 1106, 1113–14 (Cal. 1985) (quoting pattern jury instructions and explaining that "deliberate" in context of first degree murder, means

"arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action").  The bombings were not authorized by any court judgment and Sudan does not suggest that they were permissible under international law.

More pertinently, Sudan does little to explain *how* the bombing of the U.S.S. Cole fails to meet the definition of an extrajudicial killing—under either the statutory definition or international law.  Nowhere in its memorandum in support of its motion or in its reply does Sudan explain what it is about the deliberate bombing of a Navy destroyer, divorced from regularly constituted judicial proceedings in the most indisputable terms, that puts the attack outside the scope of an "extrajudicial killing" or "summary execution."  Sudan claims that the TVPA is intended to refer to "summary execution," but that is where its analysis on this point ends.  *See* Sudan's Mot. at 7–9; Sudan's Reply at 4–9.  Simply "offering a synonym does not advance the analysis," *Owens*, 2016 WL 1170919, at *14, however, and one will search Sudan's papers in vain for a more developed argument.[12]

It may be that Sudan intends to hint that a summary execution can only be committed by a foreign state, and not a private group.  Sudan's memorandum in support of its motion includes a passing citation to an Eastern District of Virginia case in which the court concluded that TVPA claims require state action.  *See* Sudan's Mot. at 8 (citing *In re XE Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 592–94 (E.D. Va. 2009)).  It is true that the court in that case noted that the TVPA requires individuals alleged to have violated the Act to have acted "under actual or apparent authority, or color of law, of any foreign nation."  *In re XE Servs. Alien Tort Litig.*, 665 F. Supp.

---

[12] To the extent one could construe Sudan's briefing here to encompass the more precise argument that the court in *Owens* believed to be Sudan's "bottom-line objection"—that "the bombers did not know whom exactly they would kill and could not be certain that any specific individual would die"—the Court would reject that argument for the same reasons offered in *Owens*.  *See* 2016 WL 1170919, at *14.

2d at 593 (quoting TVPA § 2(a), 106 Stat. at 73); *accord* H.R. Rep. No. 102-367, at 5

(explaining that the TVPA's use of "'under actual or apparent authority, or color of law' makes

clear that the plaintiff must establish some governmental involvement in the torture or killing to

prove a claim," and therefore the Act "does not attempt to deal with torture or killing by purely

private groups").  But that limitation comes from separate language in the Act, not the Act's

definition of "extrajudicial killing."  And there is no indication that when Congress imported the

definition of "extrajudicial killing" from section 3 of the TVPA into the FSIA, it similarly meant

to carry over the state-actor limitation from section 2.  If Congress had "wished to limit

extrajudicial killings under the FSIA to those perpetrated directly by state actors, it could have

cross-referenced both TVPA sections."  *Owens*, 2016 WL 1170919, at *13.  Instead, by

removing immunity and providing liability where a foreign state merely provides material

support for an extrajudicial killing, Congress signaled that, at least in the FSIA context, those

who carry out the killing need not be state-actors.  *See* 28 U.S.C. § 1605A(a)(1).  As the court

concluded in *Owens*, "Congress clearly wanted to permit liability both when states themselves

perpetrate the predicate acts and also when they help others do so," and the "most obvious actors

that Congress would worry might receive material support . . . are non-state terrorist

organizations."  2016 WL 1170919, at *14; *accord* H.R. Rep. No. 104-383, at 62 (1995) (noting

that "[t]he existence of state-sponsored terrorism is well documented" and that state-sponsors of

terrorism "have become better at hiding their material support for their surrogates, which

includes the provision of safe havens, funding, training, supplying weaponry, medical assistance,

false travel documentation, and the like").

　　　　Instead, Sudan's contention seems to boil down to its assumption that, because one could

characterize the U.S.S. Cole bombing as a "general act of terrorism," it is categorically outside

the definition of an "extrajudicial killing" or "summary execution." Sudan's Mot. at 8 (arguing

that "the text, structure, legislative history, and Supreme Court's treatment of the TVPA confirm

its limited scope and do not provide a basis for the term 'extrajudicial killing' to include a

general act of terrorism"). Sudan points out that at the time Congress added § 1605(a)(7) (the

predecessor to § 1605A(a)(1)) to the FSIA, it rejected a Senate version of the bill which would

have withdrawn immunity from foreign states when the plaintiff sought recovery based on "an

act of international terrorism . . . which was committed or aided or abetted by a foreign state"

designated as a state sponsor of terror. *The Foreign Sovereign Immunities Act: Hearing Before

the Subcomm. on Courts and Administrative Practice of the S. Comm. on the Judiciary*, 103rd

Cong. 27–28 (1994) (reproducing proposed Senate Bill 825); *see* Sudan's Mot. at 8–9. In

addition, Sudan notes that elsewhere in the United States Code, in the Anti-Terrorism Act

("ATA"), Congress has adopted a statutory definition of international terrorism. *See* Sudan's

Mot. at 10; *see also* 28 U.S.C. § 2331(1) (defining "international terrorism"). But while

Congress adopted the ATA's definition of "material support" in the FSIA, it did not similarly

incorporate the definition of "international terrorism." *See* Sudan's Mot. at 10; *see also* 28

U.S.C. § 1605A(h)(3) ("[T]he term 'material support or resources' has the meaning given [to]

that term in section 2339A of title 18."). Based on these indicia of legislative intent, Sudan

generally claims that section 1605A "does not include 'terrorism' as a predicate act." *Id.* at 10.

Insofar as Sudan claims that the FSIA does not reach *any* acts that might be described in

common parlance as "terrorism," the Court disagrees. Indeed, it would be illogical to accept that

argument. For one thing, Congress entitled section 1605A as the "*Terrorism exception* to the

jurisdictional immunity of a foreign state." 28 U.S.C. § 1605A (emphasis added); *cf.

Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the

heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (internal quotation marks omitted)).  For another, the provision's application is limited solely to those foreign states that are "designated as a state sponsor *of terrorism*," either at the time the predicate act was committed or as a result of that act.  28 U.S.C. § 1605A(2)(A)(i)(I) (emphasis added).  And, finally, the section strips immunity from foreign states that provide material support for the specific predicate acts listed therein—several of which are quintessential examples of methods that terrorists use regularly.  *See Owens*, 2016 WL 1170919, at *15 ("That § 1605A does not include 'terrorism' does not mean that it excludes everything that could be called (or meet some legal definition of) 'terrorism.'  For the past fifteen years it has been hard to think of a more quintessential act of terrorism than the purposeful destruction of a passenger aircraft in flight—yet such an act is manifestly covered by § 1605A.").  In their Reply, Sudan ultimately concedes as much.  *See* Sudan's Reply at 7 (acknowledging that section 1605A and prior section 1605(a)(7) both "set forth four narrowly defined *acts of terrorism*" (emphasis added)).  In light of these indications, and Sudan's concession, it would be particularly perplexing if the FSIA did not reach *any* acts that can be described as "terrorism."

Moreover, and contrary to Sudan's suggestion, the legislative history that Sudan cites readily bolsters this point.  Sudan notes that certain commentators had objected to a proposed Senate bill stripping immunity for general acts of "international terrorism," on the basis that the definition of "international terrorism" was amorphous, subject to debate, and "vague and politically charged."  *See* Sudan's Mot. at 9 (quoting *The Foreign Sovereign Immunities Act: Hearing Before the Subcomm. on Courts and Administrative Practice of the S. Comm. on the Judiciary*, 103rd Cong. 83 (1994) (statement of Abraham Sofaer)).  But the very same individual who presented those criticisms noted that he favored an alternative House bill—which at that

time proposed to strip immunity for acts of torture, extrajudicial killing, and genocide—because that bill provided more "clearly defined acts *of international terrorism*." *See The Foreign Sovereign Immunities Act: Hearing Before the Subcomm. on Courts and Administrative Practice of the S. Comm. on the Judiciary*, 103rd Cong. 81–82 (1994) (statement of Abraham Sofaer) (emphasis added). Thus, far from rejecting FSIA coverage for anything that might be labeled an act of "international terrorism," the legislative history indicates that Congress, at most, cabined the FSIA's reach to particular, concretely-defined acts that are internationally recognized.[13]

The Court's conclusion is buttressed by the fact that, by 2008, courts had consistently construed "extrajudicial killing" in section 1605(a)(7) (the precursor to section 1605A) to strip immunity and provide for liability for the material support of bombings committed by terrorist organizations. *See, e.g.*, *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 53 (D.D.C. 2008) (concluding that bombing of Israeli embassy in Buenos Aires, Argentina carried out by Hezbollah was an "extrajudicial killing"); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 53 (D.D.C. 2006) (same concerning bombing of Khobar Towers residence on United States military base in Saudi Arabia carried out by Hezbollah); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 113 (D.D.C. 2005) (same concerning 1983 bombing of the United States embassy in Beirut, Lebanon carried out by Hezbollah); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 61 (D.D.C. 2003) (same concerning 1983 bombing of a United States Marine

---

[13] Sudan also cites the statement of Jamison S. Borek, then the Department of State's Deputy Legal Adviser, who testified that the proposed provision in Senate Bill 825 not only "extend[ed] beyond the reach of [the] existing statute, but it also diverg[ed] significantly from the general practice of states." *The Foreign Sovereign Immunities Act: Hearing Before the Subcomm. on Courts and Administrative Practice of the S. Comm. on the Judiciary*, 103rd Cong. 14 (1994) (statement of Jamison S. Borek). When read in context, however, it is clear that Ms. Borek was discussing the proposed bill's *jurisdictional* reach to acts committed outside the United States. *See id.* at 13–14.

barracks in Beirut carried out by Hezbollah); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 133 (D.D.C. 2001) (same concerning 1984 bombing of the United States embassy annex in Beirut carried out by Hezbollah). Sudan has identified no case to the contrary.

When Congress recodified that subsection in 2008 as part of section 1605A, it chose to employ—without alteration or qualification—the exact same language that had been used in section 1605(a)(7).  Because "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change," *Lorillard v. Pons*, 434 U.S. 575, 580 (1978), the Court finds it informative that Congress made no effort to cast aside the unanimous consensus among federal district courts when it recodified the terrorism exception in section 1605A.[14]  It might be unusual for a court to infer that Congress implicitly ratified a prevailing interpretation on the basis of district court decisions, but "it is not impossible."  *Owens*, 2016 WL 1170919, at *16; *see also* Antonin Scalia & Bryan A. Gardner, *Reading Law* 322 (2012) (noting that "[i]f a statute uses words or phrases that have already received . . . *even uniform construction by inferior courts* . . . they are to be understood according to that construction" (emphasis added)).  And FSIA is a context "in which prior construction even by district courts deserves serious weight," because the "notoriety of the underlying events, the magnitude of the judgments, and the potential diplomatic repercussions" all suggest that FSIA cases "are more likely than most to actually become known to Congress." *Owens*, 2016 WL 1170919, at *16.  To be sure, as Sudan notes, in none of these cases did a foreign state appear to contest the meaning of "extrajudicial killing."  But that reality does not

---

[14] And, as the court in *Owens* explained, for various reasons this reading was "hardly hidden from Congress," given Congress's reference to several of these judgments in related legislation and the inclusion of the prevailing interpretation of section 1605(a)(7) in a multitude of press coverage, legal commentary, and government reports.  2016 WL 1170919, at *16.

diminish the fact that, by 2008, an "unmistakable and unanimous judicial reading of §

1605(a)(7)" had been established. *Id.* at *15. This fact reinforces the Court's conclusion that a

terrorist bombing like that of the U.S.S. Cole constitutes an "extrajudicial killing" within the

meaning of section 1605A.

At bottom, Sudan's reference to acts of "international terrorism" is a red herring.

Regardless of whether one might also label the bombing of the U.S.S. Cole an act of "terrorism,"

the relevant question is whether the bombing meets the FSIA's statutory definition of

"extrajudicial killing." As explained above, the Court concludes that it does. Consequently,

Sudan's argument to the contrary fails to raise a meritorious defense.

## 2. Indirect-Victim Claims

Next, in a somewhat cursory argument, Sudan claims that the Court lacks subject-matter

jurisdiction over claims of plaintiffs who are merely the relatives of deceased victims of terrorist

acts, as each of the plaintiffs are here (plaintiffs Sudan refers to as "indirect-victims"). *See*

Sudan's Mot. at 11. As explained above, subject-matter jurisdiction under the FSIA depends on

the existence of one of the statutory exceptions to foreign sovereign immunity. *See Verlinden*

*B.V.*, 461 U.S. at 493. Beyond requiring that the case be one "in which money damages are

sought . . . for personal injury or death that was caused by an act of torture, extrajudicial killing,

aircraft sabotage, hostage taking, or the provision of material support or resources for such an

act," 28 U.S.C. § 1605A(a)(1), section 1605A(a) also provides that a claim will be heard only if

"the claimant or the victim was, at the time the act described in paragraph (1) occurred," a

United States national, a member of the armed forces, or an employee of the United States

Government or performing a contract awarded by the government, *id.* § 1605A(a)(2)(A)(ii)(I)–

(III). Sudan reads this subsection to withdraw immunity—and grant jurisdiction—only for

claims brought by either (a) a "'victim' who was injured,'" or (b) a "claimant" that is "acting as the personal representative of" the victim. Sudan's Mot. at 11. Although Sudan does not explicitly link its reading with its conclusion that subject-matter jurisdiction is lacking here, presumably Sudan intends to imply that because Plaintiffs are neither victims nor suing as Kevin Rux's legal representatives, foreign sovereign immunity has not been waived for Plaintiffs' claims.

The question of statutory interpretation Sudan raises is ultimately irrelevant, however. In focusing on *who* is asserting a claim against the foreign state, Sudan has conflated subject-matter jurisdiction with the distinct question of whether plaintiffs have stated a valid cause of action. As the D.C. Circuit has explained, "[t]here is a clearly settled distinction in federal law between statutory provisions that waive sovereign immunity and those that create a cause of action." *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004). Subsection (a)(2)(A)(ii)'s description of when a claim will be heard—and, thus, when immunity will be withdrawn—does not focus solely on the "claimant" who is asserting the claim. Instead, the subsection is phrased in the alternative. It states definitively that "a claim" under section 1605A will be heard if *either* "the claimant *or the victim*" was a United States national at the time of the act. 28 U.S.C. § 1605A(a)(2)(A)(ii) (emphasis added). And here, regardless of whether Plaintiffs can validly state a cause of action under any substantive provision of state or federal law (and thus might be described as "claimants"),[15] there is no dispute that Kevin Rux, the direct

---

[15] Indeed, the Court seriously doubts that a claimant must show the validity of their cause of action at all in order to assert jurisdiction (although their ability to invoke a particular cause of action will, of course, be subject to a Rule 12(b)(6) motion to dismiss for failure to state a claim). Subsection (a)(2)(A)(ii) asks only whether the claimant or the victim has the requisite citizenship or employment to fall within the FSIA's terrorism exception. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii). There is no indication in the statute that, for *jurisdictional* purposes, the Court must also ask whether the plaintiff can legally or factually state the cause of action—or the

"victim" of the U.S.S. Cole bombing, was a national of the United States and a member of the armed forces. Therefore, this case meets the jurisdictional requirement, and the Court properly exercised jurisdiction. *See La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya*, 533 F.3d 837, 844 (D.C. Cir. 2008) (in context of section 1605(a)(7), rejecting Libya's argument that the court lacked subject-matter jurisdiction because third-party corporate claimants could not assert a claim under the FSIA, which Libya read as limited to nationals of the United States, and noting that, among other things, the statute waives immunity "if either the claimant *or the victim* is a national of the United States," and that there was "no dispute that the victims were United States nationals" (emphasis added)); *accord Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 569–70 (7th Cir. 2012).

The case upon which Sudan relies for support, *Cicippio-Puleo v. Islamic Republic of Iran*, No. 01-1496, 2002 WL 34408105 (D.D.C. 2002), clarifies this distinction and therefore only weakens Sudan's argument. In that case, the district court had dismissed the claims asserted by the relatives of a man who had been held hostage by Hezbollah for over five years. After surveying the case law regarding plaintiffs' ability to recover for emotional injuries, the court concluded that the FSIA was not intended to require foreign states "to compensate non-victim plaintiffs for damages for which not even a domestic terrorist would be liable in most U.S. jurisdictions," and therefore dismissed the plaintiffs' complaint. *Cicippio-Puleo*, 2002 WL 34408105, at *2–3. On appeal, the D.C. Circuit noted that there was some confusion over whether the district court's decision had rested on the plaintiffs' failure to state a claim or a lack

---

claim—that he asserts. As a result, even if Sudan is correct that Plaintiffs cannot assert a cause of action under section 1605A(c), and that their claim would therefore likely be dismissed for failure to state a claim (a proposition the Court rejects, below), the Court does not read the FSIA to mandate that such a conclusion deprives the court of subject-matter jurisdiction altogether.

of subject matter jurisdiction; the district court had cited both Rule 12(b)(6) and Rule 12(h)(3) of the Federal Rules of Civil Procedure in its opinion. *See Cicippio-Puleo*, 353 F.3d at 1030. But the circuit went on to conclude that the jurisdictional ground was "inapposite, for it is clear that the District Court had jurisdiction pursuant to the statutory waiver of sovereign immunity." *Id.* The circuit's opinion then considered whether, notwithstanding the waiver of sovereign immunity, the plaintiffs could validly assert a cause of action directly against a foreign state defendant under then-existing section 1605(a)(7). The circuit concluded that plaintiffs could not, because the Flatow amendment that first codified a cause of action under 1605(a)(7) had limited that cause of action to a foreign state's officials, employees, and agents acting in their personal capacities. *See id.* at 1033–34. That conclusion was not fatal to the court's jurisdiction, however. As the circuit explained, it would "remand the case to allow plaintiffs an opportunity to amend their complaint to state a cause of action under some other source of law, including state law." *Id.* at 1036.

Obviously, because section 1605A's jurisdictional requirement focuses *alternatively* on the claimant *or* the victim, the distinction between jurisdiction and the substantive cause of action means that section 1605A might afford subject-matter jurisdiction irrespective of whether the claimant can assert a valid cause of action under subsection 1605A(c). Sudan claims that this distinction "produces the counterintuitive result that the scope of jurisdiction under § 1605A(a) allows for a broader category of plaintiff to bring an action than the category of plaintiff who is given a claim under § 1605A(c)." Sudan's Reply at 10. In particular, Sudan attacks the reasoning of the Seventh Circuit's decision in *Leibovitch*, in which that court concluded that jurisdiction was established even over the claims of the foreign national family members of a U.S. citizen victim—plaintiffs who, themselves, did not fall within the circumscribed categories

of individuals who can bring a claim under section 1605A(c).[16]  *See* 697 F.3d at 569–72.

*Leibovitch* is distinguishable because, as the Court explains below, Plaintiffs here have asserted a valid cause of action under section 1605A(c).  But even if that conclusion is incorrect, the Court fails to see how the Seventh Circuit's holding in *Leibovitch* is "counterintuitive."  Originally, 1605(a)(7) had waived sovereign immunity for terrorism-related acts without setting forth any cause of action that directly mirrored the immunity provision.  *See Owens*, 2016 WL 1170919, at *3.  And this reality persisted with respect to foreign state defendants even after the Flatow Amendment provided a federal cause of action over a foreign state's officers and agents.  *See Cicippio-Puleo*, 353 F.3d at 1036 (noting that the fact that 1605(a)(7) did not provide a cause of action against foreign states "takes nothing away from § 1605(a)(7)" because what that section "does is to make it clear that designated foreign state sponsors of terrorism will be amenable to suits in United States courts for acts of terrorism in cases in which there is a viable cause of action").  There is nothing to indicate that, when Congress provided for a new, federal cause of action under section 1605A(c) over both foreign states and their agents, it intended to eliminate claimants' ability to assert *other*, non-federal causes of action, so long as sovereign immunity had been waived.  This Court, in fact, has already held as much.[17]  *See Estate of Doe v. Islamic*

---

[16] That subsection provides, in relevant part, that a foreign state or its agency "shall be liable to": (1) "a national of the United States"; (2) "a member of the armed forces"; (3) "an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment"; or (4) "the legal representative of a person described in paragraph (1), (2), or (3)." 28 U.S.C. § 1605A(c).

[17] In a passing sentence in its reply, Sudan argues that section 1606 "on its face does not apply" to section 1605A.  *See* Sudan's Reply at 9.  Whatever skeletal argument this reference is intended to convey is insufficiently developed to warrant consideration.  *See Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived." (internal quotation marks and citations omitted)).

*Republic of Iran*, 808 F. Supp. 2d 1, 20 (D.D.C. 2011) ("Although § 1605A created a new cause

of action, it did not displace a claimant's ability to pursue claims under applicable state or

foreign law upon the waiver of sovereign immunity.")  Therefore, the Court rejects Sudan's

claim that any discrepancy between a plaintiff's ability to assert a cause of action under

subsection 1605A(c) and the waiver of sovereign immunity under subsection 1605A(a) renders

the statutory scheme "counterintuitive."

   Subsection 1605A(a)(2)(A)(ii)'s reference to "the claimant or the victim" is conclusive,

on its own, to support the Court's subject-matter jurisdiction and to reject Sudan's argument.

But, to the extent that Sudan's true intent is to attack the viability of Plaintiffs' cause of action—

despite consistently labeling its argument in both its memorandum in support and its reply as a

challenge to the Court's "jurisdiction"—the Court rejects that argument, too.  Sudan points to

subsection (c)(4), which states that a foreign state may be liable to "the legal representative of a

---

   But, in any event, the Court finds section 1606 irrelevant.  That section states that, for any claim "with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages."  28 U.S.C. § 1606.  Perhaps Sudan intends to argue that because section 1605A is not listed in section 1606, a plaintiff seeking to invoke jurisdiction under section 1605A(a)(1) is *limited* to the cause of action provided in subsection (c), and to the exclusion of alternative causes of action under state or foreign law an individual might assert "under like circumstances."  If that is Sudan's argument, the Court would reject it for much the same reason as set forth in *Owens*.  *See* 2016 WL 1170919, at *32–33.  The section reads most readily as simply a "limit[ation] on the liability that the applicable substantive law—whatever its source—can impose on the foreign sovereign."  *Id.* at *32.  And there is no indication that if section 1606 did not exist at all, plaintiffs would be unable to assert state-law causes of action against foreign sovereigns or that federal courts would be without power to adjudicate any cases falling within the FSIA's subject matter jurisdiction. *Id.* at *33.  This Court is aware of "no authority suggesting that a grant of subject-matter jurisdiction is a nullity if Congress fails to expressly define the substantive law that applies."  *Id.* "The upshot," then, "is that Congress's failure to add a cross-reference to § 1605A in § 1606 does not block state law from applying to claims for which subject-matter jurisdiction is provided by § 1605A(a)."  *Id.*

person described in paragraph (1), (2), or (3)" of that subsection.  28 U.S.C. § 1605A(c)(4).

Sudan contends that only direct victims of a terrorist attack who meet the criteria listed in

paragraphs (1) through (3), or their legal representatives, can assert a claim under subsection

1605A(c).[18]

There is nothing in the statute to support this reading, however.  Congress's use of the

disjunctive "or" in subsection (a)(2)(A)(ii) suggests that a claimant need not be a victim herself.

Moreover, Congress's use of the more general term "claimant," in lieu of the more specific term

"legal representative"—which Congress expressly chose to use in subsection (c)(4)—indicates

that a claimant can be broader than simply a victim's legal representative.  Indeed, subsection (c)

itself contains nothing limiting the cause of action to victims or their legal representatives.  Had

Congress wanted to limit the cause of action in subsection (c) only to victims or their legal

representatives, it could have expressly said so.  It could have written subsection (c) to instruct

that a foreign state or its agents are only "liable to a *victim*" who is a United States national,

armed forces member, or an employee of the government or performing on a government

contract—or, under paragraph (4), the "legal representative of a person" (and therefore, a victim)

---

[18] Subsection 1605A(c) provides, in relevant part, that:

> (c) Private right of action.—A foreign state that is or was a state sponsor
> of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or
> agent of that foreign state while acting within the scope of his or her office,
> employment, or agency, shall be liable to—
>> (1) a national of the United States,
>> (2) a member of the armed forces,
>> (3) an employee of the Government of the United States, or of an
>> individual performing a contract awarded by the United States
>> Government, acting within the scope of the employee's employment, or
>> (4) the legal representative of a person described in paragraph (1),
>> (2), or (3),
> for personal injury or death caused by acts described in subsection (a)(1) of that
> foreign state . . .

28 U.S.C. § 1605A(c).

"described in paragraph (1), (2), or (3)."  Yet, Congress conspicuously chose not to so limit the cause of action.  And Plaintiffs here are, themselves, "national[s] of the United States," 28 U.S.C. § 1605A(c)(1), who seek money damages for "personal injury or death caused by" a terrorist act described in subsection (a)(1).  Accordingly, and despite the fact that Plaintiffs seek recovery for their own injuries, and not as the legal representatives of Kevin Rux, Plaintiffs can state a cause of action under section 1605A(c).[19]

Because the purported distinction Sudan attempts to draw is irrelevant for *jurisdictional* purposes and, in any event, Plaintiffs can validly assert a cause of action under section 1605A(c), Sudan's statutory argument regarding indirect-victim claims fails to assert a meritorious defense.

### 3.  The Sufficiency of Plaintiff's Causation Evidence

Sudan's third proffered defense relates to the evidence demonstrating that the extrajudicial killing of Kevin Rux was "caused by" Sudan's material support for Al-Qaeda.  Section 1605A(a)(1)'s immunity provision provides that a foreign state is not immune if money damages are sought "for personal injury or death that was caused by" a foreign state or its agent's act of extrajudicial killing, or the provision of material support or resources for that act. 28 U.S.C. § 1605A(a)(1).  The substantive cause of action under subsection (c)(1) similarly

---

[19] Both parties cite to legislative history but the Court finds those references indeterminate.  *See* Sudan's Mot. at 12; Pls.' Opp'n at 24–27; Sudan's Reply 10–12.  In any event, where the language of the statute is clear, as the Court concludes subsection 1605A(c) is, the Court need not resort to legislative history.  *See Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 818 (D.C. Cir. 2008) ("[W]hen a statute's 'language is plain on its face, courts do not ordinarily resort to legislative history.'" (quoting *Saadeh v. Farouki*, 107 F.3d 52, 57 (D.C. Cir. 1997)).  In addition—and with the possible exception of the evidence of causation explained below—the Court notes that Sudan has advanced no other infirmities as possible defenses to the legal sufficiency of Plaintiffs' stated claim or their ability to prove their cause of action, akin to the type or arguments one might advance on a motion to dismiss, at summary judgment, or at trial. *Cf. Owens*, 2016 WL 1170919, at *30–31 (rejecting Sudan's argument that "personal injury" under section 1605A requires "bodily harm," and concluding that personal injury "includes emotional injuries of the sort the family members suffered").

makes foreign states and their agents liable for those acts or material support. *Id.* § 1605A(c).

Sudan claims that Plaintiffs failed to produce satisfactory and sufficient evidence to satisfy the

causation element.

Yet again, Sudan appears to frame its argument exclusively as one of "subject-matter

jurisdiction." *See, e.g.*, Sudan's Mot. at 13, 25; Sudan's Reply at 12.  If that is the entirety of

Sudan's defense, then it is plainly unavailing.  Here, the elements Plaintiffs must prove to prevail

on the merits of their substantive claim under subsection (c) directly mirror the jurisdictional

elements under subsection (a)(1).[20]  As the D.C. Circuit has held, "[w]hen the jurisdictional and

merits inquiries fully overlap in that fashion, a plaintiff need not prove a winning claim on the

merits merely to establish jurisdiction." *Simon v. Republic of Hungary*, 812 F.3d 127, 141 (D.C.

Cir. 2016).  Analogizing to the standard required under federal question jurisdiction—where a

federal courts' jurisdiction is similarly contingent upon the substantive claim the plaintiff

asserts—the D.C. Circuit has instead instructed that there will typically be jurisdiction under the

FSIA unless the plaintiff's claim is "'immaterial and made solely for the purpose of obtaining

jurisdiction or . . . wholly insubstantial and frivolous.'" *Agudas Chasidei Chabad of U.S. v.

Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008) (quoting *Bell v. Hood*, 327 U.S. 678, 682–83

(1946)).  That standard sets an "exceptionally low bar," and jurisdiction will be found wanting

only "if prior judicial decisions 'inescapably render the claim[] frivolous' and 'completely

devoid of merit.'" *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*,

784 F.3d 804, 812 (D.C. Cir. 2015) (quoting *Hagans v. Lavine*, 415 U.S. 528, 538, 543 (1974)).

---

[20] For the most part, the cases Sudan cites to the contrary are inapposite because those cases pre-date the codification of 1605A(c) in 2008 (and, therefore, involved plaintiffs who relied on non-federal causes of action that, presumably, did not map onto the immunity inquiry). Here, however, Plaintiffs assert a cause of action only under section 1605A(c).  *Accord Owens*, 2016 WL 1170919, at *24.

Here, Plaintiffs' claim cannot be called frivolous.  Plaintiffs have asserted, and proffered evidence to show, a multitude of connections between Sudan, Al-Qaeda, and Bin Laden.  Even if "'Plaintiffs' allegations are somewhat imprecise as to the temporal proximity of Sudan's actions to and their causal connection with the' terrorist act and 'do not chart a direct and unbroken factual line between Sudan's actions' and the terrorist act, this 'imprecision is not fatal for purposes of jurisdictional causation so long as the allegations, and the reasonable inferences drawn therefrom, demonstrate a reasonable connection' between the foreign state's actions and the terrorist act."  *Owens*, 531 F.3d at 895 (quoting *Rux*, 461 F.3d at 474 (upholding denial of motion to dismiss for lack of subject matter jurisdiction in case involving the U.S.S. Cole bombing)).

Despite Sudan's continued insistence that it challenges the default judgment only to the extent that Plaintiffs failed to prove the "jurisdictional requirements," *see* Sudan's Reply at 12–13, Sudan does assert that Plaintiffs failed to prove the causation element with sufficient evidence to support a default judgment under section 1608(e), *see id.* at 14.  One therefore gets the sense that Sudan's asserted defense really questions whether Plaintiffs provided sufficient evidence to support the causation element of their cause of action.  If that is Sudan's argument, the Court similarly rejects it.[21]

Under the FSIA, a court may only enter a default judgment against a foreign state if "the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  There is no dispute that, in undertaking that inquiry, a court must draw its "'findings

---

[21] Should the Court be incorrect that Rule 55(c) applies, the Court would not even reach this argument, which Sudan would be precluded from making under Rule 60(b).  *See Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1547 (D.C. Cir. 1987) (explaining that, as a consequence of his default, the defendant "ordinarily forfeits his right to defend on the merits," and if he "loses on the jurisdictional issue . . . his day in court is normally over").

of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence.'" *Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C. Cir. 2014) (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)).  A burden shifting framework is also at play: the FSIA "begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies." *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  "[O]nce shown, the sovereign bears the ultimate burden of persuasion to show the exception does not apply," *id.*, by a preponderance of the evidence, *Simon*, 812 F.3d at 147. Although the exact standard for what a plaintiff must show in the default judgment context to provide evidence "satisfactory to the court" under section 1608(e) is somewhat uncertain, that the plaintiff need only satisfy an initial burden of production suggests that he need only introduce sufficient evidence "to allow an issue to go to a jury . . . a burden akin to the requirement of 'substantial evidence' in administrative law.'" *Owens*, 2016 WL 1170919, at *25.

Sudan attacks the sufficiency of Plaintiffs' evidence here on several grounds.  First, Sudan claims that Plaintiffs' experts—Lorenzo Vidino and Dale Watson—merely served as conduits for the introduction of inadmissible hearsay.  Federal Rule of Evidence 703 permits experts to base their opinions on information that "experts in the particular field would reasonably rely on . . . in forming an opinion on the subject." Fed. R. Evid. 703.  That information "need not be admissible for the opinion to be admitted." *Id.*  But, although "[e]xpert opinions may be based on hearsay . . . they may not be a conduit for the introduction of factual assertions that are not based on personal knowledge." *Estate of Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 33 (D.D.C. 2010).  Sudan claims that Plaintiffs offered "no independent evidentiary basis for the factual assertions made by their experts."  Sudan's Mot. at 15.

The record does not support that contention.  For starters, Sudan claims that during Mr. Watson's testimony counsel read lengthy passages from underlying source material, such as the 9/11 Commission Report and State Department and CIA reports and fact sheets.  Sudan asserts that Mr. Watson's testimony consisted almost exclusively of simple, affirmative answers agreeing with the facts asserted in those hearsay materials.  *See* Sudan's Mot. at 16–17.  That characterization is directly at odds with the record, and obscures the testimony that followed those instances.  In reality, Mr. Watson elaborated on the source material based on his own, personal experience as an FBI Investigator.  Mr. Watson testified that his government employment involved monitoring Bin Laden's activities in Sudan and Sudan's activities related to terrorist organizations.  *See* Hr'g Tr. at 106:5–13.  Based on that experience, Mr. Watson was asked to explain the basis of his agreement with the source materials read to him, and Mr. Watson elaborated to explain how his personal experiences were consistent with what was reported in the open source material, or what the significance of those facts might be.  *See, e.g.*, Hr'g Tr. at 92:6–16, 108:20–109:10, 112:24–113:15; *see also id.* at 95:3–5 ("Based on your investigation of the Cole, do you agree with the depiction of the devastation to the boat reported in the attack?").  For example, at one point during his testimony, Mr. Watson was asked the following, with counsel quoting from the 9/11 Commission Report:

> Q:          So, Mr. Watson, as you can tell by the text, the 9/11 Commission has described how al-Qaeda flourished in Sudan.
>           It says, "Bin Laden moved to Sudan in 1991 and set up a large and complex set of intertwined business and terrorist enterprises. In time, the former would encompass numerous companies and a global network of bank accounts and nongovernmental institutions."
>           Later on in the text it says, "Meanwhile, al-Qaeda finance officers and top operatives used their position in bin Laden's businesses to acquire weapons, explosives and technical equipment for terrorist purposes."

And then at 58 it says, "The groundwork for a true global terrorist network was being laid."

Mr. Watson, do you agree with this assessment laid out in the 9/11's Commission's report?

A:      I do.

Hr'g Tr. at 108:6–22.  The testimony did not end there, however.  It continued as follows:

Q:      And the type of support that is described in the 9/11 Commission's report, what's the significance of having intertwined business and terrorist enterprises, allowing, you know, training for weapons, also acquiring weapons and explosives technical equipment, et cetera?

A:      It allowed him to expand the organization, make it better. It allowed them to have funds available through legitimate businesses. It gave them some credibility.

It also allowed for the organization to be a safe place, because, at that point in time, he had been removed from Saudi Arabia. He had no country. And so he was allowed to operate with impunity there in Sudan for a number of years until 1996, if I recall.

Q:      And one of the things you mentioned is that you said it gave the organization credibility. What do you mean by that?

A:      The ability to issue statements; the ability to recruit people; the ability to set up training camps; the ability to travel in and out of places to identify potential targets, in my opinion.

Q:      And would having a safe place to meet, the ability to travel safely and freely, would this have allowed Al-Qaeda and Osama bin Laden—would this have given them a way of shielding their activities from other law enforcement or intelligence agencies?

A:      Yeah. It's not like setting up shop in Leesburg, Virginia, where, you know, you would come under scrutiny of the Bureau or some federal agency. It's a foreign country, and a foreign country that was not the most favored, you know, looking toward the United States. So it was very difficult to operate in that environment as a U.S. Government representative.

Id. at 108:23–110:4.

The fact that much, if not all, of the open source material upon which Mr. Watson relied in informing his opinion constituted hearsay is not problematic, despite Sudan's claim to the contrary.[22] *See* 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 7:16, at 861–63 (4th ed. 2013) ("Merely to ask whether outside information would be hearsay or would be admissible is to miss the whole point of Rule 703, nor does it matter that the expert uses such material in important ways in formulating his opinion, for outside information need not play merely a background role." (footnote omitted)).  Indeed, in the terrorism context, experts' reliance on hearsay evidence is often critical.  *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005) (quoting district court approvingly, which had concluded that, "[g]iven the secretive nature of terrorists, the Court can think of few [non-hearsay] materials that experts in the field of terrorism would rely upon").  Terrorist activity is typically covert, and when creating the terrorism exception to sovereign immunity Congress recognized that state sponsors of terrorism "have become better at hiding their material support for their surrogates, which includes the provision of safe havens, funding, training, supplying weaponry, medical assistance, false travel documentation, and the like."  H.R. Rep. No. 104-383, at 62 (1995).  The types of records or direct evidence available in civil litigation are unlikely to be available in FSIA cases— particularly when, as here, Plaintiffs have no access to discovery.  *See Owens*, 2016 WL 1170919, at *26–28 (collecting cases discussing the use of expert testimony and hearsay in FSIA

---

[22] The Court grants that, as parts of these lines of questioning, portions of the allegedly hearsay documents were read into the record.  This might have posed a problem if a jury were involved.  But "claims under the FSIA are not eligible for resolution by a jury." *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30, 40 (D.D.C. 2002); *see also* 28 U.S.C. § 1330(a); *Universal Consol. Cos. v. Bank of China*, 35 F.3d 243, 244–45 (6th Cir. 1994).  Therefore, the risk of prejudice is lessened, if not altogether eliminated. *See Harris v. Rivera*, 454 U.S. 339, 346 (1981) (per curiam) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions.").

cases).  In light of these and other realities, the D.C. Circuit has noted (pertinently, in a FSIA case concerning whether a default judgment should have been denied under section 1608(e)), that "courts have the authority—indeed, we think, the obligation—to 'adjust [evidentiary requirements] to . . . differing situations.'"  *Kim*, 774 F.3d at 1048 (alteration and ellipses in original) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)); *see also id.* (positing that if courts were "to demand more of plaintiffs . . . few suits like this could ever proceed, and state sponsors of terrorism could effectively immunize themselves by killing their victims, intimidating witnesses, and refusing to appear in court").  To be sure, that latitude should not be read to permit a court to rely on *inadmissible* evidence; but the Court believes the sentiment should perhaps allow some greater leeway for an expert witness in terrorism cases to rely on hearsay evidence in formulating his or her *admissible* expert opinion.

  Sudan further claims that Mr. Watson's testimony must be wholly discounted because he was "*prohibited* from offering testimony on the basis of" his experience leading the government's response to the U.S.S. Cole attack.  *See* Sudan's Reply at 16.  In doing so, Sudan misreads the *Touhy* letter the government provided to facilitate Mr. Watson's testimony.  Mr. Watson was precluded only from "discuss[ing] or disclos[ing] the particulars of any investigations in which he was involved while an FBI employee, . . . or any non-public material." Pls.' Ex. 30 at 2; *see also* Hr'g Tr. at 80:17–22, 82:20–83:4.  Mr. Watson was also prohibited from making statements "that are portrayed, either explicitly or implicitly, as reflecting the views of the FBI or the Department of Justice, or the official position of the United States," and was authorized "only to offer his personal opinions based on non-classified, open source material." Pls.' Ex. 30 at 2. These limitations, however, did not prohibit Mr. Watson from testifying "*based on his experience* with the FBI's counterterrorism unit" during this period of time.  *Id.* at 1

(emphasis added).  And Mr. Watson's live testimony accords with this understanding: Mr. Watson would generally express his agreement or disagreement with the open source statement and then elaborate, based on his own experience, to explain why he considered that information accurate or how he believed it demonstrated that Sudan had provided material support for Al-Qaeda.

The Court similarly rejects Sudan's assertion that the Court's reliance on Dr. Vidino's testimony was in error.[23]  One of the focuses of Dr. Vidino's research is the history of Al-Qaeda, and his publications include studies regarding the organization's connections with Sudan and other political regimes in the Horn of Africa.  *See* Vidino Aff. ¶ 7.  Although Dr. Vidino's affidavit canvassed and cited heavily from secondary sources, governmental reports, and other documents that are arguably hearsay, Dr. Vidino ultimately offered his own conclusion, formed by those sources and his academic expertise, that Sudan's material support for Al-Qaeda was indispensable to its ability to carry out the U.S.S. Cole attack.  Dr. Vidino stated:

---

[23] Several of Sudan's subsidiary arguments regarding Dr. Vidino's testimony warrant only brief mention.  First, Sudan contends that Dr. Vidino was not qualified and should never have been admitted as an expert.  Magistrate Judge Facciola admitted Dr. Vidino as an expert, *see* Hr'g Tr. at 9:21–25, and to the extent Sudan's argument depends on its assertion that the undersigned did not indicate it had reviewed Dr. Vidino's credentials, the Court simply points Sudan to the Court's Rule 63 certification in which the undersigned certified its familiarity with the entire record in this case.  *See* Rule 63 Certification, ECF No. 46.  Moreover, Dr. Vidino has been admitted as an expert in several FSIA cases, including two others concerning the U.S.S. Cole attack.  *See, e.g.*, *Owens*, 2016 WL 1170919, at *28; *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 n.10 (D.D.C. 2012); *Rux*, 495 F. Supp. 2d at 544.  The Court perceives no abuse of discretion in following suit here.  Second, Sudan complains that the Court issued its Findings of Fact and Conclusions of Law "without hearing or having had the opportunity to assess the credibility of [the] witnesses."  Sudan's Mot. at 14.  But Vidino's evidence was admitted through affidavit, a procedure that courts have approved for FSIA plaintiffs seeking a default judgment. *See, e.g.*, *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010); *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 124 (D.D.C. 2002).  Finally, and for that same reason, the Court rejects Sudan's argument that the affidavit, itself, is "inadmissible hearsay," Sudan's Mot. at 20—at least insofar as Sudan challenges its use in a default judgment evidentiary hearing.

During the five years that the Sudanese government sheltered al Qaeda, the organization flourished both financially and militarily. It developed ties with several terrorist organizations and trained operatives who carried out attacks throughout the world. The help that the Sudanese government provided was indispensable, as al Qaeda could not have achieved such goals if it had not operated in a country that not only tolerated, but actually directly and knowingly helped its activities. It should be noted that, at the time, Sudan was arguably the only country in the world willing to shelter al Qaeda and that without that support the organization would have had to scatter throughout the world and constantly hide from the security apparatuses of countless countries.

Vidino Aff. ¶ 80. Dr. Vidino went on to conclude that:

It is my opinion to a reasonable degree of certainty, that Sudan's material support of al Qaeda including, (1) its provision of sanctuary and safe haven from 1991–1996; and (2) technical training and support [from] Sudanese military and intelligence forces provided al Qaeda throughout the 1990s; was indispensable for al Qaeda not just to survive but also to then develop the expertise, technical knowledge and wide network of contacts that allowed it to flourish as a terrorist organization and carry out the *USS Cole* bombing.

*Id.* ¶ 81. That Dr. Vidino relied on evidence containing hearsay in arriving at these conclusions, again, does not undermine his opinion's admissibility. *See* Mueller & Kirkpatrick, *supra*, § 7:16, at 861–63.

Beyond purportedly relying on inadmissible evidence, Sudan asserts that Plaintiffs' evidence was "otherwise insufficient to establish that Sudan's alleged provision of 'material support or resources' to al Qaeda proximately caused the attack on the U.S.S. Cole." *See* Sudan's Mot. at 15. The D.C. Circuit has interpreted "caused by" in the FSIA context to mean that a plaintiff need only make a showing of "proximate cause" to establish jurisdiction. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127–28 (D.C. Cir. 2004). Proximate causation normally requires only that there be "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Prosser & Keeton on the Law of Torts* 263 (5th ed. 1984); *accord Kilburn*, 376 F.3d at 1128 (citing same). Proximate causation "normally eliminates the bizarre," *Jerome B. Grubart, Inc. v. Great Lakes*

*Dredge & Dock Co.*, 513 U.S. 527, 536 (1995), and is "often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct," *Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014).  Proximate cause is intended to "preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity."  *Id.*

Sudan fails to show that the link between Sudan's support for Al-Qaeda and the U.S.S. Cole bombing was unforeseeable or so attenuated as to constitute fortuity.  Sudan contends that Plaintiffs failed to "bridge [the] temporal gap" between Sudan's expulsion of Bin Laden in 1996 and the attack on the U.S.S. Cole in 2000.  *See, e.g.*, Sudan's Mot. at 16, 18, 25.  But, on its own, the support Sudan provided while Bin Laden and Al-Qaeda were afforded a safe haven in Sudan suffices to show proximate cause.  Plaintiffs' expert testimony established that Sudan's support not only kept Al-Qaeda afloat, but allowed the organization to thrive, making it reasonably foreseeable to Sudan that the organization would develop the capacity to carry out sophisticated attacks like the U.S.S. Cole bombing.[24]  *See* Vidino Aff. ¶¶ 80–81; *see also* Hr'g Tr. at 110:24–111:3 (testimony of Dale L. Watson) (explaining that Bin Laden's time in Sudan allowed him to "develop[] the organization so that he could continue his activities [after] he left," and that "planning for the embassy bombings or planning for the Cole was probably years in the making").  The "classic tort notion" of proximate cause "normally eliminates the bizarre, and its use should obviate not only the complication but even the need for further temporal or spatial

---

[24] Sudan also argues that "Plaintiffs conveniently fail to mention that Bin Laden and al Qaeda were not designated as terrorists until years after Sudan expelled them."  Sudan's Reply at 15.  But the Court fails to see how the mere fact that the *United States* had not yet designated Bin Laden or Al-Qaeda as terrorists at the time they sought refuge in Sudan has any relevance.  The label that the United States government gave them says nothing about the activities Al-Qaeda or Bin Laden were involved in or whether their later activities were reasonably foreseeable to Sudan.

limitations." *Sisso v. Islamic Republic of Iran*, No. 05-0394, 2007 WL 2007582, at *7 (D.D.C.

Jul. 5, 2007) (internal quotation mark omitted) (quoting *Jerome B. Grubart, Inc.*, 513 U.S. at

536); *see Kilburn*, 376 F.3d at 1128 (noting that in *Grubart* the Supreme Court rejected the

contention that "'caused by' means that the damage must be close in time and space to the

activity that caused it"); *Prosser & Keeton*, *supra*, at 273 (explaining that proximate cause's

"connotations of proximity in time and space . . . have long since disappeared").

In addition, Plaintiffs did bridge the temporal gap in some ways, and the record contains

evidence that Sudan's provision of material support continued *after* Al-Qaeda and Bin Laden

were formally expelled from the country.  For example, Mr. Watson testified that Sudan

continued to be used as a safe haven for Al-Qaeda and other terrorist groups after 1996.  *See*

Hr'g Tr. at 112:15–23.  Mr. Watson explained that a safe haven helped the organization plan

more freely, and that Sudan's provision of passports allowed terrorist operatives to travel more

easily.  *Id.* at 113:4–15.  These same sources of evidence, and the factual findings encapsulating

them, also rebut Sudan's claim that the Court's findings were vague and failed to identify "any

specific instances [of support] reasonably connected to the U.S.S. Cole attack."  Sudan's Mot. at

18; *cf. Owens*, 531 F.3d at 895 (holding, at motion to dismiss stage, that although the allegations

did not "chart a direct and unbroken factual line between Sudan's actions and the terrorist act,"

the allegations sufficed because they, "and the reasonable inferences drawn therefrom,

demonstrate a reasonable connection between the foreign state's actions and the terrorist act"

(internal quotation marks omitted)).[25]

---

[25] Sudan also claims that the provision of financial services is insufficient to demonstrate that Sudan proximately caused the terrorist attack.  *See* Sudan's Mot. at 22.  For support, Sudan cites *In re Terrorist Attacks*, 714 F.3d 118, 124 (2d Cir. 2013).  But in that case, the Second Circuit rejected claims that providing "routine banking services to organizations and individuals said to be affiliated with al Qaeda" proximately caused the September 11, 2001 attacks.  *Id.*  The

The Court does not represent that every factual finding in its Findings of Fact and Conclusions of Law was supported by record evidence presented in a form that would be admissible at trial.[26]  But, based on the above, there can be no serious doubt that Plaintiffs provided evidence that was both "satisfactory to the Court" and sufficient to meet their burden to support a default judgment under section 1608(e).  That initial burden is "relatively low," *Owens*, 2016 WL 1170919, at *25, and Sudan's arguments to the contrary do not even contain a hint of a suggestion that Plaintiffs failed to meet it.

In addition, the Court notes that Sudan's motion focuses solely on Plaintiffs' ability to meet section 1608(e)'s "evidence satisfactory to the court" standard for a FSIA default judgment.

---

Court cited a case concerning a bank's liability for injuries resulting from routine banking services such a processing deposits, withdrawals, and other transactions.  *Id.* (citing *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C. 2003)).  The factual findings in this case are different in kind.  The Court found, based on Dr. Vidino's testimony, that Bin Laden established *joint business ventures* with the Sudanese regime, which provided a means for Al-Qaeda to funnel money through Sudanese banks and businesses.  *See Flanagan*, 87 F. Supp. 3d at 101.  These facts establish far more than a passive Sudanese financial institution processing run-of-the-mill bank transactions.

[26] In some cases the Court's Findings of Fact and Conclusions of Law cited directly to documentary evidence and underlying source data that may not, themselves, have been admissible or fully consistent with the experts' ultimate conclusions.  That said, although a court considering a motion for default judgment under section 1608(e) must draw its "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence," *Kim*, 774 F.3d at 1049 (internal quotation marks and citation omitted), the fact that courts consistently allow testimony by way of declaration or affidavit implies that the evidence need not be presented in an admissible *form* in order to constitute the necessary "evidence satisfactory to the court," 28 U.S.C. § 1608(e); *see, e.g.*, *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010); *cf. Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (explaining that "[w]hile a nonmovant is not required to produce evidence in a form that would be admissible at trial," to defeat a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, "the evidence still must be capable of being converted into admissible evidence").  Indeed, in *Kim* the D.C. Circuit considered such declarations when considering whether the plaintiffs had presented sufficient admissible evidence.  *See Kim*, 774 F.3d at 1046 (referring to the "the witnesses who submitted declarations on [the plaintiffs'] behalf"); *id.* at 1050 (citing those declarations).

For whatever reason, Sudan has not argued that, if the default judgment were vacated, it would have a meritorious defense to mount at trial or that Plaintiffs would be unable to prove their cause of action by the distinct preponderance of the evidence standard.  What is clear, however, is that Plaintiffs undoubtedly met the standard for a default judgment under section 1608(e), and Sudan has proffered "no affirmative evidence . . . to show that they fall outside the terrorism exception," nor have they presented evidence they would intend to introduce at trial denying that they had provided material support for these acts or breaking any causal chain of events leading up to the U.S.S. Cole attack.  *Kilburn*, 376 F.3d at 1132 (concluding that Libya had "so far satisfied neither a burden of production nor their required burden of persuasion").

Accordingly, Sudan has cast no doubt on the sufficiency of the Plaintiffs' evidence for purposes of the default judgment.  And, in any event, what limited defense Sudan has mounted is far outweighed by Sudan's willfulness in defaulting and the prejudice that would accrue to Plaintiffs if the default were vacated.

### 4.  Punitive Damages

Finally, Sudan contends that section 1605A does not provide for the retroactive application of punitive damages for events that occurred before that section's enactment in 2008.  Sudan urges that, "at a minimum, the judgments should be vacated to the extent of the punitive damages."  Sudan's Mot. at 26; *see Merrill Lynch Mortg. Corp. v. Narayan*, 908 F.2d 246, 253 (7th Cir. 1990) (vacating "that portion of the judgment providing for punitive damages," but affirming "for all other matters, the district court's entry of default and default judgment"); *Murray v. Solidarity of Labor Orgs. Int'l Union Benefit Fund*, 172 F. Supp. 2d 1134, 1153 (N.D. Iowa 2001) (setting aside under Rule 60(b) "only that part of the default judgment awarding $2.5 million in punitive damages on [plaintiff's] libel claim"); *cf. Rogers v. Hartford Life & Acc. Ins.*

*Co.*, 167 F.3d 933, 935–36, 943 (5th Cir. 1999) (affirming district court order that vacated only a portion of the court's default judgment in ERISA case, where the district court adjusted the default judgment to omit compensable medical damages the court had previously, and erroneously, awarded). On this score, the Court agrees that Sudan has raised a potentially meritorious defense and that, despite the willfulness of Sudan's default, Sudan has established "good cause." [27] The Court will therefore set aside the punitive damages award under Rule 55(c). The Court cautions, however, that it will not make a definitive ruling on the punitive damages award at this time, and defers resolution of that legal question until the parties have thoroughly briefed the issue.

---

[27] Plaintiffs argue that Sudan's claim is "non-jurisdictional" and therefore does not fit within the limited grounds listed in Rule 60(b) to set aside a default judgment. *See* Pls.' Opp'n at 36–37. If Rule 60(b) applied in this case, the Court would agree. Sudan responds that even under Rule 60(b), relief would be warranted as "any other reason that justifies relief" under Rule 60(b)(6). *See* Sudan's Reply at 17. Yet, the Supreme Court has cautioned that Rule 60(b)(6) should be used only in "extraordinary circumstances," like those in which a party "was deprived of any reasonable opportunity to make a defense." *Salazar ex rel. Salazar v. District of Columbia*, 633 F.3d 1110, 1120 (D.C. Cir. 2011) (quoting *Ackermann v. United States*, 340 U.S. 193, 197 (1950)). The D.C. Circuit has also "emphasized that Rule 60(b)(6) 'should be only sparingly used and may not be employed simply to rescue a litigant from strategic choices that later turn out to be improvident." *Id.* (quoting *Kramer v. Gates*, 481 F.3d 788, 792 (D.C. Cir. 2007)). In alignment with this understanding, several courts have held that legal error does not "by itself warrant the application of Rule 60(b)," and that the correction of such errors is the "function of the Courts of Appeals." *See Selkridge v. United Omaha Life Ins. Co.*, 360 F.3d 155, 173 (3d Cir. 2004) (quoting *Martinez-McBean v. Gov't of Virgin Islands*, 562 F.2d 908, 912 (3d Cir. 1977); *accord United States v. Deutsch*, 981 F.2d 299, 301 (7th Cir. 1992) (holding that litigants cannot employ Rule 60(b) "as a Trojan horse for sneaking what are actually tardy Rule 59(e) motions into the courtroom under the guise of Rule 60(b)"). Moreover, the D.C. Circuit has reiterated that, when a defendant fails to appear, he "ordinarily forfeits his right to defend on the merits," and if he "loses on the jurisdictional issue . . . his day in court is normally over." *Practical Concepts, Inc.*, 811 F.2d at 1547.

While Sudan's argument regarding the retroactive application of punitive damages may raise a meritorious defense, in light of these authorities the Court fails to see how the argument is available to Sudan under Rule 60(b)(6). *Accord Owens*, 2016 WL 1170919, at *34–35. As a result, if the Court is wrong that Rule 55(c) applies here, the Court would reject this argument and rule in favor of Plaintiffs on all grounds.

As the Supreme Court has explained, when a statute would "increase a party's liability for past conduct, or impose new duties with respect to transactions already completed," the statute operates "retroactively." *Landsgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). The Court has long applied a presumption "declin[ing] to give retroactive effect to statutes burdening private rights unless Congress ha[s] made clear its intent." *Id.* at 270. That presumption is "explained by reference to the unfairness of imposing new burdens on persons after the fact," *id.*, and its aim "is to avoid unnecessary post hoc changes to legal rules on which parties relied in shaping their primary conduct," *Republic of Austria v. Altmann*, 541 U.S. 677, 696 (2004). Therefore, "[a] statute may not be applied retroactively . . . absent a clear indication from Congress that it intended such a result." *INS v. St. Cyr*, 533 U.S. 289, 316 (2001). And the Court's "standard for finding such unambiguous direction is a demanding one." *Id.* Where the Court has found such retroactive effect authorized, the statutory language "was so clear that it could sustain only one interpretation." *Id.* at 316–17 (quoting *Lindh v. Murphy*, 521 U.S. 320, 328 n.4 (1997)) (internal quotation mark omitted).

In *Landsgraf*, for example, the Court considered the Civil Rights Act of 1991 which, for the first time, permitted plaintiffs to recover and courts to award compensatory and punitive damages for intentional discrimination under Title VII. *See* 511 U.S. at 252–53. The statute provided in relevant part that "[i]n an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 . . . against a respondent who engaged in unlawful intentional discrimination . . . the complaining party may recover compensatory and punitive damages." *Id.*; *see also* 42 U.S.C. § 1981a(a) (codified in present form). The Court noted that "[r]etroactive imposition of punitive damages would raise a serious constitutional question," and that, before entertaining the question, the Court "would have to be confronted with a statute that

explicitly authorized punitive damages for preenactment conduct." *Landsgraf*, 511 U.S. at 281. The Court found "no such explicit command" in the Civil Rights Act of 1991. *Id.*

In this case, Sudan argues that section 1605A similarly contains no explicit statement authorizing punitive damages for preenactment conduct.[28]   Sudan's Mot. at 26.  Before 2008, a foreign sovereign was not subject to punitive damages under the FSIA, and even after 2008 foreign sovereigns who are stripped of immunity under the provisions other than section 1605A remain impervious to such damages.  *See* 28 U.S.C. § 1606 ("As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter . . . a foreign state . . . shall not be liable for punitive damages.").  When Congress enacted subsection 1605A(c), however, it provided that a plaintiff asserting a private right of action under that subsection may seek "punitive damages."  28 U.S.C. § 1605A(c).  Yet, Sudan points out that section 1605A(c)'s language is permissive—a court *may* award punitive damages—and it contends that the statute provides no clear indication that the damages provision was intended to apply retroactively.  While the parties' briefing on this issue is quite

---

[28] Although Sudan claims that "retroactive imposition of punitive damages" for events that occurred before the enactment of section 1605A(c) "violates the Ex Post Facto Clause," Sudan's Mot. at 25, there is some question whether a foreign sovereign is protected by the Constitution or has the ability to challenge Congress's actions under Article I on constitutional grounds, *see Owens*, 2016 WL 1170919, at *36 (discussing issue).  That issue is immaterial here, however, because regardless of the constitutional concerns underpinning it, the presumption set forth in *Landsgraf* is a general principle of statutory construction that the Supreme Court has considered in the FSIA context generally.  *See Landsgraf*, 511 U.S. at 265–66 & n.17 (explaining that "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic," and that the principle "finds expression in several provisions of our Constitution," including, among others, the Ex Post Facto Clause); *Altmann*, 541 U.S. at 692–96 (considering the application of *Landsgraf* to the FSIA for conduct taking place before 1976 and noting that "in most cases, the antiretroactivity presumption is just that—a presumption, rather than a constitutional command").

limited, it is not immediately apparent to the Court that this permissive provision was clearly intended to allow plaintiffs to seek punitive damages for pre-enactment conduct.

Plaintiffs, for their part, point to the history of section 1605A's passage, and note that Congress made accommodations for parties to refile or convert actions that had been asserted under section 1605(a)(7) into actions under section 1605A.  Section 1605A's limitations provision does permit plaintiffs to maintain an action for conduct that predated the new cause of action's enactment, allowing plaintiffs to assert a claim under subsection 1605A(c) so long as the action is brought not later than "10 years after April 24, 1996" or "10 years after the date on which the cause of action arose."  28 U.S.C. § 1605A(b)(1)–(2).  Similarly, the National Defense Authorization Act of 2008 provided that an action which had been brought under section 1605(a)(7), relied on that provision "as creating a cause of action," and remained before the courts "in any form," including on appeal or under a Rule 60(b) motion, could be "given effect as if the action had originally been filed under section 1605A(c) of title 28, United States Code."  National Defense Authorization Act of 2008, Pub. L. No. 110-181, § 1083(c)(2)(A), 122 Stat. 3, 342–43.  Based on this history, Plaintiffs claim that "it is undeniable that Congress contemplated damages, including punitive damages, would be awarded for conduct that occurred 'before the date of the enactment' of § 1605A."  Pls.' Opp'n at 37.

Yet, while Congress clearly intended to salvage those actions in which plaintiffs had attempted to mount a federal cause of action against foreign states that proved illusory under the Flatow Amendment, it is not abundantly obvious that, in allowing those cases to move forward, Congress similarly intended to apply punitive damages retroactively.  *See Owens*, 2016 WL 1170919, at *35 (suggesting, in dicta, that "the mere fact that Congress has authorized plaintiffs to bring § 1605A(c) claims on the basis of pre-2008 conduct is not a clear statement that *punitive*

*damages* are available for that subset of claims" (emphasis in original)).  Plaintiffs are correct

that, since 2008, several courts have awarded punitive damages in cases seeking relief for

terrorist activities that took place before 2008.  *See, e.g.*, *Valore v. Islamic Republic of Iran*, 700

F. Supp. 2d 52, 87–90 (D.D.C. 2010); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51,

56, 79–83 (D.D.C. 2010).  But those damages were similarly awarded as part of default

judgments in cases where the defendants had not appeared.  Likewise, although the D.C. Circuit

held in *Bakhtiar v. Islamic Republic of Iran* that in order to "obtain[] the benefits of § 1605A and

seek[] punitive damages" plaintiffs must comply with the National Defense Authorization Act of

2008, and seek to convert their lawsuit to a section 1605A case or refile their case, the circuit

appeared to simply assume that such damages would be available for pre-2008 conduct, and its

opinion contains no analysis of that issue.  668 F.3d 773, 775 (D.C. Cir. 2012).

The Court is not currently in a position to make a definitive ruling, and would be aided by

additional briefing on the issue which, among other things, provides useful examples and

caselaw concerning circumstances in which courts have found statutory language sufficiently

clear to give a statute retroactive effect.[29]  Given the "demanding" nature of the presumption

against retroactive effect, *St. Cyr*, 533 U.S. at 316–17, however, the Court concludes that Sudan

has asserted a potentially meritorious defense.  Despite the willfulness of Sudan's default, the

existence of this defense warrants vacatur of the punitive damages award.  In addition, because

---

[29] For example, in *Landsgraf*, a prior, vetoed version of the legislation at issue there had
"contained language expressly calling for application of many of its provisions, including the
section providing for damages in cases of intentional employment discrimination, to cases
arising before its (expected) enactment."  511 U.S. at 255; *see id.* at 255 n.8 (quoting proposed
statute which provided that the compensatory and punitive damage provisions "shall apply to all
proceedings pending on or commenced after the date of enactment of this Act").  The Court
cautioned, however, that the absence of this particular language in the version of the bill that did
pass was not necessarily dispositive of the retroactivity question as applied to the final, enacted
statute.  *See id.* at 256.

this issue poses a strictly legal question of statutory interpretation regarding damages, it does not pose the same level of prejudice to Plaintiffs as an order vacating the Court's default judgment as to liability would. *See Haskins*, 755 F. Supp. 2d at 131 (concluding that, although there was "some evidence to suggest" the defendant willfully failed to respond to the complaint, that "fact is counterbalanced by the fact that [the defendant] ha[d] asserted a meritorious defense and that the plaintiff will not be prejudiced by vacating the entry of default against her"). Accordingly, the Court will vacate the default judgment entered against Sudan only to the extent of the punitive damages award.

*     *     *

Ultimately, the Court concludes that Sudan has not established "good cause" under Rule 55(c) to vacate the bulk of the default judgment. Sudan defaulted willfully, and setting aside the default judgment would prejudice Plaintiffs. While a meritorious defense might overcome these factors, the Court concludes that Sudan's jurisdictional arguments are unavailing. But, with respect to the punitive damages that the Court awarded as part of the default judgment, Sudan has asserted a plausible legal argument that the FSIA does not clearly permit such an award for conduct that took place before 2008. Therefore, the Court concludes that Sudan has established "good cause" to set aside the punitive damages award, despite the willfulness of its default, and the Court will vacate that part of the default judgment.[30]

---

[30] Plaintiffs request that, if the default judgment is vacated, the Court require Sudan to post a bond equal to the amount of compensatory damages awarded in the default judgment and covering the expenses Plaintiffs have incurred during default. *See* Pls.' Opp'n at 39. Although the compensatory damage award remains intact, the risk that Sudan will again default, and will not satisfy the judgment, remains. Nevertheless, Sudan points out several legal and procedural obstacles that likely preclude this Court from ordering Sudan to post a bond. The cases Plaintiffs cite in which courts ordered Palestinian governmental authorities to post a bond did not involve a foreign sovereign protected by the FSIA, but claims under the Antiterrorism Act. *See Gilmore*, 675 F. Supp. 2d at 107, 114; *Knox v. The Palestine Liberation Org.*, 248 F.R.D. 420, 423, 432

## IV.  CONCLUSION

For the foregoing reasons, Sudan's motion to set aside the default judgment is

**GRANTED IN PART AND DENIED IN PART**.  An order consistent with this Memorandum

Opinion is separately and contemporaneously issued.


Dated:  June 3, 2016                                             RUDOLPH CONTRERAS
                                                                United States District Judge

---

(S.D.N.Y. 2008).  The FSIA precludes prejudgment attachment of a foreign state's property "used for a commercial activity in the United States" unless the foreign state "explicitly waived its immunity from attachment prior to judgment."  28 U.S.C. § 1610(d); *see also Pine Top Receivables of Ill., LLC v. Banco de Seguros del Estado*, 771 F.3d 980, 984–86 (7th Cir. 2014) (concluding that an Illinois rule requiring out-of-state insurers, like the Uruguay-owned bank defendant at issue in that case, to deposit security with the court sufficient to satisfy any final judgment before filing a responsive pleading conflicted with the FSIA provision).  And Sudan represents that all Sudanese assets in the United States are currently blocked by sanction regulations, prohibiting Sudan from posting a bond using the typical commercial means a private party would use.  *See* Sudan's Reply at 24.  For these reasons, the Court declines to order a bond at this time, despite the continued risk that Sudan may not satisfy the judgment.